AO 241 (Rev. 09/17)

# Petition for Relief From a Conviction or Sentence
# By a Person in State Custody

### (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

### Instructions

1. To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court. You are asking for relief from the conviction or the sentence. This form is your petition for relief.

2. You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit any legal arguments, you must submit them in a separate memorandum. Be aware that any such memorandum may be subject to page limits set forth in the local rules of the court where you file this petition.

6. You must pay a fee of $5. If the fee is paid, your petition will be filed. If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you. If your account exceeds $ _____ , you must pay the filing fee.

7. In this petition, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

8. When you have completed the form, send the original and _____ copies to the Clerk of the United States District Court at this address:

### Clerk, United States District Court for
### Address
### City, State  Zip Code

If you want a file-stamped copy of the petition, you must enclose an additional copy of the petition and ask the court to file-stamp it and return it to you.

9. **CAUTION: You must include in this petition all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date**.

10. **CAPITAL CASES: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel**.

AO 241 (Rev. 09/17)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Northern District of Ohio |
|---|---|

| Name (under which you were convicted): Danny Hill | Docket or Case No.: 4:96-CV-00795 |
|---|---|

| Place of Confinement : Chillicothe Correctional Institution | Prisoner No.: A-189528 |
|---|---|

| Petitioner (include the name under which you were convicted) Danny Hill, Petitioner | v. | Respondent (authorized person having custody of petitioner) Tim Shoop, Warden of Chillicothe Correctional Institution, Respondent |
|---|---|---|

| The Attorney General of the State of: Ohio |
|---|

## PETITION

1.    (a) Name and location of court that entered the judgment of conviction you are challenging:

Trumbell County Court of Common Pleas, Trumbell County Courthouse

160 High Street N.W., Warren, Ohio, 44481

    (b) Criminal docket or case number (if you know):   1985 CR 00317

2.    (a) Date of the judgment of conviction (if you know):  03/06/1986

    (b) Date of sentencing:

3.    Length of sentence:  Death, consecutive 10-25, life, 10-25, and life.

4.    In this case, were you convicted on more than one count or of more than one crime?  ☑ Yes   ☐ No

5.    Identify all crimes of which you were convicted and sentenced in this case:  Aggravated Murder with

specificiations (4 counts); Kidnapping (1 count); Rape (1 count); Aggravated Arson (1 count); Felonious

Sexual Penetration (1 count)

6.    (a) What was your plea? (Check one)

       ☑ (1)   Not guilty     ☐ (3)   Nolo contendere (no contest)

       ☐ (2)   Guilty         ☐ (4)   Insanity plea

AO 241 (Rev. 09/17)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

_____

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

❏ Jury        ✔ Judge only

7.   Did you testify at a pretrial hearing, trial, or a post-trial hearing?

❏ Yes        ✔ No

8.   Did you appeal from the judgment of conviction?

✔ Yes        ❏ No

9.   If you did appeal, answer the following:

(a) Name of court:     Trumbell County Court of Appeal

(b) Docket or case number (if you know):     1986 TR 03720

(c) Result:     Conviction and Sentence affirmed

(d) Date of result (if you know):     11/27/1989

(e) Citation to the case (if you know):     _____

(f) Grounds raised:     PLEASE SEE EXHIBIT A

_____

_____

_____

_____

_____

(g) Did you seek further review by a higher state court?     ✔ Yes     ❏ No

If yes, answer the following:

(1) Name of court:     The Supreme Court of Ohio

(2) Docket or case number (if you know):     1990-0177

(3) Result:     Conviction and Sentence affirmed

AO 241 (Rev. 09/17)

(4) Date of result (if you know): 08/12/1992

(5) Citation to the case (if you know): 64 Ohio St. 3d 313

(6) Grounds raised: PLEASE SEE EXHIBIT B

(h) Did you file a petition for certiorari in the United States Supreme Court? ☐ Yes ☑ No

If yes, answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court? ☑ Yes ☐ No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: Trumbell County Court of Common Pleas

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding: Petition for Post-Conviction Relief

(5) Grounds raised: PLEASE SEE EXHIBIT C

(6) Did you receive a hearing where evidence was given on your petition, application, or motion? ☐ Yes ☑ No

(7) Result: Post-Conviction Petition Dismissed

Page 4 of 16

AO 241 (Rev. 09/17)

        (8) Date of result (if you know):     07/18/1994

(b) If you filed any second petition, application, or motion, give the same information:

        (1) Name of court:     Eleventh District Court of Appeals, Trumbell County

        (2) Docket or case number (if you know):

        (3) Date of filing (if you know):

        (4) Nature of the proceeding:     Notice of Appeal for Post-Conviction Relief

        (5) Grounds raised:   Please See Exhibit D

        (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

      ❏  Yes    ❏  No

        (7) Result:   Petition Denied

        (8) Date of result (if you know):     06/19/1995

(c) If you filed any third petition, application, or motion, give the same information:

        (1) Name of court:   The Supreme Court of Ohio

        (2) Docket or case number (if you know):    1995-1577

        (3) Date of filing (if you know):   08/03/1995

        (4) Nature of the proceeding:     Notice of Appeal for Post-Conviction Relief

        (5) Grounds raised:   PLEASE SEE EXHIBIT E

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes    ☑ No

(7) Result:    Petition denied

(8) Date of result (if you know):    11/15/1995

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:    ☑ Yes    ☐ No

(2) Second petition:    ☑ Yes    ☐ No

(3) Third petition:    ☑ Yes    ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

PLEASE SEE EXHIBIT F FOR PETITIONS, APPLICATIONS AND MOTIONS RELATED TO THIS
CASE

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.  Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court.  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:**    FOR ALL GROUNDS AND THEIR SUPPORTING FACTS, PROCEDURAL HISTORY AND
EXHAUSTION ISSUES, PLEASE SEE ATTACHED HABEAS PETITION.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground One, explain why:

AO 241 (Rev. 09/17)

(c)     **Direct Appeal of Ground One:**

      (1) If you appealed from the judgment of conviction, did you raise this issue?    ❒ Yes    ❒ No

      (2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)     **Post-Conviction Proceedings:**

      (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

            ❒ Yes    ❒ No

      (2) If your answer to Question (d)(1) is "Yes," state:

      Type of motion or petition: _____

      Name and location of the court where the motion or petition was filed: _____

_____

      Docket or case number (if you know): _____

      Date of the court's decision: _____

      Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

      (3) Did you receive a hearing on your motion or petition?    ❒ Yes    ❒ No

      (4) Did you appeal from the denial of your motion or petition?    ❒ Yes    ❒ No

      (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ❒ Yes    ❒ No

      (6) If your answer to Question (d)(4) is "Yes," state:

      Name and location of the court where the appeal was filed: _____

_____

      Docket or case number (if you know): _____

      Date of the court's decision: _____

      Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

      (7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:

_____

_____

**GROUND TWO:**        FOR ALL GROUNDS AND THEIR SUPPORTING FACTS, PROCEDURAL HISTORY AND EXHAUSTION ISSUES, PLEASE SEE ATTACHED HABEAS PETITION.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c)      **Direct Appeal of Ground Two:**

      (1) If you appealed from the judgment of conviction, did you raise this issue?    ❏ Yes    ❏ No

      (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

      _____

(d)      **Post-Conviction Proceedings:**

      (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ❏ Yes    ❏ No

      (2) If your answer to Question (d)(1) is "Yes," state:

      Type of motion or petition: _____

      Name and location of the court where the motion or petition was filed: _____

      _____

      Docket or case number (if you know): _____

AO 241 (Rev. 09/17)

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition? ❐ Yes ❐ No

(4) Did you appeal from the denial of your motion or petition? ❐ Yes ❐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ❐ Yes ❐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two : _____

_____

_____

**GROUND THREE:** FOR ALL GROUNDS AND THEIR SUPPORTING FACTS, PROCEDURAL HISTORY

AND EXHAUSTION ISSUES, PLEASE SEE ATTACHED HABEAS PETITION.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

(c)     **Direct Appeal of Ground Three:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?   ❒ Yes   ❒ No

    (2) If you did not raise this issue in your direct appeal, explain why: _____

    _____

    _____

(d)     **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ❒ Yes   ❒ No

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    _____

    (3) Did you receive a hearing on your motion or petition?   ❒ Yes   ❒ No

    (4) Did you appeal from the denial of your motion or petition?   ❒ Yes   ❒ No

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ❒ Yes   ❒ No

    (6) If your answer to Question (d)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    _____

    _____

AO 241 (Rev. 09/17)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:**   FOR ALL GROUNDS AND THEIR SUPPORTING FACTS, PROCEDURAL HISTORY AND

EXHAUSTION ISSUES, PLEASE SEE ATTACHED HABEAS PETITION.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c)    **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ❑   Yes    ❑   No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)    **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

❑   Yes    ❑   No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

AO 241 (Rev. 09/17)

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?     ❏ Yes    ❏ No

(4) Did you appeal from the denial of your motion or petition?    ❏ Yes    ❏ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ❏ Yes    ❏ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

13.    Please answer these additional questions about the petition you are filing:

(a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court

having jurisdiction?    ☐ Yes    ☑ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

presenting them:    All grounds raising claims pursuant to Hurst v. Florida, 577 U.S. , 136 S.Ct.616,

193 L.Ed.2d.504 (2016), which was decided after the conclusion of petitioner's State Court

proceedings.

(b)    Is there any ground in this petition that has not been presented in some state or federal court?  If so, which

ground or grounds have not been presented, and state your reasons for not presenting them:

All grounds raising claims pursuant to Hurst v. Florida, 577 U.S. , 136 S.Ct.616, 193 L.Ed.2d

504 (2016), which was decided after the conclusion of petitioner's State Court proceedings.

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

that you challenge in this petition?    ☑ Yes    ☐ No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues

raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

of any court opinion or order, if available.    PLEASE SEE EXHIBIT G

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

the judgment you are challenging?    ☐    Yes    ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

raised.

AO 241 (Rev. 09/17)

16.    Give the name and address, if you know, of each attorney who represented you in the following stages of the
       judgment you are challenging:

       (a) At preliminary hearing:    James F. Lewis and Scott Kinney, Ohio Public Defender's Office

       250 E. Broad St., Suite 1400, Columbus, OH 43215

       (b) At arraignment and plea:    Same as A

       (c) At trial:    Same as A

       (d) At sentencing:    Same as A

       (e) On appeal:    Paul Croushore P.O. Box 75170 Cincinnati, Ohio 45275-5170, Roger Warner 171 E

       Livingston Ave, Columbus, OH 43215, Carol Wright 400 N Tampa St Ste 2700, Tampa, FL 33602

       (f) In any post-conviction proceeding:    Ken Murray 316 E Mitchell Dr Phoenix, AZ, 85012-2338,

       (g) On appeal from any ruling against you in a post-conviction proceeding:    Michael Benza  6860 Snowville

       Rd. #100 Brecksville, OH 44141, Jillian Davis 1660 W. Second St, Suite 750, Cleveland, OH 44113

       Patricia Milhoff 1952 Thornapple Ave Akron OH, 44301. SEE EXHIBIT H FOR LIST OF ATTORNEYS

17.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are
       challenging?          ☐  Yes    ☑  No

       (a) If so, give name and location of court that imposed the other sentence you will serve in the future:

       (b) Give the date the other sentence was imposed:

       (c) Give the length of the other sentence:

       (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the
       future?          ☐  Yes    ☑  No

18.    TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain
       why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

AO 241 (Rev. 09/17)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)     A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

(A)     the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)     the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241 (Rev. 09/17)

(2)        The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:   PLEASE SEE ATTACHED HABEAS

PETITION

or any other relief to which petitioner may be entitled.

/s/ Vicki Ruth Adams Werneke

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on _____ (date).

/s/ Danny Lee Hill per Vicki Ruth Adams Werneke

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

Vicki Werneke is the counsel of record for Mr. Danny Hill. Because of the global pandenmic related to COVID-19,

The office of the Federal Public Defender has been shut down and the Chillicothe Correctional Institution has

been closed to visitation, therefore an official signature cannot be obtained at this time.

## ASSIGNMENT OF ERRORS, Trumbell County Court of Appeals, Eleventh Appellate District Case No. 1985 TR 03720

**FIRST ASSIGNMENT OF ERROR:** The Trial Court Erred In Admitting State Evidence Statements Of The Appellant.

**SECOND ASSIGNMENT OF ERROR:** The Trial Court Erred In The Admission Of "Other Acts" Testimony.

**THIRD ASSIGNMENT OF ERROR:** The Trial Court Improperly Admitted Certain Evidence.

**FOURTH ASSIGNMENT OF ERROR:** The Trial Court Erred In Admitting Exhibit 47, A "Stick".

**FIFTH ASSIGNMENT OF ERROR:** The Right To Confront Witnesses Was Violated.

**SIXTH ASSIGNMENT OF ERROR:** The Trial Court Erred In Denying The Appellant's Motion To Include Licensed Drivers In The Pool Of Licensed Drivers.

**SEVENTH ASSIGNMENT OF ERROR:** The Trial Court Erred In Allowing The Appellant To Waive His Right To Jury In Writing Pursuant To Criminal Rule 23.

**EIGHTH ASSIGNMENT OF ERROR:** The Trial Court Erred In Denying The Appellant Funds To Employ An Expert Witness For A Motion Hearing.

**NINETH ASSIGNMENT OF ERROR:** The Admission of Exhibit 3 (A Photograph Of Raymond Fife) Was Error.

**TENTH ASSIGNMENT OF ERROR:** The Appellee Did Not Give The Appellant Complete Discovery.

**ELEVENTH ASSIGNMENT OF ERROR:** Admission Of Certain Photographs Was An Abuse Of Discretion.

**TWELFTH ASSIGNMENT OF ERROR:** The State Made Improper Closing Arguments at Both The Guilt And Mitigation Phase Of This Case.

**THIRTEENTH ASSIGNMENT OF ERROR:** The Appellant Was Denied The Effective Assistance Of Counsel.

**FOURTEENTH ASSIGNMENT OF ERROR:** It Was Error For The Trial Court to Sentence Appellant On The Kidnapping Charge And The Kidnapping Specification.

**FIFTEENTH ASSIGNMENT OF ERROR:** The Motion For New Trial Should Have Been Granted.

**SIXTEENTH ASSIGNMENT OF ERROR:** The Trial Court Was Improperly Prevented By Deciding Whether Death Was The Appropriate Punishment.

**SEVENTEETNTH ASSIGNMENT OF ERROR:** The Trial Court Failed To Consider All Of The Evidence In Support Of Mitigating A Death Sentence.

**EIGHTEENTH ASSIGNMENT OF ERROR:** A Sentence Of Death Is Unconstitutional.

**NINETEENTH ASSIGNMENT OF ERROR:** The Court Cannot Find That After Reviewing All Of The Factors Of R.C. 2929.05 (A) That Death Was The Appropriate Sentence For Danny Lee Hill.

## PROPOSITIONS OF LAW, The Supreme Court of Ohio Case No. 1990-0177

**FIRST PROPOSITION OF LAW:** An Accused's Right To Counsel Is Violated When He Is Deprived Of Counsel For Custodial Interrogation When He Does Not Knowingly, Intelligently, And Voluntarily Relinquish A Known Right Due To The Misconduct Of Law Enforcement Authorities And The Accused Being Mentally Retarded In Violation Of The Sixth And Fourteenth Amendments Of The United States Constitution And The Equivalent Provisions Of The Ohio Constitution.

**SECOND PROPOSITION OF LAW:** An Accused's Statements Are Not Voluntary When Such Statements Were Coerced By The Psychological Tactics Of Law Enforcement Officers On A Retarded Individual Who Was Essentially Illiterate And The Admission OF Such Statements Violates The Due Process Clauses Of Both The Ohio And United States Constitution.

**THIRD PROPOSITION OF LAW:** An Accused's Statements Are Not Admissible Unless The State Establishes That The Procedural Safeguards Contained In The Miranda Warnings Were Properly Given Or Knowingly, Intelligently And Voluntarily Waived As Provided Under The Fifth And Fourteenth Amendments Of The United States Constitution And The Equivalent Provisions Of The Ohio Constitution.

**FOURTH PROPOSITITION OF LAW:** An Accused's Fourth And Fourteenth Amendment Rights Under The United States Constitution And The Equivalent Provisions Under The Ohio Constitution Are Violated When An Accused Is Seized From His Home Through The Use Of Psychological Ploys By Law Enforcement Officers Upon An Accused Who Is Mentally Retarded And Essentially Illiterate.

**FIFTH PROPOSITION OF LAW:** An Accused Is Denied His Right To Due Process Under Both The Ohio And United States Constitution When He Is Denied Is Statutory Right To Counsel Pursuant To R.C. 120.16, 2934.14, And 2935.20.

**SIXITH PROPOSITION OF LAW:** Noncompliance With R.C. 2935.05 Results In An Illegal Arrest And Any Statements And/Or Evidence Derived Therefrom Should Be Suppressed.

**SEVENTH PROPOSITION OF LAW:** When Statements Are Made By An Accused To Law Enforcement Officers Under The Impression Of Receiving Leniency Or Some Other Benefit, Then Those Statements Are Inadmissible In Any Later Trial.

**EIGHTH PROPOSITION OF LAW:** The Admissions Of Other Crimes, Wrongs, Or Acts, Into Evidence By The Trial Court Violated R.C. 2945.59 Evid. R. 404(B) And The Due Process Clause Of The Fourteenth Amendment Of The U.S. Constitution To The Prejudice Of The Appellant Thus Requiring Reversal.

**NINETH PROPOSITION OF LAW:** A Trial Court Must Exclude Evidence That Is Either Not Relevant Or Its Relevance Is Outweighed By Its Prejudicial Effect Or Such Evidence Is Soley Introduced To Influence The Court. The Effect Of The Erroneous Evidentiary Rulings Was The Denial Of The Appellant's Right To Due Process And Fair And Impartial Trial Under The Fifth, Sixth, And Fourteenth Amendments Of The U.S. Constitution And Article I, Section Ten And Sixteen Of The Ohio Constitution.

**TENTH PROPOSITION OF LAW:** An Inference Of Fact Cannot Be Predicted Upon Another Inference, But Must Be Predicted Upon A Fact Supported By Law. Sobolovitz V. Lubric Ohio Co. (1923). 107 Ohio St. 204. It Is Error From A Trial Court To Draw An Inference Form Another Inference Because The Foundation Of The Second Inference Is So Insecure Reliance Upon It Would Result In An Inferred Fact Which Is Merely Speculative In Nature.

**ELEVENTH PROPOSITION OF LAW:** An Accused's Right To Confrontation Is Violated When A Prosecutor Consults With An Important Witness While That Witness Was Subject To Recall And Was A Surprise Witness Of Which Defense Counsel Had No Prior Knowledge.

**TWELFTH PROPOSITION OF LAW:** It Is A Denial Of An Accused's Right To A Fair Cross-Section Of The Community To Deny A Request For Inclusion In Then Pool Of Prospective Jurors Licensed Drivers Pursuant To R.C. 2313.08 (B) In Violation Of The Sixth And Fourteenth Amendments To The United States Constitution And Article I, Section Ten Of The Ohio Constitution.

**THIRTEENTH PROPOSITION OF LAW:** It Is A Violation Of An Accused's Right To Jury Trial Guaranteed By The Sixth And Fourteenth Amendments To The United States Constitution And Article I, Section 10 Of The Ohio Constitution When The Court Does Not Determine On The Record, Specifically Addressing An Accused, Whether He Knowingly, Intelligently, And Voluntarily Waived His Right To A Jury Trial.

**FOURTEENTH PROPOSITION OF LAW:** It Is Reversible Error For A Trial Court To Deny An Accused Funds Necessary To Employ An Expert For Purposes Of A Motion For Closure Of Pre-Trial Hearing That Was Necessary To Preserve A Fair And Impartial Jury Pursuant To The Fifth, Sixth, And Fourteenth Amendments Of The United States Constitution And Article I, Sections 2, 10 And 16 And Article II, Section 26.

**FIFTEENTH PROPOSITION OF LAW:** A Trial Court Errs And Abuses Its Discretion In Admitting A Pre-Death Photograph Of The Victim. Such Error Violates Appellant's Rights Under Evid. R. 404, The Fifth And Fourteenth Amendments Of The U.S. Constitution And Article I, Sections Ten And Sixteen Of The Ohio Constitution.

**SIXTEENTH PROPOSITION OF LAW:** When The State Repeatedly Fails To Comply With Crim.R. 16, It Is Violating An Accused's Right To A Fair Trial And To The Effective Assistance Of Counsel.

**SEVENTEENTH PROPOSITION OF LAW:** It Is An Abuse Of Discretion For A Trial Court To Allow Into Evidence Photographs Of The Victim Because Such Photographs Were Highly Prejudicial, Gross, And Unnecessary And Which Lacked Probative Value In Determining The Issues Involved. Their Admission Violated Appellant's Fifth, Sixth, And Fourteenth Amendments To The United States Constitution And Article I, Sections Ten And Sixteenth Of The Ohio Constitution.

**EIGHTEENTH PROPOSITION OF LAW:** Prosecutorial Misconduct During Both The Guilt And Mitigation Phase Of Closing Arguments Deny An Accused His Right To A Fair Trial And Impartial Fact-Finder As Guaranteed By The Fifth, Sixth And Fourteenth Amendments To The United States Constitution And Article I, Section Ten And Sixteen Of The Ohio Constitution.

**NINETEENTH PROPOSITION OF LAW:** When The Issue Of Effective Assistance Of Counsel Is Raised That Involves Matter Both Within The Record And Outside The Record, The Proper Avenue For Reviewing That Issue Should Be On Post-Conviction Relief Even If Counsel On Appeal Is Not Trial Counsel. The Accused's Right To Effective Assistance Of Counsel Was Violated Pursuant To The Sixth And Fourteenth Amendment Rights To The United States Constitution And Article I, Section Ten And Sixteenth Of The Ohio Constitution.

**TWENTH PROPOSITION OF LAW:** The Trial Court Erred In Entering A Judgment Of Conviction For Kidnapping And The Other Felonies Where Convictions On Both Offenses Are Contrary To R.C. 2941.25. Secondly, Where An Underlying Felony Count Which Is Also Used As A Specification For Aggravated Murder Merges, Then It Cannot Be Considered As An Additional Specification For Sentencing Purposes.

**TWENTY FIRST PROPOSITION OF LAW:** A Motion For New Trial Should Not Be Denied Without A Full Hearing When Made Pursuant To Crim. R. 33. A Denial Of Such A Hearing And The Motion Violates An Accused's Fifth, Sixth, And Fourteenth Amendment Rights To The United States Constitution And Article I, Section Ten And Sixteen Of The Ohio Constitution And Crim. R. 33.

**TWENTY SECOND PROPOSITION OF LAW:** Ohio's Mandatory Sentencing Scheme Prevented The Panel Of Three Judges From Deciding Whether Death Was The Appropriate Punishment In Violation Of Appellant's Rights As Guaranteed By The Eighth And Fourteenth Amendments To The United States Constitution And Article I, Section Nine And Sixteen Of The Ohio Constitution.

**TWENTY THIRD PROPOSITION OF LAW:** The Failure To Consider All Of The Evidence In Support Of Mitigation Death Sentence Violates R.C. 2929.03(F) And The Eighth And Fourteenth Amendments Of The United States Constitution.

**TWENTY FOURTH PROPOSITION OF LAW:** The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Sections 2. 9. 10, And 16, Article I Of The Ohio Constitution Establish The Requirements For A Valid Death Penalty Scheme. Ohio Revised Code Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.04, 2929.05, Ohio's Statutory Provisions Governing The Imposition Of The Death Penalty, Do Not Meet Prescribed Constitutional Requirements And Are Unconstitutional, Both On Their Face And As Applied To Appellant.

**TWENTY FIFTH PROPOSISTION OF LAW:** This Court Cannot Find, Pursuant To R.C. 2929.05(A), That (1) The Judgment Of Guilt Of Aggravated Murder And The Specifications Was Supported By Sufficient Evidence; (2) That The Aggravating Circumstances Outweigh The Mitigating Factors In The Case; (3) That The Sentence Of Death Is Appropriate; (4) That The Sentence Of Death Is Not Excessive Or Disproportionate; (5) That The Trial And Appellate Courts Properly Weighed The Aggravating Circumstances And The Mitigating Factors. Appellant's Death Sentence Was Imposed In Violation Of His Rights To Due Process And Freedom From Cruel And Unusual Punishment As Encompassed By The Fifth, Eighth, And Fourteenth Amendments To The United States Constitution And Article I, Section Nine And Sixteen Of The Ohio Constitution.

## ISSUES RAISED ON POST-CONVICTION RELIEF, Trumbell County Court of Common Pleas

**FIRST GROUNDS OF RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because the three-judge panel failed to unanimously agree on the record as to the specifications to the aggravated murder charge as they relate to whether he committed the offenses as a principal or with prior calculation and design.

**SECOND GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because the State of Ohio failed to provide full and complete discovery of evidence which was material to the guilt or innocence of Petitioner, and which was properly demanded prior to trial.

**THIRD GROUNDS FOR RELIEF:** Petitioner Hill's death sentence if void and/or voidable because the three-judge panel considered non-statutory aggravating factors, as evidenced by their decision and findings regarding sentencing at the penalty phase.

**FOURTH GROUNDS FOR RELIEF:** Petitioner Hill's death sentence is void and/or voidable because the three-judge panel failed to consider all statutory mitigating factors on which evidence was presented.

**FIFTH GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because the incredible media attention by the print and television media prejudiced the minds of the witnesses, the prosecution, and the three-judge panel. There was an allegation that there would be race riots if Danny Hill was not convicted and sentenced to death.

**SIXTH GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because the Ohio Death Penalty Scheme, on its face and as applied in this case, violates the United States and Ohio Constitutions.

**SEVENTH GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because Hill was incompetent to understand and waive his Miranda rights, incompetent to understand and waive his constitutional rights to counsel, to jury trial, and to stand trial.

**EIGHTH GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because his trial counsel were ineffective in violation of the guarantees of the Ohio and United States Constitutions.

**NINETH GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because Petitioner Hill's rights were violated due to prosecutorial misconduct during the guilt phase and penalty phase.

**TENTH GROUNGDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because his trial court failed to ensure a complete record of the proceedings.

**ELEVENTH GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because Ohio's reviewing courts failed to fulfill their statutory obligation to meaningfully review of the proportionality of Petitioner Hill's death sentence.

**TWELTH GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because the Ohio death penalty is in violation of international laws and Article VI of the United States Constitution.

**THIRTEENTH GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable due to the mandatory nature of Ohio's capital statute.

**FOURTEENTH GROUNDS FOR RELIF:** Petitioner Hill's convictions and sentences are void and/or voidable because the grand jury proceedings were not recorded as required by Crim. R. 22.

**FIFTEENTH GROUNDS FOR RELIEF:** Petitioner Hill's convictions and sentences are void and/or voidable because he was denied a fair and impartial review of his death sentence.

## <u>ASSIGNMENT OF ERRORS, The Eleventh District Court of Appeals, Trumbell County, Ohio</u>

**FIRST ASSIGNEMNT OF ERROR:** The Trial Court Erred To The Prejudice Of Petitioner-Appellant In Overruling His Petition As To The Claims For Relief And For So Ruling Without Holding An Evidentiary Hearing.

**SECOND ASSIGNMENT OF ERROR:** The Trial Court Erred To The Prejudice Of Petitioner-Appellant In Denying Petitioner Clarification Of And Subsequently Ruling Upon The State's "Motion For Judgment Pursuant To R.C. 2953.21(C).

**THIRD ASSIGNMENT OF ERROR:** The Trial Court Erred To The Prejudice Of Petitioner In Denying The Petitioner Access To Physical Evidence For Testing Which Evidence Was Critical To The Conviction And The Testing Of Which May Reveal [Sic] The Petitioner's Innocence. (Entry Of June 30, 1994).

# PROPOSITIONS OF LAW, The Supreme Court of Ohio Case No. 1995-1577

**FIRST PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where The Petitioner Presented Evidence That The Three Judge Panel Failed To Specify In Its Findings On The Specifications That They Were Unanimously Finding That Petitioner Was The Principal Offender, Whether They Were Finding The Petitioner Committed The Aggravated Murder With Prior Calculation And Design, Or Whether They Were Unable To Come To A Unanimous Finding.

**SECOND PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where The Petitioner Presented Evidence That The State Of Ohio Failed To Provide Discovery To Which The Petitioner Had Been Entitled.

**THIRD PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where The Three-Judge Panel Considered Non-Statutory Aggravated Factors In Sentencing Petitioner.

**FOURTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where The Three-Judge Panel Failed To Consider All Statutory Mitigating Factors In Sentencing.

**FIFTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where The Incredible Media Attention And Community Feeling Prejudiced The Minds Of The Witnesses, The Prosecution, And The Three-Judge Panel.

**SIXTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/ Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where The Ohio Death Penalty Scheme, On Its Face And As Applied In This Case, Violates The United States And Ohio Constitutions.

**SEVENTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where There Were Affidavits Of Petitioner's Incompetence.

**EIGHTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where An Expert Criminal Defense Attorney Provided An Affidavit As To The Prevailing Norms For Defense Attorneys In Capital

Cases And Where It Was Apparent On The Face Of The Record That Trial Counsel Failed To Adhere To The Norms And Thus Was Ineffective.

**NINETH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where Prosecutorial Misconduct Occurred At The Guilt And Mitigation Phases Of The Trial And The Failure Of The Trial Court To Prohibit The Misconduct Was Clear Error.

**TENTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where The Trial Court Failed To Ensure That The Proceedings Were Fully Recorded.

**ELEVETH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where Ohio's Reviewing Courts Failed To Fulfill Their Statutory Obligation To Meaningfully Review The Proportionality Of Hill's Death Sentence.

**TWELETH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where Ohio's Death Penalty Violates International Laws And Article VI Of The United States Constitution.

**THIRTEENTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where Ohio's Capital Statute Makes Death Mandatory Where Aggravating Circumstances Outweigh Mitigating Circumstances.

**FOURTEENTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where The Grand Jury Transcripts Were Not Recorded As Required By Crim. R. 22.

**FIFTEENTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where The Petitioner Was Denied A Fair And Impartial Review Of His Death Sentence.

**SIXTEENTH PROPOSITION ON LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Granted An Evidentiary Hearing Or The Relief Demanded Where All Or Any Of The Preceding Issues Are Supported By Evidence Outside Of The Record And Demonstrate Prejudice Against The Rights Of The Petitioner.

**SEVENTEENTH PROPOSITION OF LAW:** In A Petition To Vacate Or Set Aside Judgment And/Or Sentence Pursuant To Ohio Revised Code Section 2953.21, The Trial Court Should Have Clarified Or Dismissed The State's Motion For Judgment Which Was Not Based Upon

Either Civ. R.12(B) (6) Or Civ. R. 56 But Was Found To Be A Unique Motion Based Upon R.C. 2953.2l(C).

**EIGHTEENTH PROPOSITION OF LAW:** The Trial Court Erred To The Prejudice Of Petitioner In Denying The Petitioner Access To Physical Evidence For Testing Which Evidence Was Critical To The Conviction And The Testing Of Which May Reveal The Petitioner's Actual Innocence (Entry Of June 30, 1994).

**Name of court:** The United States District Court, Northern District of Ohio, Eastern Division

**Docket or case number (if you know):** 4:96-cv-00795

**Date of filing:** 11/27/1996

**Nature of proceedings:** Petition for Habeas Corpus

**Grounds raised:**

## GROUNDS FOR RELIEF FOR HABEAS CORPUS, The United States District Court, Northern District of Ohio, Eastern Division No. 4:96-cv-00795

**HABEAS CORPUS CLAIM FOR RELIEF ONE:** Petitioner Hill was seized from his home under false pretenses utilizing psychological ploys and taken to the Warren Police Department for questioning on Monday September 16, 1985 in violation of his constitutional rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF TWO:** Petitioner's rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when police officers promised him that in exchange for his cooperation nothing bad would happen to him and that nobody was going to hurt him, thereby promising leniency, when in fact, Petitioner was convicted of capital murder and sentenced to death.

**HABEAS CORPUS CLAIM FOR RELIEF THREE:** As a result of his limited educational abilities and his limited comprehension of legal concepts and principals, Petitioner Hill was legally incompetent to participate in the legal system at all times herein; therefore, he was incompetent to waive his right to a jury trial and to waive his Miranda rights at the time of his interrogation by police in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF FOUR:** When the trial court judge had, or should have had a "bona fide" doubt as to Petitioner's competency, the court had an obligation to hold a competency hearing to investigate the petitioner's rational understanding of the proceedings. Failure to do so violated Petitioner's constitutional rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF FIVE:** Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were denied when the court did not determine on the record he knowingly, intelligently and voluntarily waived his right to a jury trial.

**HABEAS CORPUS CLAIM FOR RELIEF SIX:** Petitioner Hill was denied the effective assistance of counsel at the fact finding phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF SEVEN:** At Petitioner's trial the court admitted testimony and evidence which denied Hill of his due process, equal protection and impartial jury under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF EIGHT:** The state's failure to provide timely discovery of photographs utilized by a state expert witness in formulating an opinion elicited at trial deprived Petitioner Hill of his rights of due process, effective assistance of counsel, and confrontation as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the Unites States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF NINE:** The state failed to provide timely discovery of numerous exhibits thereby depriving the Petitioner of his rights of due process, effective assistance of counsel and confrontation as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendment to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF TEN:** Petitioner Hill was denied his right to a fair trial and an impartial fact-finder as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the State of Ohio engaged in prosecutorial misconduct during closing arguments in both the fact finding and penalty phases of the trial.

**HABEAS CORPUS CLAIMS FOR RELIEF ELEVEN:** Petitioner Hill was denied the effective assistance of counsel at the mitigation phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF TWELVE:** Petitioner's right to be free from cruel and unusual punishment and his right to due process of law as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution were violated when the Ohio sentencing scheme requires a mandatory sentence of death when a three judge panel finds that the aggravating circumstances outweigh the mitigating circumstances.

**HABEAS CORPUS CLAIMS FOR RELIEF THIRTEEN:** When the three judge panel failed to consider or give weight to all of the evidence Petitioner presented in mitigation, Hill was denied his constitutional right as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF FOURTEEN:** Ohio's statutory provisions governing the imposition of the death penalty do not meet the prescribed constitutional requirements of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF FIFTEEN:** Appellant's death sentence was imposed in violation of his rights to due process and freedom from cruel and unusual punishment as encompassed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the three Judge panel improperly considered non-statutory aggravating factors.

**HABEAS CORPUS CLAIMS FOR RELIEF SIXTEEN:** Petitioner Hill was denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the court on appellate review of his sentence, considered non-statutory aggravating factors.

**HABEAS CORPUS CLAIMS FOR RELIEF SEVENTEEN:** Petitioner Hill was deprived of having a full and fair evidentiary hearing in state post-conviction proceedings as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendment to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF EIGHTEEN:** The Ohio state court have effectively converted Ohio's post-conviction procedure into a meaningless ritual, rather than the statutorily mandated process for those convicted of a criminal offense to obtain redress for violations of their rights under the Ohio Constitution and the Constitution of the United States. As a result Petitioner was denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS OF RELIEF NINETEEN:** Petitioner Hill was denied his rights as guaranteed by the Fifth and Fourteenth Amendments to the Unites States Constitution when his confession was taken without procedural safeguards provided by said amendments.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY:** Petitioner's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were violated when he was subjected to numerous interrogations by a least three law enforcement officers, one of whom was his uncle, without the benefit of counsel, when the officers knew that Hill was a slow learner and therefore, susceptible to the pressure exerted by the authorities.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-ONE:** The admission of other crimes, wrongs, or acts allegedly committed by the petitioner into evidence at Petitioner's trial violated the due process clause of the United States Constitution and therefore denied Hill his rights as guaranteed by same.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-TWO:** When the State failed to prove by proof beyond a reasonable doubt and the three judge panel failed to specifically find that Petitioner has the specific intent to kill Raymond Fife, Petitioner's conviction and death sentence were in violation of the Fifth, Sixth, Eight, and Fourteenth Amendments.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-THREE:** Petitioner Hill was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the court permitted admission of gruesome, repetitive and cumulative photographs.

**HABEAS CORPUS CLAIMS OF RELIF TWENTY-FOUR:** Petitioner's rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution were violated when without probable cause he was transported to the Warren Police Department when no prior judicial authorization had been given.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-FIVE:** Petitioner Hill was denied his constitutional rights to a fair trial and due process of law when the trial court granted the prosecution's motion to quash several subpoenas of witnesses subpoenaed to testify regarding the arbitrary fashion by which the decision made to seek the death penalty in Trumbell County, Ohio in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-SIX:** Petitioner was denied his right to expert assistance upon collateral review of his convictions in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-SEVEN:** Petitioner was denied his rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution when his request for expert assistance in his post conviction petition to reexamine the dental evidence was denied.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-EIGHT:** Petitioner was denied his rights in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution when the three judge panel failed to specifically find that Appellant was the principal offender and/or that he acted with prior calculation and design.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** Yes

**Result:** Petition Denied

**Date of result (if you know):** September 29, 1999

**Name of court:** The Court of Appeals for the Sixth Circuit

**Docket or case number (if you know):** 99-4317

**Date of filing:** 08/24/2001

**Nature of proceedings:** Appeal from Habeas Corpus Denial

**Grounds raised:**

<u>**STANDARDS OF REVIEW, The Court of Appeals for the Sixth Circuit**</u>

<u>**No. 99-4317**</u>

**STANDARD OF REVIEW I:** The District Court Erred When It Refused To Grant Hill's First, Second, Third, Fourth, Fifth, Nineteenth, Twentieth, And Twenty-Fourth Habeas Claims Relating To Hill's Mental Retardation And General Competency.

Additional Facts Relating To The Grounds For Relief Concerning Petitioner's Mental Retardation.

As Set Forth In The First And Twenty-Fourth Grounds For Relief Presented To The District Court, Mr. Hill Was Improperly Seized From His Home Without Probable Cause And Under False Pretenses And Taken To The Warren Police Department For Questioning On Monday, September 16, 1985, Without Judicial Authorization And In Violation Of His Constitutional Rights As Guaranteed By The Fourth, Sixth, Eighth And Fourteenth Amendments.

As Set Forth In The Second Ground For Relief Presented To The District Court, Mr. Hill's Rights As Guaranteed By The Fourth, Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution Were Violated When Police Officers Promised Him That In Exchange For His Cooperation Nothing Bad Would Happen To Him And That Nobody Was Going To Hurt Him, Thereby Promising Leniency, When In Fact, Petitioner Was Convicted Of Capital Murder And Sentenced To Death.

As Set Forth In The Third, Fourth, Fifth, Nineteenth, And Twentieth Grounds For Relief Presented To The District Court, Mr. Hill's Was Legally Incompetent As A Result Of His Limited Mental Abilities And Possible Brain Damage To Participate In The Legal System At All Times Herein; Therefore, He Was Incompetent To Waive His Miranda Rights At The Time Of His Interrogation And Waive His Right To A Jury Trial In Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments.

**STANDARD OF REVIEW II:** During The Trial Of This Case, Evidence Was Intentionally Withheld From The Defense In Violation Of The United States Constitution.

As Set Forth In The Eighth And Ninth Grounds For Relief Presented To The District Court, Mr. Hill's Constitutional Rights Were Violated When The State Failed To Provide Timely Discovery Of Evidence.

As Set Forth In The Twenty-Fifth Ground For Relief Presented To The District Court, Mr. Hill Was Denied His Constitutional Rights To A Fair Trial And Due Process Of Law When The Trial Court Granted The Prosecution's Motion To Quash Several Subpoenas Of Defense Witnesses.

**STANDARD OF REVIEW III:** During The Trial Of This Case, Mr. Hill's Due Process Rights Were Violated When Inadmissible Testimony And Gruesome And Inflammatory Photographs Were Considered By The Trial Court.

As Set Forth In The Seventh Ground For Relief Presented To The District Court, Mr. Hill's Due Process Rights Were Violated When The Trial Court Improperly Admitted Testimony And A "Stick," Which Was Allegedly Used In The Murder, Without A Proper Foundation Being Laid.

As Set Forth In The Twenty-First Ground For Relief Presented To The District Court, Mr. Hill's Constitutional Rights Were Violated When The Trial Court Improperly Admitted Testimony From Two Women Whom Mr. Hill Was Convicted Of Raping Concerning The Specific Details Of Those Prior Acts In Addition To The Testimony Of A Former Friend Of Mr. Hill's Concerning A Homosexual Act.

As Set Forth In The Twenty-Third Ground For Relief Presented To The District Court, Mr. Hill's Constitutional Right To A Fair Trial Was Violated When The Trial Court Improperly Admitted Gruesome And Cumulative Photographs Of, Among Other Things, Extracted Portions Of The Child Victim's Post Autopsy Anatomy And Other Morgue Photographs.

**STANDARD OF REVIEW IV:** As Set Forth In The Tenth Ground For Relief Presented To The District Court, Mr. Hill Was Denied His Right To Fair Trial And An Impartial Fact-Finder As Guaranteed By The Fifth, Sixth, Eighth, And Fourteenth Amendments When The Prosecutor Made Impermissible, Prejudicial, And Inflammatory Statements In The Penalty Phase Of The Trial.

**STANDARD OF REVIEW V:** Ineffective Assistance Of Counsel.

Petitioner Hill Was Denied The Effective Assistant Of Counsel At The Fact Finding And Mitigation Phases Of His Trial As Guaranteed By The Fifth, Sixth, Eighth, And Fourteenth Amendments.

Defense Counsel Has A Duty To Conduct A Proper Mitigation Investigation. Mr. Hill's Defense Counsel's Mitigation Investigation Was Deficient And Caused Prejudice To Mr. Hill.

**STANDRD OF REVIEW VI:** Mr. Hill's Constitutional Rights Were Violated During The Penalty Phase Of His Trial When Improper Aggravating Matters Were Considered And Proper Mitigating Matters Were Not Considered.

As Set Forth In The Thirteenth Ground For Relief Presented To The District Court, Mr. Hill's Was Denied His Constitutional Rights As Guaranteed By The Eighth And Fourteenth Amendments When The Trial Court Failed To Consider Or Give Weight To All The Evidence Petitioner Presented In Mitigation.

As Set Forth In The Fifteenth And Sixteenth Grounds For Relief Presented To The District Court, Mr. Hill's Death Sentence Was Imposed In Violation Of His Rights To Due Process And Freedom From Cruel And Unusual Punishment As Encompassed By The Fifth, Eighth And Fourteenth Amendments When The Trial Court Improperly Considered Non-Statutory Aggravating Factors And When The Court, On Appellate Review Of His Sentence, Considered Non-Statutory Aggravating Factors.

As Set Forth In The Twenty-Second Ground For Relief Presented To The District Court, Mr. Hill's Conviction And Death Sentence Were In Violation Of The Fifth, Sixth, Eighth, And Fourteenth Amendments When The State Failed To Meet Its Burden Of Proof Beyond A Reasonable Doubt And The Trial Court Failed To Find That Mr. Hill Had The Specific Intent To Kill.

As Set Forth In The Twenty-Eighth Ground For Relief Presented To The District Court, Mr. Hill Was Denied His Constitutional Rights In Violation Of The Fifth, Sixth, Eighth, Ninth And Fourteenth Amendments When The Trial Court Failed To Specifically Find That He Was The Principal Offender And That He Acted With Prior Calculation And Design.

**STANDARD OF REVIEW VII:** As Set Forth In The Twelfth And Fourteenth Grounds For Relief Presented To The District Court, Mr. Hill's Constitutional Right To Be Free From Cruel And Unusual Punishment And His Right To Due Process Of Law Have Been Violated By The Application Of Ohio's Unconstitutional Death Penalty Scheme Which Requires A Mandatory Sentence Of Death When A Panel Finds That Aggravating Circumstances Outweigh Mitigating Circumstances And Which Permits The Execution Of Mentally retarded Persons.

**STANDARD OF REVIEW VIII:** Mr. Hill's Constitutional Rights Were Violated As A Result Of Errors That Occurred In The Post Conviction Process And The Inherent Unconstitutional Nature Of Ohio's Post Conviction Process.

As Set Forth In The Eighteenth Ground For Relief Presented To The District Court, The Ohio State Courts Have Effectively Converted Ohio's Post-Conviction Procedure Into A Meaningless Ritual And As A Result Mr. Hill Was Denied His Rights As Guaranteed By The Fifth, Eighth And Fourteenth Amendments.

As Set Forth In The Seventeenth Ground For Relief Presented To The District Court, Mr. Hill Was Deprived Of Ha Ying A Full And Fair Evidentiary Hearing In State Post-Conviction Proceedings As Guaranteed By The Fifth, Eighth And Fourteenth Amendments.

As Set Forth In The Twenty-Sixth Ground For Relief, Mr. Hill Was Denied His Right To Expert Assistance Upon Collateral Review Of His Convictions In Violation Of The Sixth, Eighth And Fourteenth Amendments.

As Set Forth In The Twenty-Seventh Ground For Relief, Mr. Hill Was Denied His Rights As Guaranteed By The Sixth, Eighth And Fourteenth Amendments When His Request For Expert Assistance In His Post-Conviction Petition To Re-Examine The Dental Evidence Was Denied.

**STANDARD OF REVIEW IX:** The District Court Erred When It Refused To Consider Many Of Mr. Hill's Grounds For Relief Based On Procedural Default.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** No

**Result:** Order- Mr. Hill's death sentence issue violated his Eighth Amendment because he is mentally retarded was unexhausted.

**Date of result (if you know):** August 13, 2002

**Name of court:** Trumbell County Common Pleas

**Docket or case number (if you know):** 85-CR-317

**Date of filing:** 01/17/2003

**Nature of proceedings:** Petition to Vacate Danny Hill's Death Sentence Pursuant to *Atkins v. Virgina,* 122 S.Ct. 2242 (2002), *State v. Lott*, 97 Ohio State 3D 303 (2002), and Ohio Revised Code 2953.21

**Grounds raised:**

### GROUNDS FOR RELIEF, Trumbell County Common Pleas Court, Case No. 85-CR-317

**FIRST GROUNDS FOR RELIEF:** Claim For Relief From Death Sentence Due To Petitioner's Mental Retardation.

**SECOND GROUNDS FOR RELIEF:** The Law Of *Atkins* Should Be Applied To The Proven Fact Of Petitioner's Mental Retardation And His Death Sentence Should Be Declared Void.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** Yes

**Result:** Petition denied

**Date of result (if you know):** February 15, 2006

**Name of court:** The Court of Appeals, Eleventh District, Trumbell County

**Docket or case number (if you know):** 2006-T-0039

**Date of filing:** 10/24/2007

**Nature of proceedings:** Appeal from Petition to Vacate Danny Hill's Death Sentence/ Merit Brief

**Grounds raised:**

<u>**ASSIGNMENT OF ERRORS, The Eleventh District Court of Appeals, Trumbell County Case No. 2006-T-0039**</u>

**ASSIGNMENT OF ERRORS I:** The Trial Court Erred In Failing To Apply Double Jeopardy And *Res Judicata* Doctrines To Prevent Renewed Litigation Of Mr. Hill's Status As A Person With Mental Retardation.

**ASSIGNMENT OF ERRORS II:** The Trial Court Erred In Denying Mr. Hill A Jury Determination Of His Mental Retardation Status And Not Imposing The Burden Of Proof On The State Of Ohio To Prove Absence Of Mental Retardation Beyond A Reasonable Doubt.

**ASSIGNMENT OF ERRORS III:** The Trial Court Erred In Finding That Mr. Hill Was Not A Person With Mental Retardation.

**ASSIGNMENT OF ERRORS IV:** The Trial Court Erred In Determining Mr. Hill Was Competent To Proceed With This Appeal.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** No

**Result:** Petition denied

**Date of result (if you know):** July 11, 2008

**Name of court:** The Supreme Court of Ohio

**Docket or case number (if you know):** 2008-1686

**Date of filing:** 08/25/2008

**Nature of proceedings:** Appeal from the Court of Appeal Decision on Petition to Vacate Danny's Death Sentence

**Grounds raised:**

<u>**PROPOSITION OF LAW, The Supreme Court of Ohio, No. 2008-1686**</u>

**PROPOSITION OF LAW I:** A Mitigation Phase Determination Of Mental Retardation As A Mitigating Factor Constitutes Double Jeopardy/Res Judicata And Bars The State From Further Challenging A Capital Defendant's Mental Retardation Status.

**PROPOSITION OF LAW II:** Capital Defendants Are Entitled To A Jury Determination Of Mental Retardation Status And The State Bears The Burden Of Proof To Prove The Absence Of Mental Retardation Beyond A Reasonable Doubt.

**PROPOSITION OF LAW III:** A Capital Defendant Merits A Finding That He Is Mentally Retarded Where The Historical Data And Uncontroverted Evidence Show That He Meets The Criteria Established Under State V. Lott, 97 Ohio St.3d 303 (2002).

**PROPOSITION OF LAW IV:** A Trial Court Abuses Its Discretion Where It Categorizes A Diagnosis Of Mental Retardation As "For Atkins Purposes" And Disregards Previous Determinations Of Mental Retardation, As Well As Historical Data.

**PROPOSITION OF LAW V:** A Capital Petitioner In Post-Conviction Must Be Competent At All Stages Of The Post-Conviction Process And An Indigent Petitioner Must Be Afforded The Resources To Properly Litigate Questions Of Competency.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** No

**Result:** Petition denied

**Date of result (if you know):** August 26, 2009


**Name of court:** The United States District Court, Northern District of Ohio, Eastern Division

**Docket or case number (if you know):** 4:96-cv-00795

**Date of filing:** 03/15/2010

**Nature of proceedings:** Amended Petition for Habeas Corpus

**Grounds raised:**

### GROUNDS FOR RELIEF FOR HABEAS CORPUS, The United States District Court, Northern District of Ohio, Eastern Division No. 4:96-cv-00795


**FIRST GROUNDS FOR RELIEF:** Mr. Hill Is Mentally Retarded And Thus Ineligible For The Death Penalty.  Mr. Hill's Sentence Of Death Violates His Right To Be Free From Cruel And Unusual Punishment As Guaranteed By The Eighth And Fourteenth Amendments To The United States Constitution.

**SECOND GROUNDS FOR RELIEF:** Court Appointed Atkins Counsel Rendered Ineffective Assistance To Mr. Hill, And The Trial Court Allowed For The Continued Representation Of Atkins Counsel In Spite Of Knowing That There Was A Complete And Absolute Breakdown In The Attorney-Client Relationship, Thereby Denying Hill His Right To Counsel In Violation Of His Sixth, Eighth And Fourteenth Amendment Rights.

**THIRD GROUNDS FOR RELIEF:** Because Mr. Hill Is Mentally Retarded, He Is Innocent Of The Death Penalty.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** No

**Result:** Petition denied

**Date of result (if you know):** June 25, 2014

**Name of court:** The Court of Appeals for the Sixth Circuit

**Docket or case number (if you know):** 14-3718

**Date of filing:** 01/12/2015

**Nature of proceedings:** Appeal for Denial of Habeas Corpus

**Grounds raised:**

## STATEMENT OF ISSUES FOR REVIEW, The Court of Appeals for the Sixth Circuit No. 14-3718

**STATEMENT OF ISSUES FOR REVIEW I:** Whether Danny Hill, Who Has Been Intellectually Disabled His Entire Life, Is Therefore Ineligible For The Death Penalty.

**STATEMENT OF ISSUES FOR REVIEW II:** Whether Atkins Counsel Was Ineffective In Violation Of *Strickland V. Washington* And *Atkins V. Virginia.*

**STATEMENT OF ISSUES FOR REVIEW III:** Whether Danny's Statements To The Police Should Have Been Suppressed At Trial As They Were Involuntary.

**STATEMENT OF ISSUES FOR REVIEW IV:** Whether The Ohio Supreme Court Unreasonably Applied Clearly Established Federal Law When It Held That The Prosecutor's Inflammatory Statements Through-Out The Trial Did Not Violate Danny's Right To Due Process.

**STATEMENT OF ISSUES FOR REVIEW V:** Whether The Trial Court's Failure To Inquire About Danny's Competency To Stand Trial, Despite Knowing That Danny Was Intellectual Disabled, Violated Danny's Right To A Fair Trial Under The Fourteenth Amendment.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** Yes

**Result:** It is ORDERED that the district court's denial of habeas relief with regard to Danny Hill's Atkins claim is REVERSED, and the case is REMANDED with instructions to grant the petition and to issue the writ of habeas corpus with respect to his death sentence.

**Date of result (if you know):** February 2, 2018

**Name of court:** The United States Supreme Court

**Docket or case number (if you know):** 18-56

**Date of filing:** 07/06/2018

**Nature of proceedings:** Petition for a Writ of Certiorari

**Grounds raised:**

<u>REASONS FOR GRANTING THE PETITION, The United States Supreme Court</u>

<u>No. 18-56</u>

**REASONS FOR GRANTING THE PETITION I:** The Sixth Circuit's Decision Conflicts With This Court's AEDPA Cases And With The AEDPA Cases From Other Circuit Courts.

**REASONS FOR GRANTING THE PETITION II:** Setting AEDPA Aside, The Sixth Circuit's Decision Conflicts With Moore By Substituting Lay Opinions For Expert Opinions.

**REAONS FOR GRANTING THE PETITION III:** Compelling Reasons Justify The Court's Discretionary Review.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** No

**Result:** Petition GRANTED. Judgment VACATED and case REMANDED

**Date of result (if you know):** January 7, 2019

Name of court: The United States District Court, Northern District of Ohio, Eastern Division

Docket or case number (if you know): 4:96-cv-00795

Date of filing: 11/27/1996

Nature of proceedings: Petition for Habeas Corpus

Grounds raised:

## GROUNDS FOR RELIEF FOR HABEAS CORPUS, The United States District Court, Northern District of Ohio, Eastern Division No. 4:96-cv-00795

**HABEAS CORPUS CLAIM FOR RELIEF ONE:** Petitioner Hill was seized from his home under false pretenses utilizing psychological ploys and taken to the Warren Police Department for questioning on Monday September 16, 1985 in violation of his constitutional rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF TWO:** Petitioner's rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when police officers promised him that in exchange for his cooperation nothing bad would happen to him and that nobody was going to hurt him, thereby promising leniency, when in fact, Petitioner was convicted of capital murder and sentenced to death.

**HABEAS CORPUS CLAIM FOR RELIEF THREE:** As a result of his limited educational abilities and his limited comprehension of legal concepts and principals, Petitioner Hill was legally incompetent to participate in the legal system at all times herein; therefore, he was incompetent to waive his right to a jury trial and to waive his Miranda rights at the time of his interrogation by police in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF FOUR:**  When the trial court judge had, or should have had a "bona fide" doubt as to Petitioner's competency, the court had an obligation to hold a competency hearing to investigate the petitioner's rational understanding of the proceedings. Failure to do so violated Petitioner's constitutional rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF FIVE:** Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were denied when the court did not determine on the record he knowingly, intelligently and voluntarily waived his right to a jury trial.

**HABEAS CORPUS CLAIM FOR RELIEF SIX:** Petitioner Hill was denied the effective assistance of counsel at the fact finding phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF SEVEN:** At Petitioner's trial the court admitted testimony and evidence which denied Hill of his due process, equal protection and impartial jury under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF EIGHT:** The state's failure to provide timely discovery of photographs utilized by a state expert witness in formulating an opinion elicited at trial deprived Petitioner Hill of his rights of due process, effective assistance of counsel, and confrontation as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the Unites States Constitution.

**HABEAS CORPUS CLAIM FOR RELIEF NINE:** The state failed to provide timely discovery of numerous exhibits thereby depriving the Petitioner of his rights of due process, effective assistance of counsel and confrontation as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendment to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF TEN:** Petitioner Hill was denied his right to a fair trial and an impartial fact-finder as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the State of Ohio engaged in prosecutorial misconduct during closing arguments in both the fact finding and penalty phases of the trial.

**HABEAS CORPUS CLAIMS FOR RELIEF ELEVEN:** Petitioner Hill was denied the effective assistance of counsel at the mitigation phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF TWELVE:** Petitioner's right to be free from cruel and unusual punishment and his right to due process of law as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution were violated when the Ohio sentencing scheme requires a mandatory sentence of death when a three judge panel finds that the aggravating circumstances outweigh the mitigating circumstances.

**HABEAS CORPUS CLAIMS FOR RELIEF THIRTEEN:** When the three judge panel failed to consider or give weight to all of the evidence Petitioner presented in mitigation, Hill was denied his constitutional right as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF FOURTEEN:** Ohio's statutory provisions governing the imposition of the death penalty do not meet the prescribed constitutional requirements of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF FIFTEEN:** Appellant's death sentence was imposed in violation of his rights to due process and freedom from cruel and unusual punishment as encompassed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the three Judge panel improperly considered non-statutory aggravating factors.

**HABEAS CORPUS CLAIMS FOR RELIEF SIXTEEN:** Petitioner Hill was denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the court on appellate review of his sentence, considered non-statutory aggravating factors.

**HABEAS CORPUS CLAIMS FOR RELIEF SEVENTEEN:** Petitioner Hill was deprived of having a full and fair evidentiary hearing in state post-conviction proceedings as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendment to the United States Constitution.

**HABEAS CORPUS CLAIMS FOR RELIEF EIGHTEEN:** The Ohio state court have effectively converted Ohio's post-conviction procedure into a meaningless ritual, rather than the statutorily mandated process for those convicted of a criminal offense to obtain redress for violations of their rights under the Ohio Constitution and the Constitution of the United States. As a result Petitioner was denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS OF RELIEF NINETEEN:** Petitioner Hill was denied his rights as guaranteed by the Fifth and Fourteenth Amendments to the Unites States Constitution when his confession was taken without procedural safeguards provided by said amendments.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY:** Petitioner's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were violated when he was subjected to numerous interrogations by a least three law enforcement officers, one of whom was his uncle, without the benefit of counsel, when the officers knew that Hill was a slow learner and therefore, susceptible to the pressure exerted by the authorities.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-ONE:** The admission of other crimes, wrongs, or acts allegedly committed by the petitioner into evidence at Petitioner's trial violated the due process clause of the United States Constitution and therefore denied Hill his rights as guaranteed by same.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-TWO:** When the State failed to prove by proof beyond a reasonable doubt and the three judge panel failed to specifically find that Petitioner has the specific intent to kill Raymond Fife, Petitioner's conviction and death sentence were in violation of the Fifth, Sixth, Eight, and Fourteenth Amendments.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-THREE:** Petitioner Hill was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the court permitted admission of gruesome, repetitive and cumulative photographs.

**HABEAS CORPUS CLAIMS OF RELIF TWENTY-FOUR:** Petitioner's rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution were violated when without probable cause he was transported to the Warren Police Department when no prior judicial authorization had been given.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-FIVE:** Petitioner Hill was denied his constitutional rights to a fair trial and due process of law when the trial court granted the prosecution's motion to quash several subpoenas of witnesses subpoenaed to testify regarding the arbitrary fashion by which the decision made to seek the death penalty in Trumbell County, Ohio in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-SIX:** Petitioner was denied his right to expert assistance upon collateral review of his convictions in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-SEVEN:** Petitioner was denied his rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution when his request for expert assistance in his post conviction petition to reexamine the dental evidence was denied.

**HABEAS CORPUS CLAIMS OF RELIEF TWENTY-EIGHT:** Petitioner was denied his rights in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution when the three judge panel failed to specifically find that Appellant was the principal offender and/or that he acted with prior calculation and design.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** Yes

**Result:** Petition Denied

**Date of result (if you know):** September 29, 1999

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DANNY HILL, | ) CHIEF JUDGE PAUL R. MATIA |
| Petitioner | ) CASE NO. 4:96CV0795 |
| vs. | ) |
| CARL S. ANDERSON, Warden | ) MEMORANDUM OF OPINION |
| | ) AND ORDER |
| Respondent | ) |

Danny Lee Hill has filed a petition for writ of habeas corpus
pursuant to 28 U.S.C. § 2254. Oral argument was held on
October 8, 1997. In making its decision, in addition to oral
arguments, this Court has considered the respondent's return of
writ (Doc. 22), and petitioner's proposed findings of fact and
conclusions of law (Doc. 46). For the following reasons, the
petition for writ of habeas corpus is denied.

PROCEDURAL HISTORY

On September 17, 1985, Hill was indicted by the Trumbull
County Grand Jury on counts of aggravated murder, (R.C. §
2903.01(B)), with specifications of kidnaping (R.C. § 2905.01),
rape (R.C. § 2907.02), aggravated arson (R.C. § 2909.02) and
aggravated robbery (R.C. § 2911.01) as well as separate counts for
each of the four specifications and one count of felonious sexual
penetration (R.C. § 2907.12(A)(1)(3), for a total of six counts.
He elected to have his case heard by a three judge panel who found

I hereby certify that this instrument, is a true and
correct copy of the original on file in my office.
Attest: Geri M. Smith, Clerk
U.S. District Court
Northern District of Ohio
By
Deputy Clerk

Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

him guilty of all counts with the exception of the aggravated robbery count. After a mitigation hearing the three judge panel sentenced him to death on February 28, 1986, for the aggravated murder with specifications, ten to twenty-five years imprisonment for kidnaping and aggravated arson, and life imprisonment for rape and felonious sexual penetration.

On February 14, 1986, and April 4, 1986, Hill filed motions for new trial as to the guilt phase of the proceedings. Both motions were denied.

Hill appealed his convictions and sentences to the Eleventh District Court of Appeals on April 25, 1986. On June 9, 1986, he filed a second notice of appeal pertaining to the trial court's denial of his motions for new trial. Hill raised the following nineteen assignments of error on direct appeal.

First Assignment of Error.

The trial court erred in admitting into evidence statements of the Appellant.

Issues Presented for Review and Argument.

1) An accused's Sixth Amendment right to counsel is violated when he is deprived of counsel for custodial interrogation when he does not knowingly, intelligently and voluntarily relinquish a known right due to the misconduct of law enforcement authorities and the defendant being essentially illiterate and being mentally retarded.

2) An accused's statements are not voluntary when such statements were coerced by the psychological [sic] tactics of law enforcement officers on a retarded individual who was essentially illiterate and the admission of such statements violates due process.

3) An accused's statements are not admissible unless the

2

State establishes that the procedural safeguards contained in the Miranda warnings were properly given or knowingly, intelligently and voluntarily waived.

4)  An accused's Fourth and Fifth Amendment rights are violated when an accused is seized from his home through the use of psychological ploys by law enforcement officers upon an accused who is mentally retarded and essentially illiterate.

5)  An accused is denied his right to due process pursuant to the Fourteenth Amendment when he is denied his statutory right to counsel pursuant to R.C. 120.16, 2834.14, [sic] and 2935.20.

6)  Noncompliance with R.C. 2935.05 results in an illegal arrest, and any statements and/or evidence derived therefrom should be suppressed.

7)  When statements are made by an accused to law enforcement officers under the impression of receiving leniency or some other benefit, then those statements are inadmissible in any later trial.

SECOND ASSIGNMENT OF ERROR

The trial court erred in the admission of "other acts" testimony.

Issues Presented for Review and Argument

The admission of other crimes, wrongs, acts or acts [sic] into evidence by the trial court violated R.C. 2945.59, Evid. R. 404(n) and the due process clause of the Fourteenth Amendment to the United States Constitution to the prejudice of Appellant thus requiring reversal.

THIRD ASSIGNMENT OF ERROR

The trial court improperly admitted certain evidence.

Issues Presented for Review and Argument.

A trial court must exclude evidence that is either not relative [sic], or its relevance is outweighed by its prejudicial effect or such evidence is solely introduced to influence the court.  The effect of the erroneous evidentiary rulings was the denial of Appellant's rights to due process and fair and impartial trial under the Fifth, Sixth, and

3

Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

### FOURTH ASSIGNMENT OF ERROR

The trial court erred in admitting Exhibit 47, a "stick".

#### Issues Presented for Review and Argument

It is error for a trial court to draw an inference from another inference because the foundation of the second inference is so insecure that reliance upon it would result in an inferred fact which is merely speculative in nature.

### FIFTH ASSIGNMENT OF ERROR

The right to confront witnesses was violated.

#### Issues Presented for Review and Argument

An accused's right to confrontation is violated when a Prosecutor consults with an important witness while that witness was subject to recall and was a surprise witness of which defense counsel had no prior knowledge.

### SIXTH ASSIGNMENT OF ERROR

The trial court erred in denying the Appellant's motion to include licensed drivers in the pool of licensed drivers. [sic]

#### Issues Presented for Review and Argument

It is a denial of an accused's right to a fair cross-section of the community by denying a request for inclusion in that [sic] pool of prospective jurors licensed drivers pursuant to R.C. 2323.08(B) in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.

### SEVENTH ASSIGNMENT OF ERROR

The trial court erred in allowing the Appellant to waive his right to jury in writing pursuant to Crim. R. 23.

#### Issues Presented for Review and Argument

It is a violation of an accused['s] [sic] right to jury trial guaranteed by the Sixth and Fourteenth Amendments to the

4

United States Constitution and Article I, Section 10 when the
court does not determine on the record, specifically
addressing an accused, whether he has knowingly,
intelligently, and voluntarily waived his right to a jury
trial.

## EIGHTH ASSIGNMENT OF ERROR

The trial court erred in denying the Appellant funds to
employ an expert witness for a motion hearing.

### Issues Presented for Review and Argument

It is reversible error for a trial court to deny an accused
funds necessary to employ an expert for purposes of a motion
for closure of pre-trial hearings that was necessary to
preserve a fair and impartial jury pursuant to the Fifth,
Sixth, and Fourteenth Amendments of the United States
Constitution and Article II, Section 26.

## NINTH ASSIGNMENT OF ERROR

The admission of Exhibit 3 (a photograph of Raymond Fife) was
error.

### Issues Presented for Review and Argument

The trial court erred and abused its discretion in admitting
in [sic] a pre-death photograph of the victim.  This error
violated Appellant's rights under Evid. R. 404, the Fifth and
Fourteenth Amendments to the United States Constitution and
Sections 10 and 16 of the Ohio Constitution.

## TENTH ASSIGNMENT OF ERROR

The Appellee did not give the Appellant complete discovery.

### Issues Presented for Review and Argument

When the state repeatedly fails to comply with Crim. R. 16,
it is violating an accused's right to a fair trial and the
effective assistance of counsel.

## ELEVENTH ASSIGNMENT OF ERROR

Admission of certain photographs was an abuse of discretion.

### Issues Presented for Review and Argument

5

It is an abuse of discretion for a trial court to allow into
evidence photographs of the victim because such photographs
were highly prejudicial, gross, and unnecessary and which
lacked probative value in determining the issues involved.
Their admission violated the Appellant's [sic] Fifth, Sixth,
and Fourteenth Amendments to the United States Constitution
and Article I, Sections 10 and 16 of the Ohio Constitution.

### TWELFTH ASSIGNMENT OF ERROR

The state made improper closing arguments at both the guilt
and mitigation phases of this case.

#### Issues Presented for Review and Argument

Prosecutorial misconduct during both the guilt and mitigation
phase closing arguments denied Appellant his right to a fair
trial and an impartial fact-finder as guaranteed by the
Fifth, Sixth and Fourteenth Amendments to the United States
Constitution and Article I, Sections 10 and 16 of the Ohio
Constitution.

### THIRTEENTH ASSIGNMENT OF ERROR

The Appellant was denied the effective assistance of
counsel.

#### Issue Presented for Review and Argument

When the issue of effective assistance of counsel is raised
that involves matters both within the record and outside the
record the proper avenue for reviewing that issue should be
on post-conviction relief even if counsel on appeal is not
trial counsel. The Appellant's right to effective assistance
of counsel was violated pursuant to the Sixth and Fourteenth
Amendment rights to [sic] the United States Constitution and
Article I, Sections 10 and 16 of the Ohio Constitution.

### FOURTEENTH ASSIGNMENT OF ERROR

It was error for the trial court to sentence Appellant on the
kidnaping charge and the kidnaping specification.

#### Issue Presented for Review and Argument

The trial court erred in entering a judgment of conviction
for kidnaping and other felonies where convictions on both
offenses are contrary to 2941.25. Secondly, where an
underlying felony count which is also used as a specification

6

AO 72A
(Rev.8/82)

for aggravated murder merges then it cannot be considered as an additional specification for sentencing purposes.

### FIFTEENTH ASSIGNMENT OF ERROR

The motion for new trial should have been granted.

#### Issue Presented for Review and Argument

A motion for new trial should note [sic] be denied without a full hearing when made pursuant to Crim. R. 33. A denial of such hearing and the motion violates an accused's Fifth, Sixth and Fourteenth Amendment rights to [sic] the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution and Crim. R. 33.

### SIXTEENTH ASSIGNMENT OF ERROR

The trial court was improperly prevented by [sic] deciding whether death was the appropriate punishment.

#### Issue Presented for Review and Argument

Ohio's mandatory sentencing scheme prevented the panel of three judges from deciding whether death was the appropriate punishment in violation of Appellant's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

### SEVENTEENTH ASSIGNMENT OF ERROR

The trial court failed to consider all of the evidence in support of mitigating a death sentence.

#### Issue Presented for Review and Argument

A sentence of death must be reversed when a trial court fails to consider all the evidence presented in mitigation. Such a failure violates Appellant's constitutional rights under *Lockett v. Ohio* and *Eddings v. Oklahoma*.

### EIGHTEENTH ASSIGNMENT OF ERROR

A sentence of death is unconstitutional.

#### Issues Presented for Review and Argument

7

1.  The Ohio death penalty scheme, found in Ohio Revised Code
Sections 2903.01 and 2929.02, et. *seq.*, violates the
prohibition against cruel and unusual punishment and equal
protection guarantees contained in the Eighth and Fourteenth
Amendments to the United States Constitution and Article I,
Sections 2 and 9 of the Ohio Constitution.

> A.   The imposition of the death penalty under Ohio's
> statutory authority is degrading to the dignity of human
> beings and cannot be exercised within the limits of
> contemporary civilized standards.

> B.   The death penalty is arbitrarily, freakishly, and
> discriminatorily inflicted, constituting cruel and
> unusual punishment and a denial of equal protection
> under the Eighth and Fourteenth Amendments to the United
> States Constitution and Article I, Sections 2 and 9 of
> the Ohio Constitution.

> C.   The arbitrary and capricious application of the
> death penalty under the Ohio statutory scheme persists
> due to the uncontrolled discretion of the prosecutor.

2.  The Ohio death penalty scheme, as authorized by
R.C. 2903.01 and 2929.02, *et seq.*, deprives capitally charged
defendants of their lives without due process of law in
violation of the guarantees of the Fifth and Fourteenth
Amendments to the United States Constitution and Article I,
Section 16 of the Ohio Constitution.

> A.   Where the substantive due process requirements that
> the least restrictive means of serving a compelling
> state interest, when fundamental rights are involved,
> are not met, the death penalty cannot be
> constitutionally inflicted.

> B.   The death penalty is neither the least restrictive
> means of punishment nor an effective means of
> deterrence.

> C.   The societal interest of incarceration of the
> offender can be effectively served by means less
> restrictive than the death penalty.

> D.   If retribution or revenge is to be considered, it
> can be satisfied by less onerous means than death.

3.  The Fifth and Fourteenth Amendments to the United States

8

Constitution and Article I, Section 16 of the Ohio
Constitution guarantee fairness in judicial proceedings by
requiring procedural due process, the violation of which will
result in unequal protection of law, contrary to the
guarantees in the Fourteenth Amendment and Article I,
Section 2, and the imposition of cruel and unusual
punishment, contrary to the Eighth Amendment and Article I,
Section 9 of the Ohio Constitution.

A. The Ohio death penalty scheme permits imposition of
the death penalty on a less than adequate showing of
culpability by failing to require a conscious desire to
kill, premeditation, or deliberation as the culpable
mental state.

B. The statutes fail to require a stringent standard of
proof as to guilt and conviction before the death
penalty may be imposed.

C. The Ohio death penalty statutes fail to require
that the jury consider as a mitigating factor pursuant
to R.C. 2929.04(B) that the evidence fails to preclude
doubt as to the defendant's guilt. The fact that
evidence does not foreclose doubt as to guilt must be
considered as a relevant mitigating factor under
R.C. 2929.04(B).

D. The statutes fail to require the state to prove the
absence of any mitigating factors and that death is the
only appropriate penalty before the death sentence may
be constitutionally imposed.

E. The Ohio death penalty statute impermissibly
mandates imposition of the death penalty upon proof of
an aggravating circumstance "outweighing" any evidence
in mitigation.

F. R.C. 2903.01, 2929.022. 2929.03, 2929.04 and
2929.05 violate the Eighth Amendment prohibition
against cruel and unusual punishment and the Fourteenth
Amendment due process and equal protection clauses of
the United States Constitution and Article I,
Sections 9 and 16 of the Ohio Constitution by requiring
proof of aggravating circumstances in the guilt-
determining state of a capital trial.

G. R.C. 2929.021, 2929.03 and 2929.05 fail to assure
adequate appellate analysis of excessiveness and
disproportionality of death sentences.

9

AO 72A
(Rev.8/82)

4.  By providing for a sentencing hearing before the
same jury which convicted the Appellant, the statutes
violate the Appellant's right to effective assistance
of counsel, to an impartial jury, and to a fair hearing
as guaranteed by the Sixth and Fourteenth Amendments to
the United States Constitution and Article I, Sections
5, 10 and 16 of the Ohio Constitution.

5.  Sections 2929.03 and 2929.04 of the Ohio Revised Code
violate the due process and equal protection clauses of the
Fourteenth Amendment to the United States Constitution; the
cruel and unusual punishment clauses of the Eighth Amendment
and Article I, Section 9 of the Ohio Constitution; and the
double jeopardy provisions of the Fifth Amendment and
Article I, Section 10, of the Ohio Constitution.

6.  The death penalty authorized by sections 2929.02,
2929.022, 2929.03 and 2929.04 of the Revised Code of Ohio
violates the cruel and unusual punishment provisions and due
process clauses of the state and federal constitutions.  The
aggravating circumstance of aggravated murder in the course
of kidnaping in R.C. 2929.04(A) is over broad and fails to
reasonably justify the imposition of a more severe sentence.
Eighth and Fourteenth Amendments, United States Constitution
and Article I, Sections 9, 10 and 16 of the Ohio
Constitution.

### NINETEENTH ASSIGNMENT OF ERROR

This Court cannot find that after reviewing all of the
factors of R.C. 2929.05(A) that death was the appropriate
sentence for Danny Lee Hill.

### Issue Presented for Review and Argument

This Court cannot find, pursuant to R.C. 2929.05(A), that

> (1) the judgment of guilt of aggravated murder and the
> specifications was [sic] supported by sufficient
> evidence,

> (2) that the aggravating circumstances outweigh the
> mitigating factors in the case,

> (3) that the sentence of death is appropriate,

> (4) that the sentence of death is not excessive or
> disproportionate to the penalty imposed in similar
> cases, and

10

(5) that the trial court properly weighed the aggravating circumstances and mitigating factors. Appellant's death sentence was imposed in violation of his rights to due process and freedom from cruel and unusual punishment. Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 9 and 16, Ohio Constitution.

The court of appeals affirmed the decision of the trial court on November 27, 1989. Thirty days later, Hill filed a notice of appeal of the court of appeals decision in the Supreme Court of Ohio. On February 14, 1990, the Supreme Court of Ohio stayed Hill's execution pending the resolution of his appeal. Hill raised twenty-five propositions of law. The propositions of law are as follows.

### PROPOSITION OF LAW NUMBER 1

An accused's right to counsel is violated when he is deprived of counsel for custodial interrogation when he does not knowingly, intelligently and voluntarily relinquish a known right due to the misconduct of law enforcement authorities and the accused being mentally retarded in violation of the Sixth and Fourteenth Amendments to the United States Constitution and the equivalent provisions of the Ohio Constitutions [sic].

### PROPOSITION OF LAW NUMBER 2

An accused's statements are not voluntary when such statements were coerced by the psychological tactics of law enforcement officers on a retarded individual who was essentially illiterate and the admission of such statements violates the due process clauses of both the Ohio and United States Constitutions.

### PROPOSITION OF LAW NUMBER 3

An accused's statements are not admissible unless the state establishes that the procedural safeguards continued [sic] in the Miranda warnings were properly given or knowingly, intelligently, and voluntarily waived as provided under the Fifth and Fourteenth Amendments of the United States

11

Constitution and the Equivalent portion of the Ohio Constitution.

### PROPOSITION OF LAW NUMBER 4

An accused's Fourth and Fourteenth Amendment rights under the United States Constitution and the equivalent provisions under the Ohio Constitution are violated when an accused is seized from his home through the use of psychological ploys by law enforcement officers upon an accused who is mentally retarded and essentially illiterate.

### PROPOSITION OF LAW NUMBER 5

An accused is denied his right to due process under both the Ohio and United States Constitutions when he is denied his statutory right to counsel pursuant to R.C. 120.16, 2934.14 and 2935.20

### PROPOSITION OF LAW NUMBER 6

Noncompliance with R.C. 2935.05 results in an illegal arrest, and any statements and/or evidence derived therefrom should be suppressed.

### PROPOSITION OF LAW NUMBER 7

When statements are made by an accused to law enforcement officers under the impression of receiving leniency or some other benefit, then those statements are inadmissible in any later trial.

### PROPOSITION OF LAW NUMBER 8

The admission of other crimes, wrongs, or acts into evidence by the trial court violated R.C. 2945.59, Evid. R. 404(B) and the due process clause of the Fourteenth Amendment to the U.S. Constitution to the prejudice of appellant thus requiring reversal.

### PROPOSITION OF LAW NUMBER 9

A trial court must exclude evidence that is either not relative [sic] or its relevance is outweighed by its prejudicial effect or such evidence is solely introduced to influence the court. The effect of the erroneous evidentiary rulings was the denial of appellant's right to due process and fair and impartial trial under the Fifth, Sixth and Fourteenth Amendments to the United States

12

AO 72A
(Rev.8/82)

Constitution and Article I, Sections Ten and Sixteen of the
Ohio Constitution.

PROPOSITION OF LAW NUMBER 10

An inference of fact cannot be predicated upon another
inference, but must be predicated upon a fact supported by
law. *Sobolovitz v. Lubric Ohio Co.,* 107 Ohio St. 204 (1923).
It is error for a trial court to draw an inference from
another inference because the foundation of the second
inference is so insecure that reliance upon it would result
in an inferred fact which is merely speculative in nature.

PROPOSITION OF LAW NUMBER 11

An accused's right to confrontation is violated when a
prosecutor consults with an important witness while that
witness was subject to recall and was a surprise witness of
which defense counsel had no prior knowledge.

PROPOSITION OF LAW NUMBER 12

It is a denial of an accused's right to a fair cross-section
of the community to deny a request for inclusion in the pool
of prospective jurors licensed drivers pursuant to R.C.
2313.08(B) in violation of the Sixth and Fourteenth
Amendments to the United States Constitution, and Article I,
Section Ten of the Ohio Constitution.

PROPOSITION OF LAW NUMBER 13

It is a violation of an accused's right to jury trial
guaranteed by the Sixth and Fourteenth Amendments to the
United States Constitution and Article I, Section Ten of the
Ohio Constitution when the court does not determine on the
record, specifically addressing the accused, whether he has
knowingly, intelligently, and voluntarily waived his right
to a jury trial.

PROPOSITION OF LAW NUMBER 14

It is reversible error for a trial court to deny an accused
funds necessary to employ an expert for purposes of a motion
for closure of pre-trial hearing that was necessary to
preserve a fair and impartial jury pursuant to the Fifth,
Sixth and Fourteenth Amendments, of the United States
Constitution and Article I, Sections 2, 10 and 16 and
Article II, Section 26.

13

PROPOSITION OF LAW NUMBER 15

A trial court errs and abuses its discretion in admitting a
pre-death photograph of the victim. Such error violates
appellant's rights under Evid. R. 404, the Fifth and
Fourteenth Amendments to the United States Constitution and
Article I, Sections Ten and Sixteen of the Ohio
Constitution.

PROPOSITION OF LAW NUMBER 16

When the state repeatedly fails to comply with Crim. R. 16,
it is violating an accused's right to a fair trial and to
the effective assistance of counsel.

PROPOSITION OF LAW NUMBER 17

It is an abuse of discretion for a trial court to allow into
evidence photographs of the victim because such photographs
were highly prejudicial, gross, and unnecessary and which
lacked probative value in determining the issues involved.
Their admission violated the appellant's [sic] Fifth, Sixth,
and Fourteenth Amendments to the United States Constitution
and Article I, Sections Ten and Sixteen of the Ohio
Constitution.

PROPOSITION OF LAW NUMBER 18

Prosecutorial misconduct during both the guilt and
mitigation phase of closing argument deny [sic] an accused
his right to a fair trial and an impartial fact-finder as
guaranteed by the Fifth, Sixth and Fourteenth Amendments to
the United States Constitution and Article I, Sections Ten
and Sixteen of the Ohio Constitution.

PROPOSITION OF LAW NUMBER 19

When the issue of effective assistance of counsel is raised
that involves matter both within the record and outside the
record the proper avenue for reviewing that issue should be
on post-conviction relief even if counsel on appeal is not
trial counsel.  The accused's right to effective assistance
of counsel was violated pursuant to the Sixth and Fourteenth
Amendment rights to [sic] the United States Constitution and
Article I, Sections Ten and Sixteen of the Ohio
Constitution.

14

PROPOSITION OF LAW NUMBER 20

The trial court erred in entering a judgment of conviction
for kidnaping and the other felonies where convictions on
both offenses are contrary to R.C. 2941.25. Secondly, where
an underlying felony count which is also used as a
specification for aggravated murder merges, then it cannot
be considered as an additional specification for sentencing
purposes.

PROPOSITION OF LAW NUMBER 21

A motion for new trial should not be denied without a full
hearing when made pursuant to Crim. R. 33. A denial of such
a hearing and the motion violates an accused's Fifth, Sixth
and Fourteenth Amendment rights to [sic] the United States
Constitution and Article I, Sections Ten and Sixteen of the
Ohio Constitution and Crim. R. 33.

PROPOSITION OF LAW NUMBER 22

Ohio's mandatory sentencing scheme prevented the panel of
three judges from deciding whether death was the appropriate
punishment in violation of appellant's rights as guaranteed
by the Eighth and Fourteenth Amendments to the United States
Constitution and Article I, Sections Nine and Sixteen of the
Ohio Constitution.

PROPOSITION OF LAW NUMBER 23

The failure to consider all of the evidence in support of
mitigating a death sentence violates R.C. 2929.03(F) and the
Eighth and Fourteenth Amendments to the United States
Constitution.

PROPOSITION OF LAW NUMBER 24

The Fifth, Sixth, Eighth and Fourteenth Amendments to the
United States Constitution and Sections 2,9,10 and 16,
Article I of the Ohio Constitution establish the
requirements for a valid death penalty scheme. Ohio Revised
Code Sections 2903.01, 2929.02, 2929.021, 2929.022,
2929.023, 2929.04 and 2929.05, Ohio's statutory provisions
governing the imposition of the death penalty, do not meet
the prescribed constitutional requirements and are
unconstitutional, both on their face and as applied to
appellant.

15

AO 72A
(Rev.8/82)

PROPOSITION OF LAW NUMBER 25

This Court cannot find, pursuant to R.C. 2929.05(A), that (1) the judgment of guilt of aggravated murder and the specifications was [sic] supported by sufficient evidence; (2) that the aggravating circumstances outweigh the mitigating factors in the case; (3) that the sentence of death is appropriate; (4) that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases; and (5) that the trial and appellate courts properly weighed the aggravating circumstances and mitigating factors.  Appellant's death sentence was imposed in violation of his rights to due process and freedom from cruel and unusual punishment as encompassed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections Nine and Sixteen of the Ohio Constitution.

On August 12, 1992, the Supreme Court of Ohio affirmed the decision of the Eleventh District Court of Appeals.  Hill moved for a rehearing on August 12, 1992, which was denied on September 30, 1992.

On October 22, 1992, the Supreme Court of Ohio granted Hill's motion for an indefinite stay of execution, pending disposition of his petition for *writ of certiorari* in the United States Supreme Court.  Hill filed his petition for *writ of certiorari* in the United States Supreme Court on December 29, 1992.  It was denied on March 29, 1993, and on April 8, 1993, the Supreme Court of Ohio terminated his stay of execution.

Subsequently, Hill filed another motion for stay of execution in the Supreme Court of Ohio which the Court granted on June 21, 1993, pending the exhaustion of state post-conviction proceedings.  The trial court received Hill's motion for post-

16

conviction relief on December 21, 1993, which included fifteen claims for relief. The claims for relief are as follows:

### FIRST CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable because the three judge panel failed to unanimously agree on the record as to the specifications to the aggravated murder charge as they relate to whether he committed them [sic] offenses as a principal or with prior calculation and design.

### SECOND CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable because the State of Ohio failed to provide full and complete discovery of evidence which was material to the guilt or innocence of Petitioner, which was properly demanded prior to trial.

### THIRD CLAIM FOR RELIEF

Petitioner Hill's death sentence is void and/or voidable because the three-judge panel considered non-statutory aggravating factors, as evidenced by their decision and findings regarding sentencing at the penalty phase. The trial court held, considered and weighed against the mitigating factors the following non-statutory aggravating circumstances:

"A) The manner in which the rape was committed, particularly:

    1. The amount of force;

    2. The relative size of the defendant and the victim;

    3. The relative age of the defendant and the victim;

    4. The biting of the penis;

    5. The pulling on the genitals;

    6. The length of the time of the sexual abuse;

17

7.    The concurrent use of a sharp instrument long enough to rupture the victim's urinary bladder;

B) The manner in which the kidnaping was conducted, particularly;

1.    Slamming the victim upon the ground and on the bicycle pedal;

2.    The kicking of the victim;

3.    The severe head injury inflicted;

4.    The multiple blows to the victim's body;

5.    The removal of the victim while he was still alive to a place where possible medical aid would likely be delayed.

C)   The strangulation with the victim's own clothing and the attendant torture which must have been occasioned by being pulled off the ground and held in the air;

D)   Burning of the victim's face and body which could only have been either a futile attempt to conceal his identity or simply a vicious attempt to inflict more pain;

E)   The callous denial of the victim's request for help and to get his mother;

F)   Total lack of remorse indicated by defendant's appearance at the police station after the murder inquiring about a reward;

G)   The totality of the circumstances indicating that the victim was tortured over a long period of time evidencing a vicious, perverted, animalistic state of mind.

Opinion of March 5, 1986, at 1-2.  Critical to the Court's finding was that the aggravating factors were not the specifications set forth in the statute (R.C. 2929.04(A)(7), but were in fact based upon the improper arguments of the prosecution.  See Fourth and Ninth Claim for Relief.

18

AO 72A
(Rev.8/82)

## FOURTH CLAIM FOR RELIEF

Petitioner Hill's death sentence is void and/or voidable because the three-judge panel failed to consider all statutory mitigating factors on which evidence was presented. Further the panel discounted the mitigation evidence produced by the defendant and used that evidence as further non-statutory circumstances. . .

## FIFTH CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable because the incredible media attention by the print and television media prejudiced the minds of the witnesses, the prosecution, and the three-judge panel. There was an allegation that there would be race riots if Danny Hill were not convicted and sentenced to death. See Affidavit of Vera Williams at paragraph 41. The courtroom was often so filled with spectators that the judges made special provisions in procedure for avoiding disturbances. Stephen Melius even approached the prosecution after having followed the trial on television and newspapers, stating, "I've been reading the papers everyday since this Court hearing started." (Tr. 1033). Prosecutor Kontos even began his closing argument by stating,

> "Mr. Lewis, Mr. Kenny, the defendant, Mr. Watkins, distinguished Judges of this Court. This has been a long, difficulty [sic], and trying case for everybody. I'll try to be as short as I can. *The crimes perpetrated against the victim in this case and what has happened to this particular young man shocked and stunned the community to its foundation.*" Tr. 1246 (emphasis added).

## SIXTH CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable because the Ohio Death Penalty Scheme, on its face and as applied in this case, violates the United States and Ohio Constitutions.

The Ohio Death Penalty Statutory Scheme is constitutionally deficient in the following manner:

A) Prosecutors have unregulated discretion in determining who will be charged with the death penalty.

19

B) The statutory scheme fails to require premeditation or deliberation.

C) The statutory scheme fails to establish a standard for determining the existence of mitigating factors.

D) The statutory scheme fails to establish a standard by which to balance the mitigating factors against the aggravated [sic] circumstances.

E) The statutory scheme permits the jury to consider aggravating circumstances at the trial phase.

(F) The statutory scheme does not give the sentencer the option to impose a life sentence when the sentencer determines that the aggravated circumstances outweigh the mitigating factors beyond a reasonable doubt.

G) The statutory scheme permits the same panel to decide both guilt and sentence.

H) The statutory scheme encourages capitally-charged individuals to plead guilty. Crim. R. 11 (C)(3).

I) The statutory scheme creates a mandatory death penalty.

J) The statutory scheme permits the State to argue first and last in mitigation.

K) The statutory scheme permits the death penalty to be applied in an arbitrary, capricious and discriminatory manner.

### SEVENTH CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable because Hill was incompetent to understand and waive his Miranda rights, incompetent to understand and waive his constitutional rights to counsel, to jury trial, and to stand trial. Affidavit of Kathleen Burch, Psy.D., R.N. Ms. Burch has tested and examined Danny Hill and has concluded that "the behavioral observations enumerated ... cast some doubt on his competency to cooperate with his attorneys in his defense" and that his psychological disturbance "might serve to impair his competency." See, also, Affidavit of Caroline Everington, Ph.D, who interviewed and extensively tested Hill. Dr. Everington concluded that, "it is my opinion that it is highly likely

20

that he was not fit to stand trial at that time." Dr. Everington also has concluded that, "it is probable that he did not understand the Miranda warning and, thus, the implications of the information he gave to the police." See, also, Affidavit of Jane Core.

### EIGHTH CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable because his trial counsel was ineffective in violation of the guarantees of the Ohio and United States Constitutions. Gerald Simmons is an expert criminal trial attorney, as shown by his attached affidavit. The trial work of counsel in the present case is ineffective in that it fails to meet the minimum standard of effectiveness, some areas of which are set forth in Mr. Simmons' affidavit, as follows:

a) Failure to fully and adequately investigate his client's competency: counsel failed to determine, and to present adequate evidence on, his client's competency to understand and waive his Miranda Rights [sic], to understand and waive his right to trial by jury, to understand and waive his right to testify in the guilt phase and mitigation phase, to a trial by jury, and his competency to stand trial and assist in his defense.

b) Failure to fully investigate his client's background: counsel failed to discover or fully investigate Danny Lee Hill's mental, emotional, and intellectual levels, and the associated degree of functional deficiencies.

c) Failure to Make [sic] a Motion for Acquittal pursuant to Criminal Rule 29.

d) Failure to investigate the composition of the grand jury and to obtain transcripts as [sic] after individuals testified.

e) Failure to attempt to seat a jury prior to waiving his client's jury trial right; failure to make an agreement on a life recommendation prior to accepting a three-judge panel.

f) Failure to adequately prepare for Dr. Levine's testimony, in that he was surprised by the Dr.'s testimony.

21

AO 72A
(Rev.8/82)

g) Failure to enforce separation of witnesses or to move to strike testimony of persons improperly contaminated by discussions with other witnesses during the trial.

h) Failure to make an opening statement at the mitigation hearing or to adequately prepare for the hearing.

i) Failure to object to improper prosecutorial statements. See Ninth Cause of Action.

j) Failure to develop evidence as to:

    A. Petitioner's alcohol and drug use;

    B. Petitioner's educational history;

    C. Petitioner's lack of a father figure;

    D. Petitioner's mother's inability to discipline her children properly;

    E. Petitioner's environment; and

    F. Petitioner's personality disorder.

k) Failure to obtain the results of the rape kit.

NINTH CAUSE OF ACTION [sic]

Petitioner Hill's convictions and sentences are void and/or voidable because Petitioner Hill's rights were violated due to prosecutorial misconduct during the guilt phase and penalty phase. This misconduct consisted of the following improprieties by the prosecutor in the guilt phase closing argument:

a) Prosecutor Watkins referring to the victim's right to live, to be in court, to be in school, and to celebrate his 13th birthday with his parents. Tr. 1167.

b) Referring to the acts of the Petitioner as having "destroyed and devoured a little boy." Tr. 1167

c) Basing argument on guilt on the "length of time, the manner of death ... is a new bench mark in human cruelty and murder!" Tr. 1168.

22

d) Repeating a reference to the Petitioner as an "animal." Tr. 1169.

e) Repeating the charge of "heinous, unbelievable, animalistic behavior. He would make the marquis de Sade proud!" Tr. 1173.

f) He testified to his own beliefs as to the facts, stating "as I view the evidence--as Mr. Kontos and I see the facts to be and the truth to be." Tr. 1175.

g) Arguing facts not in evidence when he stated, "they're in sexual heaven and time has no meaning and dimension." Tr. 1181.

h) Arguing facts not in evidence when he stated, "This boy was running because he was probably screaming in pain from having flammable liquid set afire on his face!" Tr. 1192.

i) Arguing facts not in evidence when he stated, "rain will affect fingerprints as it will affect blood." Tr. 1196.

j) Arguing personal belief when he stated, "I thought his [Gelfius) testimony was much more credible. I don't feel Dehus; it couldn't break down; very unlikely, and I don't think that's the case. I think that the witness from the Arson Lab who deals strictly with arson is the most credible witness. . ." Tr. 1196.

k) On rebuttal, Prosecutor Knotts compounded the attacks on Hill by stating, "This case is about an individual who thrives and relishes on inflicting pain and torture to other human beings. This individual participated in raping Raymond Fife, and he relished the thought of having him on the ground in pain ... this person sat there and enjoyed this boy struggling to grasp for air, ... So, he sat there and watched that boy burn alive; saw his flesh burning and crackling and enjoyed it." Tr. 1272-73.

l) Referred to Petitioner as having "raped" and having "burned alive" the victim when there was no evidence as to Hill having done so.

m) Argued that, "there was some talk of him being 7 or 9 mentally. I defy this Court to find anybody who is 7 to 9-years old who threatens a female with a knife and

23

tells her to perform oral sex, anal sex, vaginal sex
... The one type of age factor that they didn't
discuss, how about his criminal age? This defendant
has committed a lifetime of crime in 18 years."
Mitigation at 351.

n) Argued that he wanted to call the victim, who,
"would have been able to tell all of us ... how he felt
when he was abducted and helpless and felt doomed ...
what it felt like to be punched and continually kicked
... to be strangled so severely ... to describe the
pain involved and sexual molestation ... the
indescribable pain when your flesh is burning ... what
it would be like to have a stick rammed up your rectal
cavity. But he's not here to testify about that thanks
to the defendant." Mitigation at 351-52.

o) Argued that the victim "can't testify about how he
misses his family, about how he misses his friends in
the Scout group, about how he'd like to be home with
his father in the backyard feeding the birds, how he'd
like to be able to live and love and share his love
with his family and friends, and he will never be able
to do that because of this defendant; this
manifestation of evil, this anomaly to mankind, this
disgrace to mankind ... Mitigation at 352.

p) Argued that Hill didn't stop before killing the
victim because "he enjoyed what he did." Mitigation at
353.

TENTH CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or
voidable because the trial court failed to ensure a complete
record of the proceedings. Hill had filed a motion on
December 13, 1985, to record all proceedings, which motion
was granted on December 19, 1985, by order which stated,
"granted, with the exception that when it comes to
conferences in chambers or bench conferences, that those
matters need not be put in the record contemporaneously.
However, the defense can put into the record a summary of
what has occurred, what was requested, if there was a
request, and what the ruling of the Court was." Journal
Entry dated December 19, 1985.

24

AO 72A
(Rev.8/82)

### ELEVENTH CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable because Ohio's reviewing courts failed to fulfill their statutory obligation to meaningfully review the proportionality of Petitioner Hill's death sentence.

### TWELFTH CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable because the Ohio death penalty is in violation of international laws and Article VI of the United States Constitution.

### THIRTEENTH CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable due to the mandatory nature of Ohio's capital statute.

### FOURTEENTH CLAIM FOR RELIEF

The Petitioner Hill's convictions and sentences are void or voidable because the grand jury proceedings were not recorded as required by Crim. R. 22.

### FIFTEENTH CLAIM FOR RELIEF

Petitioner Hill's convictions and sentences are void and/or voidable because he was denied a fair and impartial review of his death sentence. *See* Exhibit Y, Petition to Vacate or Set Aside Judgment.

On April 25, 1994, the state moved for judgment in its favor. On the same day, Hill filed a "Motion for Clarification of State's 'Motion for Judgment.'" Hill then filed a "Motion and Memorandum in Support of Release of Evidence for Independent Laboratory Testing" on June 27, 1994. The trial court denied Hill's motion for clarification on June 24, 1994, and on June 30, 1994, it denied his motion for release of evidence. His post-conviction petition was denied by the trial court on July 18,

25

AO 72A
(Rev.8/82)

1994.

Hill continued the post-conviction proceedings by filing a notice of appeal in the Eleventh District Court of Appeals. Three assignments of error with numerous issues were presented. They are as follows:

> 1. The trial court erred to the prejudice of Petitioner-appellant in overruling his petition as to the claims for relief and for so ruling without holding an evidentiary hearing.
>
> 2. The trial court erred to the prejudice of Petitioner-appellant in denying petitioner clarification of and subsequently ruling upon the state's "motion for judgment pursuant to R.C. 2953.21(C). See Exhibit MM, Memorandum in Support of Jurisdiction.
>
> 3. The trial court erred to the prejudice of petitioner in denying the petitioner access to physical evidence for testing which evidence was critical to the conviction and the testing of which may reveal [sic] the petitioner's innocence. (Entry of June 30, 1994).

On June 19, 1995, the court of appeals affirmed the trial court's decision denying Hill's petition for post-conviction relief.

The court of appeals' decision was appealed to the Supreme Court of Ohio, notice of appeal having been filed on August 3, 1995. Eighteen propositions of law were presented. The assignments of error submitted to the Supreme Court of Ohio are as follows:

> 1. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where the petitioner presented evidence that the three judge panel failed to specify in its findings on the specifications that they were unanimously finding

26

AO 72A
(Rev.8/82)

that petitioner was the principal offender, whether they were finding the petitioner committed the aggravated murder with prior calculation and design, or whether they were unable to come to a unanimous finding.

2. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where the petitioner presented evidence that the State of Ohio failed to provide discovery to which the petitioner had been entitled.

3. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where the three-judge panel considered non-statutory aggravated [sic] factors in sentencing petitioner.

4. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where the three-judge panel failed to consider all statutory mitigating factors in sentencing.

5. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where the incredible media attention and community feeling prejudiced the minds of the witnesses, the prosecution, and the three-judge panel.

6. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where the Ohio death penalty scheme, on its face and as applied in this case, violates the United States and Ohio Constitutions.

7. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where there were affidavits of Petitioner's incompetence.

8. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where an expert criminal defense

27

attorney provided an affidavit as to the prevailing norms for defense attorneys in capital cases and where it was apparent on the face of the record that trial counsel failed to adhere to the norms and thus was ineffective.

9.   In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where prosecutorial misconduct occurred at the guilt and mitigation phases of the trial and the failure of the trial court to prohibit the misconduct was clear error.

10. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where the trial court failed to ensure that the proceedings were fully recorded.

11. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where Ohio's reviewing courts failed to fulfill their statutory obligation to meaningfully review the proportionality of Hill's death sentence.

12. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where Ohio's death penalty violates international laws and Article VI of the United States Constitution.

13. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where Ohio's capital statute makes death mandatory where aggravating circumstances outweigh mitigating circumstances.

14. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where the grand jury transcripts were not recorded as required by Crim. R. 22.

15. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or

28

AO 72A
(Rev.8/82)

the relief demanded where the Petitioner was denied a fair and impartial review of his death sentence.

16. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have granted an evidentiary hearing or the relief demanded where all or any of the preceding issues are supported by evidence outside of the record and demonstrate prejudice against the rights of the Petitioner.

17. In a petition to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code Section 2953.21, the trial court should have clarified or dismissed the state's motion for judgment which was not based upon either Civ. R. 12(b)(6) or Civ. R. 56 but was found to be a unique motion based upon R.C. 2953.21(C).

18. The trial court erred to the prejudice of petitioner in denying the petitioner access to physical evidence for testing which evidence was critical to the conviction and the testing of which may reveal the petitioner's actual innocence (Entry of June 30, 1994).

Hill's post-conviction appeal was dismissed by the Supreme Court of Ohio on November 15, 1995. On May 22, 1996, the Supreme Court of Ohio vacated Hill's stay of execution.

Hill filed a notice of intent to file a petition for writ of habeas corpus in federal court on April 18, 1996. On July 29, 1996, he filed a motion for stay of execution which was granted for a period of sixty days from the scheduled date of execution. (August 20, 1996 at 12:01 A.M.) Hill obtained an extension of time to file his petition until November 27, 1996. It was finally filed on December 2, 1996.

## FACTS

The following facts were set forth by the Supreme Court of Ohio in its decision on Hill's direct appeal of his convictions

29

and sentences. *State v. Hill*, <u>64 Ohio St.3d 313</u>, 313-17 (1992).

On September 10, 1985, at approximately 5:15 p.m., twelve-year-old Raymond Fife left home on his bicycle to visit a friend, Billy Simmons. According to Billy, Raymond would usually get to Billy's residence by cutting through the wooded fields with bicycle paths located behind the Valu-King store on Palmyra Road in Warren.

Matthew Hunter, a Warren Western Reserve High School student, testified that he went to the Valu-King on the date in question with his brother and sister shortly after 5:00 p.m. Upon reaching the front of the Valu-King, Hunter saw Tim Combs and defendant-appellant, Danny Lee Hill, walking in the parking lot towards the store. After purchasing some items in the Valu-King, Hunter observed defendant and Combs standing in front of a nearby laundromat. Combs greeted Hunter as he walked by. Hunter also saw Raymond Fife at that time riding his bike into the Valu-King parking lot.

Darren Ball, another student at the high school, testified that he and Troy Cree left football practice at approximately 5:15 p.m. on September 10, and walked down Willow Street to a trail in the field located behind the Valu-King. Ball testified that he and Cree saw Combs on the trail walking in the opposite direction from the Valu-King. Upon reaching the edge of the trail close to the Valu-King, Ball heard a child's scream, "like

30

somebody needed help or something."

Yet another student from the high school, Donald F. Allgood, testified that he and a friend were walking in the vicinity of the wooded field behind the Valu-King between 5:30 p.m. and 6:00 p.m. on the date in question. Allgood noticed defendant, Combs and two other persons "walking out of the field coming from the Valu-King," and saw defendant throw a stick back into the woods. Allgood also observed Combs pull up the zipper of his blue jeans. Combs "put his head down" when he saw Allgood.

At approximately 5:50 p.m. on the date in question, Simmons called the Fife residence to find out where Raymond was. Simmons then rode his bicycle to the Fife's house around 6:10 p.m. When it was apparent that Raymond Fife's whereabouts were unknown, Simmons continued on to a Boy Scouts meeting, while members of the Fife family began searching for Raymond.

At approximately 9:30 p.m., Mr. Fife found his son in the wooded field behind the Valu-King. Raymond was naked and appeared to have been severely beaten and burnt in the face. One of the medics on the scene testified that Raymond's groin was swollen and bruised, and that it appeared that his rectum had been torn. Raymond's underwear was found tied around his neck and appeared to have been lit on fire.

Raymond died in the hospital two days later. The coroner ruled Raymond's death a homicide. The cause of death was found to be cardiorespiratory arrest secondary to asphyxiation,

31

subdural hematoma and multiple trauma. The coroner testified
that the victim had been choked and had a hemorrhage in his
brain, which normally occurs after trauma or injury to the brain.
The coroner also testified that the victim sustained multiple
burns, damage to his rectal-bladder area and bite marks on his
penis. The doctor who performed the autopsy testified that the
victim sustained numerous external injuries and abrasions, and
had a ligature mark around his neck. The doctor also noticed
profuse bleeding from the victim's rectal area, and testified
that the victim had been impaled with an object that had been
inserted through the anus, and penetrated through the rectum into
the urinary bladder.

On September 12, 1985, defendant went downtown to the Warren
Police Station to inquire about a $5,000 reward that was being
offered for information concerning the murder of Raymond Fife.
Defendant met with Sergeant Thomas W. Stewart of the Warren
Police Department and told him that he had "just seen Reecie
Lowery riding the boy's bike who was beat up." When Stewart
asked defendant how he knew the bike he saw was the victim's
bike, defendant replied, "I know it is." Defendant then told
Stewart, "If you don't go out and get the bike now, maybe [Lowery
will] put it back in the field." According to Stewart, the
defendant then stated that he had seen Lowery and Andre McCain
coming through the field at around 1:00 that morning. In the
summary of his interview with defendant, Stewart noted that

32

defendant "knew a lot about the bike and about the underwear around the [victim's] neck." Also, when Stewart asked defendant if he knew Tim Combs, defendant replied, "Yeah, I know Tim Combs. * * * I ain't seen him since he's been out of the joint. He like boys. He could have done it too."

On September 13, 1985, the day after Stewart's interview with defendant, Sergeant Dennis Steinbeck of the Warren Police Department read Stewart's summary of the interview, and then went to defendant's home and asked him to come to the police station to make a statement. Defendant voluntarily went to the police station with Steinbeck, whereupon defendant was advised of his *Miranda* rights and signed a waiver of rights form. Defendant made a statement that was transcribed by Steinbeck, but the Sergeant forgot to have defendant sign the statement. Subsequently, Steinbeck discovered that some eyewitnesses had seen defendant at the Valu-King on the day of the murder.

On the following Monday, September 16, Steinbeck went to defendant's house accompanied by defendant's uncle, Detective Morris Hill of the Warren Police Department. Defendant again went voluntarily to the police station, as did his mother. Defendant was given his *Miranda* rights, which he waived at that time as well. After further questioning by Sergeants Stewart and Steinbeck and Detective Hill, defendant indicated that he wanted to be alone with his uncle, Detective Hill. Several minutes

33

AO 72A
(Rev.8/82)

later, defendant stated to Hill that he was "in the field behind Valu-King when the young Fife boy got murdered."

Defendant was given and waived his *Miranda* rights again, and then made two more voluntary statements, one on audiotape and the other on videotape. In both statements, defendant admitted that he was present during the beating and sexual assault of Raymond Fife, but that Combs did everything to the victim. Defendant stated that he saw Combs knock the victim off his bike, hold the victim in some sort of headlock, and throw him onto the bike several times. Defendant further stated that he saw Combs rape the victim anally and kick him in the head. Defendant stated that Combs pulled on the victim's penis to the point where defendant assumed Combs had pulled it off. Defendant related that Combs then took something like a broken broomstick and jammed it into the victim's rectum. Defendant also stated that Combs choked the victim and burnt him with lighter fluid. While defendant never admitted any direct involvement in the murder, he did admit that he stayed with the victim while Combs left the area of the attack to get the broomstick and the lighter fluid used to burn the victim.

Upon further investigation by authorities, defendant was indicted on counts of kidnaping, rape, aggravated arson, felonious sexual penetration, aggravated robbery and aggravated murder with specifications.

34

AO 72A
(Rev.8/82)

On January 21, 1986, defendant's trial began in front of a three judge panel. Among the voluminous testimony from witnesses and the numerous exhibits, the following evidence was adduced.

Defendant's brother, Raymond L. Vaughn, testified that he saw defendant wash his gray pants on the night of the murder as well as on the following two days. Vaughn identified the pants in court, and testified that it looked like defendant was washing out "something red. * * * It looked like blood to me * **."

Detective Sergeant William Carnahan of the Warren Police Department testified that on September 15, 1985, he went with eyewitness Donald Allgood to the place where Allgood stated he had seen defendant and Combs coming out of the wooded field, and where he had seen defendant toss "something" into the woods. Carnahan testified that he returned to the area with workers from the Warren Parks Department, and that he and Detective James Teeple found a stick about six feet from the path where Allgood saw defendant and Combs walking.

Dr. Curtis Mertz, a forensic pathologist, stated that: "It's my professional opinion, with a reasonable degree of medical certainty, Hill's teeth, as depicted by the models and the photographs that I had, made the bite on Fife's penis."

The defense called its own forensic pathologist, Dr. Lowell Levine, who stated that he could not conclude with a reasonable degree of certainty as to who made the bite marks on the victim's penis. However, Levine concluded: "What I'm saying is either

35

Hill or Combs, or both, could have left some of the marks but the one mark that's consistent with the particular area most likely was left by Hill."

Doctor Howard Adelman, the pathologist who performed the autopsy of the victim's body, testified that the size and shape of the point of the stick found by Detective Carnahan was "very compatible" with the size and shape of the opening through the victim's rectum. Adelman described the fit of the stick in the victim's rectum as "very similar to a key in a lock."

At the close of trial, the trial panel deliberated for five hours and unanimously found defendant guilty on all counts, except the aggravated robbery count and the specification of aggravated robbery to the aggravated murder count.

Pursuant to R.C. § 2929.04(B), a mitigation hearing was held by the three judge panel beginning on February 26, 1986. The panel received testimony, and thereafter weighed the aggravating circumstances against the mitigating factors. The panel then sentenced defendant to ten to twenty-five years imprisonment for both aggravated arson and kidnaping, life imprisonment for rape and felonious sexual penetration, and the death penalty for aggravated murder with specifications.

Timothy Combs was also charged and convicted as a principal offender in the murder of Raymond Fife. See *State v. Combs,* (Dec. 2, 1988), Portage App. No. 1725, unreported, 1988 WL 129449

36

AO 72A
(Rev.8/82)

(Ohio App. 11th Dist.).

Hill presented twenty-eight grounds for relief. Number twenty-six was used twice. Therefore, the Court has renumbered the last two grounds. The grounds, taken from the petition, are as follows:

1. Petitioner Hill was seized from his home under false pretenses utilizing psychological ploys and taken to the Warren Police Department for questioning on Monday September 16, 1985 in violation of his constitutional rights as guaranteed by the Fourth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

2. Petitioner's rights as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated when police officers promised him that in exchange for his cooperation nothing bad would happen to him and that nobody was going to hurt him, when in fact, petitioner was convicted of capital murder and sentenced to death.

3. As a result of his limited educational abilities and his limited comprehension of legal concepts and principles, Petitioner Hill was legally incompetent to participate in the legal system at all times herein; therefore, he was incompetent to waive his right to a jury trial and to waive his Miranda rights at the time of his interrogation by police in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

4. When the trial court had, or should have had a "bona fide" doubt as to Petitioner's competency, the court had an obligation to hold a competency hearing to investigate the petitioner's rational understanding of the proceedings. Failure to do so violated the petitioner's constitutional rights as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

5. Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were denied when the court did not determine on the record that he knowingly, intelligently and voluntarily waived his right to a jury trial.

37

AO 72A
(Rev.8/82)

6. Petitioner Hill was denied the effective assistance of counsel at the fact finding phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner Hill was denied effective assistance of counsel at the fact finding phase of his trial when counsel failed to request and insist upon a record being made of all sidebars and in-chamber conferences so as to preserve the record for future court review.

Counsel failed to pursue his motion for change of venue.

Counsel failed to attempt to seat a jury prior to waiving Petitioner's right to a jury trial.

Counsel failed to ensure that Petitioner understood various ramifications of waiving his right to a jury trial and how same would affect his rights at trial and on appeal.

Counsel failed to object to an officer's testimony that he believed that Petitioner was lying during questioning by police.

Counsel failed to object to the Prosecutor['] s improper closing argument or to move for mistrial based on said arguments.

Counsel failed to move for a judgment of acquittal at the close of the state's case.

7. At Petitioner's trial the court admitted testimony and evidence which denied Hill of his due process, equal protection and impartial jury rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

8. The state's failure to provide timely discovery of photographs utilized by a state expert witness in formulating an opinion elicited at trial deprived Petitioner Hill of his rights of due process, effective assistance of counsel, and confrontation as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

9. The state failed to provide timely discovery of numerous exhibits thereby depriving the Petitioner of his rights of due process, effective assistance of counsel and confrontation as guaranteed by the Fifth, Sixth, Eighth and

38

AO 72A
(Rev.8/82)

Fourteenth Amendments to the United States Constitution.

10. Petitioner Hill was denied his right to a fair trial and an impartial fact-finder as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the State of Ohio engaged in prosecutorial misconduct during closing arguments in both the fact finding and penalty phases of the trial.

11. Petitioner Hill was denied the effective assistance of counsel at the mitigation phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner Hill was denied effective assistance of counsel when trial counsel failed to have appropriate expert testimony presented at trial during the mitigation phase.

Trial counsel failed to secure expert assistance that could explain the dynamics of the accused's environment and how it led him to commit the crime in question.

Trial counsel also failed to secure psychological experts that could explain to the court the various learning problems Petitioner had and how this would contribute to the matter before the court.

12. Petitioner's right to be free from cruel and unusual punishment and his right to due process of law as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution were violated when the Ohio sentencing scheme requires a mandatory sentence of death when a three judge panel finds that the aggravating circumstances outweigh the mitigating circumstances.

13. When the three judge panel failed to consider or give weight to all of the evidence Petitioner presented in mitigation, Hill was denied his constitutional rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

14. Ohio's statutory provisions governing the imposition of the death penalty do not meet the prescribed constitutional requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

15. Appellant's death sentence was imposed in violation of his rights to due process and freedom from cruel and unusual punishment as encompassed by the Fifth, Eighth and

39

Fourteenth Amendments to the United States Constitution when the three judge panel improperly considered non-statutory aggravating factors.

16. Petitioner Hill was denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the court on appellate review of his sentence, considered non-statutory aggravating factors.

17. Petitioner Hill was deprived of having a full and fair evidentiary hearing in state post-conviction proceedings as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

18. The Ohio state courts have effectively converted Ohio's post-conviction procedure into a meaningless ritual, rather than the statutorily mandated process for those convicted of a criminal offense to obtain redress for violations of their rights under the Ohio Constitution and the Constitution of the United States. As a result Petitioner was denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

19. Petitioner Hill was denied his rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution when his confession was taken without the procedural safeguards provided by said Amendments.

The state's failure to properly administer Petitioner his "Miranda rights" violated his constitutional rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

20. Petitioner's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were violated when he was subjected to numerous interrogations by at least three law enforcement officers, one of whom was his uncle, without the benefit of counsel, when the officers knew that Hill was a slow learner and therefore, susceptible to the pressures exerted by the authorities.

The statements given were not knowingly and intelligently given and therefore were admitted at trial in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

21. The admission of other crimes, wrongs or acts allegedly committed by the petitioner into evidence at petitioner's

40

trial violated the due process clause of the United States Constitution and therefore denied Hill his rights as guaranteed by the same.

22. When the State failed to prove by proof beyond a reasonable doubt and the three-judge panel failed to specifically find that Petitioner had the specific intent to kill Raymond Fife, Petitioner's conviction and death sentence were in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

23. Petitioner Hill was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the court permitted the admission of gruesome, repetitive and cumulative photographs.

24. Petitioner's rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution were violated when without probable cause he was transported to the Warren Police Department when no prior judicial authorization had been given.

25. Petitioner Hill was denied his constitutional rights to a fair trial and due process of law when the trial court granted the prosecution's motion to quash several subpoenas of witnesses to testify regarding the arbitrary fashion by which the decision was made to seek the death penalty in Trumbull County, Ohio in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

26. Petitioner was denied his right to expert assistance upon collateral review of his convictions in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

27. Petitioner was denied his rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution when his request for expert assistance in his post-conviction petition to reexamine the dental evidence was denied.

28. Petitioner was denied his rights in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution when the three judge panel failed to specifically [sic] find that Appellant was the principal offender and/or that he acted with prior calculation and design.

41

LAW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132 § 104, amending 28 U.S.C. § 2254 became effective on April 24, 1996. Before considering the issues raised by the petitioner, the Court must determine whether the new provisions of § 2254 requiring greater deference to the state court decisions, apply to the present case. On April 18, 1996, Hill filed a notice of intent to file a petition for writ of habeas corpus and a motion for appointment of counsel. The petition for writ of habeas corpus was not filed until December 2, 1996. Hill contends that his case should be deemed pending as of April 18, 1996, and that the AEDPA does not apply to his case.

The United States Supreme Court held in *Lindh v. Murphy*, 521 U.S. 320 (1997), that amended § 2254 does not apply to habeas corpus cases that were pending when the Act was passed. *See Norris v. Schotten*, 146 F.3d 314, 323 (6th Cir. 1998), *cert. denied,* 119 S.Ct. 348 (1998); *Rogers v. Howes*, 144 F.3d 990, 992 n.2 (6th Cir. 1998). The Sixth Circuit recently decided this issue in *Williams v. Coyle*, 167 F.3d 1036, 1038 (6th Cir. 1999). The court analyzed pertinent statutes in arriving at its decision. In determining the meaning of a statute, the words used must be given their ordinary meaning. *Id., citing Moskal v. United States*, 498 U.S. 103, 108 (1990). Normally, a case is

42

pending when a complaint or petition is filed. *Id.* Rule 3 of the Federal Rules of Civil Procedure provides that "[a] civil action is commenced by filing a complaint with the court." The Sixth Circuit found comparable the application for a writ of habeas corpus to the filing of a civil complaint. Also, the Federal Rules of Civil Procedure apply to § 2254 cases to the extent that they do not conflict with the Rules Governing Section 2254 Cases. *Id.; See* 28 U.S.C. § 2254, R. 11. The court further found that the specific rules governing § 2254 cases require an applicant to file an application in a specific form in the district court but they do not expressly address the commencement of the proceedings. *Id.;* 28 U.S.C.§ 2254, R. 2, 3. Therefore, the court concluded that Fed. R. Civ. P. 3 requires a presumption that a habeas corpus case is filed with the filing of an application for the writ. *Id.* In addition, the court opined that the language of the habeas corpus provisions reinforce this presumption. For instance, § 2254(e) refers to "a proceeding instituted by an application for a writ of habeas corpus." 28 U.S.C. § 1914(a) provides that the "district court shall require the parties instituting any civil action, suit or proceeding . . . to pay a filing fee of $150, except that on an application for a writ of habeas corpus the filing fee shall be $5." The statutes associate the commencement of a habeas corpus proceeding with the filing of an application. Since Hill's

43

AO 72A
(Rev.8/82)

application for writ of habeas corpus was filed after the enactment of the AEDPA, the Court finds that amended § 2254 is applicable to his case.[1]

## PROCEDURAL DEFAULT

A state prisoner must exhaust his state remedies before bringing his claim in a federal court habeas corpus proceeding. 28 U.S.C. § 2254(b),(c); *Rose v. Lundy*, 455 U.S. 509 (1982). A federal court will not review a question of federal law decided by a state court if the state court's ruling is based on a state law ground that is independent of the federal question and is adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This rule applies to substantive or procedural law. *Id.*

The petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on his

---

[1] 28 U.S.C. § 2254(d), as amended, provides:
An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

44

claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994);
*Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). If the
petitioner still has a remedy in the state courts wherein the
state has an opportunity to rule on federal constitutional
questions regarding the petitioner's case, exhaustion has not
occurred. *Rust v. Zent*, 17 F.3d at 160.

When a habeas corpus petitioner is unable to present his
claims to the state court because of a procedural default, he has
waived those claims for purposes of habeas corpus review unless
he can show cause for the default and prejudice resulting from
the alleged constitutional ground. *Wainwright v. Sykes*, 433 U.S.
72 (1977).

The Sixth Circuit, in *Maupin v. Smith*, 785 F.2d 135
(6th Cir. 1986), prescribed four factors to determine a claim of
procedural default. *Id.*, at 138.

> First, the court must determine that there is a state
> procedural rule that is applicable to the petitioner's
> claim, and that the petitioner failed to comply with the
> rule . . . Second the court must decide whether the state
> courts actually enforced the state procedural sanction . . .
> Third, the court must decide whether the state procedural
> forfeiture is an "adequate and independent" state ground on
> which the state can rely to foreclose review of a federal
> constitutional claim . . . [o]nce the court determines that
> a state procedural rule was not complied with and that the
> rule was an adequate and independent state ground, then the
> petitioner must demonstrate under *Sykes* that there was
> "cause" for him not to follow the procedural rule and that
> he was actually prejudiced by the alleged constitutional
> error.

45

A state court's opinion may sometimes be ambiguous as to whether its reference to state law is an adequate and independent state ground for its judgment. *Harris v. Reed*, 489 U.S. 255, 261 (1989). In *Michigan v. Long*, 463 U.S. 1032 (1983), the United States Supreme Court set forth a rule to be used by federal courts in overcoming any ambiguity. In such situation, the court will assume that the state court's decision did not rest on independent and adequate state grounds when it is not clear that it did so and when it fairly appears that the state court rested its decision primarily on federal law. *Id.* at 1042. In other words, if it fairly appears that the state court's decision rested primarily on federal law, the court may reach the federal question on review unless the state court's decision clearly rests upon independent and adequate state grounds. *Harris v. Reed*, 489 U.S. at 261.

*Harris v. Reed* recognized a situation where a state court invokes a state procedural bar as to an issue and also discusses the merits. *Id.* at 264, n.10. When this occurs, a federal court is not released from the procedural bar but is precluded from deciding the merits of the claim. *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991); *Miller v. Rogers*, 1997 WL 436246 (6th Cir).

The Ohio Eleventh District Court of Appeals determined that certain issues raised by Hill either could have been raised on

46

AO 72A
(Rev.8/82)

direct appeal or had been previously addressed by the Ohio courts
and thus were barred by the doctrine of *res judicata*. The merits
of the issues were also discussed. In *State v. Perry*, 10 Ohio
St.2d 175 (1967), the Ohio Supreme Court ruled that "[U]nder the
doctrine of res judicata, a final judgment of conviction bars a
convicted defendant who was represented by counsel from raising
and litigating in any proceeding except an appeal from that
judgment, any defense or any claimed lack of due process that was
raised or could have been raised by the defendant at the trial,
which resulted in that judgment of conviction, or on appeal from
that judgment." *Id*. at 180. *See State v. Roberts*, 1 Ohio St.3d
36, 39 (1982).

The Supreme Court of Ohio dismissed Hill's appeal from the
court of appeals' decision without comment. Where one state
court has explained its reasons for its decision, later
unexplained rulings rest on the same grounds. *YLST v. Nunnemaker*,
501 U.S. 797, 803 (1991).

Hill contends that because his post-conviction issues are
supported by evidence *de hors* the record as well as evidence
appearing on the record, the issues are not subject to the
doctrine of *res judicata*. *State v. Smith*, 17 Ohio St.3d 98
(1985). Evidence *de hors* the record will permit issues to be
litigated that were not raised or could have been raised on
appeal. In order to overcome the bar of *res judicata,* the

47

evidence *de hors* the record must show that the petitioner could not have appealed the constitutional claim based upon information in the original trial record. *State v. Coombs*, 100 Ohio App.3d 90, 97 (Ohio App. 1st Dist. 1994); *State v. Cooperrider*, 4 Ohio St. 3d 226, 228 (1983).

But evidence presented outside the record must satisfy the same threshold standard of validity, otherwise it would be too easy to defeat the doctrine of *res judicata* as set forth in *Perry*. *State v. Coleman*, 1993 WL 74756 (Ohio App. 1st Dist). The evidence that was available to the petitioner at the time of the direct appeal is not *de hors* the record simply because it was not raised at that time. *State v. Arrington*, 1993 WL 277539 at *1 (Ohio App. 9th Dist.)

Hill argues generally that his post-conviction petition was supported by evidence *de hors* the record. However, there are no specific arguments as to why each issue found by the state courts to be procedurally barred by *res judicata* should be considered by the federal court on the existence of evidence *de hors* the record. *Res judicata* constitutes a state procedural rule utilized by the Ohio courts throughout Hill's post-conviction proceedings.

The Sixth Circuit has held that Ohio's application of the doctrine of *res judicata* pursuant to *Perry* is an adequate and independent state ground. *Brooks v. Edwards*, 1996 WL 506505 at *5

48

(6th Cir. 1996); *see Mapes v. Coyle*, <u>171 F.3d 408</u>, 421 (6th Cir. 1999). The doctrine of *res judicata* has been explicitly set forth in numerous Ohio decisions and Ohio courts have refused to hear cases on the merits because of this doctrine. *Id. State v. Cole*, <u>2 Ohio St. 3d 112</u>, 113 (1982); *State v. Perry*, <u>10 Ohio St. 2d at 180</u>.

The Ohio Supreme Court may occasionally choose to address the merits of a claim that is procedurally barred from review on the basis of *res judicata*. An occasional exception does not indicate inadequacy. Despite some inconsistencies, a "general rule" that is usually applied in the majority of cases, is entitled to be considered an adequate and independent state ground. *Plath v. Moore*, <u>130 F.3d 595</u>, 602 (4th Cir. 1997), *cert. denied*, <u>118 S.Ct. 1854</u> (1998). Hill has not brought this argument before the Court. This Court realizes that Ohio courts may sometimes deviate from their general rules but there is no indication that they do so on a regular basis. A petitioner has no reasonable expectation that the rule in *Perry* has been abandoned. The third prong of the *Maupen* test has been satisfied.

Procedural default is not applicable if the petitioner can show cause for his failure to follow the procedural requirements and actual prejudice resulting from those requirements. Cause and prejudice may be shown by offering proof of ineffective

49

assistance of counsel or that the issue was so novel at the time
of appeal that the petitioner's attorney could not reasonably
have been expected to raise it. *Reed v. Ross*, <u>468 U.S. 1</u>, 9
(1984); *Carpenter v. Mohr*, <u>163 F.3d 938</u>, 943 (6th Cir. 1998).
Hill has not attempted to show cause and prejudice to excuse his
failure to follow Ohio's procedural requirements.   The Court
finds that the final prong of the *Maupin* test has been satisfied.
The issue of procedural default will be discussed upon
examination of the individual grounds for relief presented by
Hill.

### INDIVIDUAL GROUNDS FOR RELIEF

Grounds one, two, three, nineteen and twenty generally
involve Hill's competency during the investigative stage of the
proceedings.  In *Miranda v. Arizona*, <u>384 U.S. 436</u> (1966), the
United States Supreme Court concluded that the Fifth Amendment
protects persons in all settings in which their freedom is
curtailed in any significant manner from being compelled to
incriminate themselves. *Id.* at 467.  An individual under
investigation in custody and accused of a crime is under severe
pressure to speak where he would not otherwise do so. *Id.*   To
alleviate these pressures and to permit a person to exercise his
Fifth Amendment privilege against self-incrimination, the accused
must be adequately informed of his rights and the exercise of
those rights must be honored.  *Id.*   The well known *Miranda* rights

50

were derived from this case.[2]

Essentially, Hill asserts that he has a mental deficiency which caused him to be incompetent to understand his *Miranda* rights; that he was in special education classes throughout his public school years; that his I.Q. ranged from the low 70's to the high 40's in various I.Q. tests; that he received no intellectual support or encouragement for positive development when growing up; that Hill's neurological disability affected his ability to reason as well as his judgment, planning and problem solving; that as a result, he did not understand the concept of invoking a constitutional right and invoking a choice in regard to submitting to police interrogation.

In *Colorado v. Connelly*, <u>479 U.S. 157</u> (1986), the respondent suffered from a psychosis that interfered with his ability to make free and natural choices although he understood his *Miranda* rights. The Colorado courts suppressed statements that he made to the police on the basis that he was deprived of his due process rights under the Fourteenth Amendment. The Supreme Court reversed, holding that coercive police activity is a necessary predicate to the finding that a confession was not voluntary. *Id.*

---

[2]  The Fifth Amendment, part of the Bill of
Rights of the Constitution, protects an
individual against government action. In
*Malloy v. Hogan*, <u>378 U.S. 1, 6</u> (1964), the
Supreme Court held that the privilege against
self-incrimination applied to the states
through the Fourteenth Amendment.

51

AO 72A
(Rev.8/82)

at 17. A mental condition is a significant factor as to voluntariness, but a defendant's mental condition, by itself and apart from its relation to official coercion, should not dispose of the inquiry into constitutional voluntariness. *Id.* at 164. Furthermore, the voluntariness of a confession depends on the absence of police overreaching, not on whether there was free choice. *Id.* at 170. The choice to make a statement by one in police custody must be a free and deliberate choice rather than one obtained by intimidation, coercion or deception. *Id.* Mental retardation alone is insufficient to render a confession involuntary. *United States v. Macklin*, 900 F.2d 948, 952 (6th Cir. 1990), *cert. denied*, 498 U.S. 840 (1990).

The above discussion contains a general synopsis of the law involved in grounds one, two, three, nineteen and twenty. The Court will now address each of these grounds individually.

### FIRST GROUND FOR RELIEF

1. Petitioner Hill was seized from his home under false pretenses utilizing psychological ploys and taken to the Warren Police Department for questioning on Monday, September 15, 1985, in violation of his constitutional rights as guaranteed by the Fourth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Hill raised this claim on direct appeal. The Ohio Supreme Court found this argument to be without merit. The court stated:

Our view of the record, however, indicates that defendant voluntarily went with the police officers to the police station at the urging of his mother. Defendant was not taken into custody at the time the police officers brought him to the police station; the police had come to his home to try to

52

get him to go to the police station to sign the prior
statement he had made to Sergeant Steinbeck. The officers
also wanted to get a statement from defendant's mother
concerning defendant's whereabouts on the day of the Fife
murder. In addition, defendant indicates on the audiotape
made on September 16, 1985 that he was not under arrest when
he went to the police station and that he gave his statement
voluntarily.

*State v. Hill*, 64 Ohio St.3d at 320.

Title 28 U.S.C. § 2254(e)(1) provides:

In a proceeding instituted by an application for a writ of
habeas corpus by a person in custody pursuant to a judgment
of a State court, a determination of a factual issue made by
a State court shall be presumed to be correct. The applicant
shall have the burden of rebutting the presumption of
correctness by clear and convincing evidence.

Hill argues that the facts show that he did not want to go to

the police station but his mother told him he had to go. There is

no description of a psychological ploy to get Hill to the police

station. Hill has not demonstrated that the Ohio court's

conclusion was contrary to established constitutional law or that

it was based on an unreasonable determination of the facts.

Therefore, Hill's First Ground for Relief is without merit.

### SECOND GROUND FOR RELIEF

2. Petitioner's rights as guaranteed by the Fourth, Fifth,
Sixth, Eighth and Fourteenth Amendments to the United States
Constitution were violated when police officers promised him
that in exchange for his cooperation nothing bad would happen
to him and that nobody was going to hurt him, thereby
promising leniency, when in fact, Petitioner was convicted of
capital murder and sentenced to death.

53

AO 72A
(Rev.8/82)

On September 16, 1985, Hill was questioned for hours by as many as three officers at a time. One of the officers, Morris Hill, was Hill's uncle. His uncle, while questioning him alone, indicated that nobody wanted to hurt him and that nothing bad was going to happen to him. The petitioner asserts that this statement constituted a promise of leniency and any statements that he made were involuntary.

Detective Hill testified at Hill's suppression hearing. After two other detectives left the room, Detective Hill was alone with Petitioner Hill. Detective Hill stated:

> At that point in time, you know, I set [sic] there, and I tried to let Danny know that wasn't anyone going to hurt him. No one was going to do anything to him, but the fact that I know he was involved in the homicide, and I wanted to get the truth out of him. At that point in time, he looked at me and tears started to come from his eyes, he told me – he said, "I was there. I was in the field when he got murdered." When the young Fife kid got murdered.

The record shows that no one told Hill he would walk if he told the truth nor were any threats made against him if he refused to talk. This issue was raised by Hill on direct appeal to the state courts. The Supreme Court of Ohio found that his statements were admissible because there was nothing in the record that could be characterized as a plea-bargain. *State v. Hill*, 64 Ohio St.3d at 321. Just because he cooperated and made statements against his interests does not require a conclusion that there must have been coercion or some other improper conduct causing him to give that

54

statement. *United States v. Parker*, <u>997 F.2d 219</u>, 223 (6th Cir. 1993).

The Supreme Court of Ohio's decision on the merits was based on a reasonable determination of the facts presented in the state court proceedings. The evidence shows that Hill was aware of his *Miranda* rights and that he voluntarily spoke to the police. In fact, he approached the police about the murder before he was considered a suspect. There is nothing in the record to show that Hill's admissions were made in exchange for leniency. Ground Two is without merit.

### THIRD GROUND FOR RELIEF

3. As a result of his limited educational abilities and his limited comprehension of legal concepts and principles, Petitioner Hill was legally incompetent to participate in the legal system at all times herein; therefore, he was incompetent to waive his right to a jury trial and to waive his Miranda rights at the time of his interrogation by police in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The third ground for relief consists of two parts, incompetence to waive a jury trial and incompetence as to waiver of *Miranda* rights. The first contention was not raised on direct appeal. It was presented to the trial court in post-conviction proceedings which held that this claim was barred by the doctrine of *res judicata*. The court of appeals affirmed the trial court's decision on this issue. *State v. Hill*, <u>1995 WL 418683</u> at *4 (Ohio App. Dist. 11). The four-part test set forth in *Maupin v. Smith*, <u>785 F.2d at 138</u>, discussed above in detail applies to this issue.

55

Hill argued on direct appeal in the state court that his statements to the police were involuntary because he is mentally retarded. The Supreme Court of Ohio cited *Colorado v. Connelly, supra,* in finding that there was no evidence of police coercion or overreaching necessary for a finding of involuntariness of statements made by an interrogee with low mental aptitude. *State v. Hill,* 64 Ohio St. 3d at 318. The facts found by the state court were as follows:

> The record herein indicates that defendant made a statement to Sergeant Steinbeck after waiving his *Miranda* rights, but that Steinbeck apparently forgot to have defendant sign his transcribed statement. Subsequently, Steinbeck and Detective Hill went to defendant's home to have him sign the statement and have his mother make a statement concerning defendant's whereabouts on the day of the Fife murder. Defendant and his mother voluntarily went to the police station with the officers where he was again given his *Miranda* rights before and during the time he made some incriminating statements to the police officers concerning his presence at the murder.

Hill was given his *Miranda* rights many times. The Ohio Supreme Court noted that, although Hill had some mental deficiency, he had prior dealing with the criminal process and the mental deficiencies did not invalidate the voluntariness of his statements. *Id.*

The Court finds that there is no evidence that the state court decisions were contrary to established federal law or based on an unreasonable determination of the facts. Ground Three is without merit. 28 U.S.C. § 2254(d)(1) and (2).

56

## NINETEENTH AND TWENTIETH GROUNDS FOR RELIEF

19. Petitioner Hill was denied his rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution when his confession was taken without the procedural safeguards provided by said Amendments.

20. Petitioner's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were violated when he was subjected to numerous interrogations by at least three law enforcement officers, one of whom was his uncle, without the benefit of counsel, when the officers knew that Hill was a slow learner and therefore, susceptible to the pressures extended by authorities.

Hill argues that he was interrogated several times without counsel being present and without having been provided the required *Miranda* rights. Hill's uncle, Detective Morris Hill, was one of the officers present at Hill's interrogation. His testimony at a suppression hearing is credible and eliminates the theory that his nephew was coerced into confessing. Following is a pertinent part of Detective Hill's testimony at the suppression hearing:

Q. Have you dealt with him on a professional basis?

A. Yes, sir, I have.

Q. Been involved with giving him his Constitutional Rights in the past?

A. Yes, sir, that is correct.

Q. Approximately how many times has he been arrested by your police department?

A. Approximately 15 to 20 times.

Q. Approximately how many times did you give him his rights?

A. About four or five times I've given him his rights.

57

AO 72A
(Rev.8/82)

\*      \*      \*

Q. Okay. You've had the opportunity over the years to talk to him many times?

A. Yes sir, I have.

Q. Would you describe his intelligence to the Court?

A. I would describe his intelligence as far as being fairly intelligent and very street wise; as we would call slick, as far as the street is concerned.

Q. Okay. What do you mean by that?

A. That he's the type of young man that - you know, in the streets, he has the knowledge of whatever he does out in the street, getting into trouble, he's slick enough to get out of it.

Q. When you talked to him, has he, at times, got slick with you?

A. He has in the past, yes.

Q. And how about his relationship with you and his mother? How has that been when you're involved with policy [sic] work?

A. Well, his mother has called me on numerous occasions when he has been arrested at the Warren Police Department to go down and talk to him. This is when he was a juvenile.

Q. Have you done so?

A. Yes sir, I have.

\*      \*      \*

Q. On or about the 16th of September, 1985, did you have an occasion to go see your nephew at his house?

A. Yes sir, I did.

Q. And would you tell the Court when that was?

A. Yes, sir. It was approximately 9:30 on September the 16, 1985. I was asked to go along with Sergeant Steinbeck to my sister's residence, which is 1394 Fifth Street.

Q. And what was your purpose to go there?
A. Our purpose was to go to that residence and get Danny to

58

AO 72A
(Rev.8/82)

come to the police department to sign a statement that he had given to the police department on the 13th of September.

Q.  Did you have probable cause to arrest him at that time?

A.  No sir, we did not.

Q.  And would you tell the Court how you proceeded as to getting him to come down to the police station.

A.  Yes, sir.  At that time, like I said, approximately 9:30 A.M. that morning, we arrived at my sister's residence, which is, like I said, 1394 Fifth Street.  We went there.  We knocked on the door.  My sister came to the door.  At that point in time, I had advised my sister – I say, "Could   you get Danny up and have him come down to the station to  sign a statement that he had given to the police officers on the 13th."  At that time, she yelled upstairs. She said, Danny," she said, "get up!"  She said, "The police is down  here, and Morris is down here."  And at that point in time, he said, "I'm not going nowhere."  And at that time, my sister went halfway up the step, and she said, "I say get your ass up out of the bed.  You don't have anything to hide, so get down here!"  At that point in time, Danny came down the stairs with his shirt and pants on.  He came down, he went into the kitchen, and he got his tennis shoes and put them on, and at that point in time, him, along with his mother, we went down to the police station.

Q.  Did he make any protest to you about going down to the police station personally?

A.  No, sir.  At no time he made no protest to me.

Q.  And did you explain to him why you were asking him to come down?

A.  Yes, sir.  We advised him that the statement that he had gave officers on the 13th, we wanted him to come down to the police department to sign it.

        *        *        *

Q.  Now, you get to the police department, and where do you go?

A.  We went to Interview Room Number 1.

Q.  And when you say "we," who all –

A.  Along with Detective Steinbeck and Danny.  We had my

59

AO 72A
(Rev.8/82)

sister sit out front.

Q.  Now, did there come a time he was given his
Constitutional Rights?

A.  Yes, sir.  When I got him to the Interview Room at that
point in time, I said, "Danny," I said, "this is what I  want
you to understand.  I want you to understand this very
clearly."  I said, "I want you to understand what your rights
are."  I said, "At this time, you're not under arrest, but I
want to give you your rights just in case you would say
something that might incriminate you."  And at that point in
time, I gave him his rights verbally.

Q.  And what did he say as to his rights? Did he ask any
questions?  Did he indicate he understood or what?

A.  He advised me at that point in time that he understood
exactly what his rights were.

Q.  So, you indicated then you were going to ask some
questions or [sic] him?

A.  Yes, sir.

Q.  And did you tell him what you were going to ask questions
of him about?

A.  Yes, sir, I did.

Q.  And what did you tell him?

A.  I told him we were going to ask him questions about the
Fife homicide.

Q.  He protest about that?

A.  No, sir, he did not.
            *       *       *
Q.  So, after you gave him his rights, he signed this
statement?

A.  Yes, sir, he did..

Q.  By the way, can your nephew read and write?

A.  Yes, sir, he can.

Q.  Then what happened?

60

A.  After I advised him of his rights and he signed the statement, at that point in time, Sergeant Steinbeck and myself started questioning him about the homicide that took place behind the Valu-King on Palmyra Road.

       \*      \*      \*

Q.  What was said?  How was his attitude when you started questioning him?

A.  Well, his attitude was very cooperative, but you could tell as you talked to him that he was trying to deceive you, you know, in the way of trying to hide something.  You know, he continued to lie to us and tell us different things that we, at that point in time, would know it wasn't the truth.

Q.  Did you threaten him?

A.  No, sir, I did not.

Q.  Did you make any threats - I mean any promises to him?

A.  No, sir, I did not.

Q.  So, explain to the Court exactly how you proceeded to talk to him.

A.  As I proceeded to talk to him, I told Danny - I said "Danny, listen."  I said, "You got to understand one thing. At this point in time, I believe that you had something to do with the homicide that happened behind the Valu-King."   I said, "My mind, I know that you had something to do with it just because of the fact some of the crimes that you were involved in before made me believe this."  And I continued to talk to him just in that manner.

       \*      \*      \*

Q.  Okay.  And how long were you alone with him?

A.  I was along [sic] with him no more than a couple minutes at the most.

Q.  Would you tell the Court in your own words everything that happened for those couple of minutes?

A.  Yes, sir.  At that point in time, you know, I set [sic] there, and I tried to let Danny ~~know that wasn't~~ anyone gong [sic] to hurt him.  No one was going to do anything to him, but the fact that I know that he was involved in the homicide, and I wanted to get the truth out of him.  At that point in time, he looked at me and tears started to come from his eyes.  When tears started coming from his eyes, he told

61

me – he said "I was there. I was in the field when he got murdered." When the young Fife kid got murdered.

Q. Those were the words of your nephew?

A. Those were the words of my nephew.

            *      *      *

Q. Did there come a time he would ask for a lawyer?

A. No, sir, at no given time did he ask for an attorney.

Q. Did there come a time when he asked to leave?

A. No, sir, he did not.

Q. Come a time that he asked to see his mother or wanted to remain silent?

A. Not to remain silent at no time, no.

Q. Was there anything he requested of you that you refused during that period of time and up until that period of time that Monday?

A. No, no, sir.

            *      *      *

Q. Now, I'm going to hand you what's been marked as Exhibit Number 3 for the State of Ohio in this matter, and would you tell the Court whether or not you recognize that copy of a document.

A. Yes. This is the waiver of rights that Danny Lee Hill signed.

Q. And would you tell the Court how that was given to him.

A. I – I first read the rights to Danny from this paper, and at that point in time, I turned the paper around to him, and I said, "Danny, do you understand this?" And I gave it to him to look at, and at that point in time, I'm not sure whether he read it. He looked at it and signed his name to the bottom of it.

Q. You read that whole piece of paper?

A. That is correct, sir.

Q. And that was recorded?

62

AO 72A
(Rev.8/82)

A.   That is correct.

Q.   And he signed it and waived his rights in your presence?

A.   Yes, sir, that is correct.

Q.   How long after that did you continue the recording of Danny Hill's statement?

A.   Right after he signed it and everything, we continued.

        *        *        *

Q.   What time was that?

A.   The recording started at approximately 11:30.

Q.   And what time did you give him his rights?

A.   We gave him his rights at 11:55.

Q.   And you already testified you had verbally given him his rights about 10:00 o'clock or a little after?

A.   That is correct, sir.

Q.   What happens next?

A.   After we got finished with the recording, at that point in time, his mother, she came in and talked to him, and then he was taken to a room where we had a videotape setup, and at that point in time, he was taped with the video.

Q.   And did he voluntarily agree to have his statement videotaped?

A.   Yes, sir, he did.

Q.   Make any requests to see a lawyer?

A.   No, sir, he did not.

Q.   By the way, did his mother at any time ask to have a lawyer see him?

A.   No, sir, she did not.

        *        *        *

Q.   Was your nephew at anytime mistreated, coerced, promised anything to cause him to change his mind and get something off his mind?

63

A.  Not to my knowledge, sir.

This testimony of Detective Hill shows that petitioner Hill's statements were not the result of police coercion.  Hill had been arrested numerous times and was accustomed to dealing with the police.  On other occasions his uncle had read him his rights.  Hill's decision to make a statement appears to be a deliberate choice free from coercion, or intimidation.  The Nineteenth and Twentieth Grounds for Relief are without merit.

### FOURTH GROUND FOR RELIEF

4.  When the trial court judge had, or should have had a "bona fide" doubt as to Petitioner's competency, the Court had an obligation to hold a competency hearing to investigate the Petitioner's rational understanding of the proceedings. Failure to do so violated the Petitioner's constitutional rights as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

This issue was raised under state law on direct appeal.  Hill argued in the state court that the trial court should have held a hearing as to his alleged incompetence.  The United States Supreme Court ruled that 28 U.S.C. § 2254 requires a federal habeas petitioner to allow the state a "fair opportunity to apply controlling legal principles to the facts concerning his constitutional claim." *Picard v. Connor*, 404 US. 270, 276-77 (1971).  A state law claim is insufficient. *Anderson v. Harless*, 459 U.S. 4, 6 (1982).  A citation to a state court decision predicated on state law will, not ordinarily, alert the reviewing court of a potential federal claim. *Picard*, 404 U.S. at 276.  The

64

state court must be presented with the same claim that is submitted to the federal court. *Id.*

Hill also presented this issue in his post-conviction proceedings. The court reiterated that Hill had a mental deficiency but that he had experience with the criminal justice system so that he was not a malleable victim of police suggestion. The court held that the trial court properly dismissed this claim under *res judicata*. *State v. Hill*, 1995 WL 418683 at *4-5. The Fourth Ground for Relief is procedurally defaulted under *Maupin v. Smith*, 785 F.2d at 1381.

### FIFTH GROUND FOR RELIEF

5. Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were denied when the court did not determine on the record that he knowingly, intelligently and voluntarily waived his right to a jury trial.

The fifth ground for relief was raised on direct appeal. The Supreme Court of Ohio, based on state law, found that the trial court correctly determined that Hill voluntarily waived his right to a jury trial.

On January 7, 1986, the trial court held a hearing concerning Hill's waiver of his right to trial by jury. The judge explained the differences between a jury trial and a trial before a three judge panel. Hill acknowledged that he understood the court's explanation.

65

The Sixth Circuit Court of Appeals has determined that there is no constitutional requirement that a court conduct a hearing with a defendant prior to a jury trial waiver. *United States v. Martin*, 704 F.2d 267, 271 (6th Cir. 1983); *United States v. Sammons*, 918 F.2d 592, 596 (6th Cir. 1990), *cert. denied,* 510 U.S. 1204 (1994). An intelligent waiver occurs if the defendant is aware that a jury consists of 12 members of the community, that he may participate in the selection of the jurors, the verdict by the jurors must be unanimous and that a judge alone will decide guilt or innocence if he waives a jury. *United States v. Martin*, 704 F.2d at 273. Nevertheless, this knowledge is not constitutionally required. The Fifth Ground for Relief is without merit.

### SIXTH GROUND FOR RELIEF

6. Petitioner Hill was denied effective assistance of counsel at the fact finding phase of his trial as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

The sixth claim for relief contains seven reasons why defense counsel were ineffective. For convenience, they will be separated into groups requiring similar conclusions of law.

Subgrounds (A) and (B) are as follows:

(A) Petitioner Hill was denied effective assistance of counsel at the fact finding phase of his trial when counsel failed to request and insist upon a record being made of all sidebars and in-chamber conferences so as to preserve the record for future court review.

66

(B)  Counsel failed to pursue his motion for change of venue.

Neither of these grounds were raised on direct appeal nor in post-conviction proceedings.[3]  Failure to present these issues requires application of the four-part test prescribed in *Maupin v. Smith*, 705 F.2d at 138.  As the court previously concluded, all four prongs of *Maupin* have been satisfied.

The Sixth Amendment provides that one of the elements of a fair criminal trial is the right of a defendant to have the assistance of counsel for his defense. *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  The right to counsel is crucial because our adversarial system requires access to counsel's skill and knowledge necessary for the defense of a criminal charge.  *Id.*, 466 U.S. at 686.  Because assistance of counsel is so important, an accused is entitled to have counsel appointed if retained counsel cannot be obtained. *Id.*  It follows that the right to counsel means the right to effective assistance of counsel. *Id.*, citing *McMann v. Richardson*, 397 U.S. 759, 771 (1970).

In *Strickland*, the United States Supreme Court established a two-part test against which counsel's performance must be evaluated.  First, the defendant must establish that counsel's performance was so substandard that it "fell below an objective

---

[3]Hill did allege in post-conviction proceedings that he was prejudiced by the failure of the trial court to record all proceedings.  It did not involve ineffective assistance of counsel.  In any event, the court of appeals held that it should have been raised on direct appeal and was barred by *res judicata*.

67

standard of reasonableness." *Id.*, at 687. Second, it must be

established that there was a reasonable probability that counsel's

errors affected the outcome of the trial. *Id.* The petitioner must

show that counsel's errors were so serious he was deprived of a

fair trial. *Id.*

> The *Strickland* court stated:

> Judicial scrutiny of counsel's performance must be highly
> deferential. It is all too tempting for a defendant to
> secondguess counsel's assistance after conviction or adverse
> sentence, and it is all too easy for a court, examining
> counsel's defense afer it has proved unsuccessful, to
> conclude that a particular act or omission of counsel was
> unreasonable. *Id.* at 689.

> In order to avoid the temptation to secondguess, the

reviewing "court must indulge a strong presumption that counsel's

conduct falls within a wide range of reasonable professional

assistance." *Id.* There is a presumption that, under the

circumstances, the defense attorney's actions might be considered

sound trial strategy. *Id.* See *Groseclose v. Bell*, 130 F.3d 1161,

1167 (6th Cir. 1997), *cert. denied,* 118 S.Ct. 1826 (1998).

> The following four subgrounds were raised on direct appeal in

*State v. Hill*, 64 Ohio St.3d at 330:

> (C) Counsel failed to attempt to seat a jury prior to
> waiving Petitioner's right to a jury trial.

> (D) Counsel failed to insure that Petitioner understood
> various ramifications of waiving his right to a jury trial
> and how same would affect his rights at trial and on appeal.

> (E) Counsel failed to object to an officer's testimony that
> he believed that Petitioner was lying during questioning by
> police.

68

AO 72A
(Rev.8/82)

(F)  Counsel failed to object to the Prosecutor's improper
closing argument or to move for mistrial based on said
arguments.

Hill's counsel did not address these issues in their proposed
findings of fact and conclusions of law.  Only the first two
issues were discussed briefly in Hill's brief submitted in his
direct appeal to the Supreme Court of Ohio.  As to issue (C), he
argued that waiving the jury was premature.  His attorney should
have tried to impanel a jury to determine if a change of venue was
necessary.  Further, since any verdict had to be unanimous, one
juror could affect the outcome of the proceedings.

A change of venue would be irrelevant if the trial was
conducted by a three judge panel.  There would be no need to
impanel a jury for that purpose.  In any criminal case, there is
always a chance that one juror will disagree with the other
eleven.  Counsel would always be considered ineffective when
trying a criminal case to the court.  On January 7, 1986, a
hearing was conducted by the trial court concerning Hill's waiver
of a jury trial.  After an explanation of the consequences of a
jury waiver, the court ordered a recess in order for Hill and his
attorney to discuss the situation.  Upon return, Hill acknowledged
that he reviewed the waiver form and that he wanted to be tried by
a three judge panel.  Hill does not refute that such conversation
with his attorney occurred.  Considering the entire trial record,
the evidence was certainly sufficient to convict Hill.  He has not
shown a reasonable probability that but for this alleged error,

69

the outcome would have been different.  The issue is not whether the defense attorney was inadequate, "rather it is whether he was so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992), *cert. denied*, 508 U.S. 975 (1993).

The Supreme Court of Ohio reviewed the instances of ineffective assistance of counsel in accordance with *Strickland* and found no prejudice compelling reversal of Hill's conviction and sentence.  This Court finds that the Supreme Court of Ohio's decision was a reasonable application of federal constitutional law and based on a reasonable determination of the facts.

(G).  Counsel failed to move for a judgment of acquittal at the close of the state's case.

This issue was not raised on direct appeal in the state court but was later presented in post-conviction proceedings.  The court of appeals applied *Strickland* and determined that Hill was not prejudiced by the alleged omission and also ruled that the trial court properly dismissed the matter under *res judicata*.  The four-part test set forth in *Maupin v. Smith*, 785 F.2d at 138, discussed above in detail, applies to this issue.  The Sixth Ground for Relief is without merit.

### SEVENTH GROUND FOR RELIEF

7.  At Petitioner's trial the court admitted testimony and evidence which denied Hill of his due process, equal protection and impartial jury rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

70

Hill contends that the trial court improperly permitted an ambulance attendant who was at the scene when the victim was transported to the hospital to testify that the "scene was one of the most gruesome things [I've] ever seen." Also a broom stick admitted by the court was more prejudicial than probative.

The Supreme Court of Ohio made the following findings on this contention:

> The first example of error raised by defendant concerns the testimony of Raleigh Hughes, an ambulance attendant who arrived at the murder scene, who commented on the condition of the victim's body. In summarizing his impression of what he saw, Hughes stated that it was "one of the most gruesome things I've ever seen."

> While Hughes's testimony in this respect should probably not have been admitted, there has been no showing of prejudice that overcomes the presumption that the three-judge panel considered only the relevant, nonprejudicial evidence submitted. [citation omitted]

> Defendant next challenges the admission of the broomstick into evidence by arguing that there was no probative value in its admission. However, we believe that admission of the stick was properly justified for several reasons: (1) Donald Allgood testified that he saw defendant "flick" a stick into the woods at the time and near the place where the homicide took place; (2) defendant stated on tape that Tim Combs stuck "[a] stick * * * [l]ike a broom handle thing" in the victim's rectal opening; and (3) Dr. Adelman testified that the shape of the stick in comparison to the injury inflicted in the victim's rectum was "very similar to a key in a lock." Given the foregoing testimony we find that the stick was properly admitted into evidence during the trial.

*State v. Hill*, 64 Ohio St.3d at 323-24.

This ground concerns evidentiary rulings under state law. Errors involving evidentiary matters, especially rulings regarding the admission or exclusion of evidence, usually are not questioned

71

in a federal habeas proceeding. *Waters v. Kassulke*, <u>916 F.2d 329,</u> <u>335</u> (6th Cir. 1990); *Cooper v. Sowders*, <u>837 F.2d 284</u>, 286 (6th Cir. 1988). Furthermore, in a nonjury trial introduction of incompetent evidence is not consequential in the absence of an affirmative showing of prejudice. *United States v. Joseph*, <u>781</u> <u>F.2d 549</u>, 552 (6th Cir. 1986); *United States v. McCarthy*, <u>470 F.2d</u> <u>222</u>, 224 (6th Cir. 1972).

The Ohio Supreme Court found that there was no showing of prejudice to overcome a presumption that the three judge panel considered only relevant nonprejudicial evidence. Federal law is similar. The Court finds that the ruling by the Supreme Court of Ohio was not an unreasonable application of clearly established federal law or that it resulted in a decision based on an unreasonable determination of the facts. <u>28 U.S.C. § 2254(d)</u>. The Seventh Ground for Relief is without merit.

## EIGHTH AND NINTH GROUNDS FOR RELIEF

8. The state's failure to provide timely discovery of photographs utilized by a state expert witness in formulating an opinion elicited at trial deprived Petitioner Hill of his rights of due process, effective assistance of counsel, and confrontation as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

9. The state failed to provide timely discovery of numerous exhibits thereby depriving the Petitioner of his rights of due process, effective assistance of counsel and confrontation as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The State provided discovery in response to Hill's motion but it failed to provide counsel access to certain photographs

72

utilized by an expert witness in formulating his opinion. The opinion of the expert that certain bite marks on the victim's penis were made by Hill rested on these photographs. Ground nine concerns the testimony of Donald Allgood, a witness who identified Hill from a photo array. Hill asserts that his constitutional rights were violated because the state failed to provide his counsel with the actual photo array thereby depriving him of the opportunity to contest the identification process. These grounds were raised before the Supreme Court of Ohio as Proposition of Law Number 16. *State v. Hill*, <u>64 Ohio St.3d at 327-28</u>.

The Supreme Court of Ohio found that Hill's rights were not violated because the photographs of the victim's penis and the photo array were not material. The Court stated:

> In *State v. Wickline* (1990), <u>50 Ohio St.3d 114</u>, 117, <u>552 N.E.2d 913</u>, this court reaffirmed the standard of "materiality" set forth in *State v. Johnston* (1988), <u>39 Ohio St.3d 48, 61</u>, <u>529 N.E.2d 898, 911</u>, paragraph five of the syllabus:
>
> > "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense. (*United States v. Bagley*, * * * [1984], <u>473 U.S. 667</u> . . . followed)"
>
> Upon reviewing the items enumerated by defendant, we find that his contentions in this respect are without merit. With regard to the pictures used by Dr. Levine, we point out that

73

he was defendant's expert witness and it is undisputed the
defense was aware, through discovery, that Dr. Levine
concluded the bite marks could have been made by the
defendant. Even if defendant had had the photographs used by
Dr. Levine, the outcome of the trial would not have been
different.

We also discern no prejudice to defendant from the state's
failure to supply the photo array used by Donald Allgood.
The photo array was not introduced at trial and was not
"material" under the *Johnston* test. *Id.* at 327.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme

Court held that the government's failure to provide the defense

with exculpatory material violated due process. But there is no

constitutional right to discovery in a criminal case and *Brady* did

not create one. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).

*Madsen v. Dormire*, 137 F.3d 602, 605 (8th Cir. 1998), *cert.*

*denied,* 119 S.Ct. 247 (1998). *Brady* did create a constitutional

right to exculpatory evidence but not to all evidence that might

be helpful in preparing for trial. *Gray v. Thompson*, 58 F.3d 59,

65 (4th Cir. 1995), *vacated on other grounds, Gray v. Netherland,*

518 U.S. 152 (1996).

The Supreme Court of Ohio determined using federal law that

the photograph of the victim and the photo array were not material

and the state's failure to provide them to the defense was not

prejudicial. *United States v. Bagley.* Its decision was not an

unreasonable application of clearly established federal law nor

did it result in a decision based on an unreasonable determination

of the facts. 28 U.S.C. § 2254(d). The Eighth and Ninth Grounds

for Relief are without merit.

### TENTH GROUND FOR RELIEF

10.   Petitioner Hill was denied his right to a fair trial and an impartial fact-finder as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the State of Ohio engaged in prosecutorial misconduct during closing arguments in both the fact-finding and penalty phases of the trial.

Hill raised this issue on direct appeal to the state court

based on the same statements presented to the federal court.[4]

---

[4]The alleged statements constituting prosecutorial misconduct are as follows:
1.   "You know, back on September 10th, our community had a little boy, and we've had a lot of little boys in our community, but this 12-year old boy we have not talked about too much.  We've dealt with him in an abstraction.  He hasn't been here.  And the Court is aware of the leaps and bounds and the rights of victims.  I'm not trying to ignore the procedural rights of the defendants in cases, but sometimes we forget and don't pay attention when we talk about Constitutional Rights of the defendant, and we don't, in the balance – how about Raymond Fife's right to live?  How about his Constitutional Rights to be here today, to be in school, to celebrate his 13th birthday with his parents."
2.   "The question that is to be determined by this Court is whether that man [indicating to the defendant] and his buddy, Timothy Combs, engaged in a criminal enterprise wherein he destroyed and devoured a little boy on the 10th day of September of 1985.  * * *  I can't imagine in my 10 years as being prosecutor that this could happen."
3.   "Now, one witness that testified.  Candyce Jenkins * * * describes the defendant as an 'animal.'  The other one hatred."
4.   "* * * [B]ut he [the defendant] followed him [Timothy Combs] back to the scene of the crime to look for evidence to destroy so they could cover up their heinous, unbelievable, animalistic behavior.  He would make the Marquis deSade proud!"
5.   "Now, we know on September 10th, 1985, the year of our Lord – and I'm going to go through, as I view the evidence – as Mr. Kontos and I see the facts to be and the truth to be."
6.   "Maybe Mr. Lewis will argue that Raymond wasn't on the bike.  It didn't have fingerprints.  Well, there's an

75

AO 72A
(Rev.8/82)

explanation, you don't necessarily have fingerprints on everything. And rain will affect fingerprints as it will affect blood."

7. "Who does this Court feel is more qualified? Mr. Dehus or Mr. Gelfius on the charcoal lighter as to paint thinner and hydrocarbons? I thought that his testimony was much more credible. I don't feel Mr. Dehus; it couldn't break down; very unlikely, and I don't think that's the case. I think that the witness from the Arson Lab who deals strictly with arson is the most credible witness in this case, and that substantiates the State's case."

8. "No one wants to testify against his brother, just like Morris Hill didn't want to testify against his nephew."

9. "Finally, Your Honors, to get this poor, dumb boy who really wouldn't do anything, who tried to sexually attack Mr. Melius, tried to put his mouth in the boy's penis, grabbed his penis, we know he did violently rape Mary Ann Brison in the same wooded area. Talked about how he talked hateful to her. We know what he did to Candyce Jenkins; had anal sex, oral sex, vaginal sex, once again, anal sex, had a knife and threatened to cut her vagina out; bit her on the breast. Seems to be his calling card; the bite. And when she screamed and yelled that it hurt, he said, 'Good! I want it to hurt.' And that's what this case is about. This case isn't just about a killing. This case is about an individual who thrives and relishes on inflicting pain and torture to other human beings."

10. "Raymond Fife was a 12-year-old boy; very active and vibrant, who was caught in the middle of a living hell caused by this defendant. Raymond Fife had no justice while he was living, but he demands justice now even in his absence, and justice demands, Your Honors, that you return a verdict of guilty.  * * *"

11. "The reason that it is so clear is because the defense has not shown by or has not substantiated or brought about any mitigating factors in this case, and it's very clear, aggravating circumstances, especially three of them, will clearly outweigh the absence of any mitigation."

12. "Well, I'd like to cite a few days that they weren't together. February 8th, 1984, when this defendant raped Mary Ann Brison. They weren't together March 3rd, 1984, when this defendant raped and brutalized Candyce Jenkins. They weren't together April 1984 through April 1985 when this defendant was incarcerated."

13. "In addition to that, he says he has difficulty with his motor skills between the right hand and left hand and he's not very good at that. He didn't have any problem grabbing

76

AO 72A
(Rev.8/82)

A prosecutor's conduct does not amount to a constitutional violation unless the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 179 (1986), *quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974); *Webster v. Rees*, 729 F.2d 1078, 1080-81 (6th Cir. 1984). The Sixth Circuit

---

women that I told you about before. Grabbing them with his left hand and the knife in the right hand while he sexually assaulted them."

14. "Now, there was a witness that the State would have wanted to present in this case, but unfortunately we could not call him. Raymond Fife. He would have been able to testify as to what happened that particular day. He would have been able to tell all of us, including this defendant, how he felt when he was abducted and helpless and felt doomed because he had no opportunity to escape. He would have been able to tell us what it felt like to be punched and continually kicked; what it felt like to be strangled so severely that he'd be gasping for breath. He'd be able to describe the pain involved and sexual molestation. He'd also be able to tell you and tell all of us what it would feel like – the indescribable pain when your flesh is burning and you're helpless to do anything about it. And finally, he'd be able to tell us what it would be like to have a stick rammed up your rectal cavity so deeply and so severely that it perforates through the rectum and goes into the urinary bladder. But he's not here to testify about that thanks to this defendant."

"There's some other things that Raymond Fife can't come here and testify about either. He can't testify about how he misses his family, about how he misses his friends in the Scout group, about how he'd like to be with his father in the backyard feeding the birds, how he'd like to be able to live and love and share his love with his family and friends, and he will never be able to do that because of this defendant; this manifestation of evil, this anomaly to mankind, this disgrace to mankind sitting at the end of that table took care of that! And the most commentary about the makeup of this defendant is the manner of the death of Raymond Fife.

77

uses a four-part test in determining whether prosecutorial misconduct has caused a denial of due process. The court must consider the degree to which the remarks complained of have a tendency to mislead the jury and prejudice the accused; whether the prosecutor's statements were isolated or extreme; whether they were deliberately placed before the jury; and the strength of the evidence establishing guilt of the accused. *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 19990). A prosecutor must have considerable latitude in presenting an argument to a jury and reversal should not occur unless the prosecutor's inappropriate actions resulted in prejudicial error. *Id.* at 670. The most important consideration is the fairness of the trial, not the culpability of the prosecutor. *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993), *cert denied,* 510 U.S. 1201 (1994). The prosecutor's misconduct must have a "substantial and injurious effect or influence upon the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

This Court has reviewed the statements alleged to have constituted prosecutorial misconduct and finds no prejudicial error. This case was tried before a three judge panel who presumably was able to remember the evidence presented at trial and not be misled by any of the prosecutor's statements. Most of the statements were harmless. In Statement Number 14, the prosecutor predicted what the victim would have said if he could

78

have testified.  Again, there was no jury.  Three judges should have been able to disregard any intended undue influence.  This Court finds that the prosecutor's conduct did not render Hill's trial unfair or prejudicial.

The Ohio Supreme Court determined that no prejudicial or plain error occurred.  In addition, the court noted that in a bench trial in a criminal case, the court is able to consider only the relevant, material and competent evidence in arriving at its judgment. *State v. Hill*, 64 Ohio St.3d at 330.

The Ohio Supreme Court's decision was not an unreasonable application of clearly established law nor did it result in a decision based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  The Tenth Ground for Relief has no merit.

### ELEVENTH GROUND FOR RELIEF

11. Petitioner Hill was denied the effective assistance of counsel at the mitigation phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

> (A)  Petitioner Hill was denied effective assistance of counsel when trial counsel failed to have appropriate expert testimony presented at the trial during the mitigation phase.

> (B)  Trial counsel failed to secure expert assistance that could explain the dynamics of the accused's environment and how it led him to commit the crime in question.

> (C)  Trial counsel also failed to secure psychological experts that could explain to the court the various learning problems Petitioner had and how this would contribute to the matter before the court.

79

(D) By trial counsels' failure to secure appropriate witnesses, Petitioner was denied his right to effective assistance of counsel as guaranteed by the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution.

The eleventh ground for relief was not raised on direct appeal in the state court but appears to have been presented in post-conviction proceedings to the trial court which found that it could have been raised on direct appeal and was barred by *res judicata*. These contentions do not seem to have been raised in later appeals.[5] In any event, procedural default occurred. The four-part test set forth in *Maupin v. Smith*, 785 F.2d at 138, discussed above in detail applies to this ground. Thus, the Eleventh Ground for Relief does not warrant relief.

### TWELFTH GROUND FOR RELIEF

12. Petitioner's right to be free from cruel and unusual punishment and his right to due process of law as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution were violated when the Ohio sentencing scheme requires a mandatory sentence of death when a three judge panel finds that the aggravating circumstances outweigh the mitigating circumstances.

The petitioner asserts that under Ohio law, if a three judge panel finds that the statutory aggravating factors outweigh mitigating factors beyond a reasonable doubt, the panel must impose a death sentence. This scheme allegedly denies Hill the

---

[5]The Respondent asserts that these issues were contained in Petitioner's eighth ground for relief in post-conviction proceedings before the Ohio appellate court. Examination of the record shows the assertion is not correct.

80

AO 72A
(Rev.8/82)

same sentencing alternatives available to a defendant whose case is tried to a jury. Petitioner argues that the sentencing process must permit consideration of the character and record of the defendant and allow the trier of fact to consider sentencing alternatives. Hill further argues that the three judge panel must make an individualized determination of the appropriateness of the death sentence and not be required to impose the death penalty even though the aggravating circumstances outweigh the mitigating factors. This argument was raised on direct appeal in the state court, but Hill has not addressed this ground in his proposed findings of fact and conclusions of law. *State v. Hill*, 64 Ohio St.3d at 333.

In *Boyde v. California*, 494 U.S. 370, 377 (1990), Boyde argued that the jury must have the freedom to decline to impose the death penalty even if they decide that the aggravating circumstances outweigh the mitigating factors. The Supreme Court determined that the constitution does not require unfettered sentencing discretion in the jury. States may freely enact statutes concerning consideration of mitigating circumstances to achieve more rational and equitable sentences.

The Supreme Court of Ohio found that the Ohio statutes require the sentencing authority to focus on the particular nature of the crime while allowing the accused to present a broad range of specified and unspecified factors in mitigation of the

81

Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus
Exhibit G
85 of 213

imposition of the death sentence. *State v. Hill*, 64 Ohio St.3d at 333, *citing State v. Jenkins*, 15 Ohio St.3d at 174. The Supreme Court of Ohio's ruling on the merits was not an unreasonable application of clearly established law nor did it result in an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Based on *Boyde v. California* and the Ohio Supreme Court's ruling in *State v. Hill*, 64 Ohio St.3d at 333, the Court finds this ground for relief to be without merit.

### THIRTEENTH GROUND FOR RELIEF

13. When the three judge panel failed to consider or give weight to all of the evidence petitioner presented in mitigation, Hill was denied his constitutional rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

In his brief before the Ohio Supreme Court, Hill stated that the trial court did not consider his possible brain damage, his low mentality and his good institutional record. (Ex. M at 165). The Ohio Supreme Court made a careful review and found that the trial court considered all mitigating factors presented by Hill, and articulated the reason each was outweighed by the aggravating circumstances beyond a reasonable doubt. It concluded that the court complied with R.C. § 2929.03(F). Surely, the Ohio Supreme Court considered the three omissions submitted by Hill in his brief in making its determination. Brain damage and low mentality are related. The court considered this point when independently weighing the aggravating circumstances against the mitigating

82

factors. *Id.* at 334. Even if not considered, the fact that Hill had a good institutional record would not make a difference to the court in its determination.

This Court finds that the Ohio Supreme Court's ruling was not an unreasonable application of clearly established law nor did it result in an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The Thirteenth Ground for Relief has no merit.

### FOURTEENTH GROUND FOR RELIEF

14. Ohio's statutory provisions governing the importance of the death penalty do not meet the prescribed constitutional requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

In proposition of law twenty-four before the Supreme Court of Ohio, Hill argued that the death penalty scheme established in R.C. §§ 2903.01 and 2929.02, *et seq.*, violates the United States and Ohio Constitutions both generally and as applied to the defendant. The Court stated:

> The specific claims of unconstitutionality by defendant have been rejected by this court in numerous cases. See, *e.g.*, *Jenkins, Buell* and *Lott, supra*. Accordingly, we reaffirm the constitutionality of Ohio's death penalty scheme both facially and as applied to defendant, especially since defendant proffers no compelling reason as to why the death penalty scheme is unconstitutional as applied to him. Therefore, we overrule defendant's twenty-fourth proposition of law.

Hill has now submitted to this court various reasons why the Ohio death penalty statutes are unconstitutional. All are without merit.

83

AO 72A
(Rev.8'82)

The United States Supreme Court discussed the constitutionality of the death penalty in *Gregg v. Georgia*, 428 U.S.153 (1976). The constitution recognizes the existence of capital punishment. The Fifth Amendment begins, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment of a Grand Jury . . ." *Id.* at 177. The Fourteenth Amendment, enacted at a later time, contemplated capital punishment in stating that "no state shall deprive any person of life, liberty, or property" without due process of law. *Id.* There are two aspects to consider in determining whether punishment is excessive: The punishment must not involve the unnecessary and wanton infliction of pain. Second, the punishment must not be grossly out of proportion to the severity of the crime. *Id.* at 173.

The general argument against capital punishment is that standards of decency no longer tolerate it. *Id.* at 179. However, as of 1970, five states had enacted new penalty statutes that have included the factors to be weighed and the procedures to be used in deciding when to impose the death sentence or by making the death penalty mandatory for specific offenses. *Id.* at 179-80. At least, the elected representatives of the people approve of it. *Id.* at 180-81.

The Supreme Court had held that even though society has accepted capital punishment, it still must agree with the concept

84

AO 72A
(Rev.8/82)

of human dignity. *Id.* at 182. The purposes of the death penalty are retribution and deterrence. "Capital punishment is an expression of society's moral outrage at particularly offensive conduct." *Id.* Retribution may no longer be the most important factor of the death penalty, but it is not inconsistent with human dignity. *Id.* Capital punishment may be appropriate in that society may believe that certain crimes are so grievous an affront to the community that the death sentence may be the only appropriate sanction. *Id.* at 184.

There have been many studies as to whether capital punishment is a deterrent to crime. The results have been inconclusive. *Id.* at 184-85. The Supreme Court opined that the value of deterrence is a matter for the state legislatures which can evaluate the results of the various studies and apply them to local conditions. *Id.* at 186.

Hill argues that the death penalty denies equal protection since it can be arbitrarily applied.

A state may constitutionally impose the death penalty as long as the sentencing authority is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action in imposing sentences." *Zant v. Stephens*, 462 U.S. 862, 874 (193). The aggravating circumstances satisfy this criteria. In *Jurek v. Texas*, 428 U.S. 262, 273 (1976), the Supreme Court held that by narrowing the class of persons eligible for the death penalty

85

through the finding of aggravating circumstances while in consideration of mitigating factors satisfies that criteria. The capital procedures in the State of Texas guided and focused the "jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose the death sentence." *Id.* at 274.

In *Proffitt v. Florida*, 428 U.S. 242 (1976), the court stated:

> While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, * * * the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.

In Ohio adequate guidance to prevent arbitrariness is provided by R.C. § 2929.03((D)(2). R.C. § 2929.03(D)(2) provides:

> Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the defender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding the jury shall recommend that the offender be sentenced (a) to life imprisonment without parole, life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

Hill contends Ohio's proportionality review is unconstitutional.

86

Proportionality review is not constitutionally required. *Pulley v. Harris*, <u>465 U.S. 37</u> (1984). There are various factors which minimize the risk of arbitrary and capricious sentencing such as bifurcated proceedings, the limited number of chargeable capital crimes, the requirement that at least one aggravating circumstance be found to exist and consideration of a broad range of mitigating circumstances. *State v. Jenkins*, <u>15 Ohio St.3d 164</u>, 176 (1984), *cert. denied,* 472 U.S. 1032 (1985).

The purpose of proportionality review is to ensure that sentences are not imposed arbitrarily, capriciously and indiscriminately. *Id.* The state of Ohio has a system that enables the Ohio Supreme Court to obtain a vast quantity of information with which to effect proportionality review, including data pertinent to all capital indictments, the sentence imposed on the defendant, whether or not a plea is entered and whether the indictment or a verdict is imposed by the sentencing authority. *Id. See* R.C. § 2929.021. The Ohio Supreme Court determined that information from a jury is not necessary for the court to decide whether the imposition of a death sentence is disproportionate to sentences imposed for similarly prescribed courses of conduct. *Id. State v. Jenkins*, 15 Ohio St.3d. at 177.

In summary, since proportionality review is not constitutionally required and Ohio has a satisfactory system to review proportionality, this issue is without merit.

87

Next, Hill asserts that the requirement that mitigating circumstances be shown by a preponderance of the evidence is unconstitutional. This argument is without merit simply because there is no constitutional requirement that a death penalty scheme contain a particular standard of proof for the consideration of mitigating circumstances. *See Walton v. Arizona*, 497 U.S. 639, 650 (1990); *Skaggs v. Parker*, 27 F.Supp.2d 952, 996-99 (W.D. Ky. 1998). This conclusion satisfies Hill's related contention that this burden of proof prevents the sentencer from considering relevant mitigating factors, or considering the totality of the mitigating circumstances.

Hill complains that failure to require a jury or court to make findings of mitigating circumstances precludes a meaningful review for proportionality purposes.

The United States Supreme Court recently decided that there is no constitutional requirement that a jury or trial court explain mitigating circumstances in death penalty cases. *Buchanan v. Angeline*, 118 S.Ct. 757, 761-62 (1998). As long as the jury knows that it may consider mitigating factors in conjunction with aggravating circumstances when considering the appropriate penalty, there is no constitutional violation. *Id.* *See Jeffries v. Blodgett*, 5 F.3d 1180, 1196-97 (9th Cir. 1993); *Skaggs v. Parker*, 27 F.Supp.2d at 997.

88

Hill next argues that the Ohio death penalty scheme is unconstitutional in that where no mitigation is presented the statute requires a mandatory death sentence. In *Blystone v. Pennsylvania*, <u>494 U.S. 299</u> (1990), the jury at the petitioner's sentencing found one aggravating circumstance, *i.e.,* that petitioner committed a killing while in the perpetration of a robbery. No mitigating circumstances were found. He contended that the mandatory imposition of the death sentence violated the Eighth Amendment requirement of individualized sentencing since the jury was precluded from considering whether the severity of his aggravating circumstances warranted the death penalty. *Id.* at 306. The court held that the Eighth Amendment does not require that aggravated circumstances be further refined or weighed by a jury. Furthermore, the presence of aggravating circumstances limits the class of death eligible defendants. *Id.* at 306-07.

The same reasoning can be applied to Hill's assertion that the Ohio scheme impermissively devalues the importance of mitigation because no method exists to ensure that proper weighing and consideration of the evidence occurs.

Ohio Revised Code § 2929.03(D)(2) requires the trial jury to determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating

89

circumstances found outweigh the mitigating factors, the jury must recommend to the court imposition of the death sentence. If such a finding is not found, life imprisonment with or without parole is recommended.

In *Profitt*, 420 U.S. at 257, the Court recognized that while weighing aggravating circumstances with mitigating factors may be hard, they require nothing more than is commonly required of a fact finder in a lawsuit. The various factors needed to be considered do not have numerical weights assigned to them but the jury's discretion is guided by requiring examination of specific factors that support or oppose the death penalty. Arbitrariness and capriciousness are thereby eliminated. The provisions of the Ohio statutes are sufficiently construed to provide a method of proper weighing and consideration of the evidence.

Hill argues that the Ohio death penalty statutes are unconstitutional in that they fail to require the conscious desire to kill or premeditation and deliberation before a death sentence can be imposed. In his brief before the Ohio Supreme Court, Hill refers to R.C. § 2903.01(B) and R.C. § 2929.03(A)(7) as being deficient in this regard.

Ohio Revised Code § 2903.01(B) provides in pertinent part:

No person shall purposely cause the death of another . . . while committing or attempting to commit . . . kidnaping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.

90

Ohio Revised Code § 2929.03(A)(7) provides for imposition of the death penalty if the offense was committed while the offender was committing or attempting to commit kidnaping, rape, aggravated arson, aggravated robbery or aggravated burglary and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

Purposely is an element of aggravated murder. A person acts purposely when it is his intention to cause a certain result. Therefore, in order for an individual to be found guilty of aggravated murder, he must have had a specific intent to kill. "Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result." Ohio Jury Instructions Section 409.01.

The offense referred to in R.C. § 2929.03(A)(7) is aggravated murder, prohibited in R.C. § 2903.01(B). The latter statute is not applicable until the defendant is found guilty of the prior statute which requires the conscious desire to kill. Only five felonies under R.C. § 2903.01(B) qualify for the death penalty under R.C. § 2929.03(A)(7) and, in addition, the defendant must be the principal offender or have acted with prior calculation and design. The principal offender is the perpetrator of the crime. If the defendant is not the principal offender or did not act with prior calculation and design, then the death penalty would not be imposed and failure to include a conscious desire to kill is

91

AO 72A
(Rev.8'82)

inconsequential. All of Hill's contentions in Ground Fourteen are without merit.

## FIFTEENTH AND SIXTEENTH GROUNDS FOR RELIEF

15. Appellant's death sentence was imposed in violation of his rights to due process and freedom from cruel and unusual punishment as encompassed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution when the three judge panel improperly considered non-statutory aggravating factors.

16. Petitioner Hill was denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the court on appellate review of his sentence, considered non-statutory aggravating factors.

These two related grounds for relief were raised on direct appeal in the state courts.[6] The issues were rejected by the United States Supreme Court. A death sentence may not be based on a sole nonstatutory aggravating factor. *Barclay v. Florida*, 463 U.S. 936, 966 (1983). Consideration at the sentencing phase of information not directly related to either statutory aggravating or statutory mitigating factors is appropriate as long as that information is relevant to the character of the defendant or the circumstances of the crime. *Id.* The United States Supreme Court stated in *Zant v. Stephens*:

Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other

---

[6]These issues were mentioned as part of Hill's brief in Proposition of Law 25 in the Ohio Supreme Court.

92

possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.

462 U.S. at 879; See *Skaggs v. Parker*, 27 F.Supp.2d at 998.

Hill complains that the Ohio court of appeals improperly examined a nonstatutory aggravating circumstance when it considered his character as an aggravating circumstance. Even if Hill's character was considered an aggravating circumstance, other aggravating circumstances existed as Hill was found guilty of kidnaping and rape, aggravating circumstances set forth in R.C. § 2929.04(A)(7). Grounds Fifteen and Sixteen are without merit.

### SEVENTEENTH, EIGHTEENTH, TWENTY-SIXTH AND TWENTY-SEVENTH GROUNDS FOR RELIEF

17. Petitioner Hill was deprived of having a full and fair evidentiary hearing in state post-conviction proceedings as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

18. The Ohio state courts have effectively converted Ohio's post-conviction procedure into a meaningless ritual, rather than the statutorily mandated process for those convicted of a criminal offense to obtain redress for violations of their rights under the Ohio Constitution and the Constitution of the United States. As a result, Petitioner was denied his rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

26. Petitioner was denied his right to expert assistance upon collateral review of his convictions in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

27. Petitioner was denied his rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution when his request for expert assistance in his

93

post-conviction petition to reexamine the dental evidence was denied.

The Constitution does not require a state to provide a means of post-conviction relief. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). An error in a state post-conviction proceeding does not raise a constitutional issue and is not cognizable in a federal habeas corpus action. *Gee v. Groose*, 110 F.3d 1346, 1351-52 (8th Cir. 1997); *Tokar v. Bowersox*, 1 F.Supp.2d 986, 1015 (E.D. Mo. 1998).

A state is not required to provide a system for appeal, but if it does so, the appeal must comply with the basic requirements of due process. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985). This reasoning was held to apply to further proceedings provided by the state, *i.e.*, discretionary appeals, post-conviction remedies and clemency procedures. *Woodard v. Ohio Adult Parole Authority*, 107 F.3d 1178, 1186 (6th Cir. 1997).

Habeas corpus is available when a petitioner is in custody and the detention is related to a constitutional violation. *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986). A defendant challenging the fact or duration of his imprisonment and seeking immediate release would be limited in his federal remedies to habeas corpus. *Presser v. Rodriquez*, 411 U.S. 475, 500 (1973).

94

AO 72A
(Rev.8/82)

In *Kirby v. Dutton*, <u>794 F.2d at 246</u>, Kirby claimed that he was denied effective assistance of counsel in the post-conviction proceedings as well as his rights to equal protection and due process of law. *Id.* Kirby's claims were held to be unrelated to his detention. Ruling in Kirby's favor would not have resulted in a reduction in his sentence or in any way affect his detention. *Id.* at 247. So habeas corpus was not available to him.

Hill is challenging a proceeding collateral to his detention and not the detention itself. Even if the court erred in the post-conviction proceedings, he would not be entitled to habeas corpus relief. *See Steele v. Young,* <u>11 F.3d 1518</u> (10th Cir. 1993); *Hopkinson v. Shillinger*, <u>866 F.2d 1185</u> (9th Cir. 1989). Therefore, Grounds Seventeen, Eighteen, Twenty-six and Twenty-seven are without merit.

### TWENTY-FIRST GROUND FOR RELIEF

21. The admission of other crimes, wrongs or acts allegedly committed by the petitioner into evidence at petitioner's trial violated the due process clause of the United States Constitution and therefore denied Hill his rights as guaranteed by same.

This ground concerns the testimony of Stephen Melius, a witness called by the State. Melius testified that he had been incarcerated in the same cell as Hill in late January or early February 1984 at the juvenile center in Trumbull County. He stated that he was approached by Hill and asked to engage in oral and anal sex but no physical contact was initiated. This

95

testimony was introduced to show that petitioner would engage in sex acts with a male. There was no evidence that sex occurred. Hill alleges that the testimony was clearly irrelevant and its only purpose was to influence the passions of the three judge panel.

This ground was presented on direct appeal to the state courts. The testimony of two other witnesses was involved. The Ohio Supreme Court ruled that Melius also stated that the defendant (Hill) put his hand on him and expressed a desire to perform anal intercourse and fellatio on him. Melius testified that he refused both the defendant's advances and the invitation to perform anal intercourse and fellatio with defendant.

The state court relied on Ohio Rule of Evidence 404(B) which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The state court also referred to R.C. § 2945.59 which provides as follows:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

96

In *State v. Jamison*, <u>49 Ohio St.3d 182</u> (1990), *cert. denied,*
<u>498 U.S. 881</u> (1990), the court held as stated in the syllabus:

> Other acts forming a unique, identifiable plan of criminal
> activity are admissible to establish identity under Evid. R.
> 404(B).  To be admissible these other acts must tend to show
> by substantial proof "identity" or other enumerated purposes
> under Evid. R. 404(B).  Although the standard for
> admissibility is strict, the other acts need not be the same
> as or similar to the crime charged. . .

Melius's testimony shows the defendant's motive to forcibly
have sex with another male.

In an abundance of caution the Ohio Supreme Court further
determined that even if admission of the testimony was improper,
the fact that it was tried before a three judge panel requires
that it must affirmatively appear on the record that the panel
relied on the alleged improper testimony. *State v. Post*, <u>32 Ohio</u>
<u>St.3d 380</u>, 384 (1987), *cert. denied,* <u>484 U.S. 1079</u> (1988).  The
court found that since the trial panel stated in its opinion
weighing the aggravating circumstances against the mitigating
factors that "no prior crimes were considered by the court in any
way in reaching its verdict," the defendant was not prejudiced.
*State v. Hill*, <u>64 Ohio St.2d at 322-23</u>.

Habeas corpus review is not available to determine the
propriety of state court rulings on the admissibility of evidence
unless the trial is rendered fundamentally unfair. *Moore v. Tate*,
<u>882 F.2d 1107</u>, 1109 (6th Cir. 1989).  In a nonjury trial there is
a presumption that the improper evidence, taken under objection,

97

was given no weight by the trial judge and only properly admitted and relevant evidence was used by the court in making its decision. *United States v. McCarthy*, <u>470 F.2d 222</u>, 224 (6th Cir. 1972). The Ohio Supreme Court's conclusion was similar. For the above reasons, this Court finds that Ground Twenty-one is without merit.

### TWENTY-SECOND GROUND FOR RELIEF

22. When the state failed to prove by proof beyond a reasonable doubt and the three judge panel failed to specifically find that Petitioner had the specific intent to kill Raymond Fife, Petitioner's conviction and death sentence were in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Ohio Revised Code § 2903.01(D) provides that no person shall be convicted of aggravated murder unless he is found to have intended to cause the death of another. The Ohio Supreme Court held that this provision does not require the finder of fact to make a special finding of specific intent at the guilty phase of the trial. *State v. Maurer*, <u>15 Ohio St.3d</u> 239, 247-48 (1984), *citing State v. Jenkins*, <u>15 Ohio St.3d at 212-13</u>.

The purpose of R.C. § 2903.01(D) is to ensure that defendants were not sentenced to death even though they did not participate in the actual killing, lacked the specific intent to kill, and acted only as aiders and abettors to crimes other than murder. *State v. Jenkins*, <u>15 Ohio St.3d at 212</u>.

This is a matter of state procedure which concerns state law involving no federal question of fundamental fairness or

98

constitutional protection. *Gemmel v. Buchkoe*, <u>358 F.2d 338</u>, 340 (6th Cir. 1965), *cert. denied*, <u>385 U.S. 962</u> (1966). A federal court does not act as a state court of appeals to review a state court's interpretation of its own procedure. *Allen v. Morris*, <u>845 F.2d 610</u>, 614 (6th Cir. 1988), *cert. denied*, <u>488 U.S. 1011</u> (1989). Relief is not warranted for the Twenty-second Ground.

TWENTY-THIRD GROUND FOR RELIEF

> 23. Petitioner Hill was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the Court permitted the admission of gruesome, repetitive and cumulative photographs.

Thirty-three photographs of the victim's body were admitted into evidence during the fact finding phase of Hill's trial. He contends that the inflammatory and cumulative nature of the photographs outweighed any probative value. The three judge panel utilized the photographs in determining that the aggravating circumstances outweighed the mitigating factors. A carry-over effect allegedly resulted causing the court's decision to be based on caprice or emotion rather than reason.

Hill raised this issue on direct appeal in the state courts. Habeas corpus review is not available to determine the propriety of state court rulings on the admissibility of evidence unless the trial is rendered fundamentally unfair. *Moore v. Tate*, <u>882 F.2d at 1109</u>. In determining whether the admission of certain evidence violated a defendant's constitutional rights, the court

99

AO 72A
(Rev.8/82)

must determine if the evidence is relevant or probative of an issue in which the prosecution has the burden of proof. *Skaggs v. Parker*, 27 F.Supp.2d at 985-86, *citing Estelle v. McGuire*, 502 U.S. 62, 69-70 (1991). If the evidence is relevant to an issue in the case, it must be deemed properly admitted as far as constitutional rights are concerned. *Id.*

The Ohio Supreme Court utilized *State v. Maurer*, 15 Ohio St.3d at 266 wherein the court stated:

> . . .[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number.

The Ohio court found that the probative value of the photographs outweighed any prejudicial effect. Since the case was tried to a three judge panel the outcome would not have been different even if the gruesome photographs were not admitted. *State v. Hill*, 64 Ohio St.3d at 328.

The photographs of the victim in the present case were certainly relevant. The record shows that they were used to support the testimony of the expert witness. This Court agrees with the Ohio Supreme Court's determination that admittance of the photographs did not render the trial unfair. The Twenty-third Ground for Relief is without merit.

100

AO 72A
(Rev.8/82)

## TWENTY-FOURTH GROUND FOR RELIEF

24. Petitioner's rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution were violated when without probable cause he was transported to the Warren Police Department when no prior judicial authorization had been given.

Hill failed to raise this precise ground in the state courts. In ground one of this habeas corpus action, Hill argued that he was induced through coercion and psychological ploys to go to the police station. The United States Supreme Court determined in *Anderson v. Harless*, 459 U.S. 4, 6 (1982), that 28 U.S.C. § 2254 requires a petitioner to provide the state courts with a fair opportunity to apply federal legal principles to the facts constituting his constitutional claim. The petitioner must have fairly presented the substance of his federal habeas corpus claim to the state courts. *Id.*

The facts presented to the state courts and before this Court in ground one are not the same as the facts and issues before the Court in this ground. Thus, Hill's allegations in ground twenty-four constitute a constitutional violation separate and distinct from the constitutional violations asserted on direct appeal in the state courts. Because this issue was not raised in the state courts, it is procedurally barred pursuant to *Maupin v. Smith*, 785 F.2d at 135. Ground Twenty-four does not warrant relief.

101

## TWENTY-FIFTH GROUND FOR RELIEF

25. Petitioner Hill was denied his constitutional rights to a fair trial and due process of law when the trial court granted the prosecution's motion to quash several subpoenas of witnesses subpoenaed to testify regarding the arbitrary fashion by which the decision was made to seek the death penalty in Trumbull County, Ohio in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

This ground was not raised in any manner in the state courts. Based on *Maupin v. Smith*, 785 F.2d at 135, the Court finds ground twenty-five has been procedurally defaulted.

The United States Supreme Court has ruled that the death penalty is not unconstitutional merely because of opportunities for discretionary action inherent in the processing of a murder case. *Gregg v. Georgia*, 428 U.S. at 199 (1976). There are several ways discretion is inherent in a murder case besides the decision to seek the death penalty. The prosecutor has the authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. *Id.* The jury may decide to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death. A defendant who is convicted and sentenced to die may have his sentence commuted by the governor of the state. *Id.* Arbitrariness may occur at each of these stages. Furthermore, the decision to impose the death penalty on a capriciously selected group of offenders is guided by certain standards requiring that sentencing be focused on the circumstances of the crime and the defendant. *Id.* A prosecutor's

102

decision must also be based on standards set forth in the Ohio death penalty statutes which have been found constitutional. *State v. Jenkins, supra.* Therefore, Ground Twenty-five is without merit.

### TWENTY-EIGHTH GROUND FOR RELIEF

28. Petitioner was denied his rights in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution when the three judge panel failed to specifically find that Appellant was the principal offender and/or that he acted with prior calculation and design.

The three judge panel found Hill guilty of aggravated murder and indicated the offense was committed while he was committing aggravated arson, rape and kidnaping and found that Hill was either the principal offender or, if not the principal offender, committed the aggravated murder with prior calculation and design. The court failed to specify whether they were unanimously finding that he was the principal offender, or that he committed the murder with prior calculation and design or they were unable to come to a unanimous finding.

Hill did not pursue this ground on direct appeal in the state courts. However, he presented it as his first subargument in post-conviction proceedings before the state court of appeals. The court found that he did not provide any citation or authority to support his position nor did he advance any reasoning to advocate this premise. Furthermore, as the matter was tried to a three judge panel, the court assumed regularity or lack of

103

AO 72A
(Rev.8/82)

prejudicial error. Finally, the court held that this issue could have been raised on direct appeal and was barred by res judicata. *State v. Hill*, 1995 WL 418683 at *2 (Ohio App. 11th Dist.)

Ground twenty-eight has been procedurally defaulted. The four-part test set forth in *Maupin v. Smith*, 785 F.2d at 135, discussed above in detail, applies.

The trial court stated in its sentencing decision:

. . . . The court found little credible evidence as to which
co-defendant initiated the series of crimes involved. In any
event, whoever may first have taken the victim from the bike
before all the events ended, both participants have followed
a blood lust characterized by a series of acts of torture,
rape and murder to such an extent that the question of who
started them was viewed as essentially irrelevant.

This statement sufficiently explains the court's ruling as to whether it found Hill to be a principal offender or to have acted with prior calculation and design. Little evidence was produced on the question of prior calculation and design. Both participants performed the series of acts of torture, rape and murder so that prior calculation and design was not an issue. Principal offender is defined as one who directly caused the death. Two individuals can be a principal offender when they act together to perform every act that causes the death with the intent to cause death. *State v. Frank*, 1998 WL 696777 at *6 (Ohio App. 9th Dist.). The conclusion is that the court in Hill's case determined that he was a principal offender. Therefore, the Twenty-eighth Ground does not warrant relief.

104

CONCLUSION

For the above reasons, Hill's petition for writ of habeas corpus is DENIED  The stay of execution is VACATED.  The action is hereby DISMISSED.

The Court finds, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal can be taken in good faith as to the First, Second, Third, Eighth, Ninth, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty-sixth and Twenty-seventh Grounds for Relief and hereby issues a certificate of appealability as to those issues.  The Court further finds that the petitioner has not made a substantial showing of the denial of a constitutional right or that an appeal could be taken in good faith as to the remaining issues and will not issue a certificate of appealability as to those issues.  28 U.S.C. § 2253(c).

The Clerk of Court shall send a copy of this Memorandum of Opinion and Order to Patricia A. Millhoff, Esq., 80 Bowery Street #106, Akron, Ohio 44308; George C. Pappas, Esq., 159 S. Main Street, 423 Society Building, Akron, Ohio 44308; and Charles L. Wille, Esq., Assistant Attorney General, Capital Crimes Section, 30 East Broad Street, 26th Floor, Columbus, Ohio 43215-3428

IT IS SO ORDERED.

_Paul R. Matia_

JUDGE PAUL R. MATIA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

105

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DANNY HILL                    )        JUDGE PAUL R. MATIA
                              )
            Petitioner        )        CASE NO. 4:96CV0795
                              )
       -vs-                   )
                              )        <u>JUDGMENT ENTRY</u>
CARL ANDERSON, WARDEN         )
                              )
            Respondent        )

I hereby certify that this instrument is a true and
correct copy of the original on file in my office.
Attest: Geri M. Smith, Clerk
U.S. District Court
Northern District of Ohio
Deputy Clerk

Pursuant to this Court's Memorandum of Opinion and
Order filed contemporaneously with this Judgment Entry,

It is ordered that the Petition for Writ of Habeas
Corpus is denied. The stay of execution is vacated.  The action
is dismissed. Further, the Court finds, pursuant to <u>28 U.S.C. §
1915(a)</u>(3), that an appeal can be taken in good faith as to the
First, Second, Third, Eighth, Ninth, Seventeenth, Eighteenth,
Nineteenth, Twentieth, Twenty-sixth and Twenty-seventh Grounds
for Relief and hereby issues a certificate of appealability as to
those issues.  The Court further finds that the petitioner has
not made a substantial showing of the denial of a constitutional
right or that an appeal could be taken in good faith as to the
remaining issues and will not issue a certificate of
appealability as to those issues.  <u>28 U.S.C. § 2253(c)</u>.

The Clerk of Court shall send a copy of this
Judgment Entry to Patricia A. Millhoff, Esq., 80 Bowery Street,

Akron, Ohio 44308; George C. Pappas, Esq., 159 S. Main Street,

423 Society Building, Akron, Ohio 44308; and Charles L. Wille,

Esq., Assistant Attorney General, 30 East Broad Street-26th

Floor, Columbus, Ohio 43215-3428.

IT IS SO ORDERED.

*Paul R. Matia*

JUDGE PAUL R. MATIA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

2

**Name of court:** The United States District Court, Northern District of Ohio, Eastern Division

**Docket or case number (if you know):** 4:96-cv-00795

**Date of filing:** 03/15/2010

**Nature of proceedings:** Amended Petition for Habeas Corpus

**Grounds raised:**

### GROUNDS FOR RELIEF FOR HABEAS CORPUS, The United States District Court, Northern District of Ohio, Eastern Division No. 4:96-cv-00795

**FIRST GROUNDS FOR RELIEF:** Mr. Hill Is Mentally Retarded And Thus Ineligible For The Death Penalty. Mr. Hill's Sentence Of Death Violates His Right To Be Free From Cruel And Unusual Punishment As Guaranteed By The Eighth And Fourteenth Amendments To The United States Constitution.

**SECOND GROUNDS FOR RELIEF:** Court Appointed Atkins Counsel Rendered Ineffective Assistance To Mr. Hill, And The Trial Court Allowed For The Continued Representation Of Atkins Counsel In Spite Of Knowing That There Was A Complete And Absolute Breakdown In The Attorney-Client Relationship, Thereby Denying Hill His Right To Counsel In Violation Of His Sixth, Eighth And Fourteenth Amendment Rights.

**THIRD GROUNDS FOR RELIEF:** Because Mr. Hill Is Mentally Retarded, He Is Innocent Of The Death Penalty.

**Did you receive a hearing where evidence was given on your petition, application, or motion?** No

**Result:** Petition denied

**Date of result (if you know):** June 25, 2014

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **DANNY LEE HILL,** | : | **CASE NO. 4:96 CV 00795** |
| | : | |
| **Petitioner,** | : | |
| | : | **JUDGE JOHN R. ADAMS** |
| **vs.** | : | |
| | : | |
| **CARL ANDERSON, Warden,** | : | |
| | : | **MEMORANDUM OF OPINION** |
| **Respondent.** | : | |

This matter is before the Court upon Petitioner Danny Lee Hill's ("Hill" or "Petitioner") Amended Petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254. Through this petition, Hill challenges the constitutionality of his death sentence, rendered by an Ohio court, under *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eighth Amendment forbids the execution of intellectually disabled offenders.[1] (ECF No. 94.) The Respondent, Warden Carl Anderson ("Respondent"), filed a Supplemental Return of Writ Regarding Atkins Claim. (ECF No. 98.) Hill filed a Traverse and Supplement to Traverse. (ECF Nos. 102 and 103, respectively.) For the following reasons, the Amended Petition for Writ of Habeas Corpus is denied.

---

[1]     This Court will use the term "intellectual disability" in place of the term "mental retardation" in this opinion. The designation intellectually disabled, or "ID," is now widely used by the medical community, educators and others, since the label mentally retarded long has carried a painful stigma. The terms are synonymous. *See* American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Support* 12 (11th ed. 2010) ("[T]he term ID covers the same population of individuals who were diagnosed previously with mental retardation."). *See also Hall v. Florida*, slip op. at 2 (U.S. May 27, 2014).

## I.    Factual History

On February 28, 1986, a three-judge panel sentenced Hill to death for the aggravated murder of twelve-year-old Raymond Fife ("Fife"). The Supreme Court of Ohio set out the following account of Hill's crime, as adduced by the evidence presented at trial, and judicial proceedings upon considering Hill's direct appeal of his conviction and sentence:

> On September 10, 1985, at approximately 5:15 p.m., twelve-year-old Raymond Fife left home on his bicycle to visit a friend, Billy Simmons. According to Billy, Raymond would usually get to Billy's residence by cutting through the wooded field with bicycle paths located behind the Valu-King store on Palmyra Road in Warren.
>
> Matthew Hunter, a Warren Western Reserve High School student, testified that he went to the Valu-King on the date in question with his brother and sister shortly after 5:00 p.m. Upon reaching the front of the Valu–King, Hunter saw Tim Combs and defendant-appellant, Danny Lee Hill, walking in the parking lot towards the store. After purchasing some items in the Valu–King, Hunter observed defendant and Combs standing in front of a nearby laundromat. Combs greeted Hunter as he walked by. Hunter also saw Raymond Fife at that time riding his bike into the Valu–King parking lot.
>
> Darren Ball, another student at the high school, testified that he and Troy Cree left football practice at approximately 5:15 p.m. on September 10, and walked down Willow Street to a trail in the field located behind the Valu–King. Ball testified that he and Cree saw Combs on the trail walking in the opposite direction from the Valu–King. Upon reaching the edge of the trail close to the Valu–King, Ball heard a child's scream, "like somebody needed help or something."
>
> Yet another student from the high school, Donald E. Allgood, testified that he and a friend were walking in the vicinity of the wooded field behind the Valu–King between 5:30 p.m. and 6:00 p.m. on the date in question. Allgood noticed defendant, Combs and two other persons "walking out of the field coming from Valu–King," and saw defendant throw a stick back into the woods. Allgood also observed Combs pull up the zipper of his blue jeans. Combs "put his head down" when he saw Allgood.
>
> At approximately 5:50 p.m. on the date in question, Simmons called the Fife residence to find out where Raymond was. Simmons then rode his bicycle to the Fifes' house around 6:10 p.m. When it was apparent that Raymond Fife's whereabouts were unknown, Simmons continued on to a Boy Scouts meeting, while members of the Fife family began searching for Raymond.

2

At approximately 9:30 p.m., Mr. Fife found his son in the wooded field behind the Valu–King. Raymond was naked and appeared to have been severely beaten and burnt in the face. One of the medics on the scene testified that Raymond's groin was swollen and bruised, and that it appeared that his rectum had been torn. Raymond's underwear was found tied around his neck and appeared to have been lit on fire.

Raymond died in the hospital two days later. The coroner ruled Raymond's death a homicide. The cause of death was found to be cardiorespiratory arrest secondary to asphyxiation, subdural hematoma and multiple trauma. The coroner testified that the victim had been choked and had a hemorrhage in his brain, which normally occurs after trauma or injury to the brain. The coroner also testified that the victim sustained multiple burns, damage to his rectal-bladder area and bite marks on his penis. The doctor who performed the autopsy testified that the victim sustained numerous external injuries and abrasions, and had a ligature mark around his neck. The doctor also noticed profuse bleeding from the victim's rectal area, and testified that the victim had been impaled with an object that had been inserted through the anus, and penetrated through the rectum into the urinary bladder.

On September 12, 1985, defendant went downtown to the Warren Police Station to inquire about a $5,000 reward that was being offered for information concerning the murder of Raymond Fife. Defendant met with Sergeant Thomas W. Stewart of the Warren Police Department and told him that he had "just seen Reecie Lowery riding the boy's bike who was beat up." When Stewart asked defendant how he knew the bike he saw was the victim's bike, defendant replied, "I know it is." Defendant then told Stewart, "If you don't go out and get the bike now, maybe [Lowery will] put it back in the field." According to Stewart, the defendant then stated that he had seen Lowery and Andre McCain coming through the field at around 1:00 that morning. In the summary of his interview with defendant, Stewart noted that defendant "knew a lot about the bike and about the underwear around the [victim's] neck." Also, when Stewart asked defendant if he knew Tim Combs, defendant replied, "Yeah, I know Tim Combs. * * * I ain't seen him since he's been out of the joint. He like boys. He could have done it too."

On September 13, 1985, the day after Stewart's interview with defendant, Sergeant Dennis Steinbeck of the Warren Police Department read Stewart's summary of the interview, and then went to defendant's home and asked him to come to the police station to make a statement. Defendant voluntarily went to the police station with Steinbeck, whereupon defendant was advised of his *Miranda* rights and signed a waiver-of-rights form. Defendant made a statement that was transcribed by Steinbeck, but the sergeant forgot to have defendant sign the statement. Subsequently, Steinbeck discovered that some eyewitnesses had seen defendant at the Valu–King on the day of the murder.

On the following Monday, September 16, Steinbeck went to defendant's

3

house accompanied by defendant's uncle, Detective Morris Hill of the Warren Police Department. Defendant again went voluntarily to the police station, as did his mother. Defendant was given his *Miranda* rights, which he waived at that time as well. After further questioning by Sergeants Stewart and Steinbeck and Detective Hill, defendant indicated that he wanted to be alone with his uncle, Detective Hill. Several minutes later, defendant stated to Hill that he was "in the field behind Valu-King when the young Fife boy got murdered."

Defendant was given and waived his *Miranda* rights again, and then made two more voluntary statements, one on audiotape and the other on videotape. In both statements, defendant admitted that he was present during the beating and sexual assault of Raymond Fife, but that Combs did everything to the victim. Defendant stated that he saw Combs knock the victim off his bike, hold the victim in some sort of headlock, and throw him onto the bike several times. Defendant further stated that he saw Combs rape the victim anally and kick him in the head. Defendant stated that Combs pulled on the victim's penis to the point where defendant assumed Combs had pulled it off. Defendant related that Combs then took something like a broken broomstick and jammed it into the victim's rectum. Defendant also stated that Combs choked the victim and burnt him with lighter fluid. While defendant never admitted any direct involvement in the murder, he did admit that he stayed with the victim while Combs left the area of the attack to get the broomstick and the lighter fluid used to burn the victim.

Upon further investigation by authorities, defendant was indicted on counts of kidnapping, rape, aggravated arson, felonious sexual penetration, aggravated robbery and aggravated murder with specifications.

On December 16, 1985, a pretrial hearing was held on defendant's motion to suppress statements made to police officers both orally and on tape. On January 17, 1986, the court of common pleas concluded as follows:

"It is the opinion of this Court that no Fourth Amendment violation was shown because [defendant] was at no time 'seized' by the police department, but rather came in either voluntarily, or as in the case of September 16th because of his mother's demands.

" * * *

"Defendant's Fifth Amendment Rights were clearly protected by the numerous *Miranda* Warnings and waivers. Though this Court believes that the defendant could not have effectively read the rights or waiver forms, the Court relies on the fact that at any time he was given a piece of paper to sign acknowledging receipt of the *Miranda* Warnings and waiving his rights, the paper was always read to him before he affixed any of his signatures.

"Though defendant is retarded, he is not so seriously impaired as to have been incapable of voluntarily and knowingly given the statements which the

4

defendant now seeks to suppress. The Court reaches this conclusion after seeing and listening to the defendant at the Suppression Hearing and listening to and watching the tape recording and videotaped statements of the defendant. The Court concludes that the statements were made voluntarily, willingly, and knowingly."

Meanwhile, on January 7, 1986, defendant appeared before the trial court and executed a waiver of his right to a jury trial.

On January 21, 1986, defendant's trial began in front of a three-judge panel. Among the voluminous testimony from witnesses and the numerous exhibits, the following evidence was adduced:

Defendant's brother, Raymond L. Vaughn, testified that he saw defendant wash his gray pants on the night of the murder as well as on the following two days. Vaughn identified the pants in court, and testified that it looked like defendant was washing out "something red. * * * It looked like blood to me * * *."

Detective Sergeant William Carnahan of the Warren Police Department testified that on September 15, 1985 he went with eyewitness Donald Allgood to the place where Allgood stated he had seen defendant and Combs coming out of the wooded field, and where he had seen defendant toss "something" into the woods. Carnahan testified that he returned to the area with workers from the Warren Parks Department, and that he and Detective James Teeple found a stick about six feet from the path where Allgood saw defendant and Combs walking.

Dr. Curtis Mertz, a forensic odontologist, stated that: "It's my professional opinion, with reasonable degree of medical certainty, that Hill's teeth, as depicted by the models and the photographs that I had, made the bite on Fife's penis."

The defense called its own forensic odontologist, Dr. Lowell Levine, who stated that he could not conclude with a reasonable degree of certainty as to who made the bite marks on the victim's penis. However, Levine concluded: "What I'm saying is either Hill or Combs, or both, could have left some of the marks but the one mark that's consistent with the particular area most likely was left by Hill."

Doctor Howard Adelman, the pathologist who performed the autopsy of the victim's body, testified that the size and shape of the point of the stick found by Detective Carnahan was "very compatible" with the size and shape of the opening through the victim's rectum. Adelman described the fit of the stick in the victim's rectum as "very similar to a key in a lock."

*State v. Hill*, 64 Ohio St. 3d 313, 313-17, 595 N.E.2d 884, 886-89 (Ohio 1992).

5

## II.    Procedural History[2]

### A.    State-Court Proceedings

The Trumbull County Grand Jury indicted Hill for the aggravated murder of Raymond Fife on September 10, 1985.[3]  (App. to Return of Writ, Ex. A.)  Hill's intellectual disabilities quickly surfaced as a central issue in Hill's defense when his counsel, Attorney James Lewis of the Ohio Public Defender's Office, filed a motion to suppress Hill's statements to police.  Hill argued that because he was intellectually disabled, the police were able to coerce him into signing a waiver of his right to counsel, which he could not read and did not understand, and confessing to his role in the crime.  The court conducted a three-day hearing on the suppression motion beginning on December 16, 1985, at which numerous witnesses testified, including Hill and a clinical psychologist who opined that Hill was mildly intellectually disabled.  (ECF Nos. 28, 29.)  The trial court denied Hill's motion.  On January 7, 1986, Hill again appeared before the trial court and executed a waiver of his right to a jury trial.  (ECF No. 30.)

---

[2]    The procedural history of Hill's direct appeals, post-conviction proceedings, and initial habeas proceedings is more fully set forth in this Court's Memorandum of Opinion and Order dated September 29, 1999.  (ECF No. 54.)  The Court includes here only the procedural history relevant to the claims pending before the Court, as asserted in Hill's Amended Petition for Writ of Habeas Corpus.  (ECF No. 94.)

[3]    The first count of the Indictment charged Hill with aggravated murder in violation of Ohio Rev. Code § 2941.14.  The murder count included four capital felony murder specifications under Ohio Rev. Code § 2929.04(A)(7), charging Hill with murder while committing kidnapping, rape, aggravated arson and aggravated robbery.  Hill also was indicted separately for:  kidnapping, in violation of Ohio Rev. Code § 2905.01; rape, in violation of Ohio Rev. Code § 2907.02; aggravated arson, in violation of Ohio Rev. Code § 2909.02; aggravated robbery, in violation of Ohio Rev. Code § 2911.01; and felonious sexual penetration in violation of Ohio Rev. Code § 2907.12(A)(1)(3).  (App. to Return of Writ, Ex. A.)

6

Hill's trial began on January 21, 1986, before a three-judge panel. At the close of trial, on January 31, 1986, the panel of judges deliberated for five hours and unanimously found Hill guilty on all counts, except the aggravated robbery count and the specification of aggravated robbery to the aggravated murder count. (ECF No. 27.) The court held a mitigation hearing beginning on February 26, 1986, at which three psychologists testified that Hill was intellectually disabled. The panel considered the following factors in possible mitigation:

> (1) The age of [Hill]; (2) The low intelligence of [Hill]; (3) The poor family environment; (4) The failure of the State or society to prevent this crime; (5) [Hill's] impaired judgment; (6) Whether or not he was a leader or follower.

The panel concluded that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Two days later, on February 28, 1986, the panel sentenced Hill to ten to twenty-five years' imprisonment for both aggravated arson and kidnapping, life imprisonment for rape and felonious sexual penetration, and the death penalty for aggravated murder with specifications.[4] (ECF No. 24.)

Hill appealed his conviction and sentence to the Eleventh District Court of Appeals and the Ohio Supreme Court. He maintained throughout his direct appeals that he was intellectually disabled, and that because of this condition his constitutional rights were violated during the police interrogation and trial. He claimed, for example, that his Sixth Amendment right to counsel and Fourteenth Amendments rights were violated because, as an intellectually disabled person, he could not knowingly, voluntarily, and intelligently waive his right to counsel during

---

[4]     Timothy Combs also was charged and convicted in a separate trial as a principal offender in Fife's murder. *See State v. Combs,* No. 1725, 1988 WL 129449 (Ohio Ct. App. Dec. 2, 1988).

custodial interrogation. *Hill*, 64 Ohio St. 3d at 318-19, 595 N.E.2d at 890-91. He further argued that his statements to the police were not voluntary, because they were induced by psychological tactics designed to take advantage of an intellectually disabled person who was essentially illiterate. *Id.* at 318-19, 595 N.E.2d at 890-91. He also claimed that, given his intellectual disability, the police did not properly advise him of his *Miranda* rights, nor did he knowingly, voluntarily and intelligently waive such rights. *Id.* at 319, 595 N.E.2d at 891. Finally, Hill asserted that the trial court failed to consider all of the evidence of his intellectual disability as mitigating evidence when determining his sentence. *Id.* at 333-35, 595 N.E.2d at 901-02.

In discussing Hill's claims, both the Eleventh District Court of Appeals and the Ohio Supreme Court acknowledged Hill's intellectual disability. The Ohio Supreme Court stated, "[W]e find that [Hill's] mental retardation is a possible mitigating factor." *Id.* at 335, 595 N.E.2d at 901. It summarized the testimony of the psychologists who testified during the mitigating phase of Hill's trial, stating:

> Dr. Douglas Darnall, a psychologist, testified that defendant had an I.Q. of 55 and that his intelligence level according to testing fluctuates between mild retarded and borderline intellectual functioning, and that he is of limited intellectual ability. Dr. Darnall did state, however, that defendant was able to intellectually understand right from wrong.

> Dr. Nancy Schmidtgoessling, a clinical psychologist, testified that defendant had a full scale I.Q. of 68, which is in the mild range of mental retardation, and that the defendant's mother was also mildly retarded. Dr. Schmidtgoessling also testified that defendant's moral development level was "primitive," a level at which "one do[es] things based on whether you think you'll get caught or whether it feels good. [T]hat's essentially whererreabout [*sic*] a 2–year old is."

> Dr. Douglas Crush, another psychologist, testified that defendant had a full-scale I.Q. of 64, and that his upper level cortical functioning indicated very poor efficiency.

8

Other mitigation testimony on behalf of defendant indicated that he was a follower and not a leader, who had to be placed in group homes during his youth.

*Id*. at 334-35, 595 N.E.2d at 901. Similarly, the court of appeals concluded that Hill

admittedly suffers from some mental retardation (although the evidence presented is divergent as to the severity of the handicap) and has had concommitant difficulties in language comprehension throughout his formal education. [Hill] is categorized as being mildly to moderately retarded. Evidence was presented which indicates that [Hill] is illiterate . . . .

*State v. Hill*, Nos. 3720, 3745, 1989 WL 142761, at *6 (Ohio Ct. App. Nov. 27, 1989). It also found,

The record is replete with competent, credible evidence which states that [Hill] has a diminished mental capacity. He is essentially illiterate, displays poor word and concept recognition and, allegedly, has deficient motor skills. [Hill] is characterized as being mildly to moderately retarded. There is some suggestion that [Hill's] "mental age" is that of a seven to nine year old boy. Testimony places [Hill's] I.Q. between 55 and 71, which would cause him to be categorized as mildly to moderately retarded.

*Id*. at *32.

The Ohio courts, however, denied Hill's claims based on his intellectual disability and did not find his disability to be a significant mitigating factor. The Ohio Supreme Court noted that "there are various levels of mental retardation, and a person must be viewed individually as to the degree of retardation." *Hill*, 64 Ohio St. 3d at 335, 595 N.E.2d at 901. It ultimately found "a very tenuous relationship between the acts he committed and his level of mental retardation. As several of the experts pointed out, [Hill] did not suffer from any psychosis, and he knew right from wrong." *Id*. The court also found that based on legal precedent and Hill's "prior dealings with the criminal process as a juvenile, [Hill's] mental aptitude did not undercut the voluntariness of his statements or his waiver of *Miranda* rights." *Id*. at 318, 595 N.E.2d at 890.

9

The court of appeals, in rejecting Hill's *Miranda* claim, concluded,

> However, from the record here, particularly during the suppression hearing, this court is also aware (as was the trial court below) of the long and multifaceted exposure [Hill] has had with the state's criminal justice system. The evidential table in this case also demonstrates that [Hill] exhibited a functional capacity to understand [his *Miranda*] rights, including the right to appointed counsel. . . .

> Moreover, the behavior of [Hill] during the police investigation belies the notion that he was no more than a malleable victim of police suggestion. [Hill] possessed the requisite intelligence to implicate other persons in the murder and was capable of modifying his story when inconsistencies were demonstrated to him. Additionally, [Hill] qualified and corrected the police officers's [*sic*] misstatements of the factual scenario which he had related to them. He was also able to follow "verbal concepting," displaying an understanding of the officers [*sic*] direction of questioning and the dialogue utilized during the interrogation.

*Hill*, 1989 WL 142761, at *6. It also discounted Hill's low intelligence and impaired judgment as mitigating factors, stating,

> Consideration of evidence delineating [Hill's] mental retardation is more properly applied when evaluating his ability to knowingly, intelligently and voluntarily waive his constitutional rights. There is no evidence presented that requires the conclusion that this crime was committed because a mental defect precluded [Hill] from making the correct moral or legal choice.

*Id*. at *32.

The Ohio courts affirmed Hill's conviction and sentence on direct appeal. *State v. Hill*, Nos. 3720, 3745, 1989 WL 142761 (Ohio Ct. App. Nov. 27, 1989); *State v. Hill*, 64 Ohio St. 3d 313, 595 N.E.2d 884 (Ohio 1992), *reh'g denied*, 65 Ohio St. 3d 1421, 598 N.E.2d 1172 (Ohio 1992). Hill then sought review from the United States Supreme Court. One of the questions he presented to the Court was,

> Whether a conviction and sentence of death may stand when statements are elicited from a mentally retarded, essentially illiterate accused through misconduct of law enforcement officials, coercion by psychological tactics, and promises of leniency in violation of the Fourth, Sixth and Fourteenth Amendments.

10

(App. to Return of Writ, Ex. T, 2.)  The Supreme Court denied certiorari on March 29, 1993.  *Hill v. Ohio*, 507 U.S. 1007 (1993).

Hill continued to assert claims related to his intellectual disability in state post-conviction proceedings, including claims related to the trial court's weighing of mitigating factors, his waiver of his right to counsel and to a jury, and ineffectiveness of trial counsel for not properly investigating and presenting evidence of his intellectual disability.  He attached to his petition affidavits of two experts in the field of intellectual disability, each of whom averred that Hill was intellectually disabled.  (App. to Return of Writ, Ex. Y.)  The trial court denied Hill's post-conviction petition on July 18, 1994, specifically finding the two expert opinions "unpersuasive and insufficient to establish substantive grounds for relief ."  (*Id*., Exs. FF; GG, 11.)  The Eleventh District Court of Appeals affirmed the trial court's decision on July 16, 1995.  *State v. Hill*, No. 94-T-5116, 1995 WL 418683 (Ohio Ct. App. June 16, 1995).  The Ohio Supreme Court declined further review of that decision on November 15, 1995.  *State v. Hill*, 74 Ohio St.3d 1456, 656 N.E.2d 951 (Ohio 1995) (Table).

## B.    Initial Habeas Proceedings

Hill filed a Notice of Intent to File a Petition for Writ of Habeas Corpus with this Court on April 18, 1996.  (ECF No. 1.)  He was represented by Attorneys Patricia Milhoff and George Pappas Jr.  In his habeas petition, Hill reasserted his constitutional claims relating to his intellectual disability, arguing that the Ohio courts' rulings on those claims were contrary to, or an unreasonable application of, established federal law, or an unreasonable determination of the facts.  (ECF No. 18.)  Another judge on this Court denied Hill's petition on September 29, 1999.  (ECF No. 54.)

11

Hill appealed the decision to the Sixth Circuit Court of Appeals. While his appeal was pending, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), which barred the execution of intellectually disabled offenders. Less than two months later, on August 13, 2002, the Sixth Circuit returned Hill's case to this Court with instructions to remand Hill's unexhausted *Atkins* claim to state court and stay his remaining claims pending resolution of the *Atkins* claim. *Hill v. Anderson*, 300 F.3d 679, 683 (6th Cir. 2002). The court explained that it did not dismiss Hill's "mixed petition" of exhausted and unexhausted claims, as it is authorized to do under AEDPA's § 2254(b)(2), because "Hill's new claim should first be heard by a state court," and because the issue of Hill's intellectual disability raised "a serious question" regarding the voluntariness of his confession. *Id*. at 680, 682. The court noted that "the state of Ohio has not formally conceded that [Hill] is retarded," but that "Ohio courts reviewing his case have concluded that Danny Hill is retarded, *see, e.g., Hill*, 595 N.E.2d at 901, and voluminous expert testimony supported this conclusion, J.A. at 3264-67, 3332-25, 3379-80 . . . ." *Id*. at 682. It further observed,

> A suspect's "mental condition is surely relevant to an individual's susceptibility to police coercion." *Colorado v. Connelly*, 479 U.S. 157, 165, 107 S. Ct. 515, 93 L.Ed.2d 473 (1986). State courts, including the Ohio Supreme Court, have clearly stated that Hill is retarded. *See Hill*, 595 N.E.2d at 901. The retarded have, "by definition . . . diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at —, 122 S. Ct. at 2250. . . .

*Id*. at 683. The court remarked that Hill's interactions with his uncle, Detective Morris Hill, was "of special concern." *Id*. at 682-83.

In accordance with the Sixth Circuit's remand instructions, on August 20, 2002, this

12

Court dismissed Hill's *Atkins* claim and stayed his remaining claims pending exhaustion of his state-court remedies.  (ECF No. 60.)

### C.    State *Atkins* Proceedings

Hill filed a petition to vacate his death sentence with the Trumbull County Court of Common Pleas on November 27, 2002, and an amended petition to vacate on January 17, 2003. (Supp. App., Disc 1, 31-32.)  In his petition, he asserted that his intellectual disability is "a fact of record in his case" and that the state is thereby "barred by the doctrine of collateral estoppel from any attempt to relitigate the proven fact that [he] is a person with mental retardation."  In the alternative, Hill argued the trial court should take judicial notice of the fact that he is a person with intellectual disability and/or hold a hearing on the issue of his intellectual disability.  (*Id*. at 103-08.)  The court appointed Attorneys James Lewis, Anthony Consoldane, and Gregory Meyers of the Ohio Public Defender's Office to represent him.  (*Id*. at 32.)

The Eleventh District Court of Appeals, in reviewing Hill's *Atkins* claims on appeal from the trial court, provided this account of Hill's state-court *Atkins* proceedings:

> On April 4, 2003, the trial court ruled that Hill's petition stated "substantive ground for relief sufficient to warrant an evidentiary hearing." The court granted the state's and Hill's requests to retain their own experts in the field of mental retardation. Over Hill's objection, the court determined to retain its own expert to evaluate Hill "pursuant to his *Atkins* claim." The court denied Hill's request to have a jury empanelled [*sic*] to adjudicate his *Atkins* claim.
>
> The state retained as its expert Dr. J. Gregory Olley, a professor at the University of North Carolina at Chapel Hill and a director of the university's Center for the Study of Development and Learning. Hill retained as his expert Dr. David Hammer, a professor at the Ohio State University and the director of psychology services at the university's Nisonger Center. The court, through the Forensic Center of Northeast Ohio, retained Dr. Nancy Huntsman, of the Court Psychiatric Clinic of Cleveland.

13

In April 2004, Drs. Olley, Hammer, and Huntsman evaluated Hill at the Mansfield Correctional Institution for the purposes of preparing for the Atkins hearing. At this time, Hill was administered the Wechsler Adult Intelligence Scale ("WAIS–III") IQ test, the Test of Mental Malingering, the Street Survival Skills Questionnaire, and the Woodcock–Johnson–III. The doctors concurred that Hill was either "faking bad" and/or malingering in the performance of these tests. As a result, the full scale IQ score of 58 obtained on this occasion was deemed unreliable, and no psychometric assessment of Hill's current adaptive functioning was possible. Thus, the doctors were forced to rely on collateral sources in reaching their conclusions, such as Hill's school records containing evaluations of his intellectual functioning, evaluations performed at the time of Hill's sentencing and while Hill was on death row, institutional records from the Southern Ohio Correctional Institution and the Mansfield Correctional Institution, interviews with Hill, corrections officers, and case workers, and prior court records and testimony.

The evidentiary hearing on Hill's *Atkins* petition was held on October 4 through 8 and 26 through 29, 2004, and on March 23 through 24, 2005. Doctors Olley and Huntsman testified that in their opinion, Hill is not mentally retarded. Doctor Hammer concluded that Hill qualifies for a diagnosis of mild mental retardation.

In the course of the trial, an issue arose regarding the interpretation of the results of the Vineland Social Maturity Scale test, a test designed to measure adaptive functioning and performed on Hill four times prior to the age of 18. Hill presented the testimony of Sara S. Sparrow, Ph.D., professor emerita of Yale University, to rebut certain opinions expressed by Dr. Olley. In turn, the state called Timothy Hancock, Ph.D., executive director of the Parrish Street Clinic, in Durham, North Carolina, as a surrebuttal witness to Dr. Sparrow.

The following lay persons also testified at the hearing regarding Hill's functional abilities: corrections officer John Glenn, death row case manager Greg Morrow, death row unit manager Jennifer Sue Risinger, and corrections officer Steven Black.

On November 30, 2005, Hill filed a petitioner's supplemental authority and renewed double jeopardy motion, in which he asserted that the state is barred by the doctrine of collateral estoppel and the Double Jeopardy Clause from relitigating the issue of his mental retardation.

On February 15, 2006, the trial court issued its judgment entry denying Hill's petition for postconviction relief in which he claimed to be a person with mental retardation and rejecting his arguments regarding double jeopardy/collateral estoppel.

14

On March 15, 2006, Hill filed a timely notice of appeal to this court.

On August 21, 2006, Hill, acting pro se, filed a motion to withdraw the merit brief filed by counsel and a request that this court would order a competency hearing to determine whether Hill is competent to waive all appeals and proceedings in this matter. The basis for the motion is that appointed counsel had filed a merit brief in this appeal without properly investigating Hill's "'*Atkins*' claims and/or constitutional violations."

On October 27, 2006, this court issued the following judgment entry: "The trial court is directed to promptly hold an evidentiary hearing to determine Appellant's competency to make decisions regarding his counsel and possible waiver of the right to appeal. Depending upon the outcome of that determination, the trial court shall further determine whether Appellant has actually decided to waive his right to proceed in the appeal; and whether that decision has been made voluntarily, knowingly and intelligently."

The trial court appointed Thomas Gazley, Ph.D., with the Forensic Psychiatric Center of Northeast Ohio, to evaluate Hill. Dr. Gazley interviewed Hill on two occasions in November 2006. On December 7, 2006, a hearing was held on the competency issue.

On December 8, 2006, the trial court issued a judgment entry finding that Hill is "competent to make a decision whether or not to pursue an appeal" and has, "in open court," expressed his desire to pursue an appeal from the adverse decision of the trial court on the issue of mental retardation.

On February 1, 2007, this court overruled Hill's motion to withdraw the merit brief filed by counsel, and request that this court would order a competency hearing as moot.

*State v. Hill*, 177 Ohio App. 3d 171, 178-80, 894 N.E.2d 108, 113-15 (Ohio Ct. App. 2008).

On appeal to the Eleventh District Court of Appeals, Hill raised the following

assignments of error:

1.    The trial court erred in failing to apply double jeopardy and res judicata doctrines to prevent renewed litigation of Mr. Hill's status as a person with mental retardation.

2.    The trial court erred in denying Mr. Hill a jury determination of his mental retardation status and not imposing the burden of proof on the State of Ohio to

15

prove the absence of mental retardation beyond a reasonable doubt.

3.  The trial court erred in finding that Mr. Hill was not a person with mental retardation.

4.  The trial court erred in determining Mr. Hill was competent to proceed with this appeal.

(Supp. App., Disc 1, 4004-49.)

The Ohio court of appeals affirmed the trial court's decision on July 11, 2008.  *Hill*, 177 Ohio App. 3d at 195, 894 N.E.2d at 127.  One member of the three-judge panel, Judge Colleen Mary O'Toole, dissented from the majority's conclusion that the trial court did not err in finding that Hill was not intellectually disabled.  *Id*. at 195-201, 894 N.E.2d at 127-31.  She stated,

> Based on *Atkins*, executing a person with mental retardation status, regardless of context, violates the Eighth Amendment.  Here, I believe the trial court abused its discretion in finding that [Hill] was not a person with mental retardation, because he met the three *Lott* criteria for classification as mentally retarded.

*Id*. at 201, 894 N.E.2d at 131.  The Ohio Supreme Court declined to review the case on August 26, 2009, with two justices dissenting.  *State v. Hill*, 122 Ohio St. 3d 1502, 912 N.E.2d 107 (Ohio 2009) (Table).

**D.  Resumed Habeas Proceedings**

After Hill had exhausted his state-court remedies, both parties promptly moved this Court to reopen Hill's habeas action, which this Court granted on October 1, 2009.  (ECF Nos. 63, 65, 68, respectively.)  Attorneys Mark Vander Laan and Christopher McDowell represented Hill.  On October 22, 2009, Hill moved to substitute Attorneys Vander Laan and McDowell with Attorney Dennis Sipe.  (ECF No. 69.)  In a telephone conference with the Court a week later, Hill withdrew his request, and the Court deemed his motion moot.  (ECF No. 75.)  On November 10,

16

2009, Hill filed a motion pro se "to stop all proceedings." (ECF No. 77.) The Court conducted a telephone conference with all parties on November 20, 2009, during which Hill withdrew his motion to dismiss his habeas action and requested the Court substitute the Ohio Federal Public Defender's Office as his counsel. The Court granted Hill's motion to substitute counsel and denied his motion to dismiss his case. (ECF No. 85.)

On February 24, 2010, Hill moved for an extension of time until March 15, 2010, in which to file an amended habeas petition, which the Court granted. (ECF Nos. 89, 90.) On March 4, 2010, Hill filed an affidavit with the Court, asking it again "to stop all proceedings." He explained that he believed his counsel were not ready to file an amended habeas petition before the approaching deadline and they were not following his instructions. (ECF No. 91.) Hill's counsel filed a response four days later, explaining their client's confusion. (ECF No. 92.) Hill then filed another motion to stop the proceedings on March 12, 2010, without providing any basis for the motion. (ECF No. 93.) The Court denied the motion on March 24, 2010, noting Hill's frequent, and disruptive, attempts to substitute counsel and dismiss his appeals. (ECF No. 96.)

On March 15, 2010, Hill filed an Amended Petition for Writ of Habeas Corpus in this Court. In it, he asserts three claims: 1) that the death sentence imposed against him violates the Eighth Amendment under *Atkins* due to his intellectual disability; 2) that counsel assigned to represent him at the state *Atkins* hearing rendered ineffective assistance of counsel by failing to investigate and to present compelling and relevant evidence in support of the *Atkins* claim; and 3) that he is actually innocent of the death penalty because he is mentally retarded. (ECF No. 94.) Respondent filed a Supplemental Return of Writ Regarding Atkins Claim on April 30, 2010.

17

(ECF No. 98.)  After requesting and receiving an extension of time, Hill filed a Traverse on August 2, 2010, and a Supplement to Traverse on August 5, 2010.  (ECF Nos. 102 and 103, respectively.)

On September 9, 2010, Hill requested an extension of time to file motions.  (ECF No. 114.)  Respondent opposed the motion, and the Court denied it on September 13, 2010.  (ECF Nos. 115 and 116, respectively.)  Hill then filed several motions with the Court on September 20, 2010.  He sought to expand the record with various declarations supporting his *Atkins* claims. (ECF Nos. 119 and 120.)  Hill also requested discovery to support his *Atkins* claims and his *Atkins*-related ineffective-assistance claim.  (ECF No. 117.)  And he sought an evidentiary hearing on his *Atkins* claims.  (ECF No. 118.)  On October 4, 2010, Hill filed a motion to supplement his motions for evidentiary hearing and expansion of the record.  (ECF No. 129.) Respondent opposed all motions.  (ECF Nos. 123, 125, 131.)

This Court ruled on Hill's motions on December 14, 2010.  It denied Hill's motion to expand the record, concluding that "Petitioner cannot show that he was not at fault for failing to develop the record" at the state *Atkins* hearing and therefore did not satisfy 28 U.S.C. § 2254(e)(2)'s requirements that a petitioner demonstrate that the factual predicates of his claim could have been previously discovered through the exercise of due diligence, and that he is actually innocent.  (ECF No. 132, 13.)  The Court also denied Hill's discovery request concerning his *Atkins*-related ineffective-assistance claim during post-conviction proceedings, because "Petitioner is not entitled to effective assistance of counsel during post-conviction proceedings and the issue cannot be heard on habeas review."  (*Id.* at 15.)  It granted discovery relating to the *Atkins* claims generally, however, as the information, if fully developed, may entitle Hill to relief.

18

(*Id*. at 16.)  Finally, it denied without prejudice Hill's motion for an evidentiary hearing because, again, Hill did not meet the criteria of § 2254(e)(2).  (*Id*. at 17.)

Hill notified the Court that he had completed discovery on April 13, 2011.  (ECF No. 135.)  On April 27, 2011, Hill moved to expand the record with the discovery obtained, which the Court granted "for the sole purpose of determining whether an evidentiary hearing is appropriate in this matter."  (ECF Nos. 140 and 145, respectively.)

On May 23, 2012, Hill requested that the Court reconsider its December 14, 2010, ruling regarding his requests for discovery and to expand the record "in relation to" his ineffective-assistance claim in light of the recent United States Supreme Court decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).  (ECF No. 146, 1.)  The Court denied Hill's request on July 10, 2012. (ECF No. 148.)

### III.    Petitioner's Grounds for Relief

Hill asserts three grounds for relief.  They are:

1.    Mr. Hill is mentally retarded and thus ineligible for the death penalty.  Mr. Hill's sentence of death violates his right to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

2.    Court appointed *Atkins* counsel rendered ineffective assistance to Mr. Hill, and the trial court allowed for the continued representation of *Atkins* counsel in spite of knowing that there was a complete and absolute breakdown in the attorney-client relationship, thereby denying Hill his right to counsel in violation of his Sixth, Eighth and Fourteenth Amendment Rights.

3.    Because Mr. Hill is mentally retarded, he is innocent of the death penalty.

(ECF No. 94, *passim*.)

### IV.    Standard of Review

19

Hill's Amended Petition is governed by the Antiterrorism and Effective Death Penalty
Act of 1996 ("AEDPA"), since it was filed after the Act's effective date. *Lindh v. Murphy*, 521
U.S. 320, 336 (1997); *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). AEDPA, which
amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal
criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality,
and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams
v. Taylor*, 529 U.S. 362, 436 (2000)). As the United States Supreme Court recently explained,
the Act "recognizes a foundational principle of our federal system: State courts are adequate
forums for the vindication of federal rights." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). AEDPA,
therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have
been adjudicated in state court." *Id*.

One of AEDPA's most significant limitations on the federal courts' authority to issue
writs of habeas corpus is found in § 2254(d). That provision forbids a habeas court from granting
relief with respect to a "claim that was adjudicated on the merits in State court proceedings"
*unless* the state-court decision either:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable
>        application of, clearly established Federal law, as determined by the
>        Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of
>        the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Habeas courts review the "last *explained* state-court judgment" on the
federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original).

A state-court decision is contrary to "clearly established federal law" under § 2254(d)(1)

20

only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Id*. at 413. A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id*. at 407. As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). Review under this clause, as its plain language indicates, also is limited to "the evidence presented in the State court proceeding." Furthermore, the petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S. Ct. at 15; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome

21

by clear and convincing evidence.[5]  28 U.S.C. § 2254(e)(1).  The Supreme Court repeatedly has

declined to define the "precise relationship" between § 2254(d)(2) and § 2254(e)(1).  *Burt*, 134 S.

Ct. at 15; *see also Wood v. Allen*, 558 U.S. 290, 300 (2010).   It has explained, however, that it is

> incorrect . . ., when looking at the merits, to merge the independent requirements
> of § 2254(d)(2) and (e)(1).  AEDPA does not require a petitioner to prove that a
> decision is objectively unreasonable by clear and convincing evidence.  The clear
> and convincing evidence standard is found in § 2254(e)(1), but that subsection
> pertains only to state-court determinations of factual issues, rather than decisions.

*Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).  "[A] decision adjudicated on the merits in a

state court and based on a factual determination will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the sate-court proceeding."  *Id*. at

340.  In addition, "it is not enough for the petitioner to show some unreasonable determination of

fact; rather, the petitioner must show that the resulting state court decision was 'based on' that

unreasonable determination."  *Rice,* 660 F.3d at 250.  And, as Supreme Court has cautioned, "'a

state-court factual determination is not unreasonable merely because the federal habeas court

would have reached a different conclusion in the first instance.'"  *Burt*, 134 S. Ct. at 15 (quoting

*Wood*, 558 U.S. at 301).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by

AEDPA, is an intentionally demanding standard, affording great deference to state-court

adjudications of federal claims.  In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme

Court held that as long as "fairminded jurists could disagree on the correctness of the state court's

---

[5]         Section 2254(e)(1) provides: "In a proceeding instituted by an application for a
writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be presumed to be correct.  The
applicant shall have the burden of rebutting the presumption of correctness by clear and
convincing evidence."  28 U.S.C. § 2254(e)(1).

22

decision," then relief is precluded under that provision. *Id*. at 786 (internal quotation marks omitted). The Court admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under de novo review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 785. Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted). Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87. This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id*. at 786.

Nevertheless, the Supreme Court recognized in *Harrington* that AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. at 786. "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El*, 537 U.S. at 340. Rather, "under AEDPA standards, a federal court can disagree with a state court's factual determination and 'conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.'" *Baird v. Davis*, 388 F.3d 1110, 1123 (7th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340) (Posner, J.).

In addition to § 2254(d)'s limitations, AEDPA precludes habeas review of some claims that have not been properly exhausted before the state courts, or were procedurally barred by the state courts. Section 2254(b)(1) provides that a federal court may not award habeas relief to an

23

applicant in state custody "unless it appears that – the applicant has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1); *see also Rose v. Lundy*, 455 U.S. 509 (1982). Thus, exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Rather than dismiss certain claims the court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).

In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001). To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits. *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

Also, even where a state prisoner exhausts available state-court remedies, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright*, 433 U.S. at 87. If a

24

state prisoner has defaulted his federal claims in state court pursuant to an
independent and adequate state procedural rule, federal habeas review of the
claims is barred unless the prisoner can demonstrate cause for the default and
actual prejudice as a result of the alleged violation of federal law, or demonstrate
that failure to consider the claims will result in a fundamental miscarriage of
justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To be independent, a state procedural rule and

the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*,

No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001) (citing *Coleman*, 501

U.S. at 732-33). To be adequate, a state procedural rule must be "'firmly established and

regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53,

60 (2009). If a petitioner fails to fairly present any federal habeas claims to the state courts but

has no remaining state remedies, then the petitioner has procedurally defaulted those claims.

*O'Sullivan*, 526 U.S. at 848; *Rust*, 17 F.3d at 160.

The Court will address the issues of exhaustion and procedural default presented in this

case when it reviews Hill's individual claims.

## V.     Analysis of Petitioner's Grounds for Relief

### A.     *First Ground for Relief:* Atkins *Claim*

Hill's first claim for relief is that he is intellectually disabled pursuant to *Atkins v.*

*Virginia*, 536 U.S. 304 (2002), and therefore ineligible for execution. Hill raised this claim on

post-conviction and appealed it to the Eleventh District Court of Appeals and the Ohio Supreme

Court. This claim is therefore preserved for federal habeas review.

#### 1.     Legal Standards: *Atkins* and *Lott*

In *Atkins v. Virginia*, the United States Supreme Court held that, in light of "our evolving

25

standards of decency," executing the intellectually disabled violates the Eighth Amendment's ban

on cruel and unusual punishment. *Atkins*, <u>536 U.S. at 321</u>. The Court recognized a national

consensus that intellectually disabled persons are "categorically less culpable than the average

criminal." *Id*. at 316. It explained,

> Mentally retarded persons frequently know the difference between right and wrong
> and are competent to stand trial. Because of their impairments, however, by
> definition they have diminished capacities to understand and process information,
> to communicate, to abstract from mistakes and learn from experience, to engage in
> logical reasoning, to control impulses, and to understand the reactions of others.
> There is no evidence that they are more likely to engage in criminal conduct than
> others, but there is abundant evidence that they often act on impulse rather than
> pursuant to a premeditated plan, and that in group settings they are followers
> rather than leaders. Their deficiencies do not warrant an exemption from criminal
> sanctions, but they do diminish their personal culpability.

*Id*. at 318. The Court also found intellectually disabled offenders at "special risk of wrongful

execution." *Id*. at 320. It pointed to the possibility of false confessions; the defendant's difficulty

in persuasively showing mitigation, providing meaningful assistance to counsel, and testifying;

and his or her demeanor, which may create an unwarranted impression of lack of remorse. *Id*. at

320-21. The Court concluded that given the impairments of intellectually disabled individuals,

executing them would not "measurably advance the deterrent or the retributive purpose of the

death penalty." *Id*. at 321.

The *Atkins* Court acknowledged the difficulties inherent in defining intellectual disability.

It stated,

> To the extent there is serious disagreement about the execution of mentally
> retarded offenders, it is in determining which offenders are in fact retarded. . . .
> Not all people who claim to be mentally retarded will be so impaired as to fall
> within the range of mentally retarded offenders about whom there is a national
> consensus.

26

*Id*. at 317. But it did not define the condition. Instead, as it did in the context of mental competency, the Court entrusted the states with "'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id*. (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).

The Court did, however, point states to the clinical definitions of intellectual disability promulgated by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA").[6] *Id*. at 308 n.3 (citing AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) (hereinafter, "AAMR 1992 Manual") and APA, *Diagnostic and Statistical Manual of Mental Disorders* 41-43 (4th ed. 2000) (hereinafter, "DSM-IV-TR")). It explained that those criteria "require not only subaverage

---

[6]     The Court observed:

> The American Association on Mental Retardation (AAMR) defines intellectual disability as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." . . .

> The American Psychiatric Association's definition is similar: The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." . . . "Mild" mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70.

*Id*. at 308 n.3 (citations omitted).

27

intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id*. at 318. It noted that "[existing state] statutory definitions of mental retardation are not identical, but generally conform to [those] clinical definitions . . . ."[7] *Id*. at 317 n.22. In its recent decision in *Hall v. Florida*, the Supreme Court explained that these clinical definitions of intellectual disability "were a fundamental premise of *Atkins.*" *Hall v. Florida*, slip op. at 18 (U.S. May 27, 2014). The Court stressed in *Hall* that a court's legal determination of the condition, "although distinct from a medical diagnosis," must be "informed" by "the views of medical experts" and "the medical community's diagnostic framework." *Id*. at 19-20.

---

[7]     The AAMR has cautioned, however, that "[t]he field of mental retardation is currently in a state of flux regarding not just a fuller understanding of the condition of mental retardation, but also the language and process used in naming, defining, and classifying" the condition. AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* xiii (10th ed. 2002) (hereinafter, "AAMR 2002 Manual"). At the heart of this evolving field is the very definition of intellectual disability, which has been revised nine times since 1908. *Id*. at 20-23. Since *Atkins* was decided, the AAMR has updated its manual twice: a tenth edition was published in 2002, and an eleventh edition in 2010. AAMR 2002 Manual; AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Support* (11th ed. 2010) (hereinafter, "AAMR 2010 Manual"). The APA published a fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (hereinafter, "DSM-V") in 2013. Many of the most recent changes to the clinical definitions of intellectual disability, as articulated in these updated guidelines, concern the criteria for adaptive behavior, which the Court will examine in more detail below.

In addition, as already noted, mental retardation is now commonly referred to as intellectual disability. *See supra* n.1. *See also* AMMR 2002 Manual, 5 ("The history of the condition we now know as mental retardation is replete with name changes, including feebleminded, mental defective, mentally deficient, and others. These new names arose as new theoretical frameworks appeared and older names came to signal stigma and distorted power relationships."). The AAMR has changed its name accordingly, to the American Association on Intellectual and Developmental Disabilities ("AAIDD"), although the Court will refer to the organization as AAMR throughout this opinion for consistency.

Soon after *Atkins* was decided, the Ohio Supreme Court established the "substantive standards and procedural guidelines" for Eighth Amendment intellectual disability claims in Ohio in *State v. Lott*, 97 Ohio St. 3d 303, 305, 779 N.E.2d 1011, 1014 (Ohio 2002). The court adhered to the clinical definitions cited with approval in *Atkins*, holding that to prevail on an *Atkins* claim, the defendant must prove that he or she: (1) suffers from "significantly subaverage intellectual functioning," (2) experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) manifested "onset before the age of 18." *Id*. The court noted, however, that "[w]hile IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination on this issue." *Id*. It therefore held that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." *Id*.

Because Lott's trial occurred before *Atkins* was decided, the Ohio Supreme Court determined that his *Atkins* hearing would be conducted before the trial court pursuant to Ohio's post-conviction procedures. *Id*. It further held that the trial court should conduct a de novo review of the evidence, "rely[ing] on professional evaluations of Lott's mental status, and consider[ing] expert testimony, appointing experts if necessary, in deciding this matter." *Id*. at 306, 779 N.E.2d at 1015. The court also held that the trial court, not a jury, would decide if a petitioner is intellectually disabled, and the petitioner bears the burden of proving his or her intellectual disability by a preponderance-of-the-evidence standard. *Id*.

    **2.**     **§ 2254(d)(1): Reasonableness of Ohio court's application of Supreme Court precedent**

Hill asserts, "To the extent that the state procedures themselves used to render the factual findings of the mental retardation clinical components contributed to and fostered inaccurate and unreliable factfinding by the trial court, the procedures violated clearly established federal law of" *Ford v. Wainwright*, 477 U.S. 399 (1986), *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Atkins* under § 2254(d)(1). (ECF No. 94, 15.) In *Ford* and *Panetti*, the Supreme Court held that state proceedings used to determine capital inmates' competency for execution must provide procedural due process protections. *See Ford*, 477 U.S. at 411-12; *Panetti*, 551 U.S. at 949. This argument lacks merit.

First, Hill does not clearly identify which state procedures violated these principles in his case. But even so, there is no "clearly established Federal law, as determined by the Supreme Court" on this issue, and § 2254(d)(1) does not apply. *See Williams v. Mitchell*, No. 1:09 CV 2246, 2012 WL 4505774, at **22- 28 (N.D. Ohio Sept. 28, 2012) (Nugent, J.). The Supreme Court has not addressed whether or to what extent *Ford*'s due process requirements extend to state-court determinations of intellectual disability under *Atkins*.[8] To the contrary, in *Bobby v. Bies*, 556 U.S. 825 (2009), the Court continued to emphasize that states themselves are responsible for "developing appropriate ways to enforce [*Atkins*'] constitutional restriction," and

---

[8] The Sixth Circuit has not addressed this issue either. Other circuit courts are split on the issue. *Compare Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007) (noting that "[e]ven though *Atkins* did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence"), *and Ochoa v. Workman*, 669 F.3d 1130, 1143 (10th Cir. 2012) (finding that Fourteenth Amendment due process protections are applicable in *Atkins* hearings, at least with respect to Oklahoma's decision to provide a right to a jury in such hearings); *with Hill v. Humphrey*, 662 F.3d 1335, 1360 (11th Cir. 2011) (distinguishing *Ford* and *Panetti* and holding that "[h]ere, by contrast, *Atkins* established only a substantive Eighth Amendment right for the mentally retarded, not any minimum procedural due process requirements for bringing that Eighth Amendment claim").

30

implicitly approved of Ohio's standard for intellectual disability claims. *Id*. at 831 (quoting *Atkins*, 536 U.S. at 317). *See also Schriro v. Smith*, 546 U.S. 6, 9 (2005) ("States, including Arizona, have responded to that challenge by adopting their own measures for adjudicating claims of mental retardation. While those measures *might*, in their application, be subject to constitutional challenge, Arizona had not even had a chance to apply its chosen procedures when the Ninth Circuit preemptively imposed its jury trial condition.") (emphasis added).

Moreover, even assuming that *Ford* and *Panetti* do apply here, this Court finds that the Ohio courts' adjudication of Hill's *Atkins* claim comported with the due process right to a "fair hearing" guaranteed in *Ford*. *See Ford*, 477 U.S. at 424 (Powell, J., concurring). Hill, assisted by appointed counsel and two appointed expert witnesses, conducted substantial briefing and discovery regarding his claim. (*See* Supp. App., Disc 1, 1-33.) The trial court, in accordance with the procedures established in *Lott*, held a twelve-day hearing, at which Hill submitted more than 500 pages of evidence. (*See id.* at 486-1013.) At its conclusion, the trial court issued an 84-page opinion, which thoroughly examined the evidence and explained its decision. (*See id.* at 3399-3483.) Hill then was provided with appointed counsel to appeal this decision to two higher state courts. (*See id.* at 3496-4517.) Thus, Hill was provided a full and fair opportunity to develop and present his *Atkins* claim in state court, and this claim fails.

### 3. § 2254(d)(2): Reasonableness of Ohio court's factual determinations regarding Hill's intellectual disability

As Hill concedes in his Traverse, his *Atkins* claim is more appropriately addressed as it relates to the Ohio appellate court's factual analysis under § 2254(d)(2). (ECF No. 102, 47.) Hill's primary argument under *Atkins* is that the "historical data and uncontroverted evidence

31

demonstrated that Mr. Hill meets the criteria established under psychological terms and under state law." (ECF No. 94, 20.) Respondent, in his six-page Return of Writ, counters Hill's claim simply by referring the Court to the "wealth of evidence" in the state-court record, the trial court's opinion, and audio and video recordings of Hill speaking to the trial court judge and a newspaper reporter. (ECF No. 98, 5.)

The Court first must determine the standards that govern its review of Hill's claim under § 2254(d)(2). Respondent, in his Return of Writ's only well-developed argument, contends that the Supreme Court decision in *Wood v. Allen*, 558 U.S. 290 (2010), "can fairly be read to say" that under § 2254(d)(2), a state-court finding is reasonable "if there is evidence in the State court record to support it." (*Id.* at 4.) The Court disagrees.

In *Wood*, the Court held that, "[r]eviewing all of the evidence, . . . even if it is debatable," a state court's conclusion that the petitioner's counsel made a strategic decision not to investigate further into, or present to the jury, information contained in a report about the petitioner's mental deficiencies was not unreasonable under § 2254(d)(2). *Wood*, 558 U.S. at 303. In doing so, the Court addressed the standard of review under § 2254(d)(2). It declined to reach the question of whether the "arguably more deferential" clear-and-convincing-evidence standard of § 2254(e)(1) "applies in every case presenting a challenge under § 2254(d)(2)," because its "view of the reasonableness of the state court's factual determination in this case [did] not turn on any interpretive difference regarding the relationship between these provisions." *Id.* at 300-01. But it "assume[d] for the sake of argument that the factual determination at issue should be reviewed . . . only under § 2254(d)(2) and not under § 2254(e)(1)." *Id.* at 301. The Court also acknowledged that "[t]he term 'unreasonable' is no doubt difficult to define." *Id.* at 301 (quoting *Williams,* 529

32

U.S. at 410)).  But it stressed:  "It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Id.*  The Court explained,

> In *Rice* [*v. Collins*, 546 U.S. 333, 339 (2006)], for example, in which we assumed, *arguendo*, that only § 2254(d)(2) and not § 2254(e)(1) applied, . . . we rejected the Ninth Circuit's conclusion that a state-court factual determination was unreasonable.  We noted that even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that *does not suffice* to supersede the trial court's . . . determination." [*Id.* at 341-42.]

*Id.* (emphasis added).  The Court also observed, "As for any evidence that may plausibly be read as inconsistent with the [state-court] finding that counsel made a strategic decision, we conclude that *it does not suffice* to demonstrate that the finding was unreasonable."  *Id.* at 302-03 (emphasis added).

Thus, the Court in *Wood* did not state, as Respondent argues, that a state-court factual determination is reasonable if *any evidence* exists to support it.  Rather, it reiterated that a habeas court, after reviewing *all of the evidence*, must find *sufficient* evidence of unreasonableness to warrant relief under § 2254(d)(2), and that is more evidence than would make the state-court decision merely debatable or would lead the habeas court to a different result.  Respondent's interpretation of *Wood*, though offering bright-line clarity, would render § 2254(d)(2)'s standard virtually insurmountable, extending deference nearly to the point of "abandonment or abdication of judicial review."  *Miller-El*, 537 U.S. at 340.

In this case, then, under § 2254(d)(2), the Court must review "the evidence presented in the State court proceeding" to determine whether the state court's adjudication of Hill's *Atkins* claim "was based on an unreasonable determination of the facts."  The state-court decision at

33

issue is from the Eleventh District Court of Appeals, which was the last Ohio court to render an explained judgment regarding Hill's claim. *Ylst*, 501 U.S. at 805. Hill bears the burden of rebutting that court's particular factual *findings* "by clear and convincing evidence." *Burt*, 134 S. Ct. at 15; *Rice*, 660 F.3d at 250. The Court is limited in its review to "the evidence presented in the State court proceeding.'"[9] 28 U.S.C. § 2254(d)(2). "[I]t is not enough for [Hill] to show some unreasonable determination of fact; rather, [he] must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice*, 660 F.3d at 250. Ultimately, Hill must show that the *decision as a whole* was unreasonable. *Miller-El*, 537 U.S. at 341; *see also Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011). And "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at 301.

The Court now examines the Ohio court of appeals' review of the state trial court's ruling that Hill had not met his burden of proving, by a preponderance of the evidence, that he was intellectually disabled, as defined by: (1) significantly subaverage intellectual functioning; (2) significant limitations in two or more adaptive skills; and (3) onset before the age of 18. *Lott*, 97 Ohio St. 3d at 305.

### a. significant subaverage intellectual functioning

The Ohio court of appeals agreed with the trial court that Hill met the first criterion for intellectual disability under *Lott*. The court stated,

> With respect to the first criterion, significantly subaverage intellectual functioning is clinically defined as an IQ below 70. FN2

---

[9] The Court, therefore, will not consider any of the new evidence Hill submitted in support of his petition.

34

FN2. More precisely, significantly subaverage intellectual functioning is defined as two standard deviations below the mean for the general population, i.e. an adjusted score of 100 on a standardized test. A single deviation is considered 15 points. Two deviations means a score of 70 or lower. It should also be noted that an IQ score below 70 is not determinative of a diagnosis of mental retardation. Cf. *Lott*, 97 Ohio St.3d 303, 2002-0hio-6625, 779 N.E.2d 1011, at 12 (holding "that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70").

Hill's IQ was measured nine times between 1973, when he was six years old, and 2000, when he was 33 years old. The scores range from 48 to 71, with the mean being 61.12. In April 2004, Hill scored a 58 on the Wechsler Adult Intelligence Scale. Drs. Hammer, Olley, and Huntsman all agreed that this result was unreliable due to Hill's intentionally trying to obtain a low score.

*Hill*, 177 Ohio App. 3d at 188-89, 894 N.E.2d at 121.  Neither Hill nor Respondent challenges this determination.  (*See* ECF No. 94, 21; ECF No. 98, 1.)

### b.    adaptive skills deficit

The Ohio appellate court also agreed with the trial court that Hill failed to meet, by a preponderance of the evidence, the second criterion for intellectual disability under *Lott*, which requires the offender to demonstrate "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction."  *Lott*, 97 Ohio St. 3d at 305, 779 N.E.2d at 1014.  It found "abundant competent and credible evidence" supporting the trial court's decision. *Hill*, 177 Ohio App. 3d at 194, 894 N.E.2d at 126.

Hill argues that the state appellate court's factual determination regarding his adaptive behavior was unreasonable.  (ECF No. 94, 21.)  In particular, he complains that the court failed to properly apply the clinical guidelines, and that, in the absence of reliable test results regarding adaptive functioning, the court "engaged in its own analysis of anecdotal evidence of Mr. Hill's deficits in adaptive behavior . . ., contrary to the record . . . ."  (*Id*. at 37.)

35

The Supreme Court has defined "adaptive behavior" as "an individual's ability or lack of ability to adapt or adjust to the requirements of daily life, and success or lack of success in doing so." *Hall*, slip op. at 3. *See also* AAMR 2010 Manual, 43 (AAMR defining adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives"); DSM-V, 37 (APA defining it as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background"). The concept of adaptive behavior is considered "one of the most subjective essential elements of mental retardation," and was not added to the AAMR definition until 1959. *Holladay v. Campbell*, <u>463 F. Supp. 2d 1324, 1329</u> (N.D. Ala. 2006); *see also* AAMR 1992 Manual, 38. It, like the definition of intellectual disability itself, has undergone many revisions.

In its 1992 manual, the AAMR assessed adaptive behavior based on ten skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. AAMR 1992 Manual, 38. In 2002, the AAMR grouped these adaptive skills into three general categories: conceptual, social, and practical. "Conceptual skills" include language, reading and writing, money concepts, and self-direction. "Social skills" include interpersonal relationships, personal responsibility, self-esteem, gullibility and naivete, following rules, obeying laws, and avoiding victimization. And "practical skills" include daily activities such as eating, personal hygiene, dressing, meal preparation, housekeeping, transportation, taking medication, money management, and telephone use, as well as occupational skills and maintaining a safe environment. AAMR 2002 Manual, 82. Under this standard, a significant deficit in only one of these groups satisfied the adaptive behavior criteria

36

for intellectual disability.  *Id.* at 78.  The AAMR did not change its definition of adaptive

behavior in the 2010 edition of its manual.  *See* AAMR 2010 Manual, 43.

In the DSM-IV-TR, the APA also measured adaptive behavior based on various skill

areas:  communication, self-care, home living, social/interpersonal skills, use of community

resources, self-direction, functional academic skills, work, leisure, health, and safety.  DSM-IV-

TR, 41.  It revised the criteria in the DSM-V, closely following the AAMR's new construct of

three broad skill groups.  It now provides,

> Adaptive functioning involves adaptive reasoning in three domains:  conceptual,
> social, and practical.  The *conceptual (academic) domain* involves competence in
> memory, language, reading, writing, math reasoning, acquisition of practical
> knowledge, problem solving, and judgment in novel situations, among others.
> The *social domain* involves awareness of others' thoughts, feelings, and
> experiences; empathy; interpersonal communication skills; friendship abilities;
> and social judgment, among others.  The *practical domain* involves learning and
> self-management across life settings, including personal care, job responsibilities,
> money management, recreation, self-management of behavior, and school and
> work task organization, among others.

DSM-V, 37.

In this case, the Ohio court of appeals quoted *Lott*'s standard for adaptive limitations –

"significant limitations in two or more adaptive skills, such as communication, self-care, and

self-direction" – under the definition of intellectual disability derived from the AAMR 1992

Manual and the DSM-IV-TR.  *Hill*, 177 Ohio App. 3d at 189, 894 N.E.2d at 121.  The court also

cited the AAMR 2002 Manual's revised definition of adaptive functioning.  *Id.* at n.3.  It did not,

however, identify which of these standards it was applying.  And there is no precedent in Ohio

law or from the Sixth Circuit regarding which definition of adaptive behavior should be applied

37

in this context.  Nevertheless, despite minor differences between the standards,[10] courts generally have not distinguished between them.  *See, e.g., Wiley v. Epps*, <u>625 F.3d 199, 216</u> n.13 (5th Cir. 2010) (noting that the two definitions "look at the same adaptive behavior"); *United States v. Davis*, <u>611 F. Supp. 2d 472, 490</u> (D. Md. 2009) (finding these classifications "essentially measure the same skills"); *Thomas v. Allen*, <u>614 F. Supp. 2d 1257, 1314-15</u> (N.D. Ala. 2009) (observing that the 1992 and 2002 AAMR definitions "share a common conceptual linkage").  This Court finds that, although the later guidelines provide useful clarification, the experts engaged in Hill's case most often referenced the 1992 AAMR standard for adaptive behavior cited in *Atkins* and *Lott*.  *See Wiley*, <u>625 F.3d at 216</u>; *Thomas*, <u>614 F. Supp. 2d at 1315</u>.  By that standard, therefore, Hill was required to show by a preponderance of the evidence deficits in at least two out of the ten skill areas of adaptive behavior listed above.

Significantly, the Ohio courts assessed Hill's adaptive skills as they existed at the time of the hearing.  Hill had filed a pretrial motion with the trial court arguing that the correct time frame in which to analyze his intellectual disability for purposes of his *Atkins* claim was at the time of the offense.  (Supp. App., Disc 1, 228-37.)  The State countered that the court should focus on Hill's present mental status.  (*Id*. at 217-23.)  The court, in ruling on the matter, noted that neither *Atkins* nor *Lott* addresses the time frame at which a finding of metal retardation is relevant.  It decided that it would determine whether Hill was intellectually disabled "at the time

---

[10]     The experts in this case agreed that the AAMR 2002 Manual provided a slightly more stringent standard of adaptive deficiencies than the AAMR 1992 Manual.  (Supp. App., Disc 1, Tr., 592-93; 1509-10.)

38

[he] filed [his] claim,"[11] although it stated that it would not "totally disregard, or even preclude testimony concerning [Hill's] mental status at the time of the offense . . . or . . . as to his childhood and adolescent development." (*Id*. at 249-50.) The state court of appeals did not address the temporal issue at all, and considered evidence from Hill's entire life. Hill does not contest the trial court's decision regarding this issue. (*See* ECF No. 94, 15.)

### (1) adaptive skills testing

The Ohio court of appeals began its analysis of Hill's adaptive behavior by discussing the results of tests used to assess Hill's adaptive skills, both those performed during his childhood and those performed pursuant to his *Atkins* proceedings. *Hill*, 177 Ohio App. 3d at 189-91, 894 N.E.2d at 122-24. Indeed, the AAMR prefers that practitioners use standardized testing to assess adaptive skills, which measure the subject's functioning against the general population. AAMR 2002 Manual, 76. The court, however, rejected the results of the tests as unreliable. The experts retained to evaluate Hill agreed that the results of the tests they performed were unreliable, because, as Dr. Olley reported, Hill "did not give his best effort to the tests or . . . he made a planned effort to score low." (Supp. App., Disc 1, 1224.) They also agreed, and Hill concedes, that Hill's earlier test results were not valid.[12] (*See, e.g.,* ECF No. 94, 21.) Two psychologists tested Hill's adaptive functioning when he was a child, but deemed the results unreliable because

---

[11]    As noted above, Hill filed his *Atkins* claim in state court on January 17, 2003. (Supp. App., Disc 1, 31-32.) He was 36 years old. The hearing on his claim took place about two years later, beginning on October 4, 2004, and concluding on July 15, 2005. (*Id*. at 132, 1791.)

[12]    This renders moot Hill's argument that the court of appeals incorrectly held that the trial court did not abuse its discretion in rejecting the rebuttal testimony of Dr. Sparrow that Hill's older adaptive test scores could be recalculated to reflect updated scores that would place him within the intellectually disabled range. (*Id*. at 33-35.)

39

the informant was Hill's mother, who also was intellectually disabled and, they believed, overstated Hill's abilities. (*Id*. at 515, 522, 527.) And Drs. Olley and Hammer agreed that the other early adaptive skills tests also were unreliable because the informant was not identified. (*Id*., Tr., 309, 431, 1779.)

The appellate court noted, therefore, that the trial court "[a]lternatively" favored "the more credible testimony of the other experts who concluded that Hill's adaptive capabilities are greater than those of a person with mental retardation." *Hill*, 177 Ohio App. 3d at 191, 894 N.E.2d at 123. But before it addressed the expert testimony, the court summarized the anecdotal evidence presented at Hill's hearing.

### (2)   anecdotal evidence

In reviewing the anecdotal evidence of Hill's adaptive functioning, the Ohio court first explained,

> Apart from the problematic standardized measurements of Hill's adaptive skills, the trial court and the expert witnesses had to rely on collateral, largely anecdotal evidence to determine the level of Hill's adaptive functioning. The trial court acknowledged that such evidence constituted a "thin reed" on which to make conclusions about Hill's diagnosis, but also recognized that this situation was the result of Hill's failure to cooperate with the experts retained to evaluate him.FN5  This court further emphasizes that the burden was on Hill to demonstrate that he is mentally retarded, not on the state to prove that he is not mentally retarded.
>
> FN5. Hill's own expert, Dr. Hammer, testified that the results of Hill's performance on the Test of Memory Malingering ("TOMM") "casts doubt on all the testing information collected from Mr. Hill during the evaluation process."

*Id*.

As a preliminary matter, the Court points out that the state-court record was hardly a "thin reed." At well over 6,000 pages, it was voluminous. The experts agreed that it was larger than

40

those in most capital cases in which intellectual disability is at issue.  (*See* Supp. App., Disc 1, Tr., 468-69 (Hammer test.); 833-34 (Olley test.); 1196 (Huntsman test.); 1429-30 (testimony of Sara S. Sparrow, Ph.D. (hereinafter, "Sparrow test.")).)  And while it is true that the record contains many subjective, "anecdotal" observations of Hill's academic performance, conduct, and behavior, much of that anecdotal information was provided in reports prepared by, and testimony of, both private- and public-sector psychiatrists, psychologists, social workers, and educators to support their professional opinions.

This is precisely the type of information that experts are supposed to rely on in the absence of reliable test scores.  The Supreme Court in *Hall* described the "substantial and weighty evidence" of adaptive functioning that courts should consider in determining intellectual disability as "including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances." *Hall*, slip op. at 9.  It noted that "the medical community accepts that all of this evidence can be probative of intellectual disability . . . ." *Id*.  Indeed, the AAMR recognizes that some situations call for a retrospective diagnosis, in which "formal assessment is less than optimal."  AAIDD, *User's Guide*, 17-18 (10th ed. 2007) (hereinafter, "AAIDD User's Guide").[13]  It directs practitioners in those situations to conduct a thorough review of the subject's social history and school records, as the experts and court did here.  AAIDD User's Guide, 18-20.

In fact, as will be explained in more detail below, the true "thin reed" in this case was the

---

[13]     None of the experts who testified in this case explicitly referred to the AAIDD User's Guide, but their reports and testimony substantially adhere to the AAMR/AAIDD guidelines.

41

information that was available concerning Hill's adaptive functioning at the time he filed his *Atkins* claim, the focus of the evaluation. Although Hill's malingering during the testing certainly contributed to this lack of evidence, it was the fact that Hill had been on death row for more than seventeen years, according to the experts, that made their evaluation particularly "unusual" and "challenging."[14] (*See, e.g.*, Supp. App., Disc 1, Tr., 647 (Olley test.) ("Our task is an unusual and a challenging one because the standards of our profession make no explicit statement about how to evaluate a person who has been in prison for a long time.").) *See also* AAMR 2002 Manual, 85 ("Observations made outside the context of community environments typical of the individual's age peers and culture warrant severely reduced weight.").

Nevertheless, the appellate court found "abundant competent and credible evidence" supporting the trial court's decision that Hill had not met his burden of proving that he possessed the requisite adaptive deficits to qualify as intellectually disabled. And, despite certain weak evidence and flawed analysis, this Court cannot say that the appellate court's determination was so clearly erroneous or unreasonable as to satisfy AEDPA's exacting standards.

      **(a)**     **Hill's adaptive functioning during childhood: school and juvenile court records**

---

[14]    Moreover, even if Hill had cooperated with the experts' testing, under AAMR standards, the tests should not have been dispositive anyway, since Hill was being used as his own informant regarding his functioning. The AAMR advises,

> Those who use most current adaptive behavior scales to gather information about typical behavior rely primarily on the recording of information obtained from a third person who is familiar with the individual being assessed. [T]he respondent [should be] a parent, teacher, or direct-service provider rather than from direct observation . . . or from self-report of typical behavior.

AAMR 2002 Manual, 85. The experts and court, therefore, would have had to review evidence from other sources in any event.

Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus
Exhibit G
154 of 213

In summarizing the trial court's findings regarding Hill's adaptive behavior during childhood, the Ohio appellate court stated:

> *Public School Records*. Hill's public school records amply demonstrate a history of academic underachievement and behavioral problems. Hill is often described as a lazy, manipulative, and sometimes violent youth. Although there are references to Hill's being easily led or influenced by others, the trial court noted that much of Hill's serious misconduct, including two rapes committed prior to Fife's murder, occurred when he was acting alone. Hill knew how to write and was described by at least one of his special education teachers as "a bright, perceptive boy with high reasoning ability."

*Hill*, 177 Ohio App. 3d at 192, 894 N.E.2d at 124.

This characterization of Hill's school and juvenile court records is troubling. First, the state court cites evidence here that is irrelevant under the clinical guidelines. It implies that evidence of Hill's weak academic and other adaptive functioning as a child reflects only Hill's indolence and poor behavior, excluding intellectual disability as a cause or at least casting doubt on it. But the AAMR advises that "adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning." AAIDD User's Guide, 20. "Underachievement," therefore – whatever its cause – is irrelevant to adaptive functioning. Similarly, the AAMR cautions that "adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum." *Id*. *See also* DSM-IV-TR, 42 ("Adaptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social or vocational opportunities, and the mental disorders and general medical conditions that may coexist with mental retardation."). Therefore, as the experts explained at Hill's hearing, the presence of a conduct disorder or other mental illness does not contradict a diagnosis of intellectual disability; intellectually disabled persons can, and often do, suffer from mental

43

illness.[15]  (*See* Supp. App., Disc 1, Tr.,  473 (Hammer test.); 1102 (Huntsman test.); 1537 (Sparrow test.).)  *See also Black*, 664 F.3d at 99 ("[M]ental retardation and other mental disorders are not mutually exclusive. . . .  Rather, mental retardation and any number of other factors may coexist as comorbid causes of a defendant's deficient adaptive functioning." (internal citations omitted)); *Holladay*, 463 F. Supp. 2d at 1345 ("This court rejects the argument that willful and [] anti-social behavior excludes a mental retardation determination.  To the contrary, it suggests that a person whose IQ tests strongly indicate mental retardation has not adapted.").

Furthermore, the court's finding that Hill "underachieved" academically or in any other adaptive skill as a child is squarely contradicted by the record.  This Court could not find one reference in Hill's school records by a teacher, school administrator, psychologist, psychiatrist, or anyone else suggesting that Hill was capable of performing at a substantially higher level but chose not to.[16]  And the experts all agreed that there is no evidence in the school records that Hill

---

[15]     The AAMR states that mental health disorders are "much more prevalent" among intellectually disabled persons than the general population.  AAMR 2002 Manual, 172.  The DSM-IV-TR states, "Individuals with mental retardation have a prevalence of comorbid mental disorder that is estimated to be three to four times greater than in the general population."  DSM-IV-TR, 45.

[16]     The Court found only one express statement in the record that Hill could have performed better academically than he actually did.  A teacher wrote in a "Progress Report" in 1980 that, according to Hill's IQ test results that year, he "should be reading at a mid-second grade level," but had "only demonstrated the ability to read on a first grade level."  She speculated, "Possibly this is due to Danny's need for glasses, and his dislike for reading."  (Supp. App., Disc 1, 568.)  Whatever the cause for Hill's problems in reading that year, a year that he experienced serious difficulties across the board, a seventh grader's failure to read at a second-grade rather than a first-grade level does not qualify as the type of "underachievement" the Ohio court suggests, such that Hill could have read at a significantly higher level but chose not to.  Even if Hill had read at a second-grade level when he was thirteen years old, he still would have been seriously impaired.

44

malingered, or pretended to be slower than he was.[17]  (Supp. App., Disc 1, Tr., 272-73 (Hammer test.); 856 (Olley test.); 1110 (Huntsman test.); 1541 (Sparrow test.).)  As Dr. Hammer noted, children normally do not wish to be placed in special education programs or to be labeled intellectually disabled because of the stigma attached.  (*Id*. at 225-26, 231, 298.)  In fact, if Hill's academic or other adaptive limitations could have been attributed to Hill's laziness or deception, as the court suggests, Drs. Hammer and Olley agreed that school psychologists would have reported that fact and Hill would not have been placed in special education programs and programs for intellectually disabled students.  Both the social bias and the law at that time favored mainstreaming children in school as much as possible over the risk of stigmatizing them by labeling them intellectually disabled.[18]  (*Id*. at 151, 218, 472 (Hammer test.); 828-34 (Olley test.).)

The Ohio court also discounted the repeated references in the school records to Hill being easily led by others[19] with the fact that Hill committed two rapes and other crimes on his own.  Evidence of Hill's crimes, however, should be given little, if any, weight in determining

----

[17]    Dr. Huntsman did speculate in her report, however, without citing any evidentiary support, that the early formal assessments of Hill's cognitive abilities were invalid because "Mr. Hill has always been an unmotivated test taker, I think, since there have always been rewards associated with poor performance in the forms of attention and an easier curriculum.  He had little academic interest for years . . . ."  (Supp. App., Disc 1, 1140.)

[18]    In elementary school, Hill was mainstreamed only in gym and music class.  (Supp. App., Disc 1, 247-48, 554.)  In junior high school, he also was mainstreamed in art and practical arts.  (*Id*. at 558.)

[19]    The court's acknowledgment that "there are references to Hill's being easily led or influenced by others" is a gross understatement.  Psychologists, social workers and teachers almost uniformly commented on this trait, describing Hill, for example, as a "follower," "easily influenced," or "highly suggestible."  (*See*, *e.g.*, Supp. App., Disc 1, 515, 519, 522, 527, 532, 533, 537, 557, 1976.)

his adaptive skills.  The AAMR directs, "Do not use past criminal behavior . . . to infer level of adaptive behavior or about having MR/ID . . . .  First, there is not enough available information; second, there is a lack of normative information."  AAIDD User's Guide, 17-20.  Isolated acts of criminal behavior, after all, contradict the essential meaning of adaptive behavior.  In *Penry v. Lynaugh*, <u>492 U.S. 302</u> (1989), the Supreme Court recognized that a defendant could be intellectually disabled and have sufficient insight and planning ability to deliberately kill a rape victim to avoid detection.  Such acts, it found, may exemplify a reduced ability to control one's impulses and evaluate the consequences of one's conduct, rather than undermine a diagnosis of intellectual disability.  *Id*. at 322.  Numerous other courts also have acknowledged the problematic nature of this evidence.  *See, e.g., Brumfield v. Cain*, <u>854 F. Supp. 2d 366, 395-96</u> (E.D. La. 2012) ("In assessing the weight to be given to criminal facts, this Court lends great credence to the clinical admonitions that using those facts to determine adaptive skills is at best a haphazard and risky business."); *Holladay*, <u>463 F. Supp. 2d at 1344</u> n.28 (rejecting argument that ability to commit crime and temporarily avoid capture forecloses a determination of intellectual disability and stating, "The State has repeatedly referred to Petitioner's crimes as 'complicated.' Apparently he came to harm, even kill, his ex-wife and killed all who were present.  It was not 'complicated.'  It was, perhaps, at least partly impulsive.  The Respondent refers to Petitioner's 'criminal acumen.'  He always got caught.").

Finally, this Court is most troubled by the Ohio court's finding that "Hill knew how to write and was described by 'at least' one of his special education teachers as 'a bright, perceptive boy with high reasoning ability.'"  As to Hill's writing skills, the Court finds no evidence in the record that Hill could write much more than his name during his school years, and struggled even

46

with that.  At eight years old, a school psychologist reported that Hill's motor-visual skills were so poor that he could not copy a diamond.  She also noted, "[w]hen Danny printed his name, the reproduction was very poor and he spelled his last name Hlli."  (Supp. App., Disc 1, 493.)  At thirteen years old, a school psychologist reported Hill's weakness in "reproduc[ing] symbols using phchomotor [*sic*] speed and coordination" and that his handwriting was "immature for his chronological age."  (*Id*. at 522; *see also id*. at 519 ("written expression is weak").)  A teacher wrote that year that Hill could write "simple sentences . . . with assistance," but had "a great deal of difficulty thinking of sentences to accompany pictures."  (*Id*. at 569.)  At fourteen years old, Hill's teacher wrote that one of her goals for Hill was for him to "write [his] own signature."  (*Id*. at 578.)  One of Hill's counselors testified at Hill's mitigation hearing that when Hill was fifteen years old he could not read or write.  (ECF No. 28, 78.)

In addition, the court's observation that "at least" one teacher found Hill to be "bright" and "perceptive," with "high reasoning ability," is almost cynical in its selective misrepresentation of the facts.  *See, e.g., Holladay*, 463 F. Supp. 2d at 1343 ("It is important, in determining whether a person is or is not mentally retarded, not to pick and choose so as to over-emphasize certain characteristics.").  This Court could not find one other reference to Hill as "bright," "perceptive" or in any way intellectually or academically talented from any educator or anyone else involved in Hill's education.  Indeed, the experts all agreed that Hill's school records indicated significant limitations in functional academics.  (*See* Supp. App., Disc 1, Tr., 69, 230 (Hammer test.); 783 (Olley test.); 1112 (Huntsman test.).)  Moreover, the comment is belied by the document itself.  It was written by a special education teacher at Fairhaven, a school for intellectually disabled children, on an individual educational plan ("IEP") form when Hill was

47

fourteen years old. (Supp. App., Disc 1, 578-79.) The teacher notes that Hill was reading at the first-grade level and doing math at the third-grade level. Among the goals she listed for Hill were: "develop appropriate behavior," such as "work[ing] without being disruptive[,] touch[ing] others in a manner suitable to school[, and] play[ing] cooperatively"; and "develop necessary self help [*sic*] skills," such as "shower[ing] regularly[,] us[ing] deodorant regularly[,] maintain[ing] a clean, neat appearance, mend[ing] torn clothing before wearing in public, eat[ing]/drink[ing] in a manner appropriate to school." (*Id*. at 578.) The teacher, by calling Hill "bright" and "perceptive," perhaps was attempting to set a positive tone for a student at a school for intellectually disabled children, but her goals for Hill clearly show that he was struggling to achieve academically and to behave appropriately and productively.

In fact, Hill's school and juvenile court records, which number hundreds of pages, are replete with evidence of Hill's limitations in adaptive functioning. They tell the story of a child who was raised primarily by an intellectually disabled mother, diagnosed as intellectually disabled in kindergarten, and identified and treated as such throughout his childhood. Hill was placed in special education classes for intellectually disabled students from the first grade on. At age thirteen, he was sent to a school for intellectually disabled children, and was transferred to another, similar school at fifteen because of poor academic achievement and behavior. At seventeen years old, after being arrested for, and pleading guilty to, two felony rape charges, the juvenile court placed Hill in a facility that housed mentally ill youth offenders.

Hill was born on January 6, 1967, in Warren, Ohio, to 18-year-old Vera Hill.[20] (*Id*. at

---

[20]     Hill was Vera's maiden name. She later assumed the surnames of two husbands, Vaugn and Williams.

1973.) Hill's mother was intellectually disabled (*id*. at 515, 522, 527; ECF No. 31, 256-57), had

attended school only through the eighth grade (ECF No. 31, 8), and lived primarily on public

assistance while Hill was a child (*id*. at 9.) Hill had no contact with his father. (*Id*. at 9-10.) He

lived with his mother and three brothers, each from different fathers. He was second oldest. (*Id*.

at 7.) Hill also lived for several years with a stepfather, Charles Williams, and for a period of

time with three of Mr. Williams' children, until Mr. Williams died in 1985.[21] (*Id*. at 10-11.) Mr.

Williams was kind to the children, but he abused alcohol and worked long hours, so he was not

actively involved in parenting. (*Id*. at 12-13, 256.) Hill's mother testified that all four of her

sons were "slow" in school, and they all had records of behavioral problems. (*Id*. at 12, 257-58.)

She also testified that Hill was well-behaved at home, but he had few friends and stayed home

most of the time. (*Id*. at 18-20.)

Hill entered kindergarten in the Warren City Schools in the fall of 1972, at the age of five.

That spring, the school psychologist, Karen Weiselberg, evaluated Hill at the request of his

kindergarten teacher, who was concerned about Hill's "present level of intellectual functioning,"

as he "appear[ed] to be very immature in comparison to the other students." (Supp. App., Disc 1,

489.) Dr. Weiselberg wrote that Hill's IQ score was 70, placing him in the third percentile of the

general population. (*Id*. at 490.) He did not know his correct age (he thought he was nine) or his

address, and his classmates "often pick[ed] on him." (*Id*. at 489.) He could not count dots, read

numbers, or show a certain number of fingers when asked. And he could not match most letters

of the alphabet. Dr. Weiselberg concluded that he possessed the visual-motor coordination of a

---

[21]    Hill's mother's previous marriage, to James Vaugn, ended in divorce, and it is
unclear from her testimony whether Mr. Vaugn ever lived with her and her children. (*Id*. at 11.)

49

three-year-old and, overall, was functioning at the level of a four-year-old. (*Id*. at 490.) She recommended to the principal that Hill be placed in special education classes for "educable mentally retarded" ("EMR") children. (*Id*.)

Dr. Weiselberg tested Hill again at the beginning of third grade, in September of 1975; he was eight years and eight months old at the time. (*Id*. at 492-94.) She reported that Hill's IQ was 62, placing him within the first percentile of the general population. (*Id*. at 492.) His basic skills in reading, spelling and arithmetic ranged from mid-kindergarten to beginning first-grade level. For example, on a sight recognition word test, Hill could not read any words, and on the arithmetic subtest, he could not read double digit numbers or complete any simple addition or subtraction problems. (*Id*. at 493.) She advised that Hill "will be limited in his ability to generalize, to transfer learning from one situation to another, to do abstract reasoning or to do much self evaluation." Dr. Weiselberg again diagnosed Hill as falling within the EMR classification, and found his functioning at the level of a five-year-old. (*Id*.)

In November of 1977, Hill again was placed in a special education class for fifth grade. (*Id*. at 554-55.) His goals for the year included "us[ing] the short a and short I vowel sounds to sound out words," and "[g]iven multiple choice, [to] be able to choose the main idea of the story." (*Id*. at 554.) The following year, in sixth grade, Hill was "introduced to addition . . . ." (*Id*. at 561.)

In 1980, when Hill was thirteen years old and in seventh grade, he again was evaluated by a school psychologist, Annette Campbell, because he was "unable to achieve academically and [had] been having behavioral problems in the school." (*Id*. at 520.) Hill had an F in his special-education classroom work. (*Id*.) His IQ score was 49. (*Id*. at 521.) Dr. Campbell reported that

50

Hill did not know his address or phone number, and that she observed during the testing behaviors such as "an immature pencil grip, making noises, being restless and tired, rolling his eyes back into his head, making faces when he talks, [and] working with his pencil hanging straight out of his mouth." (*Id*. at 520.) But she stated that he "did cooperate and accepted all tasks presented to him." (*Id*.) Dr. Campbell diagnosed Hill as intellectually disabled, finding weaknesses in "not being able to recall everyday information, do abstract thinking, perform mental arithmetic, perceive a total social situation, perceive patterns, and to reproduce symbols using phychomotor [*sic*] speed and coordination." (*Id*. at 522.) She also reported that Hill exhibited "a great deal of impulsivity." She explained,

> This means Danny does not think before he acts or speaks. Giving few responses is typical of mentally retarded children. He seems to feel tension and anxiety in trying to handle his environment. The school environment is extremely frustrating to Danny. Basically, testing shows that he is an affectionate child, not overtly aggressive. The fighting he has been in in school is usually cases where he is led into it by others.

(*Id*.) She concluded, "Danny is a child who is not functioning academically in his present placement. He also is extremely immature and is easily led by others into trouble around school." (*Id*.) Dr. Campbell recommended that Hill be placed in the smaller, more confined "Behavioral Improvement" unit where he would receive more individualized help "both academically and socially." And if that did not work, she recommended he be placed in the Fairhaven Program in Niles, Ohio, for the trainable mentally retarded ("TMR"). She also recommended a neurological examination to "help to explain the continuous drop in I.Q. points." (*Id*.)

Dr. Campbell repeated Hill's testing less than four months later. This time, Hill's IQ was

51

48.  (*Id.* at 513.)  She now recommended placement in the Fairhaven Program.  (*Id.* at 515.)

Hill's academic and social functioning continued to deteriorate that year.  One of his teachers

wrote that his "academic ability seems to be at a first grade level, as do his social skills."  (*Id.* at

568.)  She explained,

> Danny usually is very sleepy and has fallen asleep in class.  He is always
> unprepared for class (without paper and pencil), and when these are provided for
> him, he usually looses [*sic*] them between classes.  Often Danny wanders through
> the halls and for this reason is late for classes.
>
> Danny is unable to complete his lessons, which are on a first grade level,
> without assistance.  If Danny is left unattended, he strays from his task and begins
> to display immature behaviors, or falls asleep.  These behaviors include making
> noises, throwing small objects, verbally antagonizing others, taking things that do
> not belong to him, and wandering around the class room.
>                     . . .
>
> Danny is a very affectionate child.  He often expresses the desire to be
> hugged and will often rest his head on the teachers [*sic*] shoulder.  On occassion
> [*sic*], Danny has kissed the teacher indicating a desire to receive attention.

(*Id.*)  Hill was just beginning to learn subtraction and had "a great deal of difficulty subtracting

with numbers larger than 10."  (*Id.*)  That May, Dr. Campbell completed a psychological

evaluation form for the County Board of Mental Retardation to request Hill's placement at

Fairhaven School.  (*Id.* at 516-19.)  She listed his "developmental disability areas" as

"communication and self-help general."  (*Id.* at 516.)  Her "special instructional

recommendations" were: "1. Teach address and phone number. 2. Teach functional words in

reading. 3. Teach telling time."  (*Id.*)  Regarding Hill's academic skills, she wrote: "First and

second grade levels academically, extremely immature and dependent, responds like a five year

old . . . needs constant supervision."  (*Id.* at 519.)  Regarding his adaptive behavior, she wrote:

"He is weak in communication and self-help general.  Observations show weaknesses in

52

socialization and fine-motor skills."  (*Id.*)

Hill attended the Fairhaven Program for the 1980/81 and 1981/82 school years, but he continued to struggle academically and socially.  Hill's mother testified at his mitigation hearing that the Fairhaven students teased Hill, "call[ing] him dumb and stuff like that," and Hill often skipped school because of that.  (ECF No. 31, 15.)  His reading skills remained at the first-grade level, and his math skills advanced only to the third-grade level.  (*Id.* at 575, 578.)  The program also continued to work with him on self-help skills, such as personal hygiene, and social skills, such as controlling his temper and respecting authority.  (*Id.*)  In April 1982, Dr. Campbell again evaluated Hill.  (*Id.* at 511-12.)  His IQ score was 63.  (*Id.* at 511.)  Her testing indicated a social maturity of a twelve-year-old, with "much impulsivity" and  "much hostility and aggression."  (*Id.*)  She further noted that Hill "seem[ed] to feel insecure, immature, and inadequate needing much emotional support," had "severe problems" at school that year, and exhibited "weaknesses in the areas of communications, self-direction, socialization and occupation."  (*Id.* at 511-12.)

At this time, Hill began to get into trouble with the police, mainly for theft-related crimes and truancy.  In August 1982, the court placed him in a group home in a rural, farm setting operated by Brinkhaven Enterprises, Inc. ("Brinkhaven"), in North Lawrence, Ohio.  (*Id.* at 526.)  Hill did well there.  (*Id.* at 524, 1973.)  In January of 1983, Brinkhaven's court liaison officer wrote of Hill, "Dan is improving in his personal hygiene.  While he needs constant reminder[s] to shower, brush his teeth, etc., he does attempt to do a [more] thorough job than when he first came to the program."  He also noted that "Dan receives tutoring in basic skills, as well as requiring a lot of one-on-one teaching within the classroom itself."  (*Id.* at 524.)  His tutor at Brinkhaven reported that Hill worked at the first-grade level in reading and the second-grade level in math.

53

(*Id*. at 525.)  Mark Brink, one of Hill's youth workers, and later the vice president and court liaison officer at Brinkhaven, testified at Hill's mitigation hearing that Hill needed twenty-four hour supervision, because:

> everything you wanted Danny to do, you explained it to him.  If you wanted him – you know, you had to tell him every day: "Danny, comb your hair, brush your teeth, take a shower."  Chores, you had to follow up to make sure they're done properly.  You needed to supervise him while he was doing them a lot of times.

(ECF No. 31, 87.)  He also commented that Hill often was teased for being heavy and "one of the slower kids that we had there," and was a follower.  (*Id*. at 84-86.)  Hill left Brinkhaven in February of 1983 because of a lack of funds at the county level.  (*Id*. at 83; Supp. App., Disc 1, 526.)  He enrolled in the tenth grade at Warren Western Reserve High School.  (Supp. App., Disc 1, 1973.)

Hill rarely attended school, however, and continued to get into trouble.  By December 1983, Hill had amassed four felony and eight misdemeanor juvenile convictions, all related to theft.  (*Id*. at 1936-38, 1947-69.)  Hill told a Department of Youth Services employee that he did not attend school because students there repeatedly threatened to hurt him.  (*Id*. at 532.)  His mother told the same employee that she blamed Hill's troubles on three boys and "some adults" who threatened him and "got Danny to steal for them.  What they told him he would do."  (*Id*.)  Hill was expelled from school for the remainder of the year in February 1984.  Neither Hill nor his mother attended the expulsion hearing.  (*Id*. at 618, 1973.)

In January 1984, the juvenile court asked psychologist Douglas Darnall to evaluate Hill for a bind over proceeding.  Dr. Darnall reported to the court that Hill fell in the "mildly retarded range."  (*Id*. at 527.)  His IQ was 55.  (*Id*.)  Dr. Darnall discounted the adaptive skills test because

54

Hill's mother served as the informant, and wrote, "it is reasonable to conclude that Danny's overall functioning is within the mildly retarded range." He opined that Hill's level of adaptive functioning was "[v]ery [p]oor." He explained, "His judgement [*sic*] is poor and he does not think of consequences. He is highly suggestible." He also stated, "Danny does not comprehend the seriousness of his offenses." (*Id.*) Dr. Darnall did not recommend bind over to an adult facility. He felt Hill would not benefit from rehabilitation in an adult facility and was "likely to be exploited" because of his "passivity and limited intellectual ability." (*Id.* at 528.) Although Dr. Darnall considered Hill's prognosis "poor regardless of where [Hill was] placed," he recommended that if convicted, Hill "be placed in a juvenile facility that is highly structured and can provide programming for mentally retarded youth." (*Id.*) He "further anticipate[d] that Danny will in time need to live in an adult halfway house which would be able to provide both social as well as vocational habilitation." (*Id.*) The Probation Department agreed with Dr. Darnell and recommended that Hill be returned to Brinkhaven, where he would get the "intensive, individual attention" he needed, rather than an adult facility, where "he would only be exploited by older, more hardened criminals." (*Id.* at 529.) The bind over was denied on March 5, 1984, and Hill was again committed to Brinkhaven. (*Id.* at 1952.)

Three days later, however, Hill was back in court, this time charged with two counts of rape. (*Id.* at 1923, 1936, 1975.) He pleaded guilty to both counts and was sentenced to serve a minimum of one year and a maximum period not to exceed Hill's twenty-first birth date at the Training Center for Youth ("TCY"), a secure facility for youth offenders with psychological problems. (*Id.* at 531, 1939.) On April 25, 1984, Hill was evaluated by the head psychologist at TCY, R.W. Jackson. (*Id.* at 530.) Hill's IQ was 65. (*Id.*) Dr. Jackson wrote that Hill was an

55

"[i]ntellectually limited, socially constricted youth with very few interpersonal coping skills. Rather immature and self-centered with needs for attention and approval of others." (*Id*.) A TCY social worker stated in a treatment plan that Hill was "a very limited, mildly retarded youth who has no insight into the seriousness of his delinquent activities. He shows no remorse for his victims nor . . . shame . . . ." (*Id*. at 1975-76.) She further stated that Hill was "very easily influenced or intimidated by more mature and aggressive youths," and "appear[ed] to be becoming a very dangerous youth if not rehabilitated or given the proper amount of structure, supervision, and guidance." (*Id*. at 1976.)

TCY employees testified at Hill's mitigation hearing that the older boys frequently beat Hill, so he was moved to a smaller unit with younger, less "hostile" boys. (ECF No. 31, 100, 122, 150, 166-67.) They all agreed that Hill was a "loner" and a "follower" while there. (*Id*. at 105, 122, 124, 147, 151, 166.) One youth worker testified that "with [Hill] being so limited," he would often forget her instructions. She added, "And so, when you tell Danny to do something, then you would have to follow him through that. You just couldn't say, 'Well, Danny, I want you to go and mop the bathroom,' because he wouldn't do it." (*Id*. at 172-73.)

Hill completed the ninth grade in special education classes while at TCY in January 1985, at age eighteen. (*Id*. at 533.) He was released from TCY that March, and returned to high school in Warren.[22] (*Id*. at 537.) The goal was for him to "stay away from negative peers" because he

---

[22]     The record relating to Hill's release from TCY is chilling. An employee of the Ohio Department of Youth Services wrote in an admission report when Hill entered TCY,

> Because of his limited ability to control his behavior and [because he] follows the dictates of those with whom he chooses to associate[,] Danny's prognosis would appear to be quite guarded. In a well-structured program, Danny could no doubt function quite well. The area to which he will return is not at all

56

"continues to be a follower," and enroll in vocational training and attend community counseling after completing high school. (*Id*.) Fife's murder occurred six months later.

> **(b)** **Hill's adaptive functioning at the time of the offense: police and court records**

The state appellate court summarized the trial court's findings concerning Hill's adaptive skills at the time of the offense as follows:

> *Hill's Trial for the Murder of Raymond Fife*. The trial court observed that the record of Hill's murder trial provided evidence of Hill's ability concerning self-direction and self-preservation. In particular, the court noted Hill's initiative in coming to the police in order to misdirect the focus of the investigation by implicating others and Hill's ability to adapt his alibi to changing circumstances in the course of police interrogation. This last point was also noted by Dr. Olley in his hearing testimony: Hill "stood his ground during that interrogation very, very strongly. * * * He not only modified his story a little bit when he was faced with evidence that couldn't possibly have avoided. * * * That to me is a kind of thinking and planning and integrating complex information that is a higher level than I have seen people with mental retardation able to do."

*Hill*, 177 Ohio App. 3d at 192, 894 N.E.2d at 124.

---

> conducive to his making a positive adjustment. No doubt the community would have some very strong reactions to his return because of the nature of his offenses. Yet in view of the fact that he will be 18 years of age at the time his sentence terminates, and the mother wants him home, placement will be made with her.

(Supp. App., Disc 1, 532.) And Cheryl West, Hill's youth leader at TCY, testified at Hill's mitigation hearing that when Hill was released,

> he wasn't ready to leave. I brought it to quite a few people's attention. One in particular was Mrs. Ann Swilger. At the time, she was the deputy superintendent. And I brought it to her attention that Danny was not ready to be released. And Danny was standing there with me, and Danny said, "I would prefer to go to a group home until I get myself together. And now you're going to send me home, and if I go back home, I'm going to get in more trouble." Mrs. Swilger at that time said, "Danny, you're a hopeless case. We're going to release you as a hopeless case. Hopefully, you'll get in more trouble and you'll just do more time."

(ECF No. 31, 173.)

This Court also questions these findings. "Self-preservation" is not among the adaptive skills measured under the clinical definitions of intellectual disability. (*See supra* Section V.A.3.b.) And neither is it clear that this evidence demonstrates a strength in "self-direction" under the clinical guidelines, which define "self-direction" as more than a volitional act of self-interest. The AAMR defines it as:

> skills related to making choices; learning and following a schedule; initiating activities appropriate to the setting, conditions, schedule, and personal interests; completing necessary or required tasks; seeking assistance when needed; resolving problems confronted in familiar and novel situations; and demonstrating appropriate assertiveness and self-advocacy skills.

AAMR 1992 Manual, 40. Hill's decision to go to the police voluntarily two days after committing a murder to try to collect a reward for information about the crime is not an example of "appropriate assertiveness and self-advocacy," or an activity "appropriate to the setting" or his "personal interests"; nor is lying about, or blaming others for, your own transgressions to avoid getting into trouble – a classic tactic employed by even the youngest of children.

In fact, one could argue that Hill's actions were quite the opposite of adaptive. Instead of helping to "resolve his problems," Hill's choices consistently worked against him. Going to the police with information about the murder succeeded only in immediately drawing the police's attention to himself. Sgt. Steinbeck testified at Hill's trial that it was only after Hill showed up at the police station and told Sgt. Stewart details about the murder that most people did not know, that the police began to "pursue" Hill as a suspect. (ECF No. 24, 285-86, 301.) And Hill's confused and outlandish stories about other suspects made him appear even more guilty. For example, when Hill first went to the police, he told Sgt. Stewart that he saw a boy named Maurice Lowery riding Fife's bicycle. When Sgt. Stewart asked him if Lowery still had the

58

bicycle, he said Lowery "might have put it back in the woods by now." Then a bit later in their conversation, Hill added that he had seen Lowery and another boy from his apartment window at one o'clock in the morning "coming through the field," even though it was dark and that area was at least a mile away. (ECF No. 25, 504-08.) Similarly, Hill readily lead the police to his accomplice, Tim Combs. When Sgt. Stewart asked Hill if he knew Tim Combs, Hill replied that he knew him and he also might have assaulted Fife, since "'[h]e likes to do that to white boys, too.'" Hill then literally lead Sgt. Stewart right to Combs' door. (*Id*. at 509-11.)

After carefully reviewing the transcript of Hill's final statement to police and the trial testimony of the police officers involved, the Court finds that during the police interrogations, Hill did in fact stand his ground, but otherwise, his performance was childlike, confused, often irrational, and primarily self-defeating. Hill's second interrogation took place the day after he voluntarily went to the police. This time, Sgt. Steinbeck went to Hill's house and Hill agreed to accompany him back to the station for further questioning. (ECF No. 24, 204.) During the three-hour interrogation, Hill repeatedly changed his story, but not in a way that skillfully hid his part in the crime. Sgt. Steinbeck testified at Hill's trial,

> He contradicted himself so many times; told me so many different stories, that it took that long to find out exactly what was going on. . . . Well, I said that he told me he saw different people at different time, places. Even his own whereabouts he was confused. I felt he was keeping something from me about where he was and what he did in those time periods of those different days.

(*Id*. at 250.) Hill also agreed to go to the police station with Sgt. Steinbeck and Det. Hill, his uncle, for his third and final interrogation, at which he confessed to being at the scene of the crime after an hour and a half of questioning and gave a recorded statement without counsel present. Again, Hill's stories were confusing and contradictory. Sgt. Steinbeck testified,

59

We're talking about the same things we did Friday, telling him we believe he's lying to us. There's too many inconsistencies in his story. "We believe you know more than you're telling us. We think you're involved or know about what took place Tuesday behind the Valu-King."

(*Id*. at 271-72.)

Hill also often changed or embellished his statement at the slightest suggestion by the police, even when the information at issue was irrelevant or incriminating. At trial, Sgt. Stewart recalled saying to Hill, "'Everytime [*sic*] we suggest something to you, you have a tendency to agree with us.'" (ECF No. 26, 646.) During Hill's statement, for example, Hill first said that Fife's shorts were gray. (Supp. App., Disc 1, 2459.) Later, Sgt. Stewart asked him, "Now when he pulled his shorts off, they were blue shorts, they were yellow." Hill replied, "They were yellow." Sgt. Stewart asked, "The shorts were yellow, are you sure?" Hill answered, "Yea, because they looked like Reserve color like . . . gym shorts." When the police told Hill he had previously said the shorts were gray, Hill then claimed he did not know the color of the shorts at all; he saw only Fife's underwear. (*Id*. at 2473-74.)[23] While making his statement to the police, Hill more often seemed to be making things up as he went along to conform to the police's questions and expectations than adroitly hiding information or planting false information to

---

[23] Other examples of Hill's extemporaneous changes to his story at the suggestion of the police officers include telling the police: first Combs threw all the physical evidence "in the field," then Combs took the can of lighter fluid with him out of the field (*id*. at 2501-02); first they left Fife on his stomach, then Hill turned Fife over on his back to see if he was breathing (by checking his neck), then he turned him over twice, putting him back onto his stomach again to help him (*id*. at 2466-67, 2510-11); first he saw Combs twice since Combs was released from the penitentiary, then only once (*id*. at 2479); alternating between Combs throwing Fife's bicycle into the bushes and placing it in the bushes (*id*. at 2463, 2467-68, 2503); first Combs threw his cigarette lighter into the bushes and came back later to find it, then he kept it with him, then he left it at the scene and used matches to light a cigarette after the murder (*id*. at 2503).

60

protect himself.

Indeed, although he never admitted to harming Fife, Hill often changed his story during the interrogations and his statement in a way that only further incriminated himself.  The best example of this is that after admitting to police that he was at the scene of the crime, his proximity to, and involvement in, the assault increased with each account.  His descriptions of the events did not always flow logically, and they often contained language that is difficult to decipher, but a summary of Hill's different versions of how the murder occurred is as follows:

At first, Hill told police that after he and Combs had a general conversation near the Valu King store, he saw Combs walk into the woods.  He did not follow Combs, but a short time later hid behind some bushes in the woods and watched Combs murder Fife from a distance.  Combs didn't say anything to Hill; he ran away when he noticed Hill watching him.  Hill said he also ran away after Combs left to get lighter fluid from the back of the store, returned, and Hill saw "some smoke." (*Id*. at 2457-60, 2462.)  In his next account, Hill saw Combs grab Fife off his bicycle from a hill that overlooked the field.  He then went to the Valu King parking lot and grabbed a board to hit Combs and get him off Fife.  He walked up to Combs and Fife, but Combs told him to get back up the hill or he would blame him for the crime.  (*Id*. at 2469-71.)  In Hill's final account, he told the officers that he ran into Combs a short distance from Valu King, and he and Combs walked to the back of Valu King together.  There, they saw Fife coming up the path through the woods on his bicycle, and Combs told Hill he wanted to steal Fife's bike.  Combs asked Hill to help him, but Hill refused.  Hill then followed Combs into the woods.[24]  (*Id*. at

---

[24]     At this point Hill's story gets confused and convoluted in a way that was typical of Hill during his statement.  Hill first said, "So then I seen him go back there in the path way so I started coming around and around about that time that's when I seen him knock the boy off the

61

2480-83.)  Hill said he was just about ten feet away from Combs during the assault, but did nothing to stop it.  (*Id*. at 2485-86, 2490.)  He remained there even when Combs left to get the lighter fluid.  (*Id*. at 2492.)  Hill told police that when Combs returned, however, he was back up the hill.  He said he "had looked down there [Combs] had already seen me and [Hill] said now look what you done."  (*Id*.)  And when Combs lit the "cloth," he "had came down there" and "was trying to sneak up on him and hit him with the board."  (*Id*. at 2492-93.)  Combs told him to get back up the hill, and Hill says he took the board back behind the store.  (*Id*. at 2943.) He then followed Combs out of the field.  (*Id*. at 2499.)

Finally, far from being "planned" and "complex," many of the stories Hill concocted for the police appeared spontaneous, and were completely unbelievable.  This exchange demonstrates the confused, ad hoc nature of Hill's statement:

| Sgt. Steinbeck: | . . . [D]id Tim Combs walk with the gray shorts? |
| --- | --- |
| Danny: | Yea.  Yea he had them up under his own shirt, he had them up under his shirt and the next day, and I seen him the next day, he was hurrying right back there and then that's when he was looking, he had threw, he had pinned the bike up under some weeds like and threw them shorts up under there. |
| Sgt. Steinbeck: | So you say Tim Combs come back to the field the very next day carrying the boy's shorts and he hid the shorts and he hid the bike.  Yes? |
| Danny: | Yes. |

bike."  (*Id*. at 2481.)  When asked to clarify, he said he did not follow Combs but "walked to the other side.  Like there is this side street that you can go down."  And then, because he "kn[ew] how Tim Coomb's [*sic*] is," he "circled back" to where Combs was with Fife, and Combs "had the little boy on the ground."  When asked, "Did you see him knock him off the bike?" Hill responded, "He had him in a headlock."  (*Id*. at 2482-83.)  Later, Hill said he did see Combs knock Fife off his bike.  (*Id*. at 2488.)

62

| | |
|---|---|
| Sgt. Steinbeck: | Have you talked to Tim Combs about this after, since it happened? |
| Sgt. Stewart: | Not at all? |
| Danny: | I ain't even seen him. |
| Sgt. Steinbeck: | Danny, you said the next day you saw him bring the shorts back, how did it happen that you and him would be at the same place, at the same time the very next day? |
| Danny: | Because he came past the house and like where my house is at you can, you know, look right down there by the field when the door is open, so you saw him go past the door. |
| Sgt. Steinbeck: | You saw him walking past. |
| Danny: | Past my door. |
| Sgt. Steinbeck: | So you walked with him? |
| Danny: | No I waited until he went down the hill and I circled, I took this other path when he came down and walked down towards there he was going across the street. Around about the time he went down across the street towards that pathway where that little boy was laying, I was coming straight down there and I turned up in Valu King building and that's when I seen him stick the bike up in some bushes and he threw those shorts up on top of the bike. |
| Det. Hill: | That ain't true now, you got to find exactly what he did with those shorts? |
| Sgt. Steinbeck: | That ain't true man. |

(*Id.* at 2467-68.) Hill also claimed that the attack occurred over two hours (*id.* at 2496), and that garbage men may have removed some evidence left in the woods (*id.* at 2521).

Perhaps most troubling, and also in contravention of the clinical guidelines, the Ohio court emphasized Hill's strength in the one area of "self-direction" while ignoring the significant

63

evidence from the time of the crime demonstrating Hill's adaptive deficits. The Ohio Supreme Court has recognized that an overriding consideration in assessing adaptive skills is that "one must focus on those adaptive skills the person lacks, not on those he possesses." *State v. White*, 118 Ohio St. 3d 12, 22, 885 N.E.2d 905, 914 (Ohio 2008). *See also Black v. Bell*, 664 F.3d 81, 99 (6th Cir. 2011) ("[A] court reviewing whether a defendant is mentally retarded 'must focus on Defendant's deficits, not his abilities.'" (quoting *United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901, at *30 (N.D. Ohio Dec. 23, 2010))); *Sasser v. Hobbs*, 735 F.3d 833, 848 (8th Cir. 2013) (the adaptive skills prong of the clinical intellectual disability definition "does not involve balancing strengths against limitations. It simply requires deciding whether the evidence establishes significant limitations in two of the listed skill areas."). The AAMR stresses that "[w]ithin any individual, limitations often coexist with strengths," an assumption "essential to the application" of the intellectual disability definition. AAMR 1992 Manual, 1. It explains,

> This means that people with mental retardation are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.

*Id*. at 8-9. "Thus, in the process of diagnosing [intellectual disability], significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the potential strengths in some adaptive skills." *Id*. at 47. For example, some mildly intellectually disabled persons can read up to the fifth-grade level (Supp. App., Disc 1, Tr., 1783 (testimony of J. Gregory Olley, Ph.D. (hereinafter, "Olley test."))), hold a job with limited responsibilities (*id*. at 871 (Olley test.)), play cards (*id*. at 1136 (testimony of Nancy J. Huntsman, Ph.D. (hereinafter, "Huntsman

64

test.")), or obtain a driver's license (*id*. at 375 (testimony of David Hammer, Ph.D. (hereinafter, "Hammer test.")).

This assumption arises from the concern that if evaluators accord dispositive weight to perceived strengths, rather than focusing on actual limitations, their findings will "reflect the stereotypical view [of] mentally retarded individuals [as] utterly incapable of caring for themselves." P. White, *Treated Differently in Life But Not in Death: The Execution of the Intellectually Disabled After Atkins v. Virginia*, 76 Tenn. L. Rev. 685, 703 (2009) (internal citations and quotation marks omitted). As Dr. Hammer testified, "When most people think of mental retardation they tend to think more of the moderate, severe and profound," (Supp. App., Disc 1, Tr., 185), but persons with mild intellectual disability "are not very obvious" (*id*. at 188). Dr. Sparrow explained it this way:

> I think one of the fallacies . . . in the general public is that you can tell by talking to somebody or looking at them that they have mental retardation and you cannot. In mild mental retardation often you cannot tell by talking to somebody or looking at somebody that they have mild mental retardation. That's why we have to have tests.

(*Id*. at 1627.)

Indeed, three psychologists testified at Hill's mitigation hearing that Hill was intellectually disabled at that time and had extremely poor adaptive functioning. (ECF No. 31, 194-96 (Dr. Darnell opining that Hill's adaptive functioning was "very poor"); 263-66, 278-79, 283 (Dr. Schmidtgoessling testifying to Hill's "incapability of managing life more effectively"); 303, 336 (Dr. Crush finding "severe impairment," including functioning).) Significantly, although they rejected his claims based upon his mental status, the Ohio Supreme Court and Eleventh District Court of Appeals found these psychologists' testimony credible and concluded

65

that Hill was intellectually disabled. *See Hill*, 64 Ohio St. 3d at 335, 595 N.E.2d at 901 ("[W]e find that [Hill's] mental retardation is a possible mitigating factor."); *Hill*, 1989 WL 142761, at **6, 32 (Hill "admittedly suffers from some mental retardation . . . ."; "The record is replete with competent, credible evidence which states that [Hill] has a diminished mental capacity. He is essentially illiterate, displays poor word and concept recognition and, allegedly, has deficient motor skills. [Hill] is characterized as being mildly to moderately retarded. There is some suggestion that [Hill's] "mental age" is that of a seven to nine year old boy.").

The psychologists noted Hill's adaptive deficits particularly in functional academics and social skills. As discussed above, Hill's school and juvenile court records from the time period shortly before his arrest reflect his significant limitations in academic functioning. Moreover, there was considerable testimony at both the suppression hearing and the mitigation hearing that Hill could not read and could only write his name. Hill himself testified at the suppression hearing that he could not read and could write only his name. (ECF No. 29, 358-59.) Dr. Schmidtgoessling testified at that hearing that Hill could not read and still did not consistently spell his name correctly. (*Id*. at 482, 507.) Dr. Crush also testified at the mitigation hearing that Hill was "illiterate." (ECF No. 31, 308.) Mark Brink, the vice president of Brinkhaven, testified at the mitigation hearing that Hill could not read or write while he was at the institution and needed special, individual tutoring. (*Id*. at 78.) In addition, shortly after Hill's trial, the prison psychiatrist and social workers were concerned about Hill's "illiteracy" and resulting difficulties. Similarly, the social program specialist at Hill's prison wrote to the director of the Education Department a year after Hill was convicted that Hill was "illiterate" and needed "remedial action." (Supp. App., Disc 1, 1512.)

66

The psychologists also testified about Hill's lack of social skills.  Dr. Darnall spoke of Hill's poor self-esteem, inability to interpret social situations and create positive relationships, and that he was easily influenced by people, gravitated toward an antisocial peer group, and did not respond appropriately to authority figures.  (ECF No. 31, 189-90, 192, 197-98.)  Dr. Schmidtgoessling explained that Hill

> doesn't realize the impact that he has on other people.  I think because he's not reflective, because he can't examine his own life, because he really can't appreciate how other people feel, yeah, if he had those feelings, then it would – it would inhibit.  That's what we mean by a lack of internal controls.

(*Id*. at 281.)

> ### (c)  Hill's adaptive functioning at the time he filed his *Atkins* claim:  prison records and statements to reporter and court

The Ohio court of appeals next discussed the trial court's findings regarding Hill's mental status near the time he filed his *Atkins* claim in January 2003, when Hill was 36 years old and had been on death row for seventeen years.  It stated:

> *Death Row Records*.  At the time of the evidentiary hearing, Hill had been incarcerated on death row for 20 years.  From this period of time, the trial court considered audiotaped interviews of Hill by Warren's Tribune Chronicle reporter Andrew Gray in the year 2000.  These interviews were arranged on Hill's initiative in order to generate publicity for his case.  The trial court found Hill's performance on these tapes demonstrated a high level of functional ability with respect to Hill's use of language and vocabulary, understanding of legal processes, ability to read and write, and ability to reason independently.

> The trial court considered the evidence of the various prison officials who testified at the evidentiary hearing.  These witnesses consistently testified that Hill was an "average" prisoner with respect to his abilities in comparison with other death row inmates.  They testified that Hill interacted with the other inmates, played games, maintained a prison job, kept a record of the money in his commissary account, and obeyed prison rules.  Prison officials offered further testimony in their interviews with the expert psychologists.  One official opined

67

that Hill began to behave differently after *Atkins* was decided, and he believed that Hill was "playing a game" to make others think he is retarded. Another official reported that Hill's self-care was "poor but not terrible" and that Hill had to be reminded sometimes about his hygiene.

*Hill's Appearances in Court.* The trial court stated that it had "many opportunities" to observe Hill over an extended period of time and, as a lay observer, did not perceive anything about Hill's conduct or demeanor suggesting that he suffers from mental retardation.

*Hill*, 177 Ohio App. 3d at 192-93, 894 N.E.2d at 124-25.

### (I)    Hill statements and reading

The Court finds, after reviewing Hill's taped interviews with Gray, that Hill did indeed demonstrate certain verbal skills, and he clearly read with a certain speed, accuracy and emphasis.  (*See* Supp. App., Disc. 5.)  Hill's statements in court displayed similar strengths.  This excerpt from the transcript of a pre-trial hearing held on April 15, 2004, illustrates Hill's assertiveness and composure, as well as his articulateness, measured by the fluidity of his prose, the organization of his story, the sophistication of the vocabulary, the complexity of his sentence structure, and the level of detail.  Hill stated to the Judge:

> I'm gonna tell you exactly what happened, Your Honor.  Dennis Watkins used to come over to my aunt's house, which is my Uncle Morris Hill's wife.  Her name is Q.T. Hill.  My uncle had a patio that was built onto the back of the house.  I guess the police department or whoever allowed him to store evidence in the back of this patio.  Every weekend, either Saturday or Sunday, it would either be Dennis Watkins, Peter Kontos or James Teeples that would come and inventory the stuff that was inside of this patio.  Morma [*sic*] Fife's son, me, Timothy Combs and his brother broke into my aunt's house.  We went in through the patio area of the house.  We took money, drugs and guns from out of the boxes that was inside of the patio.  A week or two later, Morma [*sic*] Fife's son came to me.  He was supposed to give me some bullets for the guns that he helped us put together.  He told me that some police officers came to him, asked him about the break-in of my aunt's house.  He told me that they used a night stick on him and told me, "Well, you're gonna need these.  You're gonna need these bullets."

68

Later on, I found out that he hung himself in the basement of her house and that her husband was accused of assaultin' him. When I told this to Maridee Costanzo, she told me that she had heard a lot of rumors circulating around about my case and that one of those rumors was about Morma [*sic*] Fife's son. I never thought that the affidavit that I gave Maridee Costanzo said everything in there. I told her to give it to the FBI so that the FBI could see it. My uncle, from what I know about, was placed up under investigation for money laundering. He was suspected as being involved in organized crime, which led to him being demoted from a police narcotics officer to a traffic cop. And I guess now he's an investigator for their office, the Public Defender's Office. Maridee, as Greg Meyers know, sat there and told him that she knew these people and that she remembered these different things. And she said that she was going to file an actual innocence claim in my case because of it. All I know was that the reason why they tricked me to sign that waiver was so that Greg Meyers could come on to be my attorney. . . . And when I told my attorney, my federal attorney what happened, this is what he said, the papers here. Would you give this to him?

(Supp. App., Disc 1, Tr. 59-61.)

Nevertheless, the Court again is troubled by some of the state court's conclusions regarding this evidence. First, the court once more improperly focuses on an apparent adaptive strength of Hill's rather than analyzing his limitations as required. As noted above, intellectually disabled individuals can read up to a fifth-grade level. Furthermore, the AAMR admonishes, "Do not use . . . verbal behavior to infer level of adaptive behavior or about having [intellectual disability]." AAIDD User's Guide, 22. As Dr. Sparrow testified, the size or sophistication of a person's vocabulary, or the "quality" of one's language, relates to cognitive, rather than adaptive, skills under the intellectual disability definition. She explained,

Size of vocabulary is definitely intellectual – the adaptive behavior measures say nothing about how good your language is in terms of how many words you know or how complicated the words you know. It just says, can you take the words you know and communicate effectively? . . . Adaptive behavior communication does not measure level of vocabulary in any way.

(Supp. App., Disc 1, Tr., 1530.)

69

Moreover, the experts agreed that Hill's explanation of his "actual innocence" claim, whether to Gray, to the trial court during his *Atkins* proceedings, or to them directly, although articulate, was neither logical nor plausible. Dr. Olley testified, "It did not strike me as being entirely plausible . . . ." (*Id*. at 744.) He also stated, "This was a very long and I have to say rambling story. Because I was writing for all I was worth but I was still having quite a hard time following it all." (*Id*. at 771.) Dr. Hammer testified,

> It was quite rambling and incoherent in many places. He jumped around. And I admit that . . . the examiners kind of looked at each other and . . . shook our heads like we couldn't follow what was being said. . . . And we tried to communicate that to Danny, but he was not able to kind of change the course or back up and explain or anything like that. He just kind of started this. And in fact it was, it wasn't based on something we asked him. He just kind of started into it.

(*Id*. at 412.) Dr. Huntsman wrote in her report that after listening to the first fifteen to twenty minutes of Hill's explanation of his "actual innocence" claim, she "revealed [her] utter confusion." (Supp. App., Disc 1, 1131.) She testified that Hill's account of the claim was "incredibly complex," but had no "logic to it." (Supp. App., Disc 1, Tr., 1031.) Dr. Sparrow opined, "The fact that it was very difficult to follow him and figure out what it was he was trying to say and where he was going means he was not doing a very good job of communicating, although he was using very nice words to do that." (*Id*. at 1532.) *See Holladay v. Allen*, 555 F.3d 1346, 1363 (11th Cir. 2009) (rejecting expert's opinion that petitioner's testimony at trial and in deposition was inconsistent with mild intellectual disability due to his vocabulary and "advanced" memory because the testimony was implausible and showed poor judgment).

It is possible that Hill had almost memorized his "actual innocence" story and was "parroting" it, like a well-rehearsed script, for the reporter and court. (*See id.* at 92-93 (Hammer

test.).)  When interviewing Hill, Dr. Olley noted that Hill's account of his claim was "very similar" to the "soliloquy" Hill made in court.  (*Id.* at 770.)  He testified, "With the ability to look back upon the tape that we just heard a few moments ago, I could see that he was recounting basically the same story spontaneously."  (*Id.* at 771.)  At the same time, Dr. Olley conceded that he did not know if Hill's story was true or fantasy (*id.* at 923); if Hill understood the meaning of the legal terms he used (*id.* at 925-26); or how often Hill had told that story (*id.* at 926).  Dr. Hammer testified that intellectually disabled persons often develop a strong skill like this as a "cloak of competence" to hide their limitations.  He explained,

> The cloak of competence is, is a concept that is talked about primarily with people with mild retardation. The idea is that many people with mild retardation are quite aware of their deficits in learning and functioning and are somewhat worried that other people will find that also. So they oftentimes will develop certain skill areas that they can hold out as indicating they have a competence in a certain area and, therefore, are trying to mask . . . what their deficits actually are[,] . . . wishing to avoid that stigmatization.

(*Id.* at 191-92.)

### (ii)    Hill's prison behavior

The evidence the Ohio court cites from Hill's prison records and the testimony of prison officials also is problematic.  The AAMR prohibits the assessment of adaptive skills in atypical environments like prison.  Its 2002 Manual instructs, "Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture."  AAMR 2002 Manual, 13.  It explains, "This means that the standards against which the individual's functioning must be measured are typical community-based environments, not environments that are isolated or segregated by ability."  *Id.* at 8.  Death row is a segregated, highly structured and regulated environment.  The prison officials' description of Hill as an

71

"average" death row inmate illustrates the problem with this evidence: what does average in this context even mean, and how does that assessment relate to the clinical definition of intellectual disability?

The experts agreed that evidence of adaptive functioning in prison, particularly death row, is of limited value because the highly structured environment limits inmates' opportunities to gain new skills or demonstrate weaknesses in existing skills. Dr. Olley wrote in his report, "Evidence of adaptive behavior in prison is limited by the confined nature of prison life. It is impossible to assess all of Mr. Hill's adaptive behavior while he is in prison." (Supp. App., Disc 1, 1124.) He testified, "Our task is an unusual and a challenging one because the standards of our profession make no explicit statement about how to evaluate a person who has been in prison for a long time." (*Id.*, Tr., 647.) Dr. Huntsman testified that formal assessments of adaptive behavior under the AAMR guidelines are "just not relevant to [the prison] setting." (*Id.* at 1130.) Dr. Hammer testified, "[Y]ou need to assess adaptive skills relative to the person functioning within the community . . . . And in this case he's obviously not functioning within the community and hasn't been functioning within the community for 20 years." (*Id.* at 407-08.)

Federal courts similarly have discounted this type of evidence as an unreliable measurement of adaptive functioning. *See, e.g., Holladay*, 55 F.3d at 1358 n.16 ("Both experts agreed that Holladay's adaptive functioning cannot be accurately assessed now because he has spent over 17 years in prison, a highly restricted and restrictive environment."); *Thomas*, 614 F. Supp. 2d at 1284 n.67 ("The constraints of a maximum-security prison environment also limit the diagnostician's ability to assess the subject's adaptive skills consistently within the AAMR definition."); *Rodriguez v. Quarterman*, No. Civ. SA-05-CA-659-RF, 2006 WL 1900630, at *11

72

(W.D. Tex. 2006) ("there is considerable debate within the professional literature over whether it is even possible to perform an adaptive skills deficit evaluation in a prison setting").

Moreover, courts have questioned the credibility and veracity of testimony offered by prison employees regarding a death row inmate's intellectual disability.  In *Hall v. Quarterman*, 534 F.3d 365 (5th Cir. 2008), the Fifth Circuit observed,

> These witnesses, given the nature of their job and its accompanying dangers, may not be inclined to volunteer evidence of mental retardation to state prosecutors. Additionally, . . . the guards demonstrated only vague and largely irrelevant understandings of mental retardation while simultaneously asserting that Hall appeared normal.

*Id*. at 395.  Commentators have noted particularly that prison officials may feel bias against inmates or pressured by peers or supervisors to report a high level of functioning.  *See, e.g.,* John M. Fabian, *Life, Death, and IQ; It's Much More Than Just a Score: The Dilemma of the Mentally Retarded on Death Row*, 5(4) J. Forensic Psychol. 13-14 (2005) (noting problems with correctional staff as source of information about adaptive functioning because they "may be plagued by certain biases for or against the defendant," "officers may have their own lay opinions on what retardation is and may also not believe these defendants are retarded because they are criminals and function fairly well in some areas," and some officers are "more likely to have experienced conflicts with the defendants which may cause bias against the defendant in an evaluative setting").[25]

---

[25]     For this reason, it is worth questioning whether any inmate who asserts an *Atkins* claim after being incarcerated for a long period of time can prevail on the claim once a court chooses to evaluate the petitioner's current rather than past intellectual abilities, assessing adaptive behavior while on death row and according great weight to the testimony of prison officials.

73

Aside from potential biases, the prison officials' testimony at Hill's hearing was rife with contradictions, with themselves and each other. Risinger told the experts during her interview that she saw Hill print out kites, or internal communications between prison inmates and employees, "with speed one to two times." (Supp. App., Disc 1, 1113; *see also id.* at 1123, 1137.) But she admitted during her testimony at the hearing that she did not actually see Hill write any kites. (Supp. App., Disc 1, Tr., 1339, 1347.) Risinger also acknowledged on cross-examination that the handwriting in Hill's kites varied and may have been written by other inmates, which was a common practice. (*Id.* at 1348-50.) Similarly, Morrow testified first that Hill could read and write his kites, but later admitted that he had never seen Hill write a kite. (*Id.* at 1254, 1265.)

Regarding Hill's hygiene, the appellate court cited Risinger's observation that Hill's self-care was "poor but not terrible," but also that Hill had to be reminded at times about his hygiene. (Supp. App., Disc 1, 1113.) However, Spicer reported that Hill "didn't like to shower or clean his cell." (*Id.* at 1114.) Morrow described Hill's hygiene as "poor" during his interview but later testified that Hill never had a "hygiene issue" and kept his cell "clean." (*Id.* at 1114, 1123; Tr., 1251.)

As to Hill's card playing, Spicer believed that the other inmates might have let Hill play cards with them because he would lose money to them. (Supp. App., Disc 1, 1114.) Risinger also said that Hill lost money playing cards. (*Id.* at 1123.) Dr. Huntsman reported that Glenn said Hill "augmented his monthly earnings by winning at card games."[26] (*Id.* at 1138.) But

---

[26] Interestingly, Dr. Hammer reported that Glenn stated that "Danny wasn't exploited [at cards] and he never lost that much." (*Id.* at 1115.) Dr. Olley did not mention Glenn's observation of Hill's card playing at all.

74

Glenn testified at the hearing that he did not observe the betting and could not prove the inmates were even betting at all. (Supp. App., Disc 1, Tr., 789-90.)

Also contrary to the guidelines, aside from noting Risinger's observation about Hill's "poor but not terrible" hygiene, the court again focused exclusively on the prison officials' observations of Hill's adaptive strengths rather than limitations. Furthermore, their testimony that Hill "interacted with the other inmates, played games, maintained a prison job, kept a record of the money in his commissary account, and obeyed prison rules" does not describe behaviors that are not necessarily inconsistent with intellectual disability. As explained above, intellectually disabled persons can "interact" with others, play simple games, perform menial jobs, keep track of a small amount of money, and obey clear rules. There was no evidence that Hill's relationships with other inmates were anything more than superficial, or that the games he played required any skill. The prison officials acknowledged that his prison job required minimum skills, the prison rules were clear and straightforward, and that he never had more than a minimal amount of money to keep track of in his account at any given time.[27] (Supp. App., Disc 1, 1115, 1123; Tr., 1207, 1272, 1273. ) *See also* DSM-IV-TR, 43 ("During their adult years, [mildly intellectually disabled persons] usually achieve social and vocational skills adequate for minimum self-support.").

---

[27] Hill's prison jobs included emptying trash cans and distributing color-coded cleaning supplies to inmates' cells. (Supp. App., Disc 1, Tr., 1340, 1372-33, 1381, 1265, 810-12.) Spicer and Morrow noted that Hill needed simple and specific instructions to perform even these duties. (Supp. App., Disc 1, 1114.) As to Hill's account with the cashier's office, he received between $3 and $16 monthly pay and rarely had more than a small amount in his account at any given time. (*Id*. at 1556, 1559, 1560, 1568, 1570, 1571, 1575, 1577; Tr., 1207-09.) Morrow's example of Hill's skill dealing with his account is that Hill realized a mistake was made when he received $3 instead of the $16 in monthly wages – hardly a sophisticated observation of a complex financial transaction. (*Id*. at 1114; Tr., 1252-53.)

75

This Court's review of Hill's prison records indicates that Hill struggled to adjust to life on death row and exhibited adaptive deficits during his early years in prison. A prison psychiatrist wrote less than a year after Hill was convicted:

> Hill is not doing too well. He has a hard time putting up with all the aggravation and teasing and threatening that goes on on K-4. . . . He is very difficult to follow and apparently has some serious identity problems in that he doesn't know who his kin is and then also has some strange beliefs, as when he tells me that various so-called kin have told him things and subsequently died and he somehow establishes a connection between the two. He isn't hearing from anybody, is not getting any visitors, cannot read or write, so has had no contact with his lawyer and is very concerned that he should have been in a mental hospital . . .
>
> All in all, it is a very confusing situation . . . .

(Supp. App., Disc 1, 996.) This psychiatrist considered Hill intellectually disabled during this time. (*Id.* at 992, 998-99.) He wrote in his notes on April 9, 1987,

> We did get the report in from TCY which shows [Hill] to be actually retarded. I plan to call Dennis Watkins in Warren to see if he has more information because it is rather puzzling that somebody with his retardation would end up on death row.

(*Id.* at 998-90.)

Hill routinely requested help with his commissary account and was confused about its balance and the status of checks sent to him from family members. (Supp. App., Disc 1, 1484, 1485, 1556, 1557, 1560, 1571, 1565, 1568.) He repeatedly violated prison rules. (*See id.* at 1343, 1351-1425.) There also is ample evidence that Hill's social skills were poor. Prison records show that Hill was "passive" and "easily led," harassed by other inmates, found unsuitable to share a cell, was afraid of other inmates and frequently requested to move to another cell to avoid them, and often fought with other inmates. (Supp. App., Disc 1, 980, 1318,

76

1343, 1389, 1390, 1393, 1394, 1419, 1462, 1465, 1466-68, 1482-84, 1557, 1567.) And the records show that Hill was reprimanded for refusing to take a shower and often had to be provided a toothbrush and toothpaste. (Supp. App., Disc 1, 1396, 1573, 1568.) A prison sergeant reported in 1988 that Hill "[s]eems dull and unintelligent, . . . [s]luggish and drowsy," "[t]ries, but cannot seem to follow directions," "[c]ontinually asks for help from staff," and "[n]eeds constant supervision." (*Id*. at 1343.)

But the evidence also demonstrates that Hill's adaptive skills improved by 1994. A mental health evaluation form from 2001 stated that Hill's institutional adjustment was "[p]oor at first but appears to have adjusted well after 1994." (Supp. App., Disc 1, 1005.) Also in 2001, a psychiatrist also noted that Hill's "conversation to [him] was very brief but [he] noted no gross abnormalities. His speech was simple but clear, logical and coherent." (*Id*. at 993.) After 1994, Hill was charged with only one offense in prison, stemming from a fight with another inmates in 1996. (*Id*. at 1352-54.) He also received good evaluations on his job performance from 1992 to 1994. (*Id*. at 1328-32.) One evaluator reported, "Inmate Hill does an excellent job on keeping the range clean. He didn't need to have [*sic*] told what to do he would just do it." (*Id*. at 1332.)

Notably, Hill told the experts that Officer Glenn, who supervised Hill and other death row inmates for seven years, knew him best. (*Id*., Tr., 786, 1042.) And Officer Glenn testified that Hill performed his job as a material handler well with minimal assistance and no modifications, handled his money well, sought medical care when he needed it, kept track of his time allotted with his attorneys, and that "Danny [was] slow when he want[ed] to be slow." (*Id*. at 787-89, 792, 793, 794-95, 815.) Except for his account of Hill's card playing, as noted above, Officer Glenn's testimony was similar to the other prison officials and to his interview with the experts.

77

He found Hill "typical in most areas of skills compared to other inmates" (Hammer report, Supp. App., Disc 1, 1155); "social with other inmates" (Huntsman report, *id*. at 1138); and "better than most" at keeping track of his commissary (*id*.).

The clinical guidelines account for such improvements in adaptive behavior, acknowledging that it is possible for an intellectually disabled person to improve in adaptive skills such that the diagnosis will no longer apply, although it is rare and generally occurs with considerable interventions and supports. The APA explains,

> After early childhood, the disorder is generally lifelong, although severity levels may change over time. . . . Early and ongoing interventions may improve adaptive functioning throughout childhood and adulthood. In some cases, these result in significant improvement of intellectual functioning, such that the diagnosis of intellectual disability is no longer appropriate. . . . Diagnostic assessments must determine whether improved adaptive skills are the result of a stable, generalized new skill acquisition (in which case the diagnosis of intellectual disability may no longer be appropriate) or whether the improvement is contingent on the presence of supports and ongoing interventions (in which case the diagnosis of intellectual disability may still be appropriate).

DSM-V, 39. *See also* AAMR 2002 Manual, 9 (although intellectual disability is a static condition, improved functioning in adulthood is expected "with appropriate personalized supports over a sustained period").

### (3)      expert opinions

The court of appeals stressed that the trial court ultimately was persuaded by the State's expert, Dr. Olley, and the independent expert, Dr. Huntsman. The court explained:

> Finally, the trial court relied on the expert opinions of Drs. Olley and Huntsman that, with reasonable psychological certainty, Hill's adaptive skill deficiencies do not meet the second criterion for mental retardation set forth in *Lott*. Both doctors relied, in part, on the same anecdotal evidence considered by the trial court. The doctors also conducted interviews with Hill and particularly noted Hill's memory of events surrounding Fife's murder 20 years before and his

78

ability to recount the narrative of the events and the complex legal history of his case since that time.

*Hill*, 177 Ohio App. 3d at 193, 894 N.E.2d at 125.

As already discussed, both the United States and Ohio supreme courts have emphasized the critical role the medical community and its clinical standards play in defining and determining intellectual disability when considering eligibility for the death penalty. In *Hall v. Florida*, the Supreme Court explained,

> That this Court, state courts, and state legislatures consult and are informed by the work of medical experts in determining intellectual disability is unsurprising. Those professionals use their learning and skills to study and consider the consequences of the classification schemes they devise in the diagnosis of persons with mental or psychiatric disorders or disabilities. Society relies upon medical and professional expertise to define and explain how to diagnose the mental condition at issue. And the definition of intellectual disability by skilled professionals has implications far beyond the confines of the death penalty: for it is relevant to education, access to social programs, and medical treatment plans. In determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions.

*Hall*, slip op. at 7-8. And Ohio's highest court expressly mandated in *Lott* that courts "rely on professional evaluations of [a defendant's] mental status, and consider expert testimony, appointing experts if necessary, in deciding this matter." *Lott*, 97 Ohio St. 3d at 306, 779 N.E.2d at 1015.

The AAMR, in turn, emphasizes the importance of the practitioner's critical judgment in assessing intellectual disability. It states, "Judgments made by conscientious, capable, and objective individuals can be an invaluable aid in the assessment process."[28] AAMR 2002

---

[28]    It also cautioned, "Inaccurate, biased, subjective judgment can be misleading at best and harmful at worst." *Id*. Clinical judgment must not be "(a) a justification for abbreviated evaluations, (b) a vehicle for stereotypes or prejudices, (c) a substitute for insufficiently explained questions, (d) an excuse for incomplete or missing data, or (e) a way to solve political problems."

79

Manual, 94 (internal quotation marks and citations omitted). It defines clinical judgment as "a special type of judgment that emerges directly from extensive data and is rooted in a high level of clinical expertise and experience. . . . [I]ts use enhances the precision, accuracy, and integrity of the clinician's decisions and recommendations." AAIDD User's Guide, 23. And notes that "it is crucial that clinicians conduct a thorough social history and align data and data collection to the critical question(s) at hand." *Id*.

Thus, habeas courts must defer to state-court determinations of the credibility of expert witnesses in determining intellectual disability under *Atkins* – especially in such a highly subjective area as adaptive behavior. The Sixth Circuit, in denying a habeas petitioner's *Atkins* claim, recently concluded that two expert opinions

> provided a basis for the state court to reasonably determine that O'Neal does not suffer from significantly subaverage intellectual functioning. And without clear and convincing evidence undermining the credibility of [those experts], we are not persuaded by O'Neal's attempts to emphasize solely the portions of [his expert's] testimony that support his claim. For better or worse, as a habeas court, we are not in a position to pick and choose which evidence we think is best so long as the presumption of correctness remains unrebutted. *See* 28 U.S.C. § 2254(e)(1).

*O'Neal v. Bagley*, 743 F.3d 1010, 1022 (6th Cir. 2013). The court stressed, "With expert testimony split, as it often is, the state court chose to credit [the two experts] over [petitioner's expert], and we cannot say from this vantage that it was unreasonable to do so." *Id*. at 1023.

### (a) Drs. Olley and Huntsman's opinions

As explained above, three psychologists provided opinions on Hill's mental status for the

---

AAIDD User's Guide, 23.

80

state trial court: Dr. Olley for Respondent, Dr. Hammer for Hill, and Dr. Huntsman, who was appointed by the court.[29]  At the time of the hearing, Dr. Olley was a psychologist and associate director of the Clinical Center for the Study of Development and Learning and clinical professor in the Department of Allied Health Sciences at the University of North Carolina at Chapel Hill. He had been a clinical psychologist for more than thirty years and affiliated with the university for about twenty-five of those years.  He had worked almost exclusively in the specialty of intellectual and related disabilities and was a fellow of the American Association on Mental Retardation.  (Supp. App., Disc 1, Tr., 636-37.)  Dr. Olley had testified in nine capital cases regarding defendants' intellectual abilities, each time on behalf of the defendant.  (*Id*. at 643-44.) Dr. Hammer had similarly impressive credentials.  He was a clinical psychologist, director of psychology services at the Nisonger Center of The Ohio State University, and an adjunct associate professor of psychology at that university.  He had been a clinical psychologist for about twenty years, specializing in the area of intellectual disability.  (*Id*. at 142-44.)  Dr. Huntsman was a forensic psychologist at the Forensic Psychiatric Center of Northeast Ohio, Inc. Her primary focus was on court-ordered evaluations for competency, which are not performed under the AAMR or APA guidelines.  (*Id*. at 992-94.)  When she did evaluate for intellectual disability, she testified that she relied only on IQ scores, and had assessed adaptive skills only "maybe a handful of times."  (*Id*. at 980-81.)

The three experts agreed on the procedures to be followed in evaluating Hill, and observed each other's interviewing and test administration.  (*Id*. at 929; Supp. App., Disc 1,

---

[29]     Two additional psychologists testified at the hearing, Drs. Sparrow and Hancock. Their testimony, however, was admitted only to clarify issues related to adaptive skills testing.

81

1118.) They each tested Hill, interviewed Hill and others, visited the prison, and reviewed Hill's school, court and prison records. Dr. Olley testified that it was the "most thorough examination of a death row inmate that [he had] been involved with." (Supp. App., Disc 1, Tr., 773.)

The trial court found the opinions of Drs. Olley and Huntsman most persuasive. They both testified that, *at the time of the hearing*, which was the focus of their evaluations, Hill did not demonstrate the requisite level of adaptive limitations to meet the standard of intellectual disability. Dr. Olley was circumspect in his opinion, careful to note the limited amount of information regarding Hill's present adaptive functioning. He wrote in his report, "The available information on Mr. Hill's current functioning does not allow a diagnosis of mental retardation."[30] (Supp. App., Disc 1, 1124-25.) Dr. Huntsman was more categorical. She opined, "Mr. Hill's level of adaptive behavior certainly exceeds the level expected of a mildly mentally retarded individual." (*Id*. at 1141.)

Drs. Olley and Huntsman both found Hill's statements to the court and interviews with the reporter and themselves to be very significant. Dr. Olley specifically was impressed by Hill's ability to recall details of past events and "to express a complex explanation of the crime in order to support his claim of innocence." (*Id*. at 1125.) He testified that Hill's reading during his Gray interview "sounded substantially above the abilities that I would associate with a person with

---

[30]     Dr. Olley elaborated on stand:
I stated earlier that any evaluation that involves retrospective information is not perfect. And in order to compensate for missing information or partial information it's important to gather information from as many sources as possible over as many years as possible.
So with that caution in mind, I felt that my conclusion was that since in this format the burden is upon the defense to show that mental retardation exists, that I had not seen sufficient information in, particularly in the areas of adaptive behavior to find that I could support a diagnosis of mental retardation.
(*Id*., Tr., 774.)

82

mental retardation" because he read with speed, accuracy and intonation. (App. Supp., Disc 1, Tr., 1764.) He also stated that he did not believe an intellectually disabled person could recite that much information from memory, particularly when he spoke for such a long period of time. (*Id*.) He explained that Hill's ability "to put the emphasis on just the right word to make a point effectively, that I have not seen in people with mental retardation who memorize things or have, say things because they've said it many times before." (*Id*. at 1783.) He testified that Hill's reading and recitation of his innocence claim just "hit[ him] between the eyeballs that this is not a man with mental retardation. So it's just a judgment." (*Id*. at 1785.) Similarly, Dr. Huntsman testified that Hill's statements displayed "energy and organization and directedness in terms of having a story to tell." (*Id*. at 1027.) She also described her interview with Hill as "remarkable for how rich in content it was and rich in the use of language and rich in the memory for people and events. And also rich in the sense . . . of the way he volunteered and initiated giving me, you know, he didn't just say a sentence and stop. He kept going. It was incredibly spontaneous." (*Id*. at 1032.)

Both experts also cited the testimony of the prison officials as persuasive, although Dr. Olley was careful to acknowledge the limitations of assessing adaptive behavior in prison. (App. Supp., Disc 1, 1124.) They placed significance on the fact that the six prison officials reported consistent information about Hill's behavior on death row, and each witness described Hill as an "average" inmate. (*Id*. at 1124, 1141; *see also* Supp. App., Disc 1, Tr., 772-73.)

Finally, both experts stressed that Hill's malingering on their tests and during their interviews was an important factor in forming their opinions. Dr. Olley testified, "[I]n my experience I had never encountered a person with mental retardation who was able to malinger or

83

fake bad as consistently as Mr. Hill did in the evaluation that we performed . . . ." (Supp. App., Disc 1, Tr., 781; *see also* Supp. App., Disc 1, 1124-25, 1140 .)

As to Hill's adaptive functioning in childhood and at the time of the offense, Dr. Olley stated in his report that "[t]oo little information is available about adaptive behavior in childhood to make a confident retrospective diagnosis of mental retardation." (Supp. App., Disc 1, Tr., 780, 783.) He conceded on stand that Hill "did function low in academic skills" and "his school personnel regarded him as a person with mental retardation and labeled him as such," but explained that educators had an interest in diagnosing intellectual disability to obtain benefits for children as well as an interest in avoiding the possible stigma of labeling them. (*Id*. at 783, 828-29.)

Dr. Huntsman did not provide an opinion as to whether Hill was intellectually disabled during those time periods in her report, but testified at the hearing that he "probably" was not. (*Id*. at 1052-53.) Although she acknowledged on cross-examination that Hill's school records showed academic deficits and some limitations in communication, self-direction and social skills, she agreed with Dr. Olley that there was insufficient information from which to draw a conclusion about Hill's adaptive behavior during those time periods. (*Id*. at 1098-1100, 1112.) Dr. Huntsman specifically discounted the diagnoses of Hill rendered by school and juvenile court psychologists because the tests were conducted for a different purpose and the psychologists' "tendency of diagnostic overinclusion." (*Id*. at 1046, 1105.)

Dr. Olley acknowledged that Hill presented a "close call." (*Id*. at 861.) He testified that Hill's case may be one of the rare instances of a person's skills improving in adulthood to such a degree that he or she does not meet the second prong of adaptive behavior and no longer can be

84

diagnosed as intellectually disabled.  (*Id*. at 861-62.)

### (b)      *State v. White*

The Ohio appellate court finished its analysis of Hill's adaptive skills by distinguishing

Hill's case from the Ohio Supreme Court case *State v. White*, 118 Ohio St. 3d 12, 885 N.E.2d

905 (Ohio 2008).  It explained:

> It is important to note that the trial court's use of anecdotal evidence in the present case is distinguishable from the use of such evidence in *White*, 118 Ohio St.3d 12, 2008-0hio-1623, 885 N.E.2d 905. In *White*, the Ohio Supreme Court reversed a trial court's finding that an *Atkins* petitioner is not mentally retarded where the trial court had relied on anecdotal evidence, such as the fact that the petitioner had a driver's license and could play video games, to support its finding that the petitioner did not demonstrate significant deficits in adaptive skills.

> In the present case and in *White*, the trial court relied upon its own perceptions and other lay testimony that the petitioner appeared to function normally. The Supreme Court held that this reliance constituted an abuse of discretion in light of expert testimony that "retarded individuals 'may look relatively normal in some areas and have * * * significant limitations in other areas.'" (Emphasis sic.) *Id*. at ¶ 69.

> The difference between the two cases lies in the fact that in the present case, two of the expert psychologists considered the same anecdotal evidence as the trial court and concluded that Hill was not mentally retarded. The trial court's conclusions were consistent with and supported by the expert opinion testimony. In *White*, the two psychologists who examined the petitioner concluded that there were significant deficiencies in two or more areas of adaptive functioning. *Id*. at ¶ 21. Thus, the trial court in *White* had substituted its judgment for that of the qualified experts. "While the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of law witnesses or of the court's own expectations of how a mentally retarded person would behave. Doing so takes an arbitrary, unreasonable attitude to the evidence before the court and [results] in an abuse of discretion." *Id*. at ¶ 74.

> Another difference is that in *White*, the experts were able to administer the SIB-R to the petitioner and obtain a psychometrically reliable measurement of his adaptive functioning. *Id*. at ¶ 14-20. In the present case, the only qualitative measurement of Hill's adaptive functioning, the Vineland I test administered when Hill was 17, indicated that Hill functioned at a level above that of the

85

mentally retarded. Apart from this test, the trial court in the present case had no choice but to rely on anecdotal evidence and/or Drs. Olley and Sparrow's doubtful extrapolations of Hill's adaptive ability.

*Hill*, 177 Ohio App. 3d at 193-94, 894 N.E.2d at 125-26.

Hill claims that the court ignored *White*'s holding "when it substituted its own judgment based on its own observations for the overwhelming historical data available regarding Danny Hill's mental retardation." (ECF No. 94, 21.) But that argument fails, since the court here did rely on facts from the record to support its conclusion. Moreover, as the court of appeals stated, the trial court here also relied on the expert opinions of Drs. Olley and Huntsman.

### (4) conclusion

The Ohio appellate court concluded, "In light of the foregoing, there is abundant competent and credible evidence to support the trial court's conclusion that Hill does not meet the second criterion for mental retardation." *Id*. at 194, 894 N.E.2d at 126. Based on its review of the entire record, this Court finds that Hill has not carried his burden of rebutting by clear and convincing evidence the presumed correctness of the Ohio appellate court's decision. The court's conclusion regarding Hill's adaptive behavior *at the time he filed his* Atkins *claim* was supported by sufficient credible evidence and, most importantly, the opinions of two experts. Although "[r]easonable minds reviewing the record might disagree" about some of the Ohio court's findings on this issue, and certain "evidence . . . may plausibly be read as inconsistent with the [state-court] finding," for this Court, "on habeas review[,] that does not suffice to supersede the trial court's . . . determination." *Wood*, 558 U.S. at 301-02 (internal quotation marks and citations omitted).

### c. onset before age 18

86

Finally, the state court of appeals agreed with the trial court that Hill did not meet the third criterion for intellectual disability under *Lott*. It stated:

> With respect to the third criterion, the trial court found that Hill had failed to demonstrate the onset of mental retardation before the age of 18. The trial court's conclusion mirrors its findings under the first two criteria: Hill demonstrated, by a preponderance of the evidence, significantly subaverage intellectual functioning prior to the age of 18, but failed to demonstrate significant limitations in two or more adaptive skills. The evidence supporting the trial court's conclusions is discussed above.

*Hill*, 177 Ohio App. 3d at 194, 894 N.E.2d at 126. As noted above, a reasonable trial-court judge may have concluded that, based on the record, Hill had severe adaptive deficits in childhood and therefore met this prong of the intellectual disability definition. But the state court did not so determine in this case, and Hill has not met his burden of proving that the state court's determination was erroneous or unreasonable.

### 4. Conclusion

*Atkins* holds that "the mentally retarded should be categorically excluded from execution," and that "death is not a suitable punishment for a mentally retarded criminal." *Atkins*, 536 U.S. at 318, 321. But the Supreme Court also repeatedly has made it clear that AEDPA imposes a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt*, 134 S. Ct. at 15. Although the Court recognizes that a reasonable trial-court judge may have come to a different conclusion based on the evidence presented at Hill's *Atkins* hearing, given the extremely deferential standard for relief under AEDPA, this Court cannot hold that Hill has rebutted with clear and convincing evidence the presumed correctness of the Ohio appellate court's factual determination that Hill is not intellectually disabled. *See* 28 U.S.C. § 2254(e)(1). Nor can this Court conclude that the state-

87

court decision denying Hill's *Atkins* claim was unreasonable "beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 787. Accordingly, this claim is denied.

**B.    *Second Ground for Relief:  Ineffective Assistance of* Atkins *Counsel***

Hill's second claim for relief is that he was deprived of his constitutional right to the effective assistance of counsel in his post-conviction *Atkins* hearing. Respondent argues that this claim is not cognizable on habeas and lacks merit. (ECF No. 98, 6.) Hill counters that his *Atkins*-related ineffective-assistance claim should be recognized based on the United States Supreme Court's Sixth and Fourteenth Amendment jurisprudence. (ECF Nos. 94 and 102.)

**1.    Procedural Posture**

Respondent contends that Hill's *Atkins*-related ineffective-assistance claim is unexhausted. (ECF No. 98, 6.) Hill replies that it is not, because no mechanism exists in Ohio for such a claim. Hill explains that, because *Atkins* was decided after his trial, under *Lott*, he had to raise his *Atkins* claim for the first time on post-conviction, and Ohio limits post-conviction relief to constitutional claims, which does not include ineffective assistance of post-conviction counsel. (ECF No. 102, 23-24.) The Court agrees. A habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).

**2.    Viability of *Atkins*-related ineffective-assistance claims in habeas corpus**

Respondent's stronger argument is that Hill's ineffective-assistance claim is barred by AEDPA's § 2254(I). It provides: "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a

88

proceeding arising under section 2254." 28 U.S.C. § 2254(I). This provision is grounded in the well-settled rule that the constitutional right to appointed counsel extends to the first appeal of right and no further. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Accordingly, there is no constitutional right to appointed counsel in habeas cases, *McCleskey v. Zant*, 499 U.S. 467, 494 (1991), or during state post-conviction collateral review, *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991). And, as there is no constitutional right to an attorney in post-conviction proceedings, a habeas petitioner cannot claim unconstitutional deprivation of effective assistance of counsel in such proceedings. *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 425 (6th Cir. 2003) (citing *Coleman*, 501 U.S. at 752-53).

Hill strenuously argues that, in accordance with his Sixth Amendment right to effective representation and his Fourteenth Amendment rights to due process and equal protection, he should have the same opportunity to assert an ineffective-assistance claim related to representation during an *Atkins* hearing held post-conviction under *Lott*, as a defendant does who was convicted and sentenced after *Atkins* was decided and therefore could assert his *Atkins* claim at trial. (ECF No. 102, 23-47.) As support, he points to the Tenth Circuit's decision in *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012). (ECF No. 149.) In that case, the court held that there is a constitutional right to effective assistance of counsel in *Atkins* proceedings. It grounded its decision in the Sixth and Fourteenth Amendments, and further concluded that "the right to counsel flows directly from, and is a necessary corollary to, the clearly established law of *Atkins*." *Id*. at 1184. The Tenth Circuit did not address § 2254(I) at all, however, or identify any other court that reached the same decision. Nor does Hill identify any court that has followed *Hooks*. Indeed, another judge in this district and a judge in the Southern District of Ohio

89

expressly have rejected these arguments. *See Bays v. Warden, Ohio State Penitentiary*, No. 3:08 CV 076, 2014 WL 29564, at **3-4 (S.D. Ohio Jan. 3, 2014) (Rose, J.); *Williams v. Mitchell*, No. 1:09 CV 2246, 2012 WL 4505774, at **22- 28 (N.D. Ohio Sept. 28, 2012) (Nugent, J.).

Despite the equitable appeal of Hill's arguments, there is no Supreme Court or Sixth Circuit authority holding that § 2254(I) is unconstitutional or otherwise not controlling in this case. *See Post v. Bradshaw*, 422 F.3d 419, 423-24 (6th Cir. 2005) (finding § 2254(I) "clear" and "expansive in its prohibition" and holding that Rule 60(b) cannot therefore be used to bring claims of ineffective assistance of habeas counsel). Section 2254(I), therefore, bars Hill's *Atkins*-related ineffective-assistance claim.

### 3.    Merits

Even if Hill's ineffective-assistance claim were cognizable in habeas, it would fail. Hill claims that his counsel:

1.    failed to argue or bring to the court's attention material and substantive facts from the record that established adaptive skill deficits;

2.    failed to intervene or object when Detective James Teeples ("Teeples") videotaped Hill's *Atkins* testing;

3.    failed to properly investigate by not contacting school and prison psychologists and death row inmates;

4.    failed to object to the proceedings on competency grounds;

5.    "was forced to" proceed despite his antagonistic relationship with Hill; and

6.    failed to object to "the fanatical prosecution" of Hill's claim.

(ECF No. 94, 50-51.) Respondent replies, without any support or analysis, that the claim should be "denied as without merit . . . and frivolous, where Hill's trial counsel Meyers demonstrated a

national level performance that few, if any, career capital defenders could meet, and none could exceed."  (ECF No. 98, 6.)

### a.    legal standards

To succeed on a claim of ineffective assistance of counsel, a petitioner must satisfy the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id* at 687.  To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness."  *Id.* at 688.  It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time."  *Id*. at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors.  To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id*. at 693 (citation omitted).  Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail.  *See Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697).  The Supreme Court recently explained, "Surmounting *Strickland*'s high bar is never an easy task. . . .  An ineffective-assistance claim can function as a way to escape rules of

91

waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter,* 131 S. Ct. 770, 788 (2011) (citations and internal quotation marks omitted).

Thus, as the Supreme Court often has repeated, "[j]udicial scrutiny of a counsel's performance must be highly deferential'" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ." *Strickland*, 466 U.S. at 689. The Court recently emphasized, "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions." *Cullen v. Pinholster,* 131 S. Ct. 1388, 1406-07 (2011) (quoting *Strickland*, 466 U.S. at 689-90).

Under AEDPA, a habeas court is limited to determining whether a state-court decision regarding an ineffective-assistance claim was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1); *Mitchell v. Mason,* 325 F.3d 732, 737-38 (6th Cir. 2003) (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of § 2254(d)(1) applies. The Supreme Court recently observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Harrington*, 131 S. Ct. at 788. Therefore, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

92

### b.     analysis

### (1)     failure to investigate and present evidence

Hill claims that his *Atkins* counsel was ineffective for failing to investigate and present material evidence that established his adaptive skills deficits.  (ECF No. 94, 52-60.)  Specifically, he asserts that his counsel should have contacted school psychologists Karen Weiselberg and Annette Campbell, prison psychiatrist John Vermeulen, a psychologist who tested Hill for the prison in 2000, and other death row inmates.  He also argues that counsel should have presented the testimony of Hill's family members, such as his mother and "other aunts and uncles who lived in the area."  The Court disagrees.

A defendant's attorney is responsible for making tactical decisions of trial strategy.  A petitioner claiming ineffective counsel, therefore, must show that his or her counsel's actions were not supported by a reasonable strategy.  *Strickland*, 466 U.S. at 689.  The Supreme Court has made clear, however, that merely labeling an attorney's decision "trial strategy" does not end the inquiry; the strategic decision itself must be the product of a reasonable investigation.  The *Strickland* Court set forth this duty to investigate, explaining:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91.  The Sixth Circuit has found ineffective assistance in numerous cases where counsel failed to conduct an adequate investigation, including interviewing potentially important witnesses, or did not present important testimony or evidence at trial.  *See,*

*e.g., Ramonez v. Berghuis*, 490 F.3d 482, 491 (6th Cir. 2007) (finding ineffectiveness where counsel decided not to interview three potential witnesses who could have corroborated defendant's testimony and contradicted complaining witness' testimony); *Towns v. Smith*, 395 F.3d 251 (6th Cir. 2005) (finding ineffectiveness where counsel decided not to interview a potentially important witness); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (finding ineffectiveness where counsel failed to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Groseclose v. Bell*, 130 F.3d 1161, 1170 (6th Cir. 1997) (finding ineffectiveness where counsel had no strategy and conducted no investigation at all).

Nevertheless, the Supreme Court has stated that "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). It further has instructed, "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Accordingly, the Sixth Circuit repeatedly has concluded that an attorney's pretrial investigation and decisions in presenting evidence and testimony was reasonable given the circumstances. *See, e.g., Landrum v. Mitchell*, 625 F.3d 905, 921-22 (6th Cir. 2010) (finding no ineffective assistance where petitioner failed to show prejudice resulting from trial counsel's failure to conduct proper investigation or interview potential witnesses, and present important lay and expert testimony); *Austin v. Bell*, 126 F.3d

94

843, 848 (6th Cir. 1997) (finding no ineffective assistance where counsel did not call witnesses with credibility and reliability problems).

Here, the Court finds neither deficient representation nor prejudice. First, it is clear from the hearing transcript that Hill's counsel's strategy was to rely on the expert testimony of Dr. Hammer and to have Dr. Hammer interpret the facts in the record for the court in light of the clinical guidelines. He explained to the court, in objecting to the prison guards' testimony as inadmissible lay opinion, that it is more appropriate for "a psychologist to filter factual data relative to Prong II . . . than from factual anecdotal being delivered directly to this Court." (Supp. App., Disc 1, Tr., 1245; *see also id*. at 560-72.)

This strategy accords with the Ohio Supreme Court's emphasis in *Lott* and *White* on expert testimony in *Atkins* proceedings. In *Lott*, the court instructed trial courts to "rely on professional evaluations of [a defendant's] mental status, and consider expert testimony, appointing experts if necessary, in deciding this matter." *Lott,* 97 Ohio St. 3d at 306, 779 N.E.2d at 1015. The court added in *White*,

> While the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how a mentally retarded person would behave. Doing so shows an arbitrary, unreasonable attitude toward the evidence before the court and constitutes an abuse of discretion.

*White*, 118 Ohio St. 3d at 24, 885 N.E.2d 915-16.

Second, the testimony of Drs. Weiselberg-Ross, Campbell, and Vermeulen would have been cumulative, since their notes, reports, and letters were admitted into evidence and discussed at length by both parties' experts. Similarly, Hill's mother and grandmother testified at Hill's mitigation hearing, and the transcripts of their testimony also were admitted into evidence at the

95

*Atkins* hearing.  (*See* Supp. App., Disc 1, 1104.)

Third, it is not reasonably probable that the result of Hill's *Atkins* hearing would have been different had Dr. Spindler, other family members, and death row inmates testified.  Hill admits that Dr. Spindler "does not recall Danny Hill or why he administered the test to him." (ECF No. 94, 57.)  The testimony of additional family members and other death row prisoners would have been equally weak.

These sub-claims are meritless.

### (2)      failure to challenge Hill's competency

Hill argues that his counsel should have objected to the entire *Atkins* hearing on competency grounds.  (*Id*. at 60-63.)  The trial court did, however, hold a hearing on Hill's competency on December 7, 2006, less than ten months after it issued its opinion on Hill's *Atkins* claim.  The Eleventh District Court of Appeals remanded the case to the trial court for the competency hearing after Hill's counsel filed a motion to withdraw from the case because Hill no longer wished to pursue his appeal and wanted them to withdraw as his counsel.  (Supp. App., Disc 1, Tr., 1926-28.)  After hearing testimony from a psychologist, the court found that Hill was competent to make decisions about his appeal.  (*Id*. at 1954.)  There is no evidence that the outcome would have been any different if such a hearing had taken place in the proceeding two years, before or during Hill's *Atkins* hearing.  This sub-claim fails as speculative.

### (3)      failure to object to Teeples videotaping Hill

For this sub-claim, Hill argues that his *Atkins* counsel should have objected when Detective Teeples videotaped Hill's testing related to his *Atkins* hearing.  Teeples also was present during Hill's final interrogation by police at which he confessed to being present at the

96

crime, and Hill believed Teeples was part of a conspiracy to falsely hold him responsible for the murder. Hill claims Teeples' presence during the testing contributed to his difficulty with the testing. (ECF No. 94, 50.)

This sub-claim also lacks merit. Hill has offered no evidence to show when, if ever, his counsel was aware of this issue, and whether or not he could have objected in time. Moreover, it is pure speculation to suggest that Hill's performance on the test would have been different had Teeples not been videotaping it.

### (4) being "forced to" proceed with representation

Hill argues that his *Atkins* counsel should not have allowed himself to be "forced to" continue to represent him when their relationship had deteriorated. (*Id*. at 63-80.) As Hill acknowledges, his counsel twice filed motions to withdraw from the case, both of which were denied. (*Id*. at 65.) There was nothing more counsel could do. This claim is meritless.[31]

### (5) failure to object to "the fanatical prosecution"

Hill finally claims that his counsel was ineffective because he did not object to "the fanatical prosecution." (ECF No. 94, 80.) To the contrary, the Court notes that, after reviewing the entire record, it is apparent that Hill's counsel represented him skillfully and ardently. Hill offers no evidence to support this claim, and it fails.

---

[31] Hill also appears to frame this sub-claim as an error of the trial court in denying the motions to withdraw. He fails to develop that argument, however, and it is waived. *See United States v. Crosgrove*, 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address Cosgrove's general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

Accordingly, Hill's claim for ineffective assistance of *Atkins* counsel is denied.

**C.      Third Ground for Relief:  Actual Innocence**

Hill claims for his third ground for relief that he is actually innocent of the death penalty because he is intellectually disabled.  Respondent counters that this claim is a "reiteration" of his *Atkins* claim "and fails for the same reason." (ECF No. 98, 6.)

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court explained that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Id.* at 404.  The Court stated in dicta, however, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional" regardless of whether any constitutional violation occurred during trial.  *Id*. at 417.

The Supreme Court has never applied such a claim, however, and recently declined to resolve whether a "free-standing" actual innocence claim is cognizable on federal habeas review. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).  The Sixth Circuit also has held that such a claim is not a valid ground for habeas relief.  *See, e.g., Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007); *Thomas v. Perry*, No. 13-1681, 2014 WL 128153, at *2 (6th Cir. Jan. 15, 2014). Moreover, the *Herrera* Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high."  *Herrera,* 506 U.S. at 417; *see also House v. Bell*, 547 U.S. 518, 520 (2006).

Because this claim has not yet been recognized by the Supreme Court or the Sixth Circuit, relief on this claim is denied.

98

## VI.   CERTIFICATE OF APPEALABILITY ANALYSIS

This Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Hill's grounds for relief.  The Sixth Circuit has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Hill presented in his Amended Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has make a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to AEDPA's enactment.

99

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000). In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute. *Id.* at 483. Thus, the Court determined,

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Id.* at 483-04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on the distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

After taking the above standards into consideration, the Court finds that it will issue a COA for Hill's *Atkins* claim, his first ground for relief. Reasonable jurists could debate this Court's conclusion on the merits of this claim. The Court will not issue a COA for Hill's second

100

ground for relief (ineffective assistance of *Atkins* counsel) or third ground for relief (actual innocence), as neither is a cognizable ground for federal habeas relief. No jurist of reason would debate the Court's conclusions on these claims.

## VII.   CONCLUSION

Accordingly, this Court finds that Petitioner Danny Lee Hill's Amended Petition for Writ of Habeas Corpus is denied. The Court further certifies, pursuant to 29 U.S.C. § 1915(a)(3), that an appeal from this decision as to Hill's first ground for relief can be taken in good faith.

IT IS SO ORDERED.

                        */s/ John R. Adams*
                        JOHN R. ADAMS
                        UNITED STATES DISTRICT JUDGE

June 25, 2014

101

**16. Give the names and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:**

**g. On appeal from any ruling against you in post-conviction proceedings:** Michael A. Vadar Laan, Christopher R. McDowell, Amanda Prebble, Dinsmore & Shohl, 225 E. Fifth Street, Suite 1900, Cincinnati, OH 45202

George Pappas, 631 W Exchange St, Suite A, Akron, OH 44302

Vicki Ruth Adams Werneke, Lori Riga, Alan Rossman, 1660 W. Second Street, Suite 750, Cleveland, OH 44113

Kimberly Beck, 719 S Shoreline Blvd, Corpus Christi, TX 78401

Gregory Meyers, David Bodiker, Linda Prucha, Luz V. Lopez-Ortiz, Ohio Public Defender, 250 E. Broad St., Suite 1400, Columbus, OH 43215

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **DANNY LEE HILL,** | ) | |
| | ) | |
| **Petitioner** | ) | **Case No.** |
| | ) | |
| **v.** | ) | **CAPITAL HABEAS CASE** |
| | ) | |
| **TIM SHOOP, Warden** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## DANNY LEE HILL'S PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TITLE 28 U.S.C. SECTION 2254

## INTRODUCTION

1.      The foundation of the State's case against Danny Lee Hill was the bitemark comparison evidence, the *only* alleged physical evidence in the case. Mr. Hill was convicted and sentenced to death because the State asserted that the bitemark comparison was sound science that conclusively proved Mr. Hill committed the brutal attack on Raymond Fife. The assumption that bitemark comparison was based on valid scientific principles has been the anchor for the prosecution's case over the years.

2.      Bitemark comparison though is pseudoscience, and the evidence in this case stands apart as grossly speculative and unreliable even in a discipline today known for its complete unreliability. No court today would ever allow bitemark comparison evidence to be used at a trial because it has been completely and totally discredited by the scientific community. The impact that such evidence has on a case cannot be overstated. The use of faux evidence has led to dozens of wrongful convictions across the country and Mr. Hill's case is a primary example. But for the testimony of Dr. Curtis Mertz, the forensic odontologist, Mr. Hill could not have been convicted

of the crimes against Fife.

3.      But when the Ohio courts were presented with this revelation, the state courts turned a blind eye and refused to acknowledge that Mr. Hill's fundamental rights to a fair trial and due process were violated. The well-established fundamental due process principles require that a capital offense be based on reliable, admissible evidence, not pseudoscience and wholesale fabrication that drove to his conviction. At each step along the way, lower courts have evaded their judicial responsibilities, invoking erroneous standards, imposing spurious burdens, misconstruing both fact and law, and, finally, refusing to engage in the fulsome, objective analysis required by the constitution.

4.      The Ohio courts found correctly that because the bitemark comparison used against him has been discredited, Mr. Hill had met the stringent standard for filing a motion for new trial to present newly discovered evidence. However, the state court unreasonably applied the facts and unreasonably interpreted clearly established Supreme Court authority to the claims.

5.      First, by requiring Mr. Hill to "vitiate" the sufficiency of the evidence against him, the courts constructively required Mr. Hill to prove his actual innocence. Second, the courts' refusal to meaningfully interpret the facts and instead rely on a misapplication of the "law of the case" concept further ensconced the error caused by the admission of the junk science. Third, the state courts applied unsubstantiated and unfounded inferences to deny the motion for new trial. These errors were only exacerbated by a series of decisions by the trial court — denying Mr. Hill a hearing, striking his evidence, and allowing the conflicted Trumbull County Prosecutors' office to continue prosecuting his case —that impermissibly tilted the proceedings for the State.

6.       Mr. Hill is entitled to habeas relief as his constitutional rights to a fair trial and fundamental due process have been gravely denied.

2

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/ Vicki Ruth Adams Werneke*
VICKI RUTH ADAMS WERNEKE (0088560)
Assistant Federal Public Defender

*/s/ Lori Riga*
LORI RIGA (0066994)
Research and Writing Attorney
Federal Defender Office/Capital Habeas Unit
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856; (216) 522-1951(f)
vicki_werneke@fd.org
lori_riga@fd.org

## PROCEDURAL HISTORY

7.      This Court possesses jurisdiction over this Petition pursuant to 28 U.S.C. § 2254 because Mr. Hill asserts a federal constitutional challenge to his conviction and incarceration by the State of Ohio.

8.      Mr. Hill's constitutional claims were fully litigated in state court. On June 13, 2016, Mr. Hill filed, with permission of the Court of Common Pleas for Trumbull County, Ohio, a delayed Motion for New Trial based on new evidence. Mr. Hill's motion requested a new trial pursuant to Ohio Criminal Rule 33 and asserted that Mr. Hill's conviction and incarceration violated his federal Fifth, Eighth, and Fourteenth Amendment rights. *Id.* at 43-47. The Court of Common Pleas denied Mr. Hill relief on October 5, 2016, without addressing the specific federal constitutional claims. *See* Exhibit 1, 10/3/16 Court of Common Pleas Order ("Tr. Order").

9.      On February 27, 2017, Mr. Hill timely appealed the Court of Common Pleas' ruling to the Eleventh District Court of Appeals. There, Mr. Hill appealed the denial of his Rule 33 motion

3

and re-asserted his claim that his conviction, incarceration, and death sentence violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Mr. Hill also asserted that the Court of Common Pleas violated due process when it denied his motion for new trial.

10.    Mr. Hill's appeal was denied on December 3, 2018. Exhibit 2, *State v. Hill*, 125 N.E.3d 158 (Ohio Ct. App. 2018). In support, the Honorable Diane V. Grendell authored an opinion in her name only. The Honorable Thomas R. Wright concurred in judgment only. The Honorable Colleen Mary O'Toole dissented.

11.    Mr. Hill filed timely a petition for discretionary review with the Ohio Supreme Court, challenging the denial of his motion for new trial and once again raised his federal constitutional claims under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *Hill v. State*, Case No. 2019-0068.

12.    On June 12, 2019, the Ohio Supreme Court declined Mr. Hill's petition. Exhibit 3. *State v. Hill*, 156 Ohio St.3d 1405 (Ohio 2019).

13.    This habeas petition is timely filed.

## THIS NUMERICALLY SECOND HABEAS PETITION IS NOT SUBJECT TO THE GATE KEEPING FUNCTION OF 28 U.S.C. § 2244(B).

14.    Although Mr. Hill's initial habeas petition had already been addressed and ruled on by the court, this second-in-time habeas petition is not subject to the gate keeping function of 28 U.S.C. §2244(b) as this is not a successor petition. "The phrase 'second or successive petition' is a term of art given substance in [the Supreme Court's] prior habeas corpus cases." *Slack v. McDaniel*, 529 U.S. 473, 486 (2000). As a term of art, a literal reading of this phrase is improper. *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998). AEDPA does not define "second or successive petition" so the parameters of the phrase are set by the doctrine of abuse of the writ. *Felker v. Turpin*, 518 U.S. 651, 665 (1996). This definition of "abuse of the writ' remains

4

unchanged by AEDPA. *Slack*, 529 U.S. at 486; *Martinez-Villareal*, 523 U.S. at 644-45 (using pre-AEDPA law); *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007).

15.     A petition is second or successive under §2244(b) if it raises a claim that was or could have been raised in the earlier petition. *In re Bowen*, 436 F.3d 699, 74-05 (6th Cir. 2006). A habeas petition is "numerically second" but not successive under §2244(b) when it presents a claim that is "unripe when [the] initial petition was filed [because] the events giving rise to the claim had not yet occurred." *In re Jones*, 652 F.3d at 605.

16.     Ohio Criminal Rule 33 requires a petitioner to file a Request for Leave to File a Motion for New Trial when more than 120 days have elapsed since the conviction. On November 14, 2014, Mr. Hill filed his Request for Leave. After conducting a hearing on the request for leave motion, the trial court found Mr. Hill could not have raised the claims concerning the discredited bitemark evidence previously and had been diligent in raising the claim upon discovery.

17.     The issues raised in this habeas petition were not raised in the first-in-time habeas petition in 1996, and could not have been raised previously. In August 2013, the American Board of Forensic Odontology (ABFO), the organization responsible for accrediting and establishing standards for bite mark analysts, stated for the first time, in its Reference Manual, that open-population identification is no longer sanctioned. Based on these new guidelines and other media that reported it, Mr. Hill's counsel requested that another forensic odontologist affirm the ABFO's retreat from its previously claimed ability to identify "the biter", and to review the bitemark evidence proffered at Mr. Hill's trial.

18.     After a review of this evidence, Dr. Franklin Wright determined that the bitemark identification testimony in Mr. Hill's trial was now understood by the scientific community, including the ABFO, to be completely unreliable. Exhibit 4, 2014 Affidavit of Dr. Franklin Wright.

Moreover, Dr. Wright averred that he recognized the evidence from this case from his work with Dr. Mertz after Mr. Hill's trial and that Dr. Merz regretted his testimony at the Hill trial. Dr. Wright averred that he believed Dr. Mertz testified as he did out of sympathy for the victim and possibly pressure from the prosecution and the community. (In a declaration signed on June 7, 2020, Dr. Wright attested that besides prosecutorial pressure, Dr. Mertz's testimony was also motivated by racial animus against Mr. Hill.) As the trial court found, these new scientific developments and Dr. Mertz's own assessment of his trial testimony could not have been produced within 120 days of Mr. Hill's trial. *In re Jones*, 652 F.3d at 605.

## I.    PROCEDURAL BACKGROUND

### A.    Conviction and Direct Appeal

19.    On January 31, 1986, a three-judge panel found Mr. Hill guilty of aggravated murder, with specifications. A mitigation hearing took place on February 26, 1986; two days later, the panel sentenced Mr. Hill to death. The convictions and sentences were affirmed on direct appeal. *See State v. Hill*, 11th Dist. Nos. 3720, 3745, 1989 WL 142761 (Ohio Ct. App. Nov. 27 1989); *State v. Hill*, 595 N.E.2d 884 (Ohio 1992).

20.    Mr. Hill thereafter filed in the Trumbull County Court of Common Pleas a Petition to Vacate or Set Aside Judgment and/or Sentence Pursuant to Ohio Revised Code Section 2953.21. Although Mr. Hill requested discovery, the court issued an opinion denying the request without conducting an evidentiary hearing or allowing any discovery.

21.    Mr. Hill appealed to the Eleventh District Court of Appeals, which affirmed the lower court's decision. *State v. Hill*, 11th Dist. No. 94-T-5116, 1995 WL 418683 (June 16, 1995). The Ohio Supreme Court declined to accept jurisdiction to review. *State v. Hill*, 656 N.E.2d 951 (Ohio 1995). No application for re-opening the direct appeal pursuant to Ohio Rule of Appellate

Procedure 26(B) was filed on Mr. Hill's behalf.

**B.    Federal Habeas Claims**

22.    On December 2, 1996, Mr. Hill filed in this Court an initial Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254. This Court denied the petition on September 29, 1999.

23.    Mr. Hill timely appealed that ruling to the United States Court of Appeals for the Sixth Circuit. In *Hill v. Anderson*, 300 F.3d 679 (6th Cir. 2002), the Court of Appeals held that, given the United States Supreme Court's then recent ruling in *Atkins v. Virginia*, 536 U.S. 304 (2002), Mr. Hill's cognitive deficiency-based Eighth Amendment claim had not been exhausted in state court. It ordered Mr. Hill back to state court to litigate the issue.

24.    On November 27, 2002, Mr. Hill filed an *Atkins* claim in the Trumbull County Court of Common Pleas. A hearing was conducted in October 2004, with rebuttal testimony in March 2005. On February 15, 2006, the Court of Common Pleas denied Mr. Hill's *Atkins*-based petition.

25.    An appeal was perfected to the Eleventh District Court of Appeals, which affirmed the trial court's denial on July 11, 2008, with one judge dissenting. *State v. Hill*, 177 Ohio App. 3d 171, 2008-Ohio-3509 (11th Dist.). The opinion was authored by the Honorable Diane V. Grendell.

26.    The Ohio Supreme Court declined jurisdiction on August 26, 2009, with two justices dissenting. *State v. Hill*, 912 N.E.2d 107 (Ohio 2009).

27.    Mr. Hill thereafter filed an Amended Petition for Writ of Habeas Corpus in this Court regarding his exhausted *Atkins* claim. The petition was denied June 25, 2014. *Hill v. Anderson*, 96-cv-00795, 2014 WL 2890416 (N.D. Ohio Jan. 25, 2014)

28.     On February 2, 2018, the Sixth Circuit Court of Appeals reversed this Court's ruling, holding that the state court's *Atkins*-based determinations regarding Mr. Hill's cognitive function were an unreasonable application of clearly established law. *Hill v. Anderson*, <u>881 F.3d 483</u> (6th Cir. 2018).

29.     On January 7, 2019, the Supreme Court granted *certiorari* and vacated the Sixth Circuit's decision in a *per curiam* opinion. *Shoop v. Hill*, __ U.S. __, <u>139 S.Ct. 504</u> (2019).

30.     On May 20, 2020, after further briefing and oral argument, the Sixth Circuit Court of Appeals again ordered that habeas relief be granted on the *Atkins* claim. *Hill v. Anderson*, __ F.3d __, <u>2020 WL 2551881</u> (6th Cir. May 20, 2020). The Warden filed a petition for rehearing on May 28, 2020, that is still pending as of filing this habeas petition.

### C.     Mr. Hill's Motion for New Trial

31.     On November 14, 2014, Danny Lee Hill filed in the Trumbull County Court of Common Pleas a motion for leave to file a delayed motion for new trial based on newly-discovered evidence, pursuant to Ohio Criminal Rule 33(B). In seeking relief under Ohio Criminal Rule 33, Mr. Hill's motion asserted that he was convicted, incarcerated, and sentenced to death in violation of his federal Fifth, Eighth, and Fourteenth Amendment rights. Mr. Hill also moved to recuse the judges of the Trumbull County Court of Common Pleas.

32.     In support of his motion for new trial, Mr. Hill offered an affidavit from Dr. Franklin Wright, a prominent and widely-respected Ohio-based forensic odontologist, who (i) opined that bitemark evidence relied upon to convict Mr. Hill trial was scientifically invalid,  (ii) disclosed that Dr. Curtis Mertz, the expert who presented that evidence, had confessed on at least two occasions in the 1990s that he no longer stood by his testimony in Mr. Hill's case, and (iii) the purported mark on the victim was not even a bite mark. Mr. Hill also detailed recent developments

in the field of bitemark analysis that confirmed the scientific baselessness of the evidence used against him. Exhibit 4, 2014 Affidavit of Dr. Franklin Wright.

33.    Mr. Hill attached a draft of his proposed motion for new trial to his motion for leave, supported by an affidavit from Dr. Wright, and additional affidavits from Dr. Iain Pretty, a forensic odontologist, who confirmed and expanded upon Dr. Wright's opinion Exhibit 5, Affidavit of Dr. Ian Pretty, from Dr. Zhongxue Hua, a pathologist, who detailed the grossly speculative and unscientific nature of non-bitemark and bitemark-adjacent evidence offered at Mr. Hill's trial Exhibit 6, Affidavit of Dr. Zhongxue Hua, and Dr. Debra Davis, a psychologist and academic specializing in false confessions, who explained how the coercive interrogation techniques used on Mr. Hill rendered his statements to the police unreliable Exhibit 7, Affidavit of Dr. Debra Davis.

34.    The State opposed Mr. Hill's recusal request on November 18, 2014, and opposed Mr. Hill's motion for leave on November 20, 2014.

35.    On November 21, 2014, Presiding Judge Andrew J. Logan recused the entire Trumbull County Court of Common Pleas from further proceedings. On April 10, 2015, the Ohio Supreme Court appointed Judge Patricia A. Cosgrove to preside over the proceedings.

36.    Judge Cosgrove conducted several conferences by phone and held a formal evidentiary hearing on December 21, 2015, to determine whether the request for leave to file met the stringent standards for filing a delayed motion for new trial. On June 7, 2016, the trial court found by clear and convincing evidence that Mr. Hill was unavoidably delayed in presenting the claims previously and therefore granted Mr. Hill's motion for leave the motion for new trial. *See* Exhibit 8, Order granting leave to file Motion for New Trial.

37.    On June 13, 2016, Mr. Hill filed his motion for new trial, with a supporting

memorandum that was substantially the same as the proposed brief attached to his motion for leave.

38.     On June 16, 2016, the State responded with a consolidated motion which opposed Mr. Hill's request for a hearing and sought to strike Mr. Hill's motion in part or whole. On July 5, 2016, the State filed an additional response to Mr. Hill's motion for new trial, arguing that Mr. Hill's bitemark evidence was not "newly discovered" or "new evidence" and, in the alternative, that the evidence did not meet the requirements for a new trial under Rule 33 and *State v. Petro*, 76 N.E.2d 370 (Ohio 1947).

39.     On August 8, 2016, the court held a telephone status conference.  During that call, the court scheduled an evidentiary hearing for September 29-30. On August 17, 2016, however, the Court convened yet another telephone status conference during which it summarily canceled the scheduled hearing and stated that it would issue a decision an opinion shortly.

40.     On September 20, 2016, Mr. Hill filed a renewed motion for a hearing on his claims. He also provided the Court with supplemental authority regarding bitemark evidence—a then recent report to the President from the President's Council of Advisors on Science and Technology (PCAST), titled Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods.

41.     October 3, 2016, the Court of Common Pleas denied Mr. Hill's motion and all relief without mentioning his constitutional claims. Exhibit 1, Order denying Motion for New Trial.

42.     Although the trial court acknowledged the "shocking" nature of Mr. Hill's new bitemark evidence, and conceded it raised "serious concerns about the scientific reliability of bite mark evidence," it nonetheless denied Mr. Hill all relief. Exhibit 1, Order at 25.

43.     In its opinion, the court agreed that Mr. Hill's new evidence regarding his bitemark

identification discredited Dr. Mertz's analysis. However, it struck the non-bitemark or bitemark adjacent arguments and evidence and invoked the doctrines of *res judicata* and/or law of the case, finding itself "bound" by language found in Mr. Hill's decades-old direct appeal. The court held that Mr. Hill's new evidence did not satisfy Rule 33 or the applicable standard under *State v. Petro* because, even if the bitemark evidence was eliminated from the record, Mr. Hill could not show a strong probability of a different result at retrial.

44.     On February 27, 2017, Mr. Hill filed a timely appeal of the Court of Common Pleas' decision in the Eleventh District Court of Appeals.

45.     On December 3, 2016, a three-judge panel affirmed the trial court's decision without a binding opinion. Although Judge Grendell (once again) authored an opinion (on her own behalf), the Honorable Thomas R. Wright concurred in the decision only, and the Honorable Colleen Mary O'Toole dissented. *State v. Hill*, 125 N.E.3d 158 (Ohio Ct. App. 2018)

46.     On January 17, 2019, Mr. Hill filed a petition for discretionary review with the Ohio Supreme Court. That petition was denied on June 12, 2019. On November 6, 2019, Mr. Hill filed a petition for writ of *certiorari* in the United States Supreme Court. On January 13, 2020, that petition was denied.

## II.     FACTUAL BACKGROUND

### A.     The Investigation

47.     On Tuesday, September 10, 1985, 12-year-old, Raymond Fife was attacked while riding his bike near the Valu-King convenience store in Warren, Ohio. Initially reported missing by his family, Fife was eventually found by his father at approximately 9:00 P.M. that evening, in a wooded area behind a Valu-King convenience, unconscious but alive. He died two days later in the hospital.

48.     In the week following the assault, Mr. Hill provided the Warren Police Department with several statements regarding knowledge he claimed to possess about the assault on Fife.

49.     Mr. Hill first contacted the police voluntarily, seeking a reward for information he purported to possess. Then, however, the police treated him as a suspect. Mr. Hill, just eighteen with an I.Q. below 70, was initially unaware that he was a suspect. Mr. Hill's uncle, Morris Hill, was a detective with the Warren Police Department, and Mr. Hill knew the police officers who questioned him personally.

50.     Twice Mr. Hill was transported from his home to the Warren police station for interrogation. While he was being questioned, the Warren police rebuffed attempts by Hill's family to contact him and provide him with counsel. *See, e.g., State v. Hill*, 1989 WL 142761, at *11. This extended, coercive questioning—which included intimidation tactics by Mr. Hill's uncle, Morris Hill, with a documented history of beating Mr. Hill while he was in police custody[1]— ultimately resulted in two recorded statements, one on audio tape and one on video. In these statements Mr. Hill suggested—erratically, with little regard for realities of time, space, or human anatomy—that he witnessed the assault on Fife but adamantly denied participation. Mr. Hill named Timothy Combs as the perpetrator. Only the bitemark evidence "proved" Mr. Hill's participation in the attack.

51.     During Mr. Hill's September 16 interrogation, the police removed Combs from his high school for questioning. Combs, 17 years old with a juvenile history of rape of younger boys,

---

[1] *See, e.g., Hill v. Anderson*, 300 F.3d at 681 ("According to Detective Hill, Danny's mother then asked him to 'whup [Danny's] ass,' and when Danny, then in police custody, claimed he had nothing to do with the burglary, Detective Hill 'smacked him in the mouth.' Detective Hill said he had struck Danny while he was in police custody 'a couple of times.'")

was eventually convicted of Fife's rape and murder and sentenced to consecutive life sentences.[2] When told that Mr. Hill had identified him as the perpetrator, Combs blamed Mr. Hill for the assault before admitting that in fact he had sodomized Fife during the assault.

52. During Mr. Hill's on-going interrogation, the police leveraged Mr. Hill's anxiety and fear in several ways, including by "warning" him that Combs would testify in court that Mr. Hill was responsible for the assault if Mr. Hill did not provide the police the details they desired. The videotaped portion of Mr. Hill's interrogation from September 16, in which he purportedly offered "knowledge" about the attack on Fife, came in the aftermath of this threat.

53. An attorney, Roger Bauer, appeared at the police station and tried to advise Mr. Hill not to talk to the police. Attorney Bauer was removed by the interrogating detectives, however. The Warren Police Department later filed a grievance against Attorney Bauer that was dismissed. Exhibit 9, Affidavit of Roger Bauer.

54. On September 17, 1985, the State charged Hill with Aggravated Murder in violation of Ohio Rev. Code § 2903.01(B); Kidnapping in violation of Ohio Rev. Code § 2905.01(A); Rape in violation of Ohio Rev. Code § 2907.02(A)(1)(3); and Felonious Sexual Penetration in violation of Ohio Rev. Code § 2907.12(A)(1)(3).

55. On September 23, 1985, Mr. Hill was indicted on charges of aggravated murder, with aggravating circumstances of kidnapping, rape, aggravated arson and aggravated robbery. Ohio Rev. Code § 2929.04(A)(7). Under Ohio law then, as now, aggravated murder constituted a capital offense.

---

[2] Combs died in prison in 2018.

13

## B.    Mr. Hill's Trial

56.    Trial commenced January 21, 1986, before a three-judge panel. Pre-trial, Mr. Hill sought to suppress his statements to the police, and certain physical evidence. Those motions were denied. During the 10-day trial, the State called nearly two dozen witnesses, including four experts.

57.    No witnesses placed Mr. Hill at the actual scene of the crime, let alone claimed to have witnessed his participation in the assault. Likewise, the State offered no physical evidence connecting Mr. Hill to the violence against Fife.[3] The State admitted this deficiency in its opening and closing statements where it acknowledged it would "like to have . . . forensic evidence," but conceded it could point to "no evidence of blood," "no blood test" and no fingerprints linking Mr. Hill to the crime. Trial Tr. at 20-21, 1196.

### 1.    Fact Witnesses

58.    Among the State's witnesses were several local teenagers, including Donald Allgood, Tony Cree, and Darren Ball— who testified they saw Mr. Hill and/or Timothy Combs near the Valu-King around the time of the assault. None testified that they saw Mr. Hill with Fife, let alone that they witnessed Mr. Hill assault Fife.

59.    **Donald Allgood**, a 16-year- old student at a local high school, identified Mr. Hill as one of four individuals "coming out of the woods" where Fife was found on the day of the assault. Trial Tr. at 449-450. Allgood stated that two of those individuals, but not Mr. Hill, were pulling up their zippers. Trial Tr. at 439, 454, 480. The State ignored this part of Allgood's testimony; later, it argued that Mr. Hill must have participated in the crime because only two people

---

[3] As discussed at length herein, although the State *characterized* the bitemark evidence used against Mr. Hill as a kind of physical evidence of his participation, the purported connection between the injury to Fife's penis and Mr. Hill was based on a completely speculative analysis by Dr. Mertz.

were, or could have been, at the scene. Trial Tr. at 1250 (alleging that "the only two people back there, the only two, were Tim Combs and Danny Hill"); Trial Tr. at 1265 (arguing that Hill must have participated because "Tim couldn't do all those things at one time" by himself).

60.     Allgood also provided testimony regarding a "stick" he claimed to have witnessed Mr. Hill discard; the State later relied on this testimony to link a broken broom handle to Mr. Hill through the testimony of the State's expert pathologist, Dr. Howard Adelman.

61.     Allgood conceded that he did not mention this stick in his original statement to the police; he mentioned it only after the police arrived at his house the next day, with Prosecutor Watkins in tow. Trial Tr. at 456-457. This follow-up visit to Allgood occurred one day after Dr. Adelman had completed his initial post-mortem analysis and determined that Fife had been "penetrated" and "perforated" by an "object." Trial Tr. at 355.

62.     On the stand, Allgood could not confirm that the broken broom handle the State offered into evidence was, in actuality, the stick he witnessed being thrown. Trial Tr. at 461 (noting that the stick "was about 12 inches long" and that "it could have been" a "conventional wood stick or branch" not a broom handle); Trial Tr. at 21 (prosecution's description of the object in evidence as "18 inches" long).

63.     Allgood's recollection of four individuals exiting the path behind Valu-King was not his only point of conflict with the State's other evidence. Although Allgood testified that he was "sure" Combs was wearing full-length "blue jeans" and a "leather jacket" when he exited the path behind the Valu-King, Trial Tr. at 438, this description was contradicted by **Tony Cree** and **Darren Ball**, two teenagers who testified they saw Combs (but not Mr. Hill) at the "bend" or "curb" of the path behind Valu-King. According to Cree and Ball, when they saw Combs on the path behind the Valu-King around the time of the assault, he was wearing sunglasses, a wool hat,

a t-shirt, and a pair of shorts. Trial Tr. at 846 (Ball), 862-863 (Cree).

64.     After passing Combs on the path, Ball and Cree jogged away from him toward the Valu-King parking lot.  Trial Tr. at 864 (Cree) (confirming he saw Combs "in th[e] bend area" and that he was "traveling . . . from Valu-King"); Tr. at 845-846 (Ball) (noting that he saw Combs at the "curb" in the path "coming from the Value-King"). The bend in the path where Cree and Ball saw Combs was approximately 185 feet from the location where Fife's body was found.

65.     Neither Cree nor Ball saw Mr. Hill on the day of the assault. Both, however, testified that they assumed Combs had "gotten" somebody on the path. Trial Tr. at 853 (Ball), 866 (Cree).

66.     The State also called **Raymond Vaughn**, Mr. Hill's younger brother, who testified that he witnessed Mr. Hill washing a red stain from a pair of gray pants in the bathtub, days after the assault. *Id.* at 40. Vaughn later recanted his testimony, swearing in an affidavit he never saw Mr. Hill washing his pants and that he only testified otherwise "because of the coercion of the prosecutor." *State v. Hill*, 1989 WL 142761, at *24. The State's own witnesses testified that no trace of blood could be found on Mr. Hill's pants.

67.     The State attempted to establish Mr. Hill's sexual attraction to boys through a surprise witness, **Stephen Melius**, a frequent runaway who had been in-and-out of juvenile detention a dozen times.[4] Trial Tr. at 1130. Melius testified that Mr. Hill had once made what Melius perceived (but could not confirm) were sexual overtures when the two shared a cell in juvenile detention. Trial Tr. at 1019-1020 (Attorney Kontos admitting that the State withheld Melius' name and nature of his testimony from defense "to wait and see if the Court would admit

---

[4] Mr. Hill had been sentenced to juvenile detention for prior sexual assaults against adult women.

it or not"); 1043 (Melius). Melius did not testify that Mr. Hill became violent at any point during the events described.

68.    Sergeant Steinbeck of the Warren police sought Melius because of a third-party report that Mr. Hill had been present in the cell during a prior sexual assault against Melius. Trial Tr. at 1043-1044 (Melius). Although this report turned out to be inaccurate, Steinbeck pressed Melius on any other interactions with Mr. Hill; in response to this prodding, Melius alleged the previously unreported sexual overture by Mr. Hill. Trial Tr. at 1042.

69.    Melius's brief testimony was riddled with errors. The names and dates he provided did not match the records of the juvenile detention facility; they *did*, however, match the facts of Melius's *other*, documented sexual assault. Trial Tr. at 1115-1118 (Maderitz), 1024 (Melius) (third cellmate with Hill and Melius was "Bob," who was "white"), 1044 (third person in cell during reported sexual assault was "Bob").

70.    Other testimony was provided by Det. Hill, Mr. Hill's uncle, who acknowledged that on several prior occasions he had "whipped" Mr. Hill at the police station to get him to talk to investigators.[5] Trial Tr. at 745-746. Only after being left in an interrogation room alone with his uncle did Mr. Hill profess any first-hand knowledge about the crime about the crime against Raymond Fife. Trial Tr. at 741-744; *see also Hill v. Anderson*, 300 F.3d at 682–83 ("After being brought to the station again and left alone with his uncle for a few minutes, Danny Hill made an abrupt about-face and confessed to involvement in the crime."); *Hill v. Anderson*, 2020 WL 2551881 * 23 ("The record contains ample evidence demonstrating that Hill's waiver was neither

---

[5] The State's other witnesses included James Teeple (Trial Tr. at 117-198), who collected forensic evidence for the Warren police, Candyce Jenkins (Trial Tr. at 684-702) and Mary Ann Brison (Trial Tr. at 702-712), who both testified that Hill had previously assaulted them, and Thomas Stewart (Trial Tr. at 623-687) and Morris Hill (Trial Tr. at 713-769), a member of the Warren police who participated in Mr. Hill's interrogation.

voluntary nor knowing.").

71.     Although Mr. Hill adamantly stated that he did not participate in the assault on Fife, prosecutors used his statements against him, asserting that he knew details "about the crime that nobody but the actual killer or killers could know." Trial. Tr. at 11. This inference was undermined by Sgt. Steinbeck, who testified that rumors had swirled within Warren's insular community. According to Steinbeck, "some fiction, some reality got out in the community" regarding unreported details of the crime. Trial Tr. at 283.

### 2.     Expert Testimony and Forensic Evidence

72.     Physical evidence against Mr. Hill was non-existent. To compensate, the State relied heavily on faux scientific testimony to connect him to the assault. Its actual success was mixed. For instance, the State called **James Wurster**, an employee of the Ohio Bureau of Criminal Identification, who analyzed pants seized from Hill's home and the broken broom handle the State alleged had been used to sodomize Fife. Mr. Wurster testified that the pants revealed no trace of blood. Trial Tr. at 604-605 (testifying that he "did not find any blood" on Mr. Hill's pants), 619 (testifying that he found "no blood whatsoever" on Mr. Hill's pants). Mr. Wurster similarly testified that no trace of blood could be found on the "stick." Trial Tr. at 607-608 (testifying that he was not "able to find any blood on" the stick); 619 (agreeing that he found "no indication" of blood on the stick).

73.     Several witnesses testified that, had the stick *actually* been used in the assault, blood would likely have seeped into its grain, remaining detectable by forensic analysis. These included **Dr. Howard Adelman**, the State's expert pathologist, who acknowledged that, had the stick been used as alleged, "blood would go into the cellular structure of the wood" and "probably be absorbed right away." Trial Tr. at 407. The State's only rebuttal to that testimony was the

18

prosecutor's speculation that rain may have washed any blood away. Trial Tr. at 22 (Opening Argument).

### (a) Dr. Howard Adelman

74.    Dr. Adelman's initial connection to Mr. Hill's case was Fife's autopsy, which Adelman performed on September 13, 1985. However, he was also responsible for contacting first Dr. Lowell Levine and then Dr. Curtis Mertz, forensic odontologists, in the hope they might analyze two small wounds on the glans of Fife's penis that Adelman speculated might be bitemarks.

75.    Testifying in his role as forensic pathologist, Dr. Adelman identified blunt force trauma; ligature strangulation; subdural hemorrhage; retroperitoneal and abdominal contusions; penetration and perforation of the anus, the rectum, and urinary bladder; and third-degree burns. *See generally* Trial Tr. at 349-63.

76.    But Adelman's most important role was providing a "scientific" cover for the State's attempt to connect Mr. Hill to Fife's body. He offered: (i) his theory about Fife's arousal during asphyxiation which rationalized the "matching" of Mr. Hill's teeth to the injury on Fife even though they were of significantly different sizes; and (ii) testimony that linked Fife's internal injuries to the State's broom handle and, purportedly, Mr. Hill.

77.    More specifically, Dr. Adelman testified that it was "know[n] that asphyxia can cause erections, and in legal hangings, it's been described that there are erections and ejaculations that occur." Trial Tr. at 418. This testimony was accepted into evidence even though Dr. Adelman admitted he was "not exactly sure of the mechanism" through which asphyxia causes an erection, only that he knew it "just occurs." Trial Tr. at 418.  Dr. Adelman also opined that the State's broken broom handle fit Fife's injuries like a "key in a lock." Trial Tr. at 383. Neither opinion was

challenged with expert testimony at trial, nor supported by sound science.

### (b)   Dr. Curtis Mertz

78.     Given the attenuated and indirect nature of the State's other evidence, the prosecution's case ultimately rested on the testimony of **Dr. Curtis Mertz**, a dentist and oral surgeon who served as Chief of Dental Staff at Ashtabula Medical Center, in Ashtabula, Ohio.

79.     At the time of his testimony, Dr. Mertz was a "Diplomate" (or member) of the American Board of Forensic Odontology ("ABFO"). He was also a former president of the ABFO. Trial Tr. at 908-909.

80.     Dr. Mertz was not the State's first choice as an expert witness. Dr. Adelman first contacted Dr. Lowell Levine—at the time one of the most prominent bitemark specialists in the country, now diminished by his role in a series of false convictions. Dr. Adelman asked Levine to travel to Ohio to assess the would-be "bitemark."

81.     However, when Levine could not definitively link Hill to the injury on Fife's penis, the State sought a second opinion and, "[o]n or about September 13th, 1985," Dr. Adelman asked Dr. Mertz to "come down and view what the pathologist felt may well be a bite mark on a homicide victim." Trial Tr. at 917 (Mertz).

82.     Dr. Mertz testified unequivocally not only that the injuries found on Fife's penis were human bitemarks, but that they were caused by Mr. Hill and no one else. Trial Tr. at 937 ("It's my professional opinion, with reasonable degree of medical certainty, that Hill's teeth, as depicted by the models and photographs that I had, made the bite on [the victim].''). He also testified that he could ascertain the precise mechanism or method through which Mr. Hill left the marks on Fife. Trial Tr. at 941-942 ("And the bites undoubtedly were inflicted in this manner.") (emphasis added).

20

83.     As Dr. Mertz's notes clarify, however, no such match was possible based on the actual evidence at hand. To generate a match, Dr. Mertz speculated that Fife, a 12-year-old boy, 1) had an asphyxiation-caused erection, and 2) that erection accounted for the "approximately" 33% size differential between the marks on Fife's skin and Mr. Hill's teeth. Trial Tr. at 956, 979.

84.     Dr. Mertz cited just two sources in support of this novel theory: the introduction to a chapter on asphyxiation from the 1968 edition of Gradwohl's Legal Medicine, and a 1971 article by L.G. Farkas, "Basic Morphological Data of External Genitals in 177 Healthy Central European Men," in the American Journal of Physical Anthropology. Neither of these sources involved children Fife's age. According to Dr. Mertz, himself, he sought this literature to justify his conclusion. Trial Tr. at 954, 956, 979.

85.     Although his entire opinion was predicated on these "arousal"-adjusted measurements, Dr. Mertz testified that he could not recollect or discuss that part of his analysis. Trial Tr. at 977 ("I do not have the measurements here with me . . . And I do not have them from memory nor do I have a metal rule with me to give you the measurements.").

### 3.     The State's Characterization of the Bitemark Evidence

86.     In both its opening and closing arguments, the State repeatedly characterized Dr. Mertz's identification of Mr. Hill as *indelible*, *individualized*, and most of all, *scientific* proof of Mr. Hill's participation in the violence against Fife. It made this point in its opening statement, when it previewed its case for the three-judge panel:

> Evidence will show that in odontology, that teeth, *like fingerprints* in a way, leave identifying characteristics . . . Doctor Mertz will tell this Court that in his opinion, with reasonable medical and dental certainty, that the teeth marks on the private part of Raymond Fife were made by [Mr. Hill] . . . [Mr. Hill] has a rotated tooth and a chipped tooth which is sufficient enough for Doctor Mertz to come to the conclusion that [Mr. Hill]'s teeth marks are on [the victim].

21

Trial Tr. at 30-32 (emphasis added).

87.     And it returned to it in its closing argument, again touting Dr. Mertz's bitemark

evidence as conclusive scientific evidence of Hill's participation in the assault:

> I think that especially significant is the odontology evidence in this case . . .
> [N]ot only do we have exclusion of [Timothy Combs], we have, with
> reasonable medical certainty from Doctor Mertz, that [Mr. Hill's] tooth . . .
> gives us *the best evidence* because that's what Doctor Mertz says is a
> *trademark* and *blueprint* that we can follow in the pattern of injury on [the
> victim].

Trial Tr. at 1199-1200 (emphases added).

88.     Further, Dr. Mertz's bite-mark identification infected every corner of Mr. Hill's

trial. For instance, prosecutors invoked the purported bitemarks for admitting highly prejudicial,

otherwise inadmissible testimony regarding Mr. Hill's prior bad acts, arguing that the common

denominator of "biting" provided evidence of Mr. Hill's "method" and "motive." Trial Tr. at 33-

34.

89.     Worse, the State invoked the bitemark evidence to characterize Mr. Hill—African

American and intellectually disabled—as something worse than an "animal," caught up in "sexual

frenzy and perversion" of the attack of the white victim. Trial Tr. at 1169.

90.     Further, by using the "bitemark" to establish Mr. Hill's active participation *and*

arguing it was *per se* evidence of forced fellatio, a form of rape, the State essentially elevated Dr.

Mertz's testimony into a standalone justification for imposing the death penalty. Trial Tr. at 31.

91.     Dr. Mertz's identification of Hill proved just as important during Mr. Hill's direct

appeal.  In reviewing the propriety of Mr. Hill's death sentence, the court of appeals pointed to

Mr. Hill's "personal odontological 'signature'" on Fife's genitalia as proof he actively participated

in the assault. *State v. Hill*, 1989 WL 142761 at *30.  This was crucial, given the court's recognition

that the State's other evidence in the record left Mr. Hill's participation unknown and/or unclear.

*Id.* at *33. Elsewhere, it relied on Dr. Mertz's bitemark identification to find that Dr. Adelman's theory regarding Fife's potential asphyxiation-based arousal was admissible. *Id.* at *16.

## III. MR. HILL'S NEW EVIDENCE

92.　As detailed directly above Dr. Mertz's bitemark "identification" played an outsized role Mr. Hill's conviction and sentencing. The case against Mr. Hill was otherwise underwhelming. Although witnesses testified that they saw Hill near the Valu-King and/or with Combs, nothing implicated him in the actual attack. Dr. Mertz filled that gap.

93.　His credentials as a board-certified "Diplomate" and an ex-president of the ABFO, his use of ABFO-sanctioned methodology and an ABFO "scoring sheet," (which has also been abandoned now by the ABFO), and his rhetoric of scientific "certainty," elevated his testimony above the murkier, indirect evidence that made up the rest of the State's case. Those same qualities also hid the pseudoscientific nature of his "identification" of Mr. Hill as the "biter" of Raymond Fife.  Trial Tr. at 908-909, 949-950.

### A.　Dr. Franklin Wright

94.　As part of Mr. Hill's motion for new trial, he offered the affidavit and opinion of Dr. Franklin Wright who is (like Dr. Mertz) a former president of the ABFO and who has (also like Dr. Mertz) frequently testified on behalf of the State of Ohio in criminal prosecutions. Exhibit 4, Wright Aff. at ¶¶ 2, 4.

95.　In his affidavit and opinion, Dr. Wright methodically dismantled Dr. Mertz's bitemark opinion. He did so in two primary ways. First, he explained why Dr. Mertz's testimony regarding Mr. Hill was now universally understood to be scientifically baseless. *Id.* at ¶¶16-19. And second, he revealed that Dr. Mertz had privately retracted or recanted his testimony against Mr. Hill. *Id.* at ¶¶ 20-22. The credibility of Dr. Wright's analysis was bolstered by such criticism's

being very painful for him—Dr. Wright knew Dr. Mertz describing him as a "mentor" and "a respected teacher and scholar in the forensic odontology community." *Id.* at ¶ 20.

96.     Applying current ABFO methodology, Dr. Wright explained there no longer existed *any* sanctioned (and thus generally - accepted or scientifically - recognized) method of bitemark analysis that would permit an expert to conclude that Mr. Hill, and only Mr. Hill, bit Raymond Fife. Exhibit 4, Wright Aff. at ¶ 17 ("In my opinion, applying the current guidelines and standards of the ABFO, there is no scientific support for the conclusion that Mr. Hill left any portion of the patterned injury on the victim."); *see also* Exhibit 10, ABFO Flow Chart (MNT Ex. R); Trial Tr. at 1267 (State Closing Argument) ("That's the state of the expert evidence that we have. That the bite mark was made by this man here (indicating to [Mr. Hill]) and nobody else.").

97.     Dr. Wright also recounted that, on at least two occasions in the decade post-trial, Dr. Mertz (i) privately confided regret for his testimony against Mr. Hill, (ii) conceded that his testimony was scientifically unsupportable, and (iii) stated that he would not have given the same testimony again. *Id.* at ¶ 20, ¶ 22. According to Dr. Wright, Dr. Mertz's recantation was total; he retracted not just his identification of Mr. Hill as the source of the victim's injury, but even his underlying conclusion that the injury could reliably be classified as a human bitemark. *Id.* at ¶ 22.[6] Wright likewise stated that, in his own opinion, the mark on Fife could not be identified as a bitemark.

98.      Dr. Wright was willing and able to testify in state court until the trial court retracted the evidentiary hearing.

99.     Dr. Wright has supplemented his prior affidavit with additional relevant

---

[6] At the time of Dr. Mertz's recantations, Dr. Mertz did not share with Dr. Wright the name of the victim, the name of the defendant, or even that the defendant had been convicted and sentenced to death – a self-serving omission that came at the expense of Mr. Hill. Wright Aff. at ¶ 20-22.

information. Exhibit 11, 2020 Declaration of Dr. Franklin Wright (Wright Decl). Besides the information detailed in his 2014 affidavit, Dr. Wright would have also testified that he believes Dr. Mertz's conclusions were affected by his own racial bias. Dr. Wright's affidavit revealed that Dr. Mertz made racist comments about Mr. Hill being African-American, including calling him the "n word."

100. Dr. Wright averred these racist statements and beliefs affected Dr. Mertz's testimony in this case: "Considering [Dr. Mertz's] use of racially derogatory language in my presence, including the 'n word,' and comments he made to me about this case in particular, racial bias also played a role in Dr. Mertz's willingness to 'match' Mr. Hill to the two marks on the victim's penis." *Id.* Wright Decl. at ¶38. Said plainly, Dr. Mertz would indulge in grossly speculative trial testimony due to his explicit racism, specifically directed at Mr. Hill by his use of an incendiary racial slur to describe him.

**B. Public Criticism, Changing Standards, and the ABFO's Turn Toward Modesty**

101. As Mr. Hill explained in his motion, recent scientific review had revealed little basis for asserting *any* pattern injury was a bitemark. Mr. Hill provided this information as part of his detailed recounting of the ABFO's recent repudiation of the very "methodology" Dr. Mertz relied upon.

102. This historical overview was supported by a variety of extrinsic sources, including the affidavit of forensic odonatologist Dr. Iain Pretty. Mr. Hill's motion for new trial placed Dr. Mertz's opinion within the broader context of the scientific community's rebuke of the "discipline"—and, in doing so, detailed a watershed series of events that had sparked an on-going epistemological crisis for the ABFO and its members.

103. Mr. Hill's overview began in 2009, when the National Academy of Sciences

("NAS") issued a report, <u>Strengthening Forensic Science in the United States: A Path Forward</u> ("NAS Report")[7] that exposed the discipline's all-encompassing lack of biological, methodological, and statistical foundation.[8]

104.    Until 2009, forensic odonatologists like Dr. Mertz had devised their own standards, approved their own methodologies, and determined for themselves the acceptable scope of bitemark testimony—with no input by, or inquiry from, disinterested scientists. This permissive, nearly boundless discretion contributed to over two dozen wrongful convictions and countless baseless indictments.[9]

105.    Forensic odonatologists, the NAS discovered, had long treated their *untested* hypotheses regarding dental measurement and uniqueness as if they were proven principles. Once examined by the NAS, however, those hypotheses turned out to be universally unverifiable.  The NAS concluded that (i) the uniqueness of the human dentition had not been scientifically established; (ii) the ability of teeth to uniquely "mark" skin had not been scientifically established; and (iii) that no standards for type, quality, or number of individual characteristics necessary to "identify" an individual had ever been established. NAS Report at 175-76; *see also* Exhibit 5,

---

[7] The 2009 NAS Report was the culmination of nearly four years of work by a select committee of members of the forensic, scientific and legal communities, who were directed by Congress to assess the current state of forensic science in this country and make recommendations to strengthen it. The committee heard extensive testimony from a vast array of scientists, law enforcement officials, medical examiners, crime laboratory officials, investigators, attorneys and leaders of professional and standard-setting organizations. At the time of its publication, the NAS Report constituted the most comprehensive assessment of bitemark evidence to date, the product of a collaborative effort by highly-respected members of the scientific and legal communities, including a federal judge, prosecutor and defense attorney.

[8] As described *infra*, the NAS' criticism of the bitemark discipline is now universally accepted outside of a handful of recalcitrant practioners.

[9] For a list, see: https://www.innocenceproject.org/wp-content/uploads/2019/01/Description-of-bite-mark-exonerations-and-statistical-analysis_UPDATED-01.28.19.pdf

Pretty Aff. at ¶¶ 2.1-2.3.

106.    The NAS also noted that, although forensic odonatologists might "understand the anatomy of teeth and the mechanics of biting," their knowledge is woefully "insufficient to conclude that bite mark comparisons can result in a conclusive match" because "there is no established science indicating what percentage of the population or subgroup of the population could also have produced the bite." *Id.* at 174-75 (emphasis added). All-in-all, the NAS found that bite-mark identification was plagued by "inherent weaknesses" that called into doubt "the value and scientific objectivity" of the discipline. *Id.* at 174; *see also id.* at 176 (noting "basic problems inherent in bite mark analysis").

107.    In an aside particularly relevant to high-profile, racially-charged prosecutions like that of Mr. Hill,[10] the NAS recognized that bitemark analysts pose a significant, and discipline-specific, risk of being compromised by prosecutorial and/or public pressure:

> [F]orensic odontology suffers from the potential for large bias among bite mark experts in evaluating a specific bite mark in cases in which police agencies provide the suspects for comparison and a limited number of models from which to choose in comparing the evidence. Bite marks often are associated with highly sensationalized and prejudicial cases, and there can be a great deal of pressure on the examining expert to match a bite mark to a suspect.

*Id.* at 175.

108.    Even today, the bitemark "discipline" lacks the objective standards and verifiable methods necessary to reliably conclude that a particular suspect's teeth produced a specific

---

[10] As the local press acknowledged at the time, the investigation and trial of Mr. Hill occupied a "prominent position in the media spotlight," producing an endless barrage of "film footage and pictures [that] filled television screens and newspapers with a stoic family enduring the graphic retelling of their son's death." *See* McCarthy, <u>Fife Case Coverage Prompts Questions</u>, The Vindicator, Feb. 23, 1986 at A6.

bitemark. And yet, throughout the discipline's entire history, practitioners had been identifying "biters" to a "medical certainty" even though they did not know *what* they should measure, *how* they should measure it, or what any such measurements *actually meant*.

109.     The NAS concluded that forensic odontologists had long mistaken their subjective interpretation for objective analysis. Ironically, this charge was unwittingly confirmed by the State, in its opposition to Mr. Hill's motion in state court. There, the State attached an affidavit from Dr. Levine which acknowledges that "[t]he comparison of [Fife's] injuries with the dentition and an exemplar of the bite pattern that the dentition in question would cause *is an Art based upon Science*." *See* Exhibit 13, Levine Affidavit at 1 (emphasis added). Levine's defensive response is that of a pseudoscientist, not a real one.

110.     Following the NAS report, a growing body of research continues to reveal the magnitude of the discipline's short-comings. Among the research cited by Mr. Hill was Construct Validity Bitemark Assessments Using the ABFO Bitemark Decision Tree ("Construct Validity Study"), a study undertaken by Drs. Iain Pretty (who submitted an affidavit on Mr. Hill's behalf) and Adam Freeman (another former president of the ABFO), in which photographs of 100 patterned injuries were presented for analysis to all (at that time) 103 ABFO board-certified "Diplomates."

111.     The Construct Validity Study asked the Diplomates asked to answer three basic questions: *first*, whether there was sufficient evidence to determine a patterned injury was a human bitemark; *second*, whether, consistent with the ABFO decision tree, the injury could be determined to be either a human bitemark, not a human bitemark, or suggestive of a human bitemark (the three options the ABFO's guidelines then provided); and *third*, if the injury was a human bitemark, whether it had distinct, identifiable arches and individual tooth marks. *See* Motion for New Trial,

at 18-20.

112.     Thirty-nine board-certified ABFO Diplomates, accounting for nearly 40% of ABFO diplomates practicing at the time, answered all 100 questions, resulting in nearly 4,000 determinations. The Study did not examine the results for ground truth (i.e., whether the Diplomates accurately ascertained what type of injury they were looking at) but to see whether the ABFO's "certified" experts could agree internally, amongst themselves, regarding these threshold determinations. *Id.*

113.     The results of the Construct Validity Study were—as even the trial court conceded—"shocking," exposing the fundamental "inability of top forensic odontologists to arrive at a consensus as to whether a patterned injury constitute[s] a bitemark, much less a human one." Tr. Order at 25.

114.     The trial court's "shock" was well-founded. The 39 respondents unanimously agreed on just 4 of the 100 case studies. Only 20 of the 100 case studies resulted in 90% agreement among respondents. Most damningly, only 16 of 100 cases resulted in 90 percent agreement that a pattern *was even a bitemark*. The scientific evidence is now clear; forensic odontologists cannot reliably agree on whether they are *looking at* a bitemark, let alone who made it.[11]

---

[11] As Mr. Hill's motion detailed, the Construct Validity Study's findings were hardly anomalous. A study published in the May 2013 Journal of Forensic Sciences similarly noted that, "[w]hile most odontologists would suggest they can determine with a reasonable degree of certainty what is and what is not a bitemark, there is little evidence to support this claim." *See* Mark Page, et al., Expert Interpretation of Bitemark Injuries-A Contemporary Study, 58(3) J. FORENSIC SCI. 664 (May 2013)). Looking to close this gap, researchers asked fifteen Australian forensic odontologists-- who comprised the majority of those practicing forensic odontology in Australia-- to examine six images of potential bitemarks, five of which were of marks confirmed by living victims to have been caused by teeth. *Id.* at 665. The odontologists were then asked in narrative form whether the injuries were, in fact, bitemarks. As with the Construct Validity Study, "conclusions between practitioners [were] highly variable." *Id.* at 671. Thus, "the qualitative data plainly verify[d] the fact that there is a wide range of opinion expressed over even the most basic assumption in bitemark analysis: that of the origin of the mark itself." *Id.* The study further

115.    On-going scientific scrutiny has only reinforced these findings. In 2015, the Texas

Forensic Science Commission—which operates as a regulatory body for legal and judicial use of

forensic evidence in Texas—undertook an exhaustive six-month investigation into the scientific

reliability of bitemark comparison evidence.[12]

116.    On April 12, 2016, it released its report, titled <u>Forensic Bitemark Comparison</u>

<u>Complaint Filed by National Innocence Project on Behalf of Steven Mark Chaney</u> (the "Texas

Report").[13] Like the NAS report, the Construct Validity Study, and numerous other studies, the

Texas Commission's conclusions were devastating:

> First, there is no scientific basis for stating that a particular patterned injury
> can be associated to an individual's dentition. Any testimony describing
> human dentition as "like a fingerprint" or incorporating similar analogies
> lacks scientific support. Second, there is no scientific basis for assigning
> probability or statistical weight to an association, regardless of whether such
> probability or weight is expressed numerically (*e.g.* 1 in a million) or using
> some form of verbal scale (*e.g.*, highly likely/unlikely). Though these types
> of claims were once thought to be acceptable and have been admitted into
> evidence in criminal cases in and outside of Texas, it is now clear they have
> no place in our criminal justice system because they lack any credible
> supporting data.

*Id.* at 11-12.

117.    The Commission was also greatly troubled by the ABFO's "glacial pace, reticence

---

concluded that this "inconsistency indicates a fundamental flaw in the methodology of bitemark
analysis and should lead to concerns regarding the reliability of any conclusions reached about
matching such a bitemark to a dentition." *Id.* at 670.

[12] Under Texas law, the Commission oversees the accreditation of all laboratories in Texas, but
also investigates allegations of professional negligence or misconduct against any laboratory,
facility or entity that provides scientific testimony at trial.

[13] Over 1200 pages of exhibits were also released in support of report. Counsel have not
attached all of the exhibits to the Report to this motion, but will provide those upon request. The
report and all of the exhibits are available online at http://www.fsc.texas.gov/sites/default/files/
FinalBiteMarkReport.pdf.

to publish critical data, and willingness to allow overstatements of science to go unchecked for decades." *Id.* at 17. This recalcitrance had earned forensic odontology and its practitioners "a barrage of well-founded criticism." *Id.*

118. Because of its review, the Commission recommended "that bitemark comparison not be admitted in criminal cases in Texas unless and until" the scientific community establishes both the reliability of bitemark comparison and sufficient proficiency and accreditation protocols to ensure that reliability. *Id.* at 15-16.

119. The relentless, and relentlessly public, nature of this criticism—along with litany of overturned convictions and lawsuits—finally spurred the ABFO to re-examine its "sanctioned" methods and conclusions. For decades, the ABFO had allowed its members to promote themselves to prosecutors based on their ability to identify "the Biter," i.e., the singular individual responsible for a crime.

120. In August 2013, the ABFO officially conceded this individualization was invalid in "open" or "undefined population" cases (like Mr. Hill's), where the universe of potential suspects is unknown.[14] When the ABFO updated its Reference Manual—a field guide for

---

[14] The amount of research and analysis questioning the validity of bite-mark analysis published between the NAS report in 2009 and Mr. Hill's motion for new trial was substantial. See Bush, M.A., Bush, P.J., and Sheets, H.D., A Study of Multiple Bitemarks Inflicted in Human Skin by a Single Dentition Using Geometric Morphometric Analysis, For. Sci. Int'l 211:1-8 (2011); Bush, M.A., Miller, R.G., Bush, P.J., and Dorion, R.B., Biomechanical Factors in Human Dermal Bitemarks in a Cadaver Model, J. Forensic Sci. 54(1):167-176 (2009); Sheets, H.D., Bush, P.J., Brzozowski, C., Nawrocki, L.A., Ho, P., and Bush, M.A., Dental Shape Match Rates in Selected and Orthodontically Treated Populations in New York State: A Two Dimensional Study, J. Forensic Sci. 56(3):621-626 (2011); Bush, M.A., Bush, P.J., and Sheets, H.D., Similarity and Match Rates of the Human Dentition In 3 Dimensions: Relevance to Bitemark Analysis, Int'l J. Leg. Med. 125(6):779-784 (2011); Bush, M.A., Bush, P.J., and Sheets, H.D., Statistical Evidence for the Similarity of the Human Dentition, J. Forensic Sci. 56(1):118-123 (2011); Bush, M.A., Thorsrud, K., Miller, R.G., Dorion, R.B.J., and Bush, P.J., The Response of Skin to Applied Stress: Investigation of Bitemark Distortion in a Cadaver Model, J. Forensic Sci. 55(1):71-76 (2010); Miller, R.G., Bush, P.J., Dorion, R.B., and Bush, M.A., Uniqueness of the Dentition as Impressed

practitioners—it formally eliminated individualization and identification as a sanctioned conclusion in open-field cases. *See* Exhibit 12, <u>American Board of Forensic Odontology, Inc. Diplomates Reference Manual</u>, at 117 ("The ABFO does not support a conclusion of 'The Biter' in an open population case(s)"); *see also* Pretty Aff. at ¶¶ 3.4-3.6.

121.    Although this constituted an unprecedented, dramatic shift in ABFO-sanctioned bitemark analysis, it was not the last such change. In 2016, the ABFO *once again* revised its protocols, this time eliminating *any* conclusion beyond a broad claim that an individual could not be *eliminated* as a potential biter. Motion for New Trial at 23; *see also Ex parte Chaney*, <u>563 S.W.3d 239, 261</u> n.41 (Tex. Crim. App. 2018) ("The new Guidelines, as published in March 2016, prohibit individualization testimony in *all* cases").

122.    Roughly six months after making this change, on September 20, 2016, the President's Council of Advisors on Science and Technology (PCAST) issued yet another detailed critique of bitemark analysis, titled <u>Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods</u>.[15] It concluded:

>       that bitemark analysis does not meet the scientific standards for

---

in Human Skin: A Cadaver Model, J. Forensic Sci. 54(4):909-914 (2009); Bush, M.A., Cooper, H.I., and Dorion, R.B., <u>Inquiry into the Scientific Basis For Bitemark Profiling and Arbitrary Distortion Compensation</u>, J. Forensic Sci. 55(4):976-983 (2010); Sheets, H.D., and Bush, M.A., <u>Mathematical Matching of a Dentition to Bitemarks: Use and Evaluation of Affine Methods</u>, Forensic Sci. Int'l 207(1-3):111-118 (2011); Sheets, H.D., Bush, P.J., and Bush, M.A., <u>Bitemarks: Distortion and Covariation of the Maxillary and Mandibular Dentition as Impressed in Human Skin</u>, Forensic Sci. Int'l (2012). Broadly speaking, this research scientifically establishes that, even assuming the uniqueness of human dentition, human skin is not capable of capturing that uniqueness with sufficient fidelity to identify a "biter," as Dr. Mertz purported to do in this case.

[15]  The full report may be found at the PCAST website:

https://www.whitehouse.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf.

> foundational validity, and it far from meeting such standards. To the contrary, available scientific evidence strongly suggests that examiners cannot consistently agree on whether an injury is a human bitemark and cannot identify the source of [a] bitemark with reasonable accuracy.

PCAST Report at 87.

123.    The PCAST Report did not merely challenge the validity of the discipline's past and present practices, it raised serious questions about its future. The Council characterized "the prospects of developing bitemark analysis into a scientifically valid method" as "low" and recommended that no funds even be devoted to the attempt. *Id.* at 9. In a follow-up report responding to practitioners unhappy with PCAST's initial critique, the Council doubled-down, noting that, while there were "no empirical studies whatsoever that establish the scientific validity or degree of reliability of bitemark analysis as currently practiced," there was "considerable literature pointing to the unreliability of the method." PCAST Addendum, at 5.

124.    It is hardly surprising that the only permissible conclusions under current ABFO Guidelines are so broad and generic they bear no resemblance to the personalized dental "signature" identified by Dr. Mertz.

125.    Dr. Wright's opinion about bitemark comparison has evolved to where he now acknowledges it is not scientifically reliable.

> My recent resignation from the ABFO was prompted by the failure of the organization to recognize the profound implications of the Construct Validity Study. In my view, the results of that study required the organization to renounce the use of bitemark analysis and comparison unless and until the method could be scientifically validated. My position is consistent with the findings published by the Texas Forensic Science Commission following its six-month study, which I participated in as a subject matter expert.

Exhibit 11, Wright Decl. ¶ 17.

### C.    Critical Analysis Specific to Dr. Mertz's Testimony

126.    Although Dr. Mertz's testimony against Mr. Hill embodied all of his discipline's

above-detailed elemental flaws, many of the most troubling aspects of his identification of Mr. Hill are distinct to Mr. Hill's trial. These aspects are largely the product of specific obstacles posed by the purported bitemarks on Fife.

127.     First, human skin is a fundamentally unreliable template for capturing impressions. With Fife, this lack of reliability was exacerbated by the subject injury's location on his penis, where the skin is curved and "highly distortable." Exhibit 5, Pretty Aff. at ¶ 5 (noting that penile "tissue is highly distortable," and "[t]he surface is curved, soft and the risk of postural distortion high."); Wright Aff. at ¶ 18 ("the location of the patterned injury in [Fife's] case render[ed] it impossible to make *any* positive association between a suspected biter and the patterned injury in question."). Second, Dr. Mertz's measurements of the pattern injury *did not match* Mr. Hill's teeth—the marks were roughly 33% smaller than Mr. Hill's dentition. Trial Tr. at 956, 979.

128.     For an actual scientist, beholden to objective methods and measurements, these factors would have been enough to deter any attempt at analysis, let alone "certain" conclusions. Rather than being dissuaded, however, Dr. Mertz saw an opportunity to solve one problem with the other. He *relied* upon the variability of penile skin to rationalize "matching" the otherwise mismatched injury to Mr. Hill.

129.     To do so, Dr. Mertz baselessly testified that (i) Fife's penis was erect at the time of the purported bite because of his asphyxiation, and (ii) that the erection could reliably account for the "approximately" 33% size differential between the marks in Fife's skin and Hill's teeth. Trial Tr. at 956. Dr. Mertz's opinion rested *entirely* on this macabre theory; without it, there was no match, no testimony, and no conviction.

130.     In retrospect, that such testimony was permitted seems remarkable; after all, Dr. Mertz's opinion required him to delve into highly-specific subfields of anatomy and pathology—

34

fields in which he was decidedly not an expert. That lack of expertise is why, even when he found supporting literature, he misinterpreted it. For instance, his use of <u>Gradwohl</u> was directly contradicted by the text itself, which specifically rejected the possibility of drawing the kinds of conclusions he offered on the stand. Exhibit 6, Hua Affidavit at ¶ 17. Similarly, his extrapolation of measurements from the Farkas article—which synthesized the results of numerous studies of grown men from around the world—was both statistically invalid and riddled with basic mathematical errors.[16]

131.    As Mr. Hill and his experts noted, Dr. Mertz's cherry-picking foray into old medical literature is a prototypical example of motivated reasoning or confirmation bias. That Dr. Mertz's "analysis" would always point to Mr. Hill was something of an open secret. According to the State's closing argument, Dr. Mertz "knew . . . before he even finished" his review of Fife's body he would identify Mr. Hill: "that that is what they were going to find, and that's what they found, and that's [that Mr. Hill] did the biting." Trial Tr. at 1266.

### D.    Analysis of Non-Bitemark and Bitemark-Adjacent Evidence

132.    Besides his "new" bitemark evidence, Mr. Hill supported his motion with expert opinions that illuminated the tenuous—and often baseless—nature of much of the non-bitemark or bitemark-adjacent evidence adduced at Mr. Hill's trial. These included analysis and opinion from Drs. Hua and Davis.

---

[16] Dr. Wright, who revered Dr. Mertz, was nonetheless compelled to describe this portion of Dr. Mertz's testimony as "nothing but a blind guess," impermissible under the ABFO guidelines. Exhibit 4 Wright Aff. at ¶ 18. Dr. Pretty labeled this testimony "unscientific, unsubstantiated, and speculative. Exhibit 5, Pretty Aff. at ¶ 7.2. And Dr. Hua concluded that "Dr. Mertz ignore[d] both biological reality and statistical methodology, rendering his opinion speculative, unscientific, and fatally flawed." Exhibit 6, Hua Aff. at ¶ 21.

1.     **The Pathology Evidence "Linking" Mr. Hill to the Crime Was Baseless**

133.     Dr. Hua's affidavit detailed why Dr. Adelman's testimony about asphyxiation-based erections would never be admissible today: "Dr. Adelman's reliance on anecdotal evidence and/or historical narratives as a basis for his opinion [on Fife's possible erection] is . . . inappropriate and renders his opinions in this specific case speculative and unreliable." Exhibit 6, Hua Aff. at ¶ 11.[17] Decades of research have revealed that "the differences between the biological mechanisms involved in judicial hanging, autoerotic asphyxiation, and strangulation are substantial, and any extrapolation from the effects of one to the others is baseless." *Id.* at ¶ 12.

134.     Regarding Dr. Adelman's testimony that the State's "stick" fit Fife's injuries like a "key in a lock," Dr. Hua explained there is (and was) no reliable means of narrowly identifying the instrument that caused these injuries, let alone with the precision necessary to describe it through the analogy of a "key and a lock." *Id.* at ¶ 8.

2.     **Mr. Hill's Statements to the Police Were Unreliable**

135.     The expert affidavit provided by Dr. Davis addressed the manipulative interrogation methods the Warren police used on Mr. Hill, a developmentally disabled eighteen-year with an I.Q. below 70. Her analysis explained how, by subjecting Mr. Hill to a dizzying barrage of facts and threats, the Warren Police extracted from Mr. Hill false "knowledge" of the assault.[18] Exhibit 7, Davis Aff. at 3-4.

---

[17] Dr. Adelman admitted he was "not exactly sure of the mechanism" through which asphyxia causes an erection, but rather that it "just occurs." Trial Tr. at 418.

[18] Although technically at an age of majority, Mr. Hill has been identified as intellectually disabled (also known as all of his life, with his IQ estimated at various times to be between 49 and 70. *Hill v. Anderson*, 2020 WL 2551881 (6th Cir. May 20, 2020); Exhibit 14, Affidavit of Dr. Stephen Greenspan. It is not surprising that Mr. Hill was unaware that he could refuse to talk to the police; nor is it likely that he was competent to understand his rights when he was subjected to repeated and lengthy interviews. Nor was he capable of comprehending the grave and complicated long-term ramifications of waiving those rights. Already highly susceptible to influence given his

136.    The United States Supreme Court has recognized the risk posed by such tactics, including the "inherently compelling pressures" of custodial police interrogation and the way, "[e]ven for an adult, the physical and psychological isolation of custodial interrogation can 'undermine the individual's will to resist and ... compel him to speak where he would not otherwise do so freely.'" *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011). In doing so, the Court has noted "mounting empirical evidence that [interrogative] pressures can induce a frighteningly high percentage of people to confess to crimes they never committed." *Corley v. United States*, 556 U.S. 303, 321 (2009) (citing Drizin & Leo, The Problem of False Confessions in the Post–DNA World, 82 N.C. L. Rev. 891, 906-07 (2004)).

137.    Given these developments, Dr. Davis's opinion regarding the effect of coercion on Mr. Hill's recorded statements should not have been controversial. Nearly seventeen years ago, even before this wave of research, the Sixth Circuit detailed the troubling circumstances under which Mr. Hill stated the police:

> Questioned twice, he consistently denied any involvement in the killing. Then his uncle was assigned to the case. After being brought to the station again and left alone with his uncle for a few minutes, Danny Hill made an abrupt about-face and confessed to involvement in the crime. In evaluating these events, Danny Hill's previous interactions with his uncle are important: twice before, when Hill was in police custody, his uncle struck him when he refused to talk. Even accepting his uncle's version of events, in which Detective Hill simply told Danny Hill he believed he was involved in the killing, this episode raises a serious question of coercion. That any officer had struck a suspect is troubling; of special concern here is that Danny Hill was struck by an officer who was also a close family member.

*Hill v. Anderson*, 300 F.3d at 682–83. *See also Hill v. Anderson*, 2020 WL 2551881 * 22 ("And while Hill was certainly exposed several times to Miranda warnings, we are not convinced that he

---

age and mental capacity. Mr. Hill's pliability was augmented by the fact that the police relied on a physically-threatening family member, Det. Hill, to apply additional pressure.

ever registered the warnings' meaning.").

138.     According to Dr. Davis, on-going study continues to identify environmental and psychological factors that might cause individuals to confess to crimes they did not commit. Perhaps, given Mr. Hills heightened susceptibility and the conditions of his interrogation, his recorded statements display many of the warning signs of a false confession—for instance, his account was self-contradictory, fantastical, and, though he occasionally alighted on a relevant fact or detail, he could not describe the crime or the scene in a holistic and coherent manner. Exhibit 7 Davis Aff. at ¶¶ 34, 37.

139.     Further, Mr. Hill misstated basic elements of the events. At various points he stated that the attack took place over two or three hours, when it was likely no more than fifteen minutes in duration. At another point, Mr. Hill falsely suggested Combs tore Fife's penis wholly from his body.

140.     The police were *so* effective at bending Mr. Hill's testimony to their understanding of the crime they became self-conscious, stating to Mr. Hill "it seems like everything we suggest to you, you agree with us [.]" Exhibit 7 Davis Aff. at ¶ 32 .[19]

141.     In keeping with this, Dr. Davis noted that many of the "details" relied upon by the State as evidence of guilt—what the State contended only the killer could have known—were the product of leading questions and planted answers. Trial Tr. at 11. For instance, although the State alleged that Mr. Hill "knew" details regarding Fife underwear, which were found around his neck, Mr. Hill never mentioned this fact until the police provided him with the detail and even then he

---

[19] There are similar examples on nearly *every* page of the interrogation transcripts, typically involving details the State continues to characterize as evidence of guilt. These details include his participation in the assault; the fact that Fife was set on fire; that Fife was covered in vomit; that Fife was "bleeding bad"; the color of Fife's shorts; and oral-genital contact between assailant and victim.

repeatedly described Fife as *wearing* the underwear during the assault. Exhibit 7 Davis Aff., at ¶ 34.

142.    Likewise, when Mr. Hill was asked about Fife's position on the ground after the assault, Mr. Hill stated that Fife was on his stomach, face down. Only when investigators told Mr. Hill he was found on his back, and asked Mr. Hill if he or Combs had turned the boy over, did Mr. Hill respond that he had crept from the bushes in which he was hiding and turned Fife over to check if he was breathing.

### E.    Conclusion

143.    Viewed as a whole, Mr. Hill's new evidence showed not just that the State's "best evidence" was a wholesale fabrication, but that the State's entire case against Mr. Hill was infected with manufactured, manipulated, and unreliable evidence. Mr. Hill should never have been convicted *with* Dr. Mertz's bitemark opinion; he would not have been convicted without it.

### STANDARD OF REVIEW

144.    Mr. Hill brings this petition pursuant to 28 U.S.C. § 2254(a), and asserts that his conviction, incarceration, and sentence are "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

145.    To succeed, Mr. Hill must show he has exhausted the remedies provided by the State of Ohio, 28 U.S.C. § 2254(b)(1)(A). Further, if his due process claim was adjudicated on the merits, he must establish that he was denied relief based upon an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding[.]" 28 U.S.C. § 2554(d)(2).

146.    A federal court may only "issue the writ in cases where there is no possibility fair-minded jurists could disagree." *Harrington v. Richter,* 562 U.S. 86, 102 (2011). Although this

standard is "difficult to meet," *Harrington*, 562 U.S. at 102, it is "not insatiable," and thus, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (internal quotations omitted).

147.    "[W]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (quoting *Harrington*). Where evidence exists that the state court *did not* adjudicate the merits of petitioner's constitutional claim, "the deference due under AEDPA does not apply." *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) (citations omitted). In such situations, federal courts review "questions of law and mixed questions of law and fact *de novo*." *Id*.

148.    Although state court factual determinations are typically "presumed correct absent clear and convincing evidence to the contrary," *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003), where a court "does not determine a factual issue" its factual conclusions "[are] not entitled to deference" under Section 2254(e)(1). *Leonard v. Warden, Ohio State Penitentiary*, No. 09-056, 2013 WL 831727, at *12 (S.D. Ohio Mar. 6, 2013); *see also Channer v. Brooks*, 320 F.3d 188, 195 (2d Cir. 2003) ("It is true that where a state court does not resolve a question of fact, no presumption of correctness can possibly attach with respect to that issue"). Likewise, where a state court has addressed a factual issue through applying legal principles, the opinion "does not enjoy AEDPA's strong presumption in favor of a state court's finding of historical fact." *Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009); *see also* § 2254(e)(1).

149.    Finally, "the amount of deference paid to a state court varies based on the nature of that court's ruling." *Miller v. Stovall*, 608 F.3d 913, 918 (6th Cir. 2010). Where "one of the three

judges on [a] state appellate panel concurred in the judgment only and another dissented from the court's judgment," the outcome "is not a majority decision" but "a state court *result*" and the traditional deference conferred under AEDPA is unwarranted. *Ayers v. Hudson*, <u>623 F.3d 301, 308</u> (6th Cir. 2010).

150.   In such circumstances, the court must conduct "'an independent review of the record and applicable law to determine' if the state court's result 'is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.'" *Id.* (quoting *Harris v. Stovall*, <u>212 F.3d 940, 943</u> (6th Cir. 2000)). This review "is not a full, de novo review of the claims," however, "but remains deferential because [the court] cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA." *Id.*

## GROUND FOR RELIEF

**The Trial Court Violated Mr. Hill's Fourteenth Amendment Right to Due Process When it Failed to Conduct a Materiality Review of the New Evidence As Required Under Ohio Rule of Criminal Procedure 33.**

**A.    Introduction**

151.   The previous paragraphs are incorporated into this ground for relief as if repeated. The trial court violated Mr. Hill's Fourteenth Amendment right to due process when it refused to assess the materiality of his original conviction and sentence, given the new evidence.

152.   In 1986, Danny Lee Hill was convicted of the murder of Raymond Fife and sentenced to death. Mr. Hill has consistently denied participation in the assault on Fife. The State presented no direct evidence of Mr. Hill's participation in the attack, and instead relied heavily on the expert testimony of Dr. Curtis Mertz, a forensic odontologist. Dr. Mertz testified that a pattern injury found on the penis of the victim, Raymond Fife, was a bitemark—and that Mr. Hill, and

only Mr. Hill, could have made it.

153.    According to prosecutors, Dr. Mertz's testimony was the State's "best evidence" and a conclusive, scientific link between Mr. Hill and the violence perpetrated against the victim. On direct appeal, the Ohio courts relied on the testimony to rebut Mr. Hill's assertion he was, at most, a passive observer to the attack.

154.    At the time of the trial, bitemark comparison was considered valid scientific evidence. Now though, it has been clearly established and accepted that such testimony is not admissible as it lacks any validated or verifiable and methodological basis. This is not a point of dispute; it is universally acknowledged that testimony like that relied on to convict Mr. Hill—purporting to identify Mr. Hill as Fife's "biter," to the exclusion of anyone else—lacks any scientific validity. Moreover, the bitemark evidence against Mr. Hill was particularly baseless relying on gross speculation and likely springing from the racist beliefs of Dr. Mertz, and the pressure put upon him to convict Mr. Hill.

155.    Citing these developments, Mr. Hill sought a new trial in state court pursuant to Ohio Criminal Rule 33, asserting a federal due process claim based on the debunked bitemark evidence relied on to convict him.

156.    The trial court denied his motion without mentioning or addressing his federal constitutional claim. What analysis the court did provide was rife with factual and legal error. A comparison of the court's order with the trial record confirms the unreasonableness of the trial court's analysis. For instance, specific facts the trial court treated as dispositive are directly contradicted by the actual evidence adduced at Mr. Hill's trial. More generally, the court refused to independently assess the record, erroneously invoking principles of "preclusion." In doing so, and in adopting purported "facts" from Mr. Hill's decades-old direct appeal, the court repeatedly

mis-cited and mischaracterized the very opinions it deemed "binding."

157.    Mr. Hill appealed the trial court's order to the Eleventh District Court of Appeals, which affirmed the trial court's order. It did so without an opinion of "the court," however. Instead, one judge filed an opinion on her own behalf, one judge concurred in the judgment only, and one judge dissented. The sole written opinion repeats many of the trial court's errors.

158.    The non-binding opinion from the appellate court acknowledged the trial court's factual errors and conceded the remaining evidence against Mr. Hill was exclusively inferential. But it asserted that the remaining evidence would sustain his conviction. This was not the proper analysis of the federal due process claims.

159.    To determine whether Mr. Hill's trial and conviction were "fundamentally unfair," a court must analyze whether this evidence was a "crucial, critical, highly significant factor" in his conviction and sentencing. *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000). The only "reasonable" conclusion based on the trial record is that Dr. Mertz's testimony was essential to Mr. Hill's conviction. This is further confirmed by the State's own characterization of the bitemark opinion as its "best evidence." Given the inferential nature of the non-bitemark case against Mr. Hill, any determination that Dr. Mertz's testimony was not unconstitutionally prejudicial would be facially unreasonable.

160.    Mr. Hill's conviction and sentence are predicated on fabricated scientific evidence, violating his due process rights. The crucial importance of Dr. Mertz's testimony is obvious from the trial record, from the prosecution's characterization, and from the opinions denying Mr. Hill's direct appeal. Viewed as a whole, it is inarguable that Dr. Mertz's testimony played a "crucial, critical, highly significant factor," in Mr. Hill's conviction and sentencing. *Brown*, 227 F.3d at 645.

161.     The trial and appellate courts erred by not recognizing the clear violation of Mr. Hill's rights. Their decisions are unreasonable—the product of misconstrued and mischaracterized facts, inapposite legal principles, and outright error. The errors by the trial and appellate court were so great, so egregious, and so concerted, that the denial of Mr. Hill's motion for new trial was, itself, fundamentally unfair and constitutionally infirm.

**B.     Clearly Established Federal Authority**

162.     Generally, "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial," *Spencer v. Texas*, 385 U.S. 554, 563–64 (1967), and requires that a defendant be given "a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi,* 410 U.S. 284, 302–03 (1973). This right does not end with the trial's conclusion.

163.     While the violation of a state rule or law rarely implicates a federal constitutional right, the United States Supreme Court has held that once a state creates a procedure or right, it must conduct any procedure in accordance with the Due Process, even if the state had no constitutional obligation to enact those procedures in the first place. The Court has held, for instance, that once a state establishes the right to appeal, constitutional protections apply to the appellate process. *See Griffin* v. *Illinois*, 351 U.S. 12, 19 (1956) (right of indigent defendants to trial transcript); *Douglas* v. *California*, 372 U.S. 353, 356-358 (1963) (right to counsel on first appeal granted as a matter of right); *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (parole revocation implicates protections of the Due Process Clause); *Evitts* v. *Lucey*, 469 U.S. 387, 396 (1985) (right to effective assistance of counsel on first appeal granted as a matter of right); cf. *Superintendent, Massachusetts Correctional Inst.* v. *Hill*, 472 U.S. 445, 455 (1985) (Due Process Clause requires that good time prison credits can be taken away only upon showing "some evidence" to justify the revocation).  It is now firmly established that a Due Process liberty interest

"may arise from an expectation or interest created by state law or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

164.    Here, Ohio Rule Criminal Procedure 33 has created a liberty interest implicating the Fourteenth Amendment and is therefore properly presented as a claim for federal habeas review. If a Rule 33 applicant meets the timeliness requirements, he or she may present new evidence at an evidentiary hearing so the trial court can conduct its materiality analysis to determine whether the applicant is entitled to a new trial. By creating this right to present new evidence and obtain a court's concomitant materiality review, the state has built an expectation or interest grounded in federal Due Process. Because the state trial court afforded Mr. Hill neither a hearing nor a materiality review, even though it acknowledged that Mr. Hill timely presented new evidence, the state violated his Fourteenth Amendment rights.

### C.    Denial of an Evidentiary Hearing

165.    Initially, the trial court had granted Mr. Hill's request for an evidentiary hearing and had scheduled a date for it. Then without explanation, the trial court retracted the hearing. The court denied the motion for new trial without conducting a robust and thorough review of the State's evidence against Mr. Hill.

166.    Dr. Wright would have testified at the evidentiary hearing that not only was the mark on the victim not a human bitemark, but also "that even the ABFO Board-Certified Diplomates cannot reliably identify a pattern injury as a human bite mark." Exhibit 11, Wright Decl. ¶ 16. Dr. Wright would have also testified about the implicit bias that negatively affected Dr. Mertz's conclusions and testimony at Mr. Hill's trial. Wright ¶ 30-39.

167.    A full and robust hearing would have included a detailed review of the prosecution's case against Mr. Hill sans the bitemark. This would include testimony that the

"stick" was not and could not be linked to the assault on Fife. Only one witness supposedly saw Mr. Hill with a stick, but did not testify the one introduced was "the" stick. Then Dr. Adelman's implied medical opinion that the "stick" fit like a "key in a lock" to the wounds suffered by Fife was not scientifically sound. Exhibit 6, Hua Aff.

168.    Although the Sixth Circuit could not grant habeas relief on the *Miranda* claim, the Court did agree that Mr. Hill's statements to the police resulted from coerced interrogations. *Hill v. Anderson*, 2020 WL 2551881 * 22-23. Dr. Debra Davis was prepared to testify at the evidentiary hearing about her research and training into coerced confessions. She would opine that Mr. Hill's statements were clearly the result of improper tactics by the police and not reliable. Exhibit 7, Davis Aff.

### D.    Trumbull County Prosecutor Should Have Been Disqualified

169.    Dennis Watkins has been the Trumbull County Prosecutor since 1984. He has built his career around his prosecution of Danny Hill and his efforts to see him executed at all costs. A motion to have him and his office recused from the case was denied by the trial court.

170.    Mr. Hill's initial trial counsel, James Lewis, had been the Trumbull County Public Defender for many years. But when he retired in 2013, the Trumbull County Prosecutor hired him to be an attorney in the office. Mr. Lewis was working at the prosecutor's office during the time Mr. Hill was litigating his Motion for New Trial. Mr. Lewis's employment with the prosecutor's office created a real and substantial conflict of interest that warranted disqualification of the entire prosecutor's office.

171.    Besides Mr. Lewis's employment with the prosecutor's office, Mr. Hill asserted the close relationship between the victim's mother, Miriam Fife, and the prosecutor's office made it impossible for the prosecutor to review the case with any objective lens. Right after the co-

defendant's trial, Mrs. Fife went to work for the Trumbull County Prosecutor's Office, first as a volunteer, then finally as a full time employee as the victim-witness advocate. Mrs. Fife retired in March 2015, but she has continued to volunteer at the office.

172.    After the trial court denied the Motion for New Trial, Mr. Hill appealed the denial of the motion to the Eleventh District Court of Appeals. Mr. Hill also filed in the Court of Appeals a motion to disqualify the prosecutor's office from litigating the appeal. Mr. Hill requested that a special prosecutor be appointed. The appeals court denied the motion, but Judge O'Toole dissented and agreed a special prosecutor should have been appointed. Exhibit 15, Journal Entry 5/27/2017.

173.    The Supreme Court has held:

The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger* v. *United States,* 295 U.S. 78, 88 (1935). *See also Cone* v. *Bell,* 556 U.S. 449, 469 (2009).

174.    The Ohio Supreme court established a three-part inquiry for determining whether a prosecutor's office should be disqualified when a conflict of interest exists because of the. employment of an attorney who previously represented the defendant. That test asks:

1. Is there a substantial relationship between the matter at issue and the matter of the former attorney's prior representation?
2. If there is a substantial relationship, is the presumption of shared confidences rebutted?
3. If the attorney did have personal contact or knowledge of the related matter, are there sufficient screens to rebut the presumption of shared confidences as to avoid imputed disqualification?

*Kala v. Aluminum Smelting & Refining Co., Inc.*, 81 Ohio St. 3d 1, 11, 688 N.E.2d 258, 266 (1998).

"[A]ny doubts as to the existence of an asserted conflict of interest must be resolved in favor of disqualification in order to dispel any appearance of impropriety." *Id.* When the factors are applied to Mr. Hill's case the result is abundantly clear that an actual conflict of interest exists, both primary and imputed, and disqualification of the prosecutor from Mr. Hill's case is necessary to remedy such a conflict.

175.   First, there is a substantial relationship; Mr. Lewis represented Mr. Hill in 1985-1986. When Mr. Hill returned to Trumbull County to litigate his *Atkins* claim in 2003, it was revealed that Mr. Lewis had hired Mr. Hill's uncle, Morris Hill, as an investigator with the public defender office. Morris Hill retired as a detective with the Warren City Police Department in 1997; he had been one of the detectives involved in coercing an incriminating statement from Mr. Hill during several hours of interrogations in 1985.

176.   Second, it is presumed there are shared confidences that the non-moving party must rebut. The Trumbull County Prosecutor's Office is small in number, employing only 16 attorneys. In their response to the motion, the State cited to an order from *State v. Mason*, Cuyahoga County Case No. CR14-588061, wherein the court denied the defendant's request for disqualification of the Cuyahoga County Prosecutor's Office because the elected prosecutor had been a judicial official along with the defendant. But, in that case, the court found the size of Cuyahoga County prosecutor's office was sufficiently large enough to rebut the presumption of shared confidences and that effective screening was possible under those particular circumstances.

177.   The State asserted that Mr. Lewis had no input on Mr. Hill's post-conviction litigation, but that statement was not an adequate rebuttal to the presumption of shared confidences. The prosecutor also objected to the request for an evidentiary hearing.

178.   As Judge O'Toole stated in her dissent:

One of Mr. Hill's main concerns here is that his former trial attorney was later hired by the prosecutor's office, following his retirement from the Trumbull County Public Defender. Mr. Hill aptly asserts this "creates a real and significant conflict of interest that, by itself, warrants disqualification of the office."

The ongoing record in this case is long and hard fought. It is clear, based upon the record, that the prosecutor's office as well as Mr. Hill's prior attorney's involvement implicates a conflict of interest as specified in *Kala v. Aluminum Smelting & Refining* Co., *Inc.*, 81 Ohio St.3d 1 (1998). In addition, the Ohio Rules of Professional Conduct further support the disqualification of the prosecutor's office. See *Dickens v. J & E Custom Homes, Inc.*, 187 Ohio App.3d 627, 2010-Ohio-2634, ¶¶ 2, 4 (2d Dist); Prof.Cond.R. 1.9; Prof.Cond.R. 1, 10.

179.    Failing to disqualify the prosecutor's office from the motion for new trial litigation contributed to the state court's flawed analysis and is another factor that renders that decision unfit for any deference under §2254(d)(1) and (2).

### E.    Conclusion

180.    At the time of Mr. Hill's trial, there was an assumption that bitemark comparison expert testimony was valid and reliable. That assumption has been turned on its head and revealed to that bitemark comparison is not scientifically based and never has been. The bitemark comparison testimony was critical to Mr. Hill's conviction and death sentence and has been justification for appellate courts to uphold his conviction and sentence at every appeal. The failure of the state court to follow the established process for reviewing the claim violated Mr. Hill's constitutional right to due process and a fair proceeding and was an unreasonable application of clearly established federal authority, and unreasonable application of the facts. §2254(d)(1) and (d)(2).

## PRAYER FOR RELIEF

Mr. Hill requests the following relief from this court:

1.  Request the Court order the Warden to file the state court record pursuant to Rule 5.

2.  Grant discovery as may be necessary to develop the factual record more thoroughly.

3. Grant an evidentiary hearing or remand to the Ohio courts for a full and fair evidentiary hearing.

4. Grant habeas relief by directing a new trial sans the bitemark comparison testimony.

5. Any other relief deemed appropriate by the Court.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/ Vicki Ruth Adams Werneke*
VICKI RUTH ADAMS WERNEKE (0088560)
Assistant Federal Public Defender

*/s/ Lori Riga*
LORI RIGA (0066994)
Research and Writing Attorney
Federal Defender Office/Capital Habeas Unit
1660 West Second Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856; (216) 522-1951(f)
vicki_werneke@fd.org
lori_riga@fd.org

## CERTIFICATE OF SERVICE

I certify that on June 12, 2020, a copy of the foregoing **PETITION FOR WRIT OF HABEAS CORPUS** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Vicki Ruth Adams Werneke*
VICKI RUTH ADAMS WERNEKE

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

STATE OF OHIO

        **Plaintiff-Respondent,**

  v.

DANNY LEE HILL

        **Defendant-Petitioner.**

**CASE NO, 85-CR-317**
**CAPITAL CASE)**

**JUDGE PATRICIA A. COSGROVE**
**(Sitting by Assignment)**

**ORDER ON PETIONER'S MOTION FOR**
**EVIDENTIARY HEARING ON MOTION**
**FOR NEW TRIAL**

On June 7, 2016, this Court granted leave to Petitioner to file a motion for a new trial

based on newly discovered evidence relating to expert testimony that was not in existence in

1986 at the time of Petitioner's death penalty trial in 1986. On June 13, 2016, the Petitioner filed

his motion for new trial and requested an evidentiary hearing. On June 16, 2016, the

Respondent ("hereinafter referred to as the State") filed a motion to strike pursuant to Civ. R. 12

(F), on the basis that the additional claims were barred by res judicata and added without leave of

court. In order to give context to the arguments of Petitioner and the State, it is necessary to

discuss the evidence in this case that was presented at trial.

**PROCEDURAL HISTORY**

On January 31, 1986, after a trial presided over by a three-judge panel, Danny Lee Hill

(hereinafter referred to as Petitioner), was found guilty of Aggravated Murder with four separate

death penalty specifications. The Petitioner, indicted as a principal offender, and was found

guilty of Aggravated Murder with specifications of Aggravating Circumstances under R.C.

1985 CR
00317
00084217296

Habeas Petition Exhibit 1

2903.01 (B) for committing the crime during the commission of Kidnapping or Rape, or Aggravated Arson. Hill was also found guilty of Count 2, Kidnapping (R.C. 2905.01), Count 3, Rape (R.C. 2907.02), Count 4, Aggravated Arson (R.C. 2909.02), and Count 6, Felonious Sexual Penetration. (R.C. 2907.12 (A) (1) (3). Hill was acquitted on Count 5, Aggravated Robbery under R.C. 2911.01.

On February 28, 1986, the three-judge panel unanimously found that the aggravating circumstances of the crimes outweighed the mitigating factors beyond a reasonable doubt. One of the aggravating circumstances cited by the trial court in the sentencing entry referenced bite marks on the victim's penis. The three-judge panel, after hearing the evidence, opined in its judgment entry that both Danny Lee Hill and the Co-Defendant, Timothy Combs, jointly participated   in the torture, rape, and murder of the minor victim, Raymond Fife, who at the time was twelve (12) years old.

On March 5, 1986, the three-judge panel imposed the sentence of death on Danny Lee Hill. The convictions and sentences were affirmed on direct appeal. *State v. Hill*, 11th Dist. Nos. 3720, 3745, 1989 WL 142761 (Nov. 27, 1989), 1989 Ohio App. LEXIS 4461* 1); *State v. Hill*, 64 Ohio St. 3d 313, 595 N.E.2d 884 (1992); Rehearing denied by *State v. Hill*, 65 Ohio St. 3d 1421, 598 N.E. 2d 1172, 1992 Ohio *LEXIS* 2122 (1992), Writ of certiorari denied *Hill v. Ohio*, 507 U.S. 1007, 113 S. Ct. 1651, 123 L.Ed. 2d 272 (1993); Writ of habeas corpus denied, Dismissed by *Hill v. Anderson*, 1999 U.S. Dist. *LEXIS* 23332 N.D. Ohio, Sept. 29, 1999).

The Petitioner filed a Petition to Vacate or Set Aside Judgment and/or Sentence pursuant to Crim. R. 33 (B). The trial court denied the petition and the decision was affirmed by the 11th District Court of Appeals. *State v. Hill*, 11th Dist. No. 94-T-5116, 1995 WL 418683 (June 16,

1995). The Ohio Supreme Court declined to accept jurisdiction. *State v. Hill*, <u>74 Ohio St. 3d</u> <u>1456, 656 N.E.2d 951</u> (1995).

Petitioner has filed subsequent motions in state court to have his death sentence vacated based upon claims of reduced mental capacity or retardation under *Adkins v. Virginia*, <u>536 U.S.</u> <u>304</u> (2002). On November 27, 2002, the Petitioner filed an amended *Atkins* claim in Trumbull County Common Pleas Court which was later denied. The 11th District Court of Appeals affirmed the denial on July 11, 2008, *State v. Hill*, <u>177 Ohio App. 3d 171, 2008-Ohio-3509, 894</u> <u>N.E. 2d 108</u>, and on August 26, 2009, the Ohio Supreme Court declined to review the case. *State v. Hill*, <u>122 Ohio St.3d 1502, 2009-Ohio-4233, 912 N.E. 2d 107</u>.

The Petitioner filed a habeas corpus petition in the Northern District of Ohio on March 15, 2010. On June 25, 2014, the Northern District of Ohio denied Hill's habeas petition. This decision is currently on appeal to the United States Court of Appeals for the Sixth Circuit. *Hill v. Anderson*, Case No. 99-4317.

## MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL

On November 14, 2014, the Petitioner filed a request for leave to file a motion for a new trial pursuant to Ohio Crim. R. 33 (B). On November 20, 2014, the State filed a brief in opposition. On February 12, 2015, the Petitioner filed a reply brief. On March 19, 2015, the judges in the Trumbull County Common Pleas Court voluntarily recused themselves from hearing the Petitioner's motion for leave to file a motion for new trial. Thereafter, the Ohio Supreme Court appointed Judge Patricia A. Cosgrove to preside over this case. On May 14, 2015, the Petitioner, without leave of court (and opposed by the State) filed a brief citing supplemental authority in support of its request to file a motion for a new trial. Later, this Court granted leave to Petitioner to file the supplemental brief.

This Court conducted several pretrial conferences by telephone with the attorneys in this case. On December 21, 2015, this Court, in an abundance of caution and in its discretion, conducted an evidentiary hearing on the Petitioner's motion for leave to file a motion for a new trial under Crim. R. 33. The *sole basis* of Petitioner's motion for leave to file a motion for a new trial is predicated on "newly discovered" bite mark evidence that did not exist in 1985.

On June 7, 2016, this Court, in its discretion granted leave to Petitioner to file a motion for new trial, finding that the Petitioner was "unavoidably prevented" from discovering new evidence relating to "bite mark" evidence that was not in existence at the time of Petitioner's trial. The Court also based its decision, in part, on the testimony of Dennis Terez, the Federal Public Defender for the Northern District of Ohio. Attorney Terez testified regarding the complex and protracted process of obtaining leave from the federal court to file a motion for a new trial in state court.

On June 13, 2016, the Petitioner filed his motion for new trial. Without seeking leave of court, Petitioner's motion expanded the grounds for his motion to include arguments regarding interrogation techniques used by police in questioning Hill, mental capacity claims, and arguments regarding the admission of a stick found at the crime scene that was believed to be used in the assault on the victim.

On June 16, 2016, the State filed a motion to strike Petitioner's motion for a new trial. The State posits that an evidentiary hearing on the Petitioner's motion for new trial is not warranted based upon the case law. On July 5, 2016, the State filed its motion in opposition to Petitioner's motion for a new trial. On July 19, 2016, the Petitioner filed a reply brief.

## ISSUES PRESENTED

There are four salient issues before this Court:

**(I)** First, the Court will address the State's Civ. R. 12 (F) motion to strike portions of the Petitioner's motion for a new trial that were filed without leave of Court.

**(II)** Second, the Court will discuss whether the bite mark evidence is contradictory or impeaching evidence under *State v. Petro*, (1947), 148 Ohio St. 505, 76 N.E.2d 370, and its progeny.

**(III)** Third, the Court discuss the application of *"the- law- of- the- case"* and *"res judicata"* to issue preclusion.

**(IV)** The Court will determine whether the Petitioner has shown that the bite mark evidence discloses a "strong probability" that the outcome would change if a new trial is granted.

Before rendering an opinion in this case, the Court has considered the following documents and information. The Court has reviewed the entire transcript (four volumes) from the 1986 trial, totaling 1,275 pages. The Court has considered the testimony and exhibits presented by Petitioner at the December 21, 2015 hearing. The Court has read and considered all the briefs (with attached exhibits) filed by the Petitioner and the State throughout the course of these proceedings. This includes the Petitioner's motion for a new trial filed on July 13, 2016, (48 pages including 369 pages of exhibits). The Court has reviewed case law from Ohio, as well as from other jurisdictions, on the legal issues presented in this case.

## EVIDENCE IN THE CASE

The key facts surrounding this case can be found in *State v. Hill*, 64 Ohio St. 3d 313, 595 N.E. 2d 884 (1992). The Ohio Supreme Court, after reviewing the sufficiency of the evidence, including the testimony of Dr. Mertz, the State's dental expert, who identified Hill as the person

who bit the victim on the penis, affirmed the Petitioner's convictions and death sentence. The following facts discussed in the next six pages of this opinion are gleaned directly from this decision. *Hill, supra.*

On September 10, 1985, at approximately 5:15 p.m., twelve-year old Raymond Fife left his home on his bicycle to visit a friend, Billy Simmons. According to Billy, Raymond would usually get to Billy's residence by cutting through a wooded field with bicycle paths located behind the Valu-King Store on Palmyra Road in Warren. Both Billy and Raymond were planning on attending a Boy Scouts meeting scheduled after school.

Mathew Hunter, a Western Reserve High School student, testified that he went to the Valu-King on the same date, shortly before 5:00 p.m. When he reached the front of the store, Hunter saw Danny Hill and Timothy Combs standing in front of a nearby laundromat. Hunter testified that he saw Raymond Fife at that time riding his bike into the Valu-King Parking lot.

Timothy Combs was convicted in a separate trial of aggravated murder with specifications of aggravating circumstances, including rape and kidnapping. Combs, a juvenile at the time of the crimes, had his case bound over to the Portage County Common Pleas Court. Combs, was convicted in a jury trial of Aggravated Murder with aggravating circumstances specifications. He was sentenced to life in prison with parole eligibility after serving 30 years.

Darren Ball, another student at the high school testified that he and Tony Cree left football practice at approximately 5:15 p.m. on September 10, and walked to a trail behind the Valu-King. Ball said that he saw Combs walking on the trail in the opposite direction from the Valu-King. Ball testified that he heard a child's scream, "like, somebody needed help or something."

Donald Allgood, another student from the high school, testified that he and a friend were walking in the vicinity of the wooded field behind the Valu-King between 5:30 p.m. and 6:00

p.m. on the date in question. Allgood noticed Hill and Combs and two other persons walking out of the field. Allgood testified that he saw Danny Hill throw a stick back into the woods. He observed Combs pull up the zipper of his pants. Combs put his head down when he saw Allgood.

At approximately 5:50 p.m. on September 10, 1985, Billy Simmons called Raymond's home trying to locate him because they were going to attend a Boy Scouts meeting. Simmons rode his bicycle to the Fife's residence around 6:10 p.m. When he found that Fife was not there, Simmons proceeded to his Boy Scouts meeting. Members of the Fife family began searching for Raymond.

At approximately 9:30 p.m., Raymond's father found his son in the wooded field behind the Valu-King. He testified that Raymond was naked and appeared to have been severely beaten with burns on his face. One of the medics at the scene testified that Raymond's groin was swollen and bruised, and it appeared that his rectum had been torn. The medic found Raymond's underwear tied around his neck and he appeared to have been lit on fire.

Raymond died in the hospital two days later. The coroner ruled Raymond's death a homicide. The cause of death was found to be cardiorespiratory arrest secondary to asphyxiation, subdural hematoma and multiple trauma. The coroner testified that the victim had been choked and had a hemorrhage in his brain, which normally occurs after trauma or injury to the brain.

The coroner testified that Raymond sustained multiple burns, damage to his rectal-bladder area and had bite marks on his penis. The victim also sustained numerous external injuries and abrasions. Dr. Adelman, the pathologist who performed the autopsy, noticed profuse bleeding from the victim's anus and rectum. He testified that the victim had been impaled with an object

that had been inserted through the anus and penetrated through the rectum into the urinary bladder.

On September 12, 1985, Hill went to the Warren Police Station to inquire about a $5,000 reward that was being offered for information concerning the murder of Raymond Fife. Hill met with Sergeant Thomas Stewart of the Warren Police Department and told him that he had "just seen Reecie Lowery riding the boy's bike who was beat up." When Stewart asked Hill how he knew the bike belonged to the victim, Hill replied "I know it is." Detective Stewart noted that Hill "knew a lot about the bike and about the underwear around the victim's neck." When Stewart asked him whether he knew Tim Combs, Hill responded that "yeah, I know Tim Combs. * * * I ain't seen him since he has been out of the joint. He likes boys. He could have *** done it too."

On September 13, 1985, after Sergeant Dennis Steinbeck of the Warren Police Department read the summary of Stewart's interview with Hill the day before, he went to Hill's residence and requested that he come to the police station to make a statement. Hill voluntarily went with Steinbeck to the police station whereupon Hill was advised of his *Miranda* rights and signed a waiver of rights form. Hill made a statement that was transcribed but the sergeant forgot to have him sign the statement. Subsequently Steinbeck discovered some eyewitnesses had seen the defendant at the Valu-King on the date of the murder.

On September 16, 1985, Steinbeck went to Hill's residence, accompanied by the defendant's uncle, Detective Morris Hill of the Warren Police Department. Hill again voluntarily went to the police station with his mother. Hill was given his *Miranda* rights, which he again waived. After further questioning by Sergeants Stewart and Steinbeck and Detective Hill, the defendant indicated that he wanted to speak alone to his uncle, Detective Hill. After

several minutes, Detective Hill stated that the defendant told him that he was "in the field behind Valu-King when the young Fife boy got murdered."

Hill, once more, was again given and waived his *Miranda* rights, and made two more voluntary statements, one on audiotape and the other on videotape. In both statements, Hill admitted that he was present during the beating and sexual assault of Raymond Fife, but that Combs did everything to the victim. Hill told police that Combs had knocked the Fife off the bicycle and threw him onto the bike several times. Hill stated that he saw Combs rape the victim anally and pull on his penis so hard he thought it came off. Hill admitted to police that he stayed with Raymond when Combs left the area of the attack to get the broomstick and lighter fluid that was used to burn the victim. Hill denied that he caused any injuries to Raymond after Combs went to the Valu-King to get lighter fluid.

Upon further investigation by authorities, Hill was indicted on Aggravated Murder with aggravating circumstances (committed in the course of Kidnapping or Rape). Hill was also indicted on charges of Kidnapping; Rape, Aggravated Arson, Felonious Sexual Penetration, and Aggravated Robbery.

On December 16, 1985, a suppression hearing was conducted by the trial court. The Defendant's motion to suppress all statements to police was denied on January 17, 1986. The trial court found no Fourth or Fifth Amendment violations and denied the motion. The Court also considered the defendant's claim that he was mental impaired or retarded to the extent that he was incapable of given a knowing or voluntary statement to police. The trial court reviewed the defendant's in statements, in particular, Hill's audio and video taped interviews with the Warren Police detectives and found no merit in these arguments.

In the videotaped statement given to police on September 16, 1985, and provided by the State to this Court, Hill described the murder and torture of Raymond Fife in graphic detail. (State's Exhibit M). Petitioner, in this statement, as well as in his other statements to police, denied that he participated in the attack on Fife. In all of his interviews with the Warren Police Department the Petitioner denied any involvement in the attack on Fife. While, Hill admitted that he was in the field when Raymond was tortured and murdered by Combs, he has maintained that he had no part in the attack on the victim.

On January 21, 1986, the defendant's trial commenced in front of a three-judge panel. Among the voluminous testimony from the witnesses and the numerous exhibits, the following evidence was adduced.

At trial, Petitioner's brother, Raymond Vaughn testified that he saw the Hill wash his gray pants on the night of the murder as well as on the following two days. Vaughn testified that it looked like Hill was washing out "something red. * * * It looked like blood to me * * *." In the September 16, 1985 interview with Warren Police investigators, Hill, denied, at least four times that he got any blood on him since he did not participate in the crimes. (State's Exhibit M). Sometime after the trial, Raymond Vaughn recanted his testimony that he saw his brother wash what appeared to be blood out of his pants.

Detective William Carnahan of the Warren Police Department testified that on September 15, 1985, he and Dennis Allgood went to the place where Allgood saw Hill and Combs come out of the wooded area when he observed Hill toss a stick into the woods. Carnahan testified that he returned to the area with workers from the Warren Parks Department, and that he and Detective James Teeple found a stick about 6-10 six feet from the path where Allgood saw Hill throw a stick.

Dr. Curtis Mertz, a dentist and oral surgeon testified at trial on behalf of the State that one of the injuries found on Raymond Fife's penis could be linked definitely to the dentition of Mr. Hill, to the exclusion of any possible contributors.

Dr. Lowell Levine, a forensic odontologist testified on behalf of the Petitioner at trial. According to Dr. Levine, he could not determine with any reasonable degree of medical certainty whether Hill or Combs made the injuries on the victim's penis. Dr. Levine testified that at least one of the marks was most likely made by Hill.

Dr. Howard Adelman, the pathologist who performed the autopsy on the victim's body, testified that the size and shape of the point of the stick found by Detective Carnahan was "very" compatible" with the size and shape of the opening through the victim's rectum. Adelman described the fit of the stick in the victim's rectum as "very similar to a key in a lock."

At the close of trial, the three-judge panel, unanimously found Danny Lee Hill guilty on all counts, except the aggravated robbery count and the specification of aggravated robbery to the aggravated murder count. The convictions of the Defendant and imposition of the death sentence was affirmed by the Ohio Supreme Court. *Hill, supra.*

## CIVIL RULE 12 (F) MOTION TO STRIKE

Prior to filing a responsive pleading in opposition to Petitioner's motion for new trial, the State filed a motion, pursuant to Civ. R 12 (F), to strike all or portions of his motion for new trial. Civ. R. 12 (F) provides that upon "motion made by a party before responding to a pleading * * *, the court may order stricken from any pleading any insufficient claim or defense or any redundant, immaterial, impertinent, or scandalous matter." Crim. R. 57 (B) provides that the Court may look to the rules of civil procedure where no comparable criminal rule exists.

Courts have broad discretion in ruling on a motion to strike. *Squire v. Geer*, <u>117 Ohio St. 3d 506, 508</u> (2008). A motion to strike will be granted when a party fails to follow procedural requirements enforced by a court. *State ex rel. Ebbing v. Ricketts*, <u>133 Ohio St. 3d 339, 342,</u> (2012). In *Ebbing*, the trial court did not abuse its discretion in striking a reply brief from the record since party did not first obtain the court's permission to file the same.

On June 7, 2016, after previously conducting an evidentiary hearing on Petitioner's motion for leave to file a new trial, this Court determined that the Petitioner was "unavoidably prevented" from filing the motion within the time parameters of Crim. R. 33 (B). The Court's decision granting leave to file a motion for new trial was based in large measure on the guidelines enacted in 2013 by of the American Board of Forensic Dentistry ("ABFO"). The 2013 ABFO guidelines did not recognize the identification of a specific individual as a "biter" in the open population.

Dr. Franklin Wright, a respected forensic odontologist, testified at the prior hearing in December 2015 that the 2013 ABFO guidelines were not widely disseminated beyond the forensic odontology field in 2013. In April, 2016, ABFO, placed further limitations on the parameters of expert opinions in relation to questioned detention claimed to be a bite mark.

The Court also found that the Petitioner was "unavoidably prevented" from filing the motion earlier within the time frame of Crim. R. 33 (B) based on the testimony of Dennis Terez, the Public Defender for the Northern District of Ohio. Attorney Terez testified regarding the complex and protracted procedure that was necessary in this case to obtain leave from the federal court to file a motion for new trial in state court. The Court incorporates by reference the findings in its June 7, 2016 order into this decision.

The Court unequivocally stated in its June 7, 2016 order granting leave to Petitioner to file a motion for new trial that the new trial motion should be confined solely to the issue of the bite mark evidence.

"Since the (ABFO) guidelines were not in existence in 1986 at the time of Petitioner's trial, no amount of due diligence by Petitioner's counsel, could have discovered the information that was not in existence. (Court's Order on Petitioner's Request for Leave to File a Motion for New Trial, June 7, 2016, pg. 9).

However, when the Petitioner filed his motion for a new trial on June 13, 2016, without any attempt to seek leave from this Court, he included issues that were never raised in his prior motion for leave to file a new trial motion. Pursuant to Civ. R. 12 (F), the State filed a motion to strike the Petitioner's motion for a new trial.

The first claim unilaterally added to Petitioner's motion for new trial attempts to resurrect claims that have been considered and rejected by the Ohio Supreme Court regarding the voluntariness of Hill's statements given to the Warren Police Department after the murder of Raymond Fife in 1985. Hill continues to argue that his statements to law enforcement were not knowingly and volunteered rendered. Petitioner alleges that the interrogation tactics used in 1985 by law enforcement are now "disfavored" "based upon mounting empirical evidence" that people give false confessions under the "pressure of custodial interrogation." (Petitioner's motion, at pg. 35).

The highest court in this state, the Ohio Supreme Court, has previously reviewed and rejected Petitioner's claim that his statements to police were not voluntarily given and/or were the result of impaired mental capacity. *State v. Hill, supra*, 64 Ohio St.3d 313, 318-320. The Ohio Supreme Court ruled that Petitioner's statements to the Warren Police Department were

given of his own volition and free will, and the statements were either volunteered by Hill or given with appropriate *Miranda* admonitions. *Hill, supra*, at 317-320.

As part of this Court's review of this case, it watched Hill's interview with the Warren Police Department that was video-taped on September 16, 1985, days after Raymond Fife was murdered. (State's Exhibit M). In the videotaped interview with police, Petitioner is lucid and coherent, as he calmly answered questions and volunteered details about the murder and protracted torture of Raymond Fife, conduct that he attributed to the Co-Defendant Timothy Combs. During the interview, Hill even demonstrated the location of the parties during the attack on a chalkboard.

What this Court found most striking about the videotaped interview is the calm, detached manner that Hill described the struggle of Raymond Fife during the brutal attack. Hill, without any emotion in his voice, described the boy's struggle to run, and at times, Fife's attempts to crawl away from the scene several times. Hill told police that at one point he looked into Raymond's eyes and "the boy looked back at him." The Petitioner stayed with the victim while Combs got the stick that was used to impale the victim. By Hill's own admission, he continued to stay with the boy while Combs went to Valu-King to obtain lighter fluid that was used to set the victim on fire.

There is good reason that the Ohio Supreme Court, the U.S. District Court, the 11th District Court of Appeals, and the Trumbull County Common Pleas Court, have all concluded that Petitioner's statements were voluntarily and intelligently given to law enforcement. Likewise, these same courts have consistently rejected claims that Hill's statements were affected by any claims of limited mental capacity. The common thread in all of the above opinions was that the Petitioner clearly knew right from wrong.

"Upon careful review of the testimony and the audiotape and videotape statements, we do not find that the interrogation tactics used by the police officers, even in light of defendant's mental capacity, rendered the statements involuntary, or that officers improperly induced the defendant to make incriminating statements. *State v. Hill*, supra., <u>64 Ohio St. at 319</u> (direct appeal).

The second issue raised by Petitioner, without leave of Court in his motion for new trial, involved the stick or broomstick handle that was introduced by the State in Hill's trial. (State's Tr. Ex. 47). Dr. Zhongxue Hua, a pathologist, takes issue with Dr. Adelman's trial testimony regarding the stick or broken broom handle. (Petitioner's Exhibit E). At trial, Dr. Adelman compared the dimensions and configuration of the State's Trial Exhibit 47 with the anal and rectal injuries suffered by the victim.

Dr. Adelman testified that the he found two different types of injuries to the rectal area, one penetrating the anus, rectum and urinary bladder and one none-penetrating injury that reached, but did not penetrate the rectum wall. Dr. Adelman testified that the one of the injuries was a "circular" injury that measured slightly under an inch that penetrated the anus and left an imprint on the wall of the rectum. (Tr. TOP -359).

The other rectal injury was made by an object with a sharp pointed end that perforated the rectum, through the urinary bladder and went through the urinary bladder. (Tr. TOP – 355). In order to penetrate these organs, the object inserted had to be at least six (6) to eight (8) inches to reach the urinary bladder. (Tr. TOP -355). Dr. Adelman testified after that these penetrating injuries were partially circular and similar in diameter to the other injury except the point of the object inserted had a sharp pointed edge. (Tr. TOP – 359). The insertion of the object would have caused a "terrible amount of pain" to the victim. (Tr. TOP – 356).

Dr. Hua is critical of Dr. Adelman's conclusions that the stick was compatible with the victim's injuries and "very similar to a key in a lock." (Tr. TOP at 418).

In Dr. Hua's affidavit, he opines "it [was] not scientifically possible to reliably identify the instrument that caused the injuries in question through the type of examination performed on Fife by Adelman – let alone, to identify the instrument to the level of certainty necessary to describe it through the analogy of a key. (Hua affidavit, at para. 12).

The irony in Dr. Hua's affidavit is that it ignores the other evidence in this case that tends to corroborate the findings of Dr. Adelman. It is the Petitioner, himself, who provided some of the best corroborating evidence of the description of the stick or broom handle used by Combs on the victim. Unlike, Dr. Adelman, who had the stick or broken broom handle to compare with the injuries at the time of the autopsy, Dr. Hua was not present during the autopsy and did not have the opportunity to actually compare the injuries with the stick.

In Hill's videotaped interview with police on September 16, 1985, Hill described the item used by Combs to penetrate the victim's rectum as a stick or "broom handle thing." Hill told police that it was "smooth on one end with ridges on the other end." (State's Exhibit M). Hill's description to investigators appears to be an accurate description of the stick introduced at trial (State's Tr. Exhibit 47).

A microscopic examination of State's Exhibit 47 was conducted by Dr. Adelman. He testified that the stick was made of wood and contained plant cells. (Tr. TOP – 377-338). The same type of plant cells were similar to the plant cells found in the anal tissue of Fife. (Tr. TOP – 378). Dr. Adelman testified that the size and shape of the point of the stick were "very compatible" with the size and shape of the openings of the wound, similar to a "lock in a key." (Tr. TOP – 382-383).

In addition to the similarities in the description of the injuries when compared with the stick or broom handle provided by Dr. Adelman and the Petitioner, the trial testimony of Donald Allgood further corroborated that a stick was used in the attack of Fife. Donald Allgood testified that he saw Hill "throw a "stick" back into the woods at the time and near the place where the homicide occurred. *State v. Hill*, supra, 64 Ohio St.3d, at 313, 324. The stick or broom handle (State's Exhibit 47) was found six to ten feet from the path where Allgood saw Hill throw the stick. This was contrary to Hill's contention that he never had the stick.

In the final analysis, while there was strong evidence that the stick or broken broom handle (State' Exhibit 47) that was found approximately 6 to 10 feet from where Allgood saw Hill throw a stick, is of little import. The fact remains that an object or objects that had a jagged end and a smooth end was used to impale the victim. Dr. Hua's testimony merely impeaches the trial testimony and has no effect on the totality of the sufficiency of the evidence in this case.

The Court's order filed on June 7, 2016, granting leave to Petitioner to file a new trial motion, was limited only to the issue of the scientific reliability of bite mark evidence based upon the scientific advances in field of forensic dentistry and the 2013 ABFO guidelines.

The Court finds the additional claims unilaterally added by Petitioner in his motion for new trial are redundant, impertinent, and immaterial under Civ. R. 12 (F), and are hereby ordered stricken. In addition, any further discussion of these claims is barred by the "*law of the case*" doctrine and "*res judicata.*" State v. Ketterer, 126 Ohio St.3d 448, 2010-Ohio 331, State v. Gray, 8th Dist. No. 85677, 2004-Ohio7030, jurisdiction declined, 105 Ohio St.3d 1363.

## II.  NEW EVIDENCE v. NEW THEORY & THE "*PETRO*" DOCTRINE

The State argues that the Petitioner's request for an evidentiary hearing on his motion as well as the motion for new trial itself should be denied because the bite mark evidence

contradicts or impeaches prior trial testimony which cannot serve as the basis for a new trial. *State v. Petro*, (1947), 148 Ohio St. 505, 76 N.E.2d 370. *Petro* remains good law. Conversely, the Petitioner maintains that the bite mark evidence does not merely impeach the opinions of the testimony of the trial experts, it demonstrates there was no reliable scientific basis for the testimony and therefore Hill is entitled to a new trial.

This Court has examined the definition of "newly discovered" evidence as utilized in state and federal courts in criminal as well as civil cases. There is a plethora of case law defining the term "newly discovered evidence" both in the context of a motion for a new trial made pursuant to Crim. R. 33, and a motion to set aside a judgment under Civ. R. 60 (b).

In *U.S. v. Olender*, 338 F.2d 629 (2003), the Defendant was found guilty of being a felon in possession of a weapon based upon a 2001 conviction of Felonious Assault. In 2003 it was determined that the Defendant had previously pled guilty to a misdemeanor, not a felony. The Sixth Circuit Court of Appeals upheld the ruling of the Federal District Court, Northern District, finding that the State produced evidence beyond a reasonable doubt that he was a convicted felon. Any information discovered after trial could not be used to retroactively change the facts presented at trial.

> "Newly discovered evidence does not include new legal theories or new interpretations of the legal significance of the evidence." *U.S. v. Olender, supra* at 635-636. See, *U.S. v. Seago*, 930 F.2d 482, 489 (6th Cir. 1991).

> "Evidence will not be deemed "newly discovered" simply because it appears in a different light under a new theory. A party who desires to present his case under a different theory in which facts available at the original trial now first become important, will not be granted a new trial." *U.S. Olender, supra* at 636. *U.S. v. Hamling*, 525 F.2d 758-759 (9th Cir. 1975).

> "An attempt to relitigate the case on a new theory is not considered newly discovered evidence but is merely a newly discovered issue

law. *U.S. v. Olender, supra* at 636, citing *U.S. v. Shelton,* 459 F.2d 1005 (9th Cir. 1972).

It is settled practice that the phrase "newly discovered evidence" refers to evidence that existed at the time of trial but of which the moving party was ignorant. *Brown v. Penn R.R.*, 282 F.2d 522 (3rd Cir. 1960), cert denied 365 U.S. 818 (1961). The majority of courts have concurred with this reasoning in a myriad of factual scenarios.

In *Swope v. Siegel-Robert, Inc.*, 243 F,3d, 486, para. 35, (8th Cir. 20011), held that an IRS appraisal report that did not exist at the time of trial but was prepared, afterwards, is not "newly discovered evidence." See also, *Lapiczak v. Zaist,* 54 F.R.D. 546, 548 (D. Vt. 1972) (witness opinions developed after trial were not permitted under Civ. R. 60 (b) (2), *Ryan v. U.S. Lines Co.*, 303 F.2d 430 (2nd Cir. 1962) (result of new physical examination was not "newly discovered evidence"), *Corex Corp. v. United States,* 638 F.2d 119 (9th Cir. 1981) (fact that the district court considered after-occurring events in granting a Civ. R. 60 (b) (2) motion was grounds for reversal).

In *Foley v. Kentucky,* 425 S.W. 3d 380 (2014), the Kentucky Supreme Court denied the defendant's request for a new trial based upon a ballistics report prepared by a forensic firearm specialist compiled eighteen (18) years after the defendant was convicted of murder. In *Foley*, as in the instant case, the expert had reviewed the trial testimony, autopsy report, and other information, in arriving at his conclusions. The forensic firearm expert concluded that based on his analysis the trajectory of the bullets supported the claim of self-defense. "An opinion consisting simply of a reexamination and reinterpretation of previously known facts cannot be regarded as "newly discovered evidence,"

*In State v. Unsworth*, 2010-Ohio-398, the Defendant argued that he was entitled to a new trial under Crim. R. 33 (b), since post-trial a new DNA database became available through the

National Center for Forensic Science ("NCFS") that cast doubt that the race of the perpetrator.

contradict the trial testimony.

In *State v. Johnson*, 2010-Ohio-4117; 2010 Ohio App LEXIS 3486, ** 1, the Defendant

sought a new trial based on new evidence that challenged the scientific accuracy of the gunshot

residue (Atomic Absorption Spectrometry or "AAS") test introduced in his trial. Johnson

presented expert testimony at a hearing that the AAS method of testing was no longer accepted

in the scientific community, and therefore he was entitled to a new trial. Relying on *Petro*, the

Court denied Johnson's motion for a new trial, holding that the gunshot residue evidence was not

"newly discovered" evidence and the expert's testimony "would do nothing more than impeach

the trial testimony of the coroner relating to the gunshot residue testing." *Id.*, at 5-19.

While, the *"Petro"* doctrine paints with a broad brush a general statement that

contradictory or impeaching evidence can never serve as the basis to grant a motion for new trial,

this Court will determine from a due process analysis, whether the new evidence even if

contradictory and impeaching , can serve as the basis for a new trial in this case.

In *Dayton v. Martin* (1987), 43 Ohio App. 3d. 87, 539N.E.2d 646, the court rejected a per

se interpretation of *Petro* that would exclude all newly discovered evidence as a basis for a new

trial simply because that evidence is in the nature of impeaching or contradicting evidence.

*Dayton* held that the primary focus should be on whether the newly discovered evidence would

create a "strong probability" of a different result at trial, or whether the impeaching or

contradicting evidence would be "insufficient to create a strong probability" of a different result.

*Id.* at 90; *State v. Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604.

## Petitioner's Affidavits Critical of the 1986 Trial Testimony

The crux of Petitioner's basis for a new trial pivots on the scientific advances in forensic odontology made since 1986. The Court previously conducted an evidentiary hearing on December 21, 2015, in which Petitioner introduced the 2013 guidelines of the American Board of Forensic Odontology (ABFO) Reference Manual. The guidelines were established by the "Diplomates" of the American Board of Forensic Odontology for the analysis of bite mark evidence. The 2013 guidelines did not recognize the identification of a specific biter in the open population.

In March 16, 2016, as the result of continued scientific study, and empirical and peer review, the 2013 ABFO guidelines, were amended. The 2016 ABFO guidelines restricted, even further, the scientifically accepted standards relating to the identification of a pattern injury as a human bite mark.

The 2016 ABFO guidelines provide that "terms assuring unconditional identification of a perpetrator, or identification "without doubt", are not sanctioned as a final conclusion in an open population case." (Petitioner's Exhibit S). The 2016 ABFO guidelines recognize that even where a patterned injury is determined to be "human", only the following terms should be used as they relate to questioned dentition to a bite mark: A) Excluded as Having Made the Bitemark, B) Not Excluded as Having Made the Bitemark, C) Inconclusive.

The Petitioner's motion for an evidentiary hearing on the motion for new trial is based on the enactment of the ABFO guidelines in 2013 and 2016, and upon sworn affidavits from nationally recognized forensic odontologists that are attached as exhibits to his motion.

Petitioner submits an affidavit of Dr. Franklin Wright as an exhibit to his motion. Based upon his review of the materials from the 1986 trial, Dr. Wright concluded that Dr. Mertz's

testimony was not based upon any reliable scientific principles, much less, the ABFO-approved methodology, that was not in existence at the time of trial. Dr. Wright avers in his affidavit that the patterned injury on the victim's penis..."is not a human bite mark." (Wright affidavit at pg. 3).

Dr. Iain Pretty, a widely published British forensic odontologist and former chair of the American Academy of Forensic Science's Odontology Section, also concluded that there was insufficient evidence to determine whether the marks on the penis were human in origin. (Pretty affidavit at pg. 5).

Dr. Pretty avers that there is insufficient evidence to reach a conclusion at any level of scientific certainty regarding the causation of the small circular wounds to portions of the glans penis of the victim. (Pretty affidavit, at 3-4). The Petitioner submitted additional affidavits echoing the findings of Dr. Wright and Dr. Pretty.

The Petitioner submitted an affidavit from Dr. Zhongxue Hua. Dr. Hua criticized the testimony of Dr. Adelman and Dr. Mertz and concluded that there was no scientific basis to support their conclusions that Fife's penis was erect at the time the patterned injuries occurred. (Hua affidavit, pgs. 2-6, Petitioner's Exhibit E).

### Trial Testimony of Dr. Curtis Mertz, Dr. Howard Adelman & Dr. Lowell Levine

In the Petitioner's 1986 trial, Dr. Curtis Mertz, a forensic odontologist testified for the State. Mertz, a board certified forensic odontologist, was a past president of the American Society of Forensic Odontology (forerunner organization of ABFO) and a founder of ABFO. (Tr. TOP – 908-909).

Dr. Mertz viewed the victim's body at the morgue. At trial, he testified "I saw what I felt was a human bite mark." (Tr. TOP – 920). Dental impressions were later made of the lower

and upper teeth of Danny Lee Hill and Co-Defendant Timothy Combs. Photographs and x-rays were also taken of the suspects' teeth. (Tr. TOP – 932). The doctor found the models or dental impressions to be of "excellent quality." (Tr. TOP – 933).

Dr. Mertz testified that based on the photographs and dental impressions, he found to a reasonable degree of professional certainty that Hill made at least some of the bite marks on the victim's penis. (Tr. TOP -937-960). Dr. Mertz testified, "My opinion is very strong that you can exclude Combs, and in my opinion is, if you want to put it on a varying scale, slightly stronger that it is Hill's bite." (Tr. TOP – 952).

Dr. Mertz not only identified Hill as the biter, but testified that the victim's penis was erect at the time the marks were inflicted. This testimony was necessitated in part to explain the discrepancy between the measurements of Hill's teeth when compared to the size of the "teeth" marks on the penis. (Tr. TOP – 946-947, 956).

In arriving at the conclusion that the victim's penis was erect, Dr. Mertz testified that he relied on data gathered from textbooks and studies. (Tr. TOP – 955 - 957).

On cross-examination, Dr. Mertz admitted that he had involved in approximately 35 bite mark cases, but only one of the cases dealt with a claimed bite mark on a penis. (Tr. TOP – 964).

Dr. Howard Adelman, the pathologist who performed the autopsy on Raymond Fife on September 13, 1985, testified that as the result of the attack, Raymond Fife suffered several life-threatening injuries, any one of which, or in combination with the others, could have resulted in his death. The fatal injuries included, a subdural hemorrhage, penetration and perforation of the rectum and urinary bladder, strangulation (ligature marks were found on the victim's throat) burns, and contusions that were indicative of a severe beating of the victim. (Tr. TOP – 370).

Dr. Adelman also addressed the issue as to whether the victim's penis was erect or flaccid at the time of the attack. Dr. Adelman testified that he was familiar with certain medical articles (no citations were provided in court), including one study that discussed a known connection between asphyxia during a legal hanging and the cause of an erection (Tr. TOP – 418).

Dr. Lowell Levine, a dentist and forensic odontologist, testified for Petitioner at trial that he had been involved in hundreds of bite mark cases over the years, although he had "rarely" seen a case involving a bite mark on a penis. (Tr. TOP -113).

After reviewing the same information as Dr. Mertz, Dr. Levine concluded that the marks on the penis were human in origin and could have been made by either Hill or Combs. (Tr. TOP 1145 – 1148). Dr. Mertz testified that there was one mark on the victim's penis "that was most likely made by Hill" (Tr. TOP – 1153).

### 2013 & 2016 ABFO Guidelines

Although there have been concerns over the years calling into question the reliability of bite mark evidence, it is only during the period 2013-2016, that forensic odontologists, including the Diplomates of ABFO, have almost universally recognized that any expert opinion on bite evidence that purports to identify a specific biter from the open population is without any scientific basis. However, the science of bite mark evidence continues to evolve and be in flux.

The scientific validation of the 2013 ABFO guidelines that Petitioner relied on so heavily in his motion for a new trial have been severely questioned by the Diplomates of the ABFO. In 2015, Dr. Ian Pretty (one of Petitioner's experts in this case) and Dr. Adam Freeman, another forensic odontologist, conducted a study entitled, *Construct Validity Bitemark Assessments Study Using the ABFO Bitemark Decision Tree ("Construct Validity Study")*. (See, Petitioner's brief at 18-20). Using 100 photographs of patterned injuries, 103 ABFO board-certified Diplomates

were asked to decide 1) whether there was sufficient evidence to render an opinion whether the patterned injury was a human bite mark; 2) whether, consistent with the 2013 ABFO guidelines, the injury could be determined to be either a human bite mark, not a human bite mark, or suggestive of a human bite mark, and; 3) if a human bite mark, whether it had distinct, identifiable arches and individual tooth marks.

The results of the study were shocking to say the least. On the most basic question as to whether they could determine the origin of the mark based upon the on the information provided, only 39 analysts came to unanimous agreement on just 4 of the 100 case studies. By the time the analysts finished question three of the study, the experts were significantly fractionalized on nearly all the cases. Of the initial 100 cases, there remained just 8 case studies in which at least 90 percent of the analysts were still in agreement.

Considering the inability of top forensic odontologists to arrive at a consensus as to whether a patterned injury constituted a bite mark, much less a human one, it is no wonder that the ABFO scrapped the 2013 guidelines in 2016.

The import of this study as it applies to this case is that even respected scientists, such as Iain Pretty, have recommend further study on the reliability of the scientific methodology and constructs recommended in the ABFO guidelines. The 2013 ABFO guidelines that Petitioner relied on his motion for leave for a new trial have been discredited. Now, Petitioner argues that this Court should apply the 2016 ABFO guidelines which have not been subjected to controlled studies or peer review.

There is no question that the advancements in forensic odontology impeach and contradict the trial testimony of the experts. However, this determination alone, does not resolve the

question as to whether the bite mark evidence creates a "strong probability" that there would be a different outcome in a future trial.

### III. DOCTRINE OF *"THE-LAW-OF-THE CASE"* & *"RES JUDICATA"* AS APPLIED TO THE EVIDENCE IN THIS CASE

The *"law-of-the case doctrine"* provides that the "decision of a reviewing court in a case remains the law of the case on the legal questions involved in all subsequent proceedings in the case at both the trial and reviewing levels." *Hubbard ex. rel Creed v. Sauline*, 74 Ohio ST.3d 402, 404, 659 N.E.2d 781 (1996), quoting *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). The rule is necessary to ensure consistency of results and avoid endless litigation.

*"Res judicata"* operates in a similar way. A final judgment of conviction bars a convicted defendant, who was represented from counsel from raising any defense or claimed lack of due process that could have been raised at trial or in an earlier appeal. State v. Szefcyk, 77 Ohio St.3d 93, 95, 671 N.E.2d 233 (1996).

The Petitioner claims that the doctrines of *"law-of-the case"* and *"res judicata"* are inapplicable to this case because the unreliability of the bite mark evidence did not become apparent until recent years. However, the Ohio Supreme Court decision affirming Petitioner's convictions only briefly mentioned the bite mark testimony as one of many factors supporting the sufficiency of the totality of the evidence.

This Court is bound by the decision of the Ohio Supreme Court (*State v. Hill*, 1989 Ohio App. LEXIS 4462) that weighed the sufficiency of the evidence on the Aggravated Murder count and independently weighed the sufficiency of the Rape, Kidnapping, and Aggravated Arson specifications.

The Petitioner was indicted on Aggravated Murder and charged that Danny Lee Hill did purposely cause the death of Raymond C. Fife, * * * while committing Kidnapping or Rape, or Aggravated Arson. Imposition of a death sentence in Hill's case was triggered by the unanimous verdict of the three-judge panel that found Hill guilty on the Aggravated Murder with the specifications that the crime was committed during the commission of Kidnapping (specification 1), Rape (specification 2) or Aggravated Arson (specification 3). A conviction any one of the specifications made Hill eligible to receive a death sentence. R.C. 2941.14 and R.C. 2929.04 (A) (7).

On February 28, 1986, the three-judge panel unanimously found the above statutory aggravating circumstances outweighed the mitigating factors beyond any reasonable doubt and sentenced the Petitioner to death.

Dr. Adelman who performed the autopsy in this case testified that Raymond Fife's death was due to cardiorespiratory arrest secondary to asphyxiation, subdural hematoma, and multiple trauma. At no time, did Dr. Adelman testify that the victim died from being bitten on the penis.

Under Ohio law, there can be more than one principal offender in the commission of a crime. "Principal offender" means the "actual" killer and not the "sole offender. As there can be more than one actual killer, there can be more than one principal offender. *State v. Skatzes*, 104 Ohio St.3d 195; 2004-Ohio-6391; 819bN.E. 2d 215; 2004 Ohio LEXIS 2859.

The bite mark evidence was one factor, of many, in determining whether Hill was a principal offender in the commission of the Rape. The Ohio Supreme Court not only affirmed Petitioner's Aggravated Murder conviction but analyzed the evidence on each specification, independently. Even without taking into account the bite mark evidence, the Ohio Supreme

Court discussed in detail the totality of the evidence in the case that supported Hill's conviction

on the Rape specification.

> "The evidence which supported the rape conviction indicated the victim was subjected to a significant amount of force. This is consistent with the relative size and age differences between the appellant and the victim. Initially, the victim was restrained and his mouth covered, but as the various sexual acts were performed, he was rendered unconscious. The physical attacks perpetrated on the deceased caused him to vomit and also caused extensive physical damage.
>
> Specifically, during the assault, which lasted approximately forty-five minutes, the victim was repeatedly bitten on the penis, which was evidenced by the bite marks. In addition, the autopsy revealed that the deceased had suffered multiple contusions, abrasions, and lacerations on his back, face, and thigh. Furthermore, his genitalia was pulled with egregious force.
>
> He was impaled repeatedly with both the blunt end and sharp end of an instrument which was long enough to perforate the rectum and rupture the victim's urinary bladder. As an apparent result of the agony of the cumulative torture, the victim was heard screaming continuously, for a period of twenty to thirty seconds, by a passersby. At this time, witnesses observed Combs on the path behind the Valu-King.
>
> Additionally, appellant's own statement indicated he remained with the victim while Combs absented himself from the scene, and he did not go for help. This direct evidence base provides, at the very least, that appellant was the only other person {present} when the victim was experiencing the pinnacle of excruciating pain from these egregious assaults."
>
> *State v. Hill*, 1989 Ohio App. LEXIS 4462, at 84-85.

The reasoning in the Supreme Court decision evinced a detailed understanding of

the trial record. For instance, the Supreme Court noted that Hill continued to stay with the

victim while Combs went to the Valu-King to obtain lighter fluid. At trial, Troy Cree, testified

that he and his friend Darren Ball were returning home from football practice around 5:30 p.m.

when they saw Timothy Combs walking toward the Valu-King. Cree testified at the same time

he saw Combs, he heard a "kid" scream that lasted approximately 30 seconds. (Tr. TOP -860-862). Cree's testimony was corroborated by Darren Ball, who testified he heard a "child" scream at the time he saw Combs near the Valu-King. (Tr. TOP -847-849).

In Hill's initial statement to Warren police made on September 10, 1985, as well as in subsequent statements, Hill admitted that he stayed with the victim while Combs went to Valu-King. Hill denied raping the victim either orally or anally or inserting the broom handle into the victim's rectum in Combs' absence. However, Hill admitted to police that Raymond was still alive when Combs went to Valu-King.

> "The boy was laying down –He was on his back. He
> was still moving." (Petitioner's Exhibit L at 2).

The Ohio Supreme Court independently weighed all of the trial evidence and found that Petitioner's conviction for Aggravated Murder and the rape specification; as well the kidnapping and aggravated arson specifications, were supported by evidence beyond a reasonable doubt. Even when the Supreme Court discussed the bite mark testimony, because both Hill and Combs were principal offenders acting in concert with one another, the Court made no conclusion as to whether Hill or Combs made the bite marks. This decision of the Ohio Supreme Court is binding on this Court and constitutes *the law of the case*."

## IV. DOES THE BITE MARK EVIDENCE SHOW A "STRONG PROBABILITY" THAT THE OUTCOME WOULD CHANGE IF A NEW TRIAL IS GRANTED?

A Crim. R. 33 (A)(6) motion for a new trial on the ground of newly discovered evidence may be granted only if the evidence shows all of the following:

> (1) discloses a strong probability that it will change the result if a new
> trial is granted, (2) has been discovered since the trial, (3) is such as
> could not in the exercise of due diligence have been discovered before
> the trial, (4) is material to the issues, (5) is not merely cumulative to
> former evidence, and does not merely impeach or contradict the former

evidence. *State v. Petro*, (1947) <u>148 Ohio St. 505</u>, <u>76 N.E.2d 370</u>, syllabus.

The entire underpinning of Petitioner's argument for a new trial is predicated on the changes in forensic dentistry made in the last several years. Hill contends that without the bite mark evidence there is a "strong probability" that a new trial would yield a different outcome. There are several legal impediments to Petitioner's position.

The Petitioner was convicted of Aggravated Murder as a principal offender with three (3) separate specifications of aggravating circumstances. (R.C. 2903.01(B). Hill was convicted of Aggravated Murder count with the following specifications; (Kidnapping – R.C. 2905.01, specification 1), (Rape – R.C. 2907.02, specification 2), (Aggravated Arson) – R.C. 2929.04, specification 3). A conviction on Aggravated Murder with one of the above aggravated circumstances triggered the imposition of the death penalty.

On February 28, 1986, after a mitigation hearing, the three-judge panel found the aggravating circumstances outweighed any mitigating factors. Hill was sentenced to death for Aggravated Murder with specifications that the crime was committed during the commission of Kidnapping, Rape, or Aggravated Arson.

In Count three of the indictment, Hill was charged with Rape, in violation of R.C. 2907.02, stating "Danny Lee Hill, did, engage in **sexual conduct** with Raymond C. Fife…, the said Danny Lee Hill having purposely compelled Raymond C. Fife to submit by force or threat of force, and the said Raymond C. Fife being less than thirteen (13) years of age.) R.C. 2907.01 defines sexual conduct to include all of the following; anal intercourse, fellatio, and cunnilingus between persons regardless of sex. R.C. 2907.01. The pertinent essential element of Rape is sexual conduct, not the exact type of sexual conduct. *State v. Himes*, 7[th] Dist. No. 08MA 146 at para. 30.

The relevancy of bite-mark testimony was a factor in proving whether Hill's mouth came into contact with the victim's penis (oral sex). The bite mark evidence had no relevance on the question of whether Hill had anal intercourse with Fife. In one of Hill's statements made to police, he admitted that one point during the attack, he turned the victim over to see if "he was still breathing." (Petitioner's Exhibit M, pg. 25). This statement is somewhat incredulous considering that by Hill's own admissions he did nothing to help the boy escape, did not seek medical attention for Fife, even when he was alone with him, and never attempted to intervene in the protracted torture of the victim.

**Most importantly, the bite mark evidence does nothing to vitiate the sufficiency of the overwhelming evidence against the Petitioner on the Kidnapping specification to the Aggravated Murder count. The Kidnapping specification provides a separate and independent basis for imposition of the death penalty in this case.**

According to evidence at trial, cited previously in this opinion, Hill refused to help Fife as he repeatedly attempted to run or crawl away from the attack. He watched over or kept Fife in the secluded wooded area while Combs got the lighter or charcoal fluid. Although Hill denied he ever inflicted any injuries on Fife (who was still alive at that time) when Combs went to Valu-King, passersby heard screams of "pain" from a "child" that lasted 20 to 30 seconds during the time Combs was at Valu-King.

Even if this Court were to conclude based on today's advances in forensic odontology and the ABFO guidelines, that the bite-mark evidence is unreliable and could not be introduced in a future trial, there is no probability, much less a strong probability that a new trial would result in different outcome. This is especially true considering the overwhelming evidence supporting the

Petitioner's conviction on the Kidnapping specification. Much of this evidence came from the Petitioner admissions and observations from passersby.

Petitioner, in his brief refers to cases on the "Project Innocence" website that purport to "exonerate" individuals based on new bite mark evidence. (Petitioner's brief at pg. 35). The vast majority of these "exonerations" are based on cases that involved new DNA evidence. Many of the reversals also involve egregious misconduct on the part of prosecutors such as withholding exculpatory evidence or suborning perjury. (See, Petitioner's brief at p. 35, case involving Steven Mark Chaney).

It is important to emphasize that while the results of new DNA testing can be "outcome determinative" pursuant to R.C. 2953.73 and positively identify or exclude the perpetrator; no ABFO guideline, now or in the future, will ever be able to identify the person who made the bite mark on Fife's penis or whether it was a bite mark.

For all of the above reasons, the Court finds that even if the bite mark evidence is excluded, considering the totality of the evidence against the Petitioner, particularly on the Kidnapping specification, Petitioner has failed to demonstrate a "strong probability" that there would be a different outcome if a new trial were granted in this case.

## CONCLUSION

This Court cannot consider the bite mark evidence in a jurisprudential vacuum. Although, the Court has serious concerns about the scientific reliability of bite mark evidence, this does automatically translate into a conclusion that the Petitioner is entitled to a new trial pursuant to Crim. R. 33. The granting of a new trial based on newly discovered evidence by its obvious terms involves consideration of newly discovered evidence. What is less obvious, is that the Court, should determine is there exists is a strong probability of a different result, less

consideration of the evidence adduced at trial. *State v. Gillespie*, 2nd Dist. No. 24456, para. 36, 2012-Ohio1656.

Although Petitioner believes that without the bite mark evidence the outcome of a new trial would be different or Hill would be "exonerated" this conclusion is not based in law or fact. Petitioner's asserts that the evidence supporting Hill's convictions was weak. To the contrary, considering the evidence "adduced" at trial, there is more than sufficient evidence to support Hill's conviction on Aggravated Murder and three death penalty specifications. *Compare*, *Gillespie, supra* (conviction based on identification of suspect made two years after crime).

The Ohio Supreme Court thoroughly reviewed the sufficiency of the evidence in this case when it affirmed the Petitioner's convictions. This Court previously recounted some of the salient findings of the Ohio Supreme Court in when it affirmed Hill's convictions. The majority of the Court's findings on sufficiency had nothing to do with the bite mark evidence.

The Supreme Court honed in on Hill's claim that he never participated in the assault and torture of Raymond Fife. The Court determined that the victim had been impaled repeatedly with both the blunt and sharp end of an instrument that was long enough to perforate the rectum and rupture the urinary bladder.

**"As an apparent result of the agony of the cumulative torture, the victim was heard screaming continuously, for a period of twenty to thirty seconds, by a passerby. At this time witnesses observed Combs on the path behind the Valu-King."**

The Supreme Court discussed the issue of causation citing to Hill's incriminating admissions made to law enforcement on several occasions.

**"Additionally, appellant's own statement indicated he remained with the victim while Combs absented himself from the scene, and he did not go for help. This direct evidence**

base provides, at the very least, that appellant was the only other person {present} when the victim was experiencing the pinnacle of excruciating pain from these egregious assaults" *State v. Hill*, 1989 Ohio App. LEXIS 4462, at 84-85. (emphasis added).

The Court finds that the bite mark evidence contradicts and impeaches the trial evidence. *State v. Petro.* More significantly, however, when considering the sufficiency of the evidence on the Aggravated Murder count and the death penalty pecifications, in particular, the Kidnapping specification, the evidence does not create a strong possibility that the outcome would be any different if a new trial were granted pursuant to Crim. R. 33. *Dayton, supra.*

The Court grants the State's Civ. R. 12 (F) motion to strike the portions of Petitioner's motion for a new trial that added without leave of court.

The decision to conduct an evidentiary hearing , as with the decision whether to grant a motion for new trial is entrusted to the sound discretion of the trial court. *State v. Smith*, 30 Ohio App. 3d 138, 139, 506 N.E.2d 1205 (9th Dist. 1986); *Toledo v. Stuart*, 11 Ohio App.2d 292, 293, 11 OBR 557, 456 N.E.2d 474 (6th Dist. 1983).

**For all of the foregoing reasons, the Petitioner's motion for a new trial is DENIED.**

This is a final and appealable order. There is no just cause for delay.

IT IS SO ORDERED.

JUDGE PATRICIA A. COSGROVE

(Sitting by Assignment)
Ohio Constitution
Art. IV, Sec. 6
15JA-0843

FILED
COURT OF COMMON PLEAS

OCT - 3 2016

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

cc: Trumbull County Prosecuting Dennis Watkins
    Assistant Trumbull Prosecuting Attorney
    Attorney Vicki Ruth Adams Werneke, Assistant Ohio Public Defender
    Attorney Sarah R. Kostick, Pro Bono Attorney for Petitioner
    Judge Patricia A. Cosgrove

<u>125 N.E.3d 158</u>
Court of Appeals of Ohio, Eleventh
District, Trumbull County.

STATE of Ohio, Plaintiff-Appellee,
v.
**Danny** Lee **HILL**,
Defendant-Appellant.

NO. 2016-T-0099
|
Decided 12/03/2018

**Synopsis**
**Background:** Defendant, convicted of aggravated murder, filed motions for new trial and to disqualify county prosecutor. The Court of Common Pleas, Trumbull County, No. 85 CR 317, denied the motions. Defendant appealed.

**Holdings:** The Court of Appeals, Diane V. Grendell, J., held that:

[1] trial court could strike portions of defendant's motion for new trial that exceeded scope of the issue related to the bite mark evidence;

[2] there was no evidence presented in defendant's motion for new trial that defendant was unavoidably delayed in obtaining expert testimony concerning victim's injuries and defendant's confession;

[3] trial court did not err in its application of res judicata and the law of the case doctrine;

[4] trial court did not fail to acknowledge that the bite mark evidence on the murder victim was newly discovered evidence;

[5] evidence supported trial court's conclusion that a new trial would not result in a different outcome;

[6] trial court did not abuse its discretion by denying defendant's motion for a new trial without holding an evidentiary hearing; and

[7] there was no actual breach of confidence resulting in prejudice to defendant by defendant's former trial counsel taking position with county prosecutor's office.

Affirmed.

Thomas R. Wright, P.J., concurred in judgment only.

Colleen Mary O'Toole, J., dissented with opinion.

**Procedural Posture(s):** Appellate Review; Post-Conviction Review.

West Headnotes (19)

[1]     **Criminal Law** ⬧ Newly
        Discovered Evidence
        **Criminal Law** ⬧ Time for Making
        When considering an untimely motion for new trial based on newly discovered evidence, a trial court is required to engage in a two-step process, first determining whether

**Habeas Petition Exhibit 2**
**1 of 26**

the motion should be allowed and then considering the merits thereof. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[2]** **Criminal Law** ⬤ Newly Discovered Evidence

To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[3]** **Criminal Law** ⬤ Time for Making

A trial court considering an untimely motion for a new trial would only need to consider whether evidence is, in fact, newly discovered if it finds that defendant had no knowledge of the existence of the ground supporting the motion and could not have learned of that existence within the time prescribed for filing the motion in the exercise of reasonable

diligence. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[4]** **Criminal Law** ⬤ Newly Discovered Evidence

**Criminal Law** ⬤ Surprise and newly discovered evidence

The allowance of a motion for a new trial on the grounds of newly discovered evidence is within the competence and discretion of the trial judge; and in the absence of a clear showing of abuse such decision will not be disturbed. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[5]** **Criminal Law** ⬤ Scope of assignment

The trial court granted defendant leave to file his motion for a new trial only on the basis of bite mark evidence found on the murder victim and presented at trial, and therefore the trial court could strike portions of defendant's motion for new trial that exceeded scope of the issue related to the bite mark evidence; defendant's request for leave only referenced the bite mark evidence, and defendant's two witnesses at evidentiary hearing only discussed the bite mark evidence. (Per Diane V. Grendell, J., with one judge concurring in judgment only.) Ohio Civ. R. 12(F).

Case: 4:20-cv-01343-JRA Doc #: 1-2 Filed: 06/22/20 3 of 26. PageID #: 341

**[6]** **Criminal Law** ⬌ **What constitutes newly discovered evidence in general**

There was no evidence presented in defendant's motion for new trial that defendant was unavoidably delayed in obtaining testimony from doctor challenging the opinions of pathologist regarding the victim's injuries and testimony from doctor opining that little weight should be given to defendant's confession as evidence of his guilt; grounds for their testimony were expressly acknowledged at time of trial, and many of the points raised by the doctor opining about defendant's confession were raised by trial counsel. (Per Diane V. Grendell, J., with one judge concurring in judgment only.) Ohio Civ. R. 12(F).

**[7]** **Judgment** ⬌ **Criminal prosecutions**

Where leave to file a motion for new trial is based on issues that could have been raised on direct appeal the doctrine of res judicata is properly invoked to deny leave. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[8]** **Criminal Law** ⬌ **Particular evidence or cases**

**Judgment** ⬌ **Criminal prosecutions**

The trial court did not err in its application of res judicata and the law of the case doctrine in its denial of defendant's motion for a new trial based on newly discovered evidence related to bite mark evidence on the murder victim presented at trial; the bite mark evidence did nothing to vitiate the sufficiency of the overwhelming evidence against defendant. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[9]** **Criminal Law** ⬌ **Determination**

The trial court determining whether to grant defendant's motion for new trial did not fail to acknowledge that the bite mark evidence on the murder victim was newly discovered evidence; trial court explicitly referred to "new evidence relating to bite mark evidence," and trial court subjected the bite mark evidence to an analysis to determine whether newly discovered evidence warranted the granting of a motion for a new trial. (Per Diane V. Grendell, J., with one judge concurring in judgment only.) Ohio Crim. R. 33.

**[10]** **Criminal Law** ⬌ **Particular evidence or cases**

Case: 4:20-cv-01343-JRA Doc #: 1-1 Filed: 06/12/20 42 of 26. PageID #: 342

Defendant's presence during murder of victim could not be seriously questioned, and therefore evidence supported the trial court's conclusion that a new trial would not result in a different outcome; witnesses observed defendant with other principal convicted of the murder in area in which victim was later found, witness observed defendant toss stick that matched description of that which was used during the attack, defendant attempted to implicate persons who were not found to have any connection with the crime, defendant misled police about his involvement by denying his presence at crime scene and his association with other principal convicted for murdering the victim, and defendant's brother testified that several days after the attack he observed defendant washing a pair of pants that were stained with something red that "looked like blood." (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[11] Criminal Law** ☞ Degree of proof
**Criminal Law** ☞ Relative strength of circumstantial and direct evidence

Circumstantial evidence and direct evidence inherently possess the same probative value, and when the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for

such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[12] Homicide** ☞ Homicide in General

Circumstantial evidence alone may be sufficient to support a conviction for murder. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[13] Criminal Law** ☞ Subsequent Condition or Conduct of Accused

The fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[14] Criminal Law** ☞ Suppression or destruction of evidence, or misrepresentations to avoid suspicion or cast it upon another

Exculpatory statements, when shown to be false or misleading, are circumstantial evidence of guilty consciousness and have independent probative value. (Per Diane V.

Grendell, J., with one judge concurring in judgment only.)

**[15]** **Criminal Law** 👈 Hearing and rehearing in general

The trial court did not abuse its discretion by denying defendant's motion for a new trial without holding an evidentiary hearing; trial court did not question the validity of defendant's newly discovered bite mark evidence and proceeded on the assumption that his evidence would have precluded the admission of the State's evidence at trial, and trial court then considered whether the absence of bite mark evidence would have been outcome determinative. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

🚩 Ohio Crim. R. 33.

**[16]** **Criminal Law** 👈 Hearing and rehearing in general

Rule of criminal procedure governing a new trial does not require a hearing on a motion for new trial and the decision to conduct a hearing lies within the sound discretion of the trial court. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

🚩 Ohio Crim. R. 33.

**[17]** **Criminal Law** 👈 Disqualification of one prosecutor affecting or imputed to the rest of the office

There was no actual breach of confidence resulting in prejudice to defendant by defendant's former trial counsel taking a position with county prosecutor's office; defendant proffered no evidence of an actual breach of confidence resulting from his former trial counsel's employment by prosecutor's office. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[18]** **Criminal Law** 👈 Disqualification of Prosecutor

Hiring of defendant's uncle as an investigator with public defender's office and victim's mother as a victim's advocate with prosecutor's office had no bearing on whether county prosecutor's office should have been disqualified; neither defendant's uncle nor victim's mother were attorneys. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**[19]** **Criminal Law** 👈 Decisions on motion for new trial

Circumstantial evidence overwhelmingly pointed toward defendant's guilt in aggravated murder convictions, and therefore the trial court did not commit

prejudicial and reversible error when it failed to consider and rule on defendant's argument in motion for a new trial that expert testimony on behalf of the State should have been treated as fabrication. (Per Diane V. Grendell, J., with one judge concurring in judgment only.)

**\*161** Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 85 CR 317.

### Attorneys and Law Firms

Dennis Watkins, Trumbull County Prosecutor, and LuWayne Annos, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

Sarah Kostick, 33 N. Stone Avenue, 21st Floor, Tucson, AZ 85701, and Vicki Ruth Adams Werneke, Assistant Federal Public Defender, 1660 West Second Street, Suite 750, Cleveland, OH 44113 (For Defendant-Appellant).

### OPINION

DIANE V. GRENDELL, J.

{¶ 1} Defendant-appellant, **Danny** Lee **Hill**, appeals the decisions of the Trumbull County Court of Common Pleas to deny his Motion for New Trial without hearing and to deny his Motion to Disqualify the Office of the Trumbull County Prosecutor. The issues before this court are whether a trial court may strike portions of a motion for new trial based on newly discovered evidence that exceeded the scope of the court's order granting leave to file the motion for new trial; whether the doctrines of res judicata and law of the case may be applied in analyzing the merits of a motion for new trial; whether a trial court must formally recognize evidence as newly discovered in its analysis of whether the evidence justifies the granting of a motion for new trial; whether an aggravated murder conviction may be sustained based solely on circumstantial evidence; whether a trial court errs in denying a motion for new trial without holding a hearing where the determinative issue turns on the probability of a different outcome at trial in the absence of certain evidence; whether a county prosecutor's office must be disqualified where defendant's former trial counsel takes a position with the office in the absence of actual prejudice; and whether a demonstration of the unreliability of bite mark evidence renders trial proceedings so fundamentally unfair as to deprive a defendant of due process. For the following reasons, we affirm the decision of the court below.

{¶ 2} On November 14, 2014, Hill filed a Request for Leave to File a Motion for New Trial pursuant to Ohio Criminal Rule 33(B). On November 20, 2014, the State filed its Response to Hill's Request, to which Hill filed a Reply on February 12, 2015. On May 14, 2015, Hill filed Supplemental Authority in Relation to his Request for Leave to File a Motion for New Trial.

{¶ 3} On May 22, 2015, Hill filed a Motion to Disqualify the Office of the Trumbull County Prosecutor. On June 16, 2015, the State filed

Habeas Petition Exhibit 2
6 of 26

its Response to Hill's Motion to disqualify, to which Hill filed a Reply on July 7, 2015.

{¶ 4} On December 21, 2015, the trial court held an evidentiary hearing on Hill's Request for Leave, at the conclusion of which it orally denied the Motion to Disqualify the Office of the Trumbull County Prosecutor.

{¶ 5} On June 7, 2016, the trial court issued its Order on Petitioner's Request **162 for Leave to File a Motion for New Trial pursuant to Ohio Criminal Rule 33(B). The court noted that on January 31, 1986, after a trial presided over by a three-judge panel, Hill was found guilty of Aggravated Murder in violation of R.C. 2903.01(B) with Specifications for Kidnapping, Rape, and Aggravated Arson (Count # 1); Kidnapping in violation of R.C. 2905.01 (Count # 2); Rape in violation of R.C. 2907.02 (Count # 3); Aggravated Arson in violation of R.C. 2909.02 (Count # 4); and Felonious Sexual Penetration in violation of former R.C. 2907.12(A)(1) and (3) (Count # 6). The court further noted that, on March 5, 1986, Hill was sentenced to death for Aggravated Murder. [1]

[1]  Hill was sentenced to imprisonment for the indeterminate period of ten to twenty-five years for Kidnapping, the determinate period of life for Rape, the indeterminate period of ten to twenty-five years for Aggravated Arson, and the determinate period of life for Felonious Sexual Penetration.

{¶ 6} Hill's convictions are based on the murder of Raymond Fife on September 10, 1985. The factual record is set forth in detail in *State v. Hill*, 11th Dist. Trumbull Nos. 3720 and 3745, 1989 WL 142761 (Nov. 27, 1989), and *State v. Hill*, 64 Ohio St.3d 313, 595 N.E.2d 884 (1992).

{¶ 7} The trial court determined, by clear and convincing evidence, that Hill was unavoidably prevented from filing his Motion for Leave within the one hundred twenty day period provided for by Criminal Rule 33. The court noted that "[t]he crux of Petitioner's argument for leave to file a motion for new trial * * * pivots on the scientific advances in forensic odontology made since 1986 that call into question the reliability of bite mark evidence presented in Hill's trial." In 2013, the American Board of Forensic Odontology established new guidelines for bite mark analysis which could not have been discovered by any amount of due diligence in 1986. Moreover, the court found that "the local and state Public Defender's Office had a conflict of interest in preparing and filing the motion for leave for a new trial" resulting in unavoidable further delay.

{¶ 8} On these grounds, the trial court granted Hill leave to file a motion for new trial.

{¶ 9} On June 13, 2016, Hill filed a Motion for New Trial. On July 5, 2016, the State filed its Response, to which Hill filed a Reply on July 19, 2016.

{¶ 10} On June 16, 2016, the State filed a Motion to Strike Defendant's Motion for New Trial. On June 27, 2016, Hill filed a Response

{¶ 11} On September 21, 2016, Hill filed Supplemental Authority and Renewed Motion

for Evidentiary Hearing. On September 23, 2016, the State filed its Response, to which Hill filed a Reply on September 26, 2016.

{¶ 12} On October 3, 2016, the trial court issued its Order on Petitioner's Motion for Evidentiary Hearing on Motion for New Trial.

{¶ 13} With respect to the State's Motion to Strike, the trial court found that, in his June 13, 2016 Motion for New Trial, Hill "included issues that were never raised in his prior motion for leave to file a new trial motion." These issues included "the voluntariness of Hill's statements given to the Warren Police Department after the murder of Raymond Fife in 1985" and Dr. Adelman's testimony regarding "the stick or broomstick handle that was introduced by the State at Hill's trial." The court found these additional claims, "unilaterally added by Petitioner in his motion for new trial," to be redundant, impertinent, and immaterial under Civil Rule 12(F). Moreover, the court found "any further **\*163** discussion of these claims * * * barred by the '*law of the case*' doctrine and '*res judicata*.'" The court ordered these claims stricken.

{¶ 14} The trial court then considered whether Hill's newly discovered bite mark evidence, even if contradicting or impeaching prior trial testimony, "can serve as the basis for a new trial in this case," which question turned on "whether the bite mark evidence creates a 'strong probability' that there would be a different outcome in a future trial." Without conducting an evidentiary hearing on the issue, the court concluded that, "even if the bite mark evidence is excluded, considering the totality of the evidence against the Petitioner, particularly

on the Kidnapping specification, Petitioner has failed to demonstrate a 'strong probability' that there would be a different outcome if a new trial were granted in this case." In reaching its conclusion, the court noted that the "Ohio Supreme Court thoroughly reviewed the sufficiency of the evidence in this case when it affirmed the Petitioner's convictions," and the "majority of the Court's findings on sufficiency had nothing to do with the bite mark evidence."

{¶ 15} Accordingly, the trial court denied Hill's Motion for New Trial.

{¶ 16} On October 26, 2016, Hill filed a Notice of Appeal. On appeal, Hill raises the following assignments of error.

{¶ 17} "[1.] The trial court committed prejudicial and reversible error when it held it was precluded under the doctrines of *res judicata* and/or 'law of the case' from an independent review of the evidentiary record and/or an independent determination of the merits of Mr. Hill's motion for new trial based on newly discovered evidence, thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶ 18} "[2.] The trial court committed prejudicial error when it held that Mr. Hill's new evidence did not satisfy the requirements of *State v. Petro* because the bitemark evidence proffered by Mr. Hill did not create a 'strong probability' of a different result if Mr. Hill is granted a new trial thus denying Mr. Hill due process of law in violation of the Fifth,

Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶ 19} "[3.] The trial court committed prejudicial and reversible error when it failed to hold that Mr. Hill's bitemark evidence constituted 'new evidence' under 🚩 Criminal Rule 33 and 📄 State v. Petro thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶ 20} "[4.] The trial court committed prejudicial and reversible error when it granted the State's Rule 12 motion to strike Mr. Hill's non-bitemark evidence based on an erroneous interpretation of 📄 State v. Petro and/or an inappropriate application of 'law of the case' and/or res judicata thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶ 21} "[5.] The trial court committed prejudicial and reversible error when it failed to conduct an evidentiary hearing before denying Mr. Hill's motion thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶ 22} "[6.] The trial court abused its discretion by not granting Mr. Hill's motion to disqualify the Trumbull County Prosecutor thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, **\*164** Eighth, and Fourteenth Amendments to the United States Constitution."

{¶ 23} "[7.] The trial court committed prejudicial and reversible error when it failed to consider and rule on Mr. Hill's argument that the fabricated expert evidence at his trial constituted a violation of his Eighth and Fourteenth Amendment rights."

[1] {¶ 24} When considering an untimely motion for new trial based on newly discovered evidence, a trial court is required to engage in a "two-step process," first determining whether the motion should be allowed and then considering the merits thereof. State v. Elersic, 11th Dist. Geauga No. 2006-G-2740, 2007-Ohio-3371, 2007 WL 1881496, ¶ 23.

{¶ 25} With respect to the timeliness requirement, the Rules of Criminal Procedure provide:

> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering

the evidence within the one hundred twenty day period.

Crim.R. 33(B).

{¶ 26} With respect to the merits of a motion for new trial, Criminal Rule 33 provides:

> A new trial may be granted on motion of the defendant * * * [w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach

the affidavits of such witnesses.

Crim.R. 33(A)(6).

**[2]** {¶ 27} "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227 (1993), citing *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

**[3]** {¶ 28} Moreover, a "trial court would only need to consider whether the evidence is, in fact, 'newly discovered' if it finds that appellant 'had no knowledge of the existence of the ground supporting the motion and could not have learned of that existence within the time prescribed for filing the motion in the exercise of reasonable diligence.' " (Citation omitted.) *State v. Trimble*, 2015-Ohio-942, 30 N.E.3d 222, ¶ 19 (11th Dist.).

***165** **[4]** {¶ 29} "The allowance of a motion for a new trial on the grounds of newly discovered evidence is within the competence and discretion of the trial judge; and in the absence of a clear showing of abuse such decision will not be disturbed." *State v. Williams*, 43 Ohio St.2d 88, 330 N.E.2d 891

(1975), paragraph two of the syllabus; *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph one of the syllabus.

{¶ 30} Hill's assignments of error will be considered out of order.

**[5]** **[6]** {¶ 31} In the fourth assignment of error, Hill contends that the trial court erred in applying Civil Rule 12(F) to strike portions of his Motion for New Trial.

{¶ 32} Civil Rule 12(F) provides: "Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within twenty-eight days after the service of the pleading upon him or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient claim or defense or any redundant, immaterial, impertinent, or scandalous matter."

{¶ 33} Hill notes that the "trial court cited no authority for applying Civil Rule 12(F) in a criminal context." Appellant's brief at 41. On the contrary, the trial court cited to Criminal Rule 57(B) which provides: "If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules of criminal procedure, and shall look to the rules of civil procedure and to the applicable law if no rule of criminal procedure exists." *Compare State v. Schlee*, 117 Ohio St.3d 153, 2008-Ohio-545, 882 N.E.2d 431, ¶ 10 ("the plain language of Crim.R. 57(B) permits a trial court in a criminal case to look to the Rules of Civil Procedure for guidance when no applicable Rule of Criminal Procedure exists"); *Elersic*, 2007-Ohio-3371,

at ¶ 23 (Criminal Rule 33 "does not specify the procedure by which the initial order is to be obtained"). The court also cited precedent for striking a reply brief when it was not filed by rule or with leave of the court. *State ex rel. Ebbing v. Ricketts*, 133 Ohio St.3d 339, 2012-Ohio-4699, 978 N.E.2d 188, ¶ 15.

{¶ 34} In the present case, the trial court granted the State's Motion to Strike to the extent that Hill's Motion for New Trial included material supporting additional claims beyond the scope of Hill's Motion for Leave, which was "limited * * * to the issue of the scientific reliability of bite mark evidence based upon the scientific advances in [the] field of forensic dentistry and the 2013 ABFO guidelines." These materials included the affidavits of Dr. Zhongxue Hua (challenging the opinions of pathologist Dr. Howard Adelman regarding the victim's injuries), Dr. Stephen Greenspan (challenging opinions proffered in the course of proceedings on Hill's *Atkins* petition), and Dr. Deborah Davis (opining that "little weight should be given to [Hill's] confession [2] as evidence of guilt").

[2]     As a practical matter, Hill never confessed to inflicting any harm to the victim but, rather, made incriminating/ inculpatory statements.

{¶ 35} The trial court understood that it had granted Hill leave to file his Motion for a New Trial only on the basis of bite mark evidence. This conclusion is hardly controversial given that Hill's Request for Leave only referenced and/or discussed bite mark evidence. *See* pages 11 to 13 of the Request for Leave discussing "newly discovered evidence" and

"due diligence." Moreover, at the evidentiary hearing held on the Request for Leave, Hill's two witnesses only discussed the bite mark evidence. **166** Accordingly, we reject Hill's argument that there was "an absence of any formal direction to Mr. Hill that he must confine his motion for new trial solely to bite mark issues." Appellant's brief at 43. The trial court could not be expected to grant leave beyond what was formally sought and argued for by Hill.

{¶ 36} Hill also contends that the affidavits in question are "new" inasmuch as "[n]either Dr. Hua nor Dr. Davis have previously testified on behalf of Mr. Hill" and "[n]o court has ever ruled on the admissibility or inadmissibility of their testimony." Appellant's brief at 43. Hill's argument fails to appreciate that the crucial issue is whether there was unavoidable delay in obtaining their testimony. Dr. Hua's affidavit essentially concedes that his opinions are not based on any advances in scientific knowledge. He states: "At no point, *including at the time the opinions were proffered in 1985-86 or today*, has there been a reliable scientific basis for Dr. Adelman's testimony regarding the nature of the wounds to Raymond Fife's rectum, or any object purportedly used to create those wounds." [3] Dr. Davis offers nothing more than her opinion that "Danny Hill's confession was highly unreliable" based "on the evidence surrounding the interrogations themselves and Danny's personal characteristics."

[3] Dr. Hua also challenged the validity of Dr. Adelman's trial testimony regarding asphyxia and erection. As this testimony pertained to the bitemark evidence on which the Request for

Leave was granted, it should have been and in fact was considered by the trial court in ruling on the merits of the Motion for New Trial. The court stated: "The Petitioner submitted an affidavit from Dr. Zhongxue Hua. Dr. Hua criticized the testimony of Dr. Adelman and Dr. Mertz and concluded that there was no scientific basis to support their conclusions that Fife's penis was erect at the time the patterned injuries occurred."

{¶ 37} Nothing about these affidavits suggests that Hill could not have learned of the existence of the grounds for their testimony in the exercise of reasonable diligence. On the contrary, the grounds for Hua's and Davis' testimony were expressly acknowledged at the time of trial. At trial, counsel for Hill spoke derisively of Dr. Adelman's testimony identifying the stick that was used to sodomize Fife:

> This must be the stick! So, they submit it, and at a point in time * * * Mr. Adelman comes up with the conclusion this could be the stick. Well, he's assuming, first off, it's a stick or piece of wood of some sort, okay, evidentally [sic], from the plant material later on, but he assumes it's the stick. So, he shows sections and everything else, and yeah, it could have caused that. You could have taken any broom handle, anything;

implement handle, anything, split it, crack it like it usually does like that, and it probably would have fit also. The prosecutor's got this wonderful stick. This is evidence. Boy! That is great!

{¶ 38} Similarly, many of the salient points raised by Dr. Davis were previously raised by trial counsel. He emphasized that Hill had been placed in classes for the educable mentally retarded since the first grade. Counsel also suggested that the officers and detectives were fully aware of Hill's diminished capacity and intentionally interrogated Hill before his more intellectually competent co-principal, Timothy Combs, because "they know damn well how basically stupid Danny is and they could break him down." Both Davis and trial counsel describe Hill's statements as being the product of manipulative interrogation techniques and inherently unreliable.

{¶ 39} In the absence of any evidence that Hill was unavoidably delayed in obtaining the testimony of Drs. Hua and **167 Davis, their testimony was properly struck from consideration by the trial court as the court could not have properly considered its merits. *Trimble*, 2015-Ohio-942, 30 N.E.3d 222, at ¶ 12 ("[a] trial court may not consider the merits of the motion for a new trial until it makes a finding of unavoidable delay"); *State v. Rodriguez-Baron*, 7th Dist. Mahoning No. 12-MA-44, 2012-Ohio-5360, 2012 WL 5863613, ¶ 11 ("[l]eave of court must be granted before the merits of the motion are reached").

{¶ 40} Hill also objects to the trial court's reference to res judicata and the law of the case doctrine as barring further discussion of the issues raised by Drs. Hua and Davis. For the law of the case doctrine, *see Nolan v. Nolan, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984)* ("the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels"); for res judicata, *see State v. Szefcyk, 77 Ohio St.3d 93, 671 N.E.2d 233 (1996),* syllabus ("a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment").

**[7]** {¶ 41} We note, however, that, where leave to file a motion for new trial is based on issues that could have been raised on direct appeal the doctrine of res judicata is properly invoked to deny leave. *State v. Shuster,* 5th Dist. Morgan No. 16AP0012, 2017-Ohio-2776, 2017 WL 2258804, ¶ 18 (cases cited).

{¶ 42} The fourth assignment of error is without merit.

**[8]** {¶ 43} In his first assignment of error, Hill contends that the trial court erred in its application of res judicata and the law of the case doctrine as a way of excusing itself "from engaging in an independent re-examination of the new evidence and evidentiary record as required by Criminal Rule 33 and *State*

*v. Petro.*" Since "the trial court's denial of Mr. Hill's motion rests upon its finding of preclusion, * * * its Order must be reversed." Appellant's brief at 11-12.

{¶ 44} The trial court invoked the law of the case doctrine and res judicata to establish the following as binding: "[t]he Ohio Supreme Court independently weighed all of the trial evidence and found that Petitioner's conviction for Aggravated Murder and the rape specification, as well [as] the kidnapping and aggravated arson specifications, were supported by evidence beyond a reasonable doubt." We disagree, however, that the court based its denial of Hill's Motion for New Trial solely on the Supreme Court's determination that there was sufficient evidence to support Hill's convictions.

{¶ 45} The trial court did independently consider whether the bite mark evidence satisfied the standard set by *Petro*, in particular whether the evidence disclosed a "strong probability" that it would change the outcome if a new trial were granted, albeit not doing so "in a jurisprudential vacuum." The court appealed to prior judicial review of the evidence to convict Hill to support its own conclusion that Hill's convictions could stand independently of the bite mark evidence.

{¶ 46} The trial court frankly acknowledged that "[t]he granting of a new trial based on newly discovered evidence by its obvious terms involves consideration of newly discovered evidence." The court noted the "relevancy of bite-mark testimony [as] a factor in proving whether Hill's **168** mouth came into contact with the victim's penis," but "had no relevance

on the question of whether Hill had anal intercourse with Fife." Similarly, "the bite mark evidence does nothing to vitiate the sufficiency of the overwhelming evidence against the Petition on the Kidnapping specification to the Aggravated Murder count," and the same could be said of the Aggravated Arson charge. The court's appeal to the Supreme Court's review of the evidence is used to support its conclusion that Hill's convictions remain valid even in the absence of the bite mark evidence, rather than the proposition that consideration of Hill's evidence is foreclosed. Hill may certainly disagree with the court's conclusion regarding the significance of the bite mark evidence to his convictions, but this does not render the court's invocation of res judicata and the law of the case doctrine reversible error per se.

{¶ 47} The first assignment of error is without merit.

**[9]** {¶ 48} In the third assignment of error, Hill faults the trial court for "never formally acknowledg[ing] that Mr. Hill's bitemark evidence constituted new evidence pursuant to Criminal Rule 33." Appellant's brief at 26.

{¶ 49} Hill's argument is undermined by the trial court's own statements acknowledging that the bite mark evidence is newly discovered evidence. *See, e.g.,* "this Court, in its discretion granted leave to Petitioner to file a motion for new trial, finding that the Petitioner was 'unavoidably prevented' from discovering new evidence relating to 'bite mark' evidence that was not in existence at the time of Petitioner's trial," and "[t]he *sole basis* of Petitioner's motion for leave to file a motion for a new trial is predicated on 'newly discovered' bite mark

evidence that did not exist in 1985." Moreover, the court subjected Hill's bite mark evidence to the *Petro* analysis, which action would be nonsensical unless the evidence was considered newly discovered evidence.

{¶ 50} The third assignment of error is without merit.

[10] {¶ 51} In the second assignment of error, Hill challenges the trial court's decision to deny his Motion for New Trial on the grounds that, "even if the bite mark evidence is excluded, considering the totality of the evidence against the Petitioner, particularly on the Kidnapping specification, Petitioner has failed to demonstrate a 'strong probability' that there would be a different outcome if a new trial were granted in this case." Hill counters that, in the absence of the bite mark evidence, "there existed *no other direct evidence* supporting Mr. Hill's active involvement in those specific crimes." Appellant's brief at 22. Thus, the court could not simply assume, based on the sufficiency of the non-bite mark evidence, that the results of Hill's trial would have been the same. According to Hill, "the bitemark was essential to showing that [he] was an active participant, not a passive accomplice." Appellant's brief at 24.

[11]   [12] {¶ 52} Before considering the trial evidence, it should be emphasized that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value," and that, "[w]hen the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in

order to support a conviction." *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. It follows that "circumstantial evidence alone may be sufficient to support a conviction for murder." **\*169** *State v. Nicely,* 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988), paragraph one of the syllabus.

[13] {¶ 53} It should also be recognized that: "It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." (Citation omitted.) *State v. Williams,* 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997); *State v. Wagner,* 8th Dist. Cuyahoga No. 48433, 1985 WL 7448, \*2 (Jan. 17, 1985) ("Ohio law is clear that evidence of flight from the scene of a crime may be considered as some evidence of guilt").

[14] {¶ 54} Similarly, exculpatory statements, "when shown to be false or misleading, are circumstantial evidence of guilty consciousness and have independent probative value." (Citation omitted.) *State v. Thompson,* 10th Dist. Franklin No. 05AP-1268, 2006-Ohio-3440, 2006 WL 1826737, ¶ 21; *Wilson v. United States,* 162 U.S. 613, 620-621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896) ("if the jury were satisfied, from the evidence, that false statements in the case were made by defendant * * *, they had the right * * * to regard false statements in explanation or defense, made or procured to be made, as in themselves tending to show guilt").

{¶ 55} Turning to the evidence at trial, it cannot be reasonably doubted that Hill was present during the kidnapping, assault, rape, and burning of Fife. The issue, then, is whether there was evidence from which Hill's participation in the kidnapping, assault, rape, and burning of Fife may be inferred. Finally, we must consider whether there was a strong probability of Hill's convictions in the absence of the bite mark evidence. [4]

[4]    The focus is not whether the bite mark evidence contributed to Hill's convictions, which it certainly did, but, rather, was there a strong probability of conviction had such evidence not been presented.

{¶ 56} The testimony from the following witnesses established Hill's presence with Combs at the scene of the crime both before and after the attack:

{¶ 57} Matthew Hunter, a student at Warren Western Reserve on September 10, 1985, saw Hill and Combs together while he was cutting grass for a neighbor on Jackson Street at about 3:00 p.m. Later that afternoon, around 5:00 p.m., Hunter took a trail through a wooded area from Jackson Street to the Valu-King on Palmyra Road. At this time, Hunter saw Hill and Combs "in the parking lot coming towards the store." Hunter went into the store to purchase cookies and juice. Upon exiting, he saw Hill and Combs standing in front of a Laundromat connected to the Valu-King. After passing by Hill and Combs, Hunter saw "Raymond Fife coming in the parking lot off Palmyra Road" on a bike. Hunter described the bike as "a small dirt bike," red with

"knobby tires." Hunter re-entered the woods and returned home.

{¶ 58} Darren Ball, a student at Warren Western Reserve at the time, was walking home with a friend, Troy Cree, after football practice at about 5:30 p.m. From Willow Drive, they entered a trail leading through a field/woods toward the Valu-King. They met Combs on the trail "coming from the Valu-King." After acknowledging Combs, they jogged for about twenty seconds to the end of the trail where they heard a child's scream "like somebody needed help or something." Ball explained that they began to jog because Combs is "a fag" and "does it on boys." Upon hearing the scream, Ball turned around but did not see Combs.

**\*170** {¶ 59} Cree likewise recalled passing Combs on the trail and hearing a child scream about thirty seconds later.

{¶ 60} Donald Allgood, a student at Warren Western Reserve, was walking on Willow Drive around 5:30, 6:00 p.m. and saw Hill, Combs, Andre McCain, and one other person "walking out of the field coming from Valu-King." From Willow, they turned north on Hemlock Avenue. Allgood observed that Hill "with a little flick of his wrist * * * threw a stick to his right." Allgood estimated the stick to be about twelve inches long. Allgood noted that Combs was pulling up his zipper and held his head down.

{¶ 61} Raymond Fife was found that evening by his father in the wooded area behind the Valu-King.

{¶ 62} On September 12, 1985, the day that Fife died from his injuries, Hill came to the Warren Police Department claiming to have "some information about that boy that was beat up." At this point, Hill had not been contacted by the police in connection with the crime. Hill spoke with Sergeant Thomas Stewart and offered that he had seen a person named Reecie Lowry riding Fife's bike. Hill correctly described the bike as a reddish dirt bike with knob wheels. Hill could not explain how he knew it was Fife's bike. When asked if Lowry still had the bike, Hill replied that Lowry probably had put the bike back in the field where Fife was attacked (and where the bike was found the next day). Hill also mentioned seeing Lowry together with Andre McCain. Another detail of the attack mentioned by Hill was Fife had been choked with underwear.

{¶ 63} Earlier that day, the police had learned from Cree that Combs had been in the woods behind the Valu‑King at the time of the attack (as noted above, neither Cree nor Ball had seen Hill or Fife although they had heard a child's scream). Since Combs was a suspect, Sergeant Stewart mentioned his name. Hill responded by suggesting that Combs "could have done it," since he "likes to * * * mess with [white boys] in the butt." However, Hill denied seeing Combs since Combs had been released from "the joint."

{¶ 64} On September 13, 1985, Hill was interviewed by Detective Dennis Steinbeck. Hill claimed that, on September 10, he was at home sleeping until 7:00 p.m. Hill repeated his statements that he had seen Lowry on Fife's bike on a couple of occasions since the attack; he had not seen Combs since he had gone to

jail; and he was not present at the Palmyra Road Valu‑King.

{¶ 65} Hill's initial statements to the police are indicative of his guilt for several reasons. In them, he tried to implicate persons in the crime who were not found to have any connection with the crime. Hill also misled the police about his own involvement by denying his presence at the crime scene and his association with the other principal convicted for murdering Fife.

{¶ 66} On September 16, 1985, Hill was brought to the police station by Detectives Steinbeck and Morris Hill (Danny's uncle). Hill consented to conduct recorded interviews, one audio and the other video. Hill admitted that he was with Combs when Fife was attacked but denied participating. Hill's statements during the interviews were generally inconsistent and incoherent. Hill claimed it was Combs' idea to attack Fife in order to take his bike. Hill described the attack in some detail. Some details were corroborated by other evidence and some details were demonstrably false. Some details were suggested by police officers and some Hill proffered of his own accord. Hill's description of the attack also varied as he told it. For example, *171 when asked by the police Hill affirmed in both the audio and video interviews that Fife vomited during the assault, a detail confirmed by emergency personnel.[5] However, in the audio interview Fife vomited because Combs had smashed his head against the bike pedal while in the video interview Fife vomited because Combs was abusing his genitals.

<sup>5</sup> EMT Raleigh Hughes spoke with Fife's father who described his son as "engulfed with vomit" and having "vomited all over himself." Hughes himself did not observe any vomit as the father wiped it off prior to his arrival.

{¶ 67} Hill's account of his own behavior during the assault was similarly inconsistent. At one point, Hill remained by the Valu-King and watched the attack from a distance. At another point, Hill was only a few feet from the attack. At another point, Hill had taken a board with the intent of hitting Combs with it. At another point, Hill was left alone with Fife while Combs went to Valu-King.

{¶ 68} While much of Hill's testimony is of doubtful veracity, Hill betrays his guilt by making several statements which were not suggested by police, were contradicted by other evidence or were of an incredible nature, and served to deflect blame away from him.

{¶ 69} Hill consistently testified that, after the attack, he chased and/or followed Combs out of the field onto Jackson Street, despite the police suggesting that they exited onto Willow Drive as witnessed by Allgood. It was necessary for the otherwise suggestible Hill to deny being seen exiting onto Willow Drive because Allgood, in addition to seeing him in Combs' company, testified that Hill possessed a stick matching the description of the stick used to sodomize Fife.

{¶ 70} Dr. Adelman testified that one of Fife's several mortal injuries was "the penetration and perforation of the rectum and the urinary bladder." He described two wounds in particular, a contusion in the rectum and a penetration into the urinary bladder through the rectum. Dr. Adelman was able to identify the presence of plant cells in the injured areas of the rectum and bladder.

{¶ 71} Allgood testified that he observed Hill throw a stick about twelve inches long back into the woods. During the September 16 interviews, Hill described a stick which he claimed Combs used to sodomize Fife as "like a broom handle thing * * * but some of it was broke"; "it had ridged ends like and the other end wasn't ridged, it had like a round -- it was like a round head." After Combs had finished "grind[ing] it in his butt," Hill "didn't see the stick no more" because Combs "must of just threw it."

{¶ 72} Notably, Hill advised the police that the stick would not or could not be found. Hill suggested that a garbage man might have come and taken the stick, insisting, despite police incredulity, that "they come back there to pick up the garbage." Hill added that Combs might have returned and picked up the stick and, alternatively, that Combs was looking for the stick the next day but was unable to find it.

{¶ 73} On the same day that Hill was providing these statements to the police, Officer James Teeple was searching the area near Willow Drive where Allgood had seen Hill throw the stick (Allgood had been taken to the scene and pointed out the specific area police officers). Teeple found a stick matching Hill's (yet unknown) description - a broken broom handle - about six feet from the path. Teeple focused on this particular stick because in size it matched Allgood's description and because "it appeared

to have been freshly **\*172** put": "All the other sticks were under grass, were covered with moss, were securely attached or growing there. It looked like a broom handle and \* \* \* was not covered with any moss or it was not dirty, it wasn't grown with weeds."

{¶ 74} Although no blood or other physical evidence linking it to Fife was found on the stick, the inference remains reasonable that it was the stick involved and it was in Hill's possession as he exited the path. Even without this inference, Allgood's testimony remains that Hill exited the trail holding a twelve inch stick and a stick of that size is consistent with the injuries to Fife's rectum and bladder.

{¶ 75} Hill's own testimony also implicates him. Hunter testified that Hill and Combs were standing near Valu-King when Fife was approaching the parking lot. Hill claimed that Combs wanted Fife's bike and went after Fife for that purpose. Hill continued that Combs wanted him to help but he refused. Combs then went into the field several hundred feet distant while Hill remained by the building. From this position, Hill claimed he saw Combs knock Fife off the bike, strip Fife, begin to strangle him, and throw him to the ground. In the course of describing the events of the attack, Hill's position changes to within ten feet of the events he is describing, close enough that Fife, in Hill's words, "was looking at me, like he wanted me to come over there and get him." Hill's explanations as to how he came to join Combs in the woods are risible, as he variously describes hiding in the bushes and/or attempting to sneak up on Combs with a board to hit him. No factfinder would be bound to accept Hill's proffered reasons as to how he

came to be present in the woods where Fife was attacked. And any rational factfinder would be justified in inferring from Hill's proffered nonsense that his real motivation and reason for accompanying Combs was to participate in Fife's rape, beating, strangulation, burning, and, ultimately, murder.

{¶ 76} There are other aspects of Hill's statements to the police that support his convictions. Hill was asked why he never attempted to contact the police, intervene in the attack, or seek medical help for Fife after the attack. Hill explained: "If I would have ran and tried to find my uncle [Detective Morris] or you or one of you all, tell one of you all -- his mother don't like me anyway. She would have found him down here, he would have went home and told his mother that I was the one that did it, and she would have followed him down here and said that she probably know that I would do something like that." While theoretically possible, the more reasonable inference is that Hill failed to report the crime because he committed the crime.

{¶ 77} Such examples could be multiplied. As a final point, it is worth noting that Hill admits he was left alone with Fife. According to Hill's statements, Combs left the scene to obtain a stick and/or lighter fluid used to sodomize and/or burn Fife respectively. There is some corroboration for this fact in the testimony of Ball and Cree who encountered Combs alone on the trail but who did not see either Hill or Fife, whose testimony also suggests that Combs may have been serving as a lookout for Hill. Whether Combs was looking for a stick or serving as lookout, the fact remains that Combs

trusted Hill to be left alone with Fife from which the obvious implication may be inferred.

{¶ 78} Raymond Vaughn, Hill's brother, testified that on the evening of September 20, 1985, Hill was washing a pair of pants in the bathtub (the family did not have an automatic washer) that were stained with something red that "looked like blood." **173** Vaughn saw Hill wash the same pair of pants on two successive nights. [6]

[6] Hill contends Vaughn's testimony has little probative value because he recanted following trial. Reply brief at 28. Although Vaughn subsequently claimed his testimony was coerced, he also testified that he first confided his observations to his grandmother at the time Hill was arrested – prior to any possible coercion.

{¶ 79} The State also presented testimony pursuant to Evid.R. 404(B) and R.C. 2945.59 for the purpose of showing motive, plan, and identity of the defendant. Hill, 64 Ohio St.3d at 322, 595 N.E.2d 884. Candyce Jenkins testified that, in 1984, Hill anally raped and bit her during an attack in which he also threatened to sodomize her with a knife. [7] Mary Ann Brison testified that, in 1984, Hill raped her in the woods behind the Valu-King. Stephen Melius testified that, in 1984, he was in juvenile detention with Hill and that Hill importuned him to engage in homosexual acts.

[7] Hill maintains that Jenkins' testimony would have been inadmissible without the bite mark evidence but this is doubtful. Jenkins' testimony was nonetheless indicative of motive, plan, and identity inasmuch as Hill raped her anally, demonstrated a delight in inflicting pain, threatened sodomy with an inanimate object, and, according to Hill's own statement, disposed of evidence following the rape in the woods behind Valu-King where Fife was attacked.

{¶ 80} The foregoing evidence fairly supports the trial court's conclusion, "[e]ven if this Court were to conclude based on today's advance in forensic odontology and the ABFO guidelines, that the bite-mark evidence is unreliable and could not be introduced in a future trial, there is no probability, much less a strong probability that a new trial would result in a different outcome." That Hill was present during the attack cannot be seriously questioned. The issue is whether his active participation can be inferred from his efforts to conceal his involvement and to place the blame on others. Such an inference is legally permissible and, given the facts of the present case, compelling. Compare State v. Trewartha, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218, ¶ 40 (10th Dist.) (finding the following facts "more than enough for a jury to directly or circumstantially find defendant guilty of aggravated murder while committing an aggravated robbery": "[t]he state's witnesses linked defendant to procurement of the alleged murder weapon, placed defendant at the scene of the crime with the weapon, proximally connected defendant and the only other possible shooter to the victim at the time of the fatal gunshot, and associated defendant with property last seen on the victim's person").

{¶ 81} Although the foregoing analysis focuses on the sixth 🔖 *Petro* factor, the trial court noted without elaboration that "[t]here is no question that the advancements in forensic odontology impeach and contradict the trial testimony of the experts." Further considering this 🔖 *Petro* factor, it is noteworthy that Hill's trial counsel raised many of the same arguments advanced by Hill as newly discovered evidence, albeit without the endorsement of expert witnesses. Hill's bite-mark evidence is to a degree cumulative. For example, regarding the bite mark testimony, Hill's trial counsel emphasized that the two experts who testified at trial contradicted each other to such a degree that the reliability of the expertise itself was called into question:

> [I]f these are the giants; maybe the top two or third, fourth best * * *, if that's what we've got here and they disagree, what does that make the state of the evidence? How can you consider that? **\*174** * * * You got the two best supposedly, or at least Mr. Levine, I would say, is better, but you got two experienced people, and they give different opinions. Mr. Levine also said that it could be caused by -- he ruled out Mr. Combs because he didn't see any fractured teeth. Of course, he said it could be caused by any person. In other words,

the characteristics aren't that great that he would pin it down to anybody. Just a fractured tooth, maybe. So, what do we have? We don't have proof beyond a reasonable doubt involved in the tooth mark, and that's the only thing that really ties Danny in.

{¶ 82} Conversely, the prosecutor at trial made the point during closing arguments that the bite mark evidence was not at all necessary to convict Hill:

> [T]he other important factors in the evidence in this case and in --- especially through the pathologist, is that we know that no one person could have done all these things, and **Danny** Lee **Hill** knew that also. And this is a key. For example, when you listen to the tapes and the video cassette about knocking the boy off the bike and then removing the bike to hide it in the woods, how could one person take care of the little boy and get rid of the bike? And that makes more sense when we look at **Danny** Lee **Hill** himself; the fact that he came to the police station. Why? We know that he was trying to

Habeas Petition Exhibit 2
21 of 26

Case: 4:20-cv-01384-3RAD Doc #: 1-21 Filed: 06/22/20 22 of 26 PageID #: 360

take the blame from himself; to place the heat somewhere else. And he mentions two individuals by the name of Lowry and McCain. Talks about shorts. He talks about the bike that he saw Maurice Lowry on which he later admits were not true. But why, when he homes in to blame somebody initially, does he blame two people? Reason and common sense. That's all this case takes to realize that -- you don't even need two experts to say his teeth marks were on this little boy's penis -- he's guilty.

{¶ 83} The second assignment of error is without merit.

[15] {¶ 84} In the fifth assignment of error, Hill contends that the trial court abused its discretion by denying his Motion for New Trial without holding an evidentiary hearing. "In light of the trial court's inexperience with the facts of Mr. Hill's trial, its attempt to avoid independent analysis in favor of inapplicable theories of preclusion, and its repeated mischaracterization of the trial and appellate court records, an evidentiary hearing was, at a minimum, necessary." Appellant's brief at 53.

[16] {¶ 85} *Criminal Rule 33* does not require a hearing on a motion for new trial and the decision to conduct a hearing lies within the sound discretion of the trial court. *State v.*

*White,* 8th Dist. Cuyahoga No. 105430, 2017-Ohio-6984, 2017 WL 3189250, ¶ 28.

{¶ 86} We find no abuse of discretion in the trial court's decision not to hold a hearing on the Motion for New Trial. The court did not question the validity of Hill's bite mark evidence and proceeded on the assumption that his evidence would have precluded the admission of the State's evidence at trial. The court then considered whether the absence of bite mark evidence would have been outcome determinative. *Hill,* 64 Ohio St.3d at 333, 595 N.E.2d 884 (finding no abuse of discretion in the failure to hold a hearing where, even considering the newly discovered evidence, "the result of the defendant's trial would not have been different").

{¶ 87} The fifth assignment of error is without merit.

[17] [18] {¶ 88} In the sixth assignment of error, Hill argues that the trial court erred by denying his Motion to Disqualify **\*175** the Office of the Trumbull County Prosecutor.

{¶ 89} With respect to motions for disqualification, the Ohio Supreme Court has established the following test:

{¶ 90} In ruling on a motion for disqualification of either an individual (primary disqualification) or the entire firm (imputed disqualification) when an attorney has left a law firm and joined a firm representing the opposing party, a court must hold an evidentiary hearing and issue findings of fact using a three-part analysis:

Habeas Petition Exhibit 2
22 of 26

(1) Is there a substantial relationship between the matter at issue and the matter of the former firm's prior representation;

(2) If there is a substantial relationship between these matters, is the presumption of shared confidences within the former firm rebutted by evidence that the attorney had no personal contact with or knowledge of the related matter; and

(3) If the attorney did have personal contact with or knowledge of the related matter, did the new law firm erect adequate and timely screens to rebut a presumption of shared confidences wih the new firm so as to avoid imputed disqualification?

*Kala v. Aluminum Smelting & Refining Co, Inc.*, 81 Ohio St.3d 1, 688 N.E.2d 258 (1998), syllabus.

{¶ 91} When the motion for disqualification is directed against the entire prosecutor's office, however, Ohio courts of appeals have consistently held that the mere appearance of impropriety is insufficient to merit disqualification, and that there must be evidence of an actual breach of confidence resulting in prejudice to the defendant. *State v. Bachman*, 5th Dist. Stark No. 2014CA00188, 2015-Ohio-2054, 2015 WL 3421555, ¶ 24 (cases cited).

{¶ 92} Hill maintains that a conflict of interest exists as the result of his trial counsel, James Lewis, being hired by the prosecutor's office in January 2013, following his retirement from the Trumbull County Public Defender. Hill maintains this "creates a real and significant

conflict of interest that, by itself, warrants disqualification of the office." Appellant's brief at 54.

{¶ 93} Any presumption of shared confidences that may exist by virtue of the fact that Attorney Lewis began working for the county prosecutor's office were effectively rebutted by the following considerations. Lewis represented Hill from 1985 to 1986, but was not hired by the prosecutor's office until 2013. According to the State, Lewis was hired for a part-time position in the child support division and "has had no input in any felony case * * * includ[ing] any postconviction litigation or appeal filed by [Hill]." Hill's Motion to Disqualify was filed in May 2015, almost thirty years after Lewis' representation of Hill had terminated and was filed in connection with a Motion for New Trial based on newly discovered evidence, i.e., evidence discovered after Lewis' representation of Hill had ceased.

{¶ 94} Hill has proffered no evidence of an actual breach of confidence resulting from Attorney Lewis' employment by the prosecutor's office. Rather, Hill relies upon "the proposition that a presumption of shared confidences–and thus a conflict of interest– exists where a defendant's counsel later joins the prosecutor's office trying defendant's case." Reply brief at 39. The cases cited by Hill fail to substantiate this claim. *See Bachman*, 2015-Ohio-2054, at ¶ 24 ("[a] decree disqualifying the prosecutor's office should only be issued by a court when actual prejudice is demonstrated"); *State v. Richardson*, 2014-Ohio-3541, 17 N.E.3d 644, ¶ 32 (3d Dist.) ("the mere **\*176** appearance of impropriety in a government office is not sufficient, in and of

itself, to warrant disqualification of the entire office") (citation omitted).

{¶ 95} Hill also claims disqualification is merited on account of Attorney Lewis hiring Hill's uncle, Detective Morris Hill, as an investigator with the public defender's office and Fife's mother, Miriam Fife's, employment by the prosecutor's office as a victim's advocate. This court notes that neither Hill's uncle nor Fife's mother are attorneys and thus their employments, either past or present, have no bearing on whether the prosecutor's office should be disqualified under the framework established by *Kala*.

{¶ 96} The sixth assignment of error is without merit.

**[19]** {¶ 97} In the seventh and final assignment of error, Hill maintains that bite mark testimony of Dr. Curtis Mertz, who testified on behalf of the State at trial, "was so contrary to science and logic, and so demonstrably false, that it should be treated as pure fabrication." Appellant's brief at 57. Hill relies on the case of *Ege v. Yukins*, 485 F.3d 364 (6th Cir.2007), in which the federal court granted habeas relief on the grounds the bite mark evidence ("Dr. Warnick's statement that among the 3.5 million residents of the Detroit metropolitan area, Ege's teeth, and *only* Ege's teeth, could have made the mark on Thompson's cheek") was so egregiously prejudicial as to constitute the denial of fundamental fairness at trial. *Id.* at 375-376.

{¶ 98} *Ege* is readily distinguishable. Unlike the present case, in *Ege* "none of [the State's

non-bite mark evidence] placed Ege at the scene of Thompson's murder." *Id.* at 377. On the other hand, the *Ege* court recognized that, "[o]bviously, many cases are tried on nonphysical circumstantial evidence alone, and in many cases this circumstantial evidence overwhelmingly points toward the defendant's guilt." *Id.* Hill's is such a case.

{¶ 99} The seventh assignment of error is without merit.

{¶ 100} For the foregoing reasons, the decision of the Trumbull County Court of Common Pleas to deny Hill's Motion for New Trial without hearing and to deny his Motion to Disqualify the Office of the Trumbull County Prosecutor is affirmed. Costs to be taxed against appellant.

THOMAS R. WRIGHT, P.J., concurs in judgment only,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶ 101} Based on the decision in *Hill v. Anderson*, 881 F.3d 483 (6th Cir.2018), I would dismiss the instant appeal as moot. In that case, the United States District Court for the Northern District of Ohio had dismissed Hill's petition for habeas corpus, which was premised on the contention that his low intelligence prevents the death penalty from being applied to him; ineffective assistance of trial counsel; prosecutorial misconduct; and violation of his

due process rights. *Id.* at 486-487. On appeal, the Sixth Circuit affirmed the judgment of the district court regarding the last three claims, but reversed and remanded for the district court to grant Hill's petition on his claim his low intelligence prevents him from being executed. *Id.* at 487.

{¶ 102} In its lengthy analysis, the Sixth Circuit paid considerable attention to the decision of this court in *State v. Hill,* 177 Ohio App.3d 171, 2008-Ohio-3509, 894 N.E.2d 108 (11th Dist.) It found that this court misapplied the law regarding ***177** adaptive deficits, and misread the record regarding Hill's adaptive deficits. *Hill v. Anderson,* 881 F.3d at 492-501. [8]

---

[8]     I respectfully note that the Sixth Circuit cites to this writer's dissent in *Hill,* 177 Ohio App.3d 171, 894 N.E.2d 108, for which this writer received a storm of public attacks, with approval. *Hill v. Anderson,* 881 F.3d at 500.

{¶ 103} In *In re Guardianship of Weller,* 2d Dist. Montgomery No. 24337, 2011-Ohio-5816, 2011 WL 5452978, ¶ 7, the court stated:

{¶ 104} " 'The doctrine of mootness is rooted in the "case" or "controversy" language of Section 2, Article III of the United States Constitution and in the general notion of judicial restraint.' *James A. Keller, Inc. v. Flaherty* (1991), 74 Ohio App.3d 788, 791 [600 N.E.2d 736], * * *. 'While Ohio has no constitutional counterpart to Section 2, Article III, the courts of Ohio have long recognized that a court cannot entertain jurisdiction over a moot question.' *Id.* 'It has been long and well

established that it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect. It has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies.' *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14 [257 N.E.2d 371], * * *. In other words, an issue is moot when it has no practical significance, being instead merely hypothetical or academic." (Parallel citations omitted.)

{¶ 105} I admit the issues presented in the appeal before us, and those presented to the Sixth Circuit. Further, the State of Ohio might petition the United States Supreme Court for certiorari regarding the Sixth Circuit's decision. Pursuant to U.S. Sup.Ct. Rule 13(1), petitions for certiorari must be filed within 90 days of the date the lower court's decision becomes final. The Sixth Circuit denied the state's motion for rehearing en banc in *Hill v. Anderson* April 9, 2018, which means the state has until July 9, 2018 to petition the U.S. Supreme Court. [9] A further 60 days can be provided on a showing of good cause. U.S. Sup.Ct. Rule 13(5).

---

[9]     The 90 day period actually concludes July 8, 2018, which, however, is a Sunday.

{¶ 106} But, otherwise, unless and until the United States Supreme Court reverses the decision of the Sixth Circuit, any decision this court renders has no practical significance.

Case: 4:20-cv-01243-RAD Doc #: 1-21 Filed: 06/12/20 26 of 26. PageID #: 364

{¶ 107} Again, I would dismiss this appeal as moot.

{¶ 108} I dissent.

**All Citations**

125 N.E.3d 158, 2018 -Ohio- 4800

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# The Supreme Court of Ohio

FILED

JUN 12 2019

CLERK OF COURT
SUPREME COURT OF OHIO

State of Ohio

v.

Danny Lee Hill

Case No. 2019-0068

ENTRY

Upon consideration of the jurisdictional memoranda filed in this case, the court declines to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).

(Trumbull County Court of Appeals; No. 2016-T-0099)

Maureen O'Connor
Chief Justice

**The Official Case Announcement can be found at http://www.supremecourt.ohio.gov/ROD/docs/**

# IN THE COURT OF COMMON PLEAS
## TRUMBALL COUNTY, OHIO

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE STATE OF OHIO,              :

           Plaintiff,     :

                v.     :     Case No.: 85-CR-317

DANNY LEE HILL,          :

           Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF FRANKLIN D. WRIGHT, D.M.D.

I, Dr. Franklin D. Wright, hereby declare as follows:

## BACKGROUND

1.     I am a board-certified practicing forensic dentist with nearly three decades of experience as the forensic dental consultant to the Hamilton County, Ohio, Coroner's Office. I have presented lectures and workshops in forensic odontology throughout the United States, Europe, Central America, and South America, including to the President of the United States National Science and Technology Council, Committee on Science, Subcommittee on Forensic Science.

2.     I am a past president of the American Board of Forensic Odontology ("ABFO"), and currently chair of the ABFO Bitemark Proficiency Examination Development Committee.

3.     I have reviewed, investigated, and consulted on hundreds of bite-mark cases.

4.      I have been retained by the State of Ohio on numerous occasions to analyze bitemarks in criminal investigations and trials.  I have also testified on behalf of the State of Ohio in criminal trials, including homicides.

5.      A detailed curriculum vitae is attached as Exhibit A to this Affidavit.

6.      On January 26, 2014, Counsel for Danny Lee Hill requested that I review certain case files and evidence relating to the prosecution of Mr. Hill for the murder of Raymond Fife.  I understand that Mr. Hill was tried and convicted in the Trumbull County Court of Common Pleas in January 1986.  At that trial, the court heard testimony relating to alleged bitemark evidence from two forensic dentists: Dr. Curtis Mertz and Dr. Lowell Levine.  Such evidence is directly in my field of expertise.

7.      After my review of the materials provided to me, I authored a letter to Mr. Hill's counsel, dated March 30, 2014, in which I reported my findings.  This Affidavit confirms and supplements my findings as set forth in that letter, which is incorporated by reference and a copy of which is attached as Exhibit B to this Affidavit.

## MATERIALS CONSIDERED

8.      In reaching my opinions and as part of preparing this Affidavit, I have reviewed the following materials:  Report of Dr. Curtis Mertz Report, Report of Dr. Lowell Levine, Trial Testimony of Dr. Mertz, Trial Testimony of Dr. Levine, and twenty-two black-and-white images that were photographs of the victim in the case of *State v. Danny Lee Hill*.  I have been informed these were admitted as evidence during the trial of Danny Lee Hill.

9.      In addition, I have relied on the experience and training acquired over my nearly three-decade career as a forensic dentist and consultant.

10.     Finally, I have considered conversations that I had with Dr. Curtis Mertz, who is now deceased.

## OPINION

11.     It is my opinion, to a reasonable degree of medical/dental certainty, that the patterned injury on the victim, Raymond Fife, is not a human bitemark.

12.     Using the ABFO Bitemark Decision Tree first adopted by the ABFO in February 2013, when a patterned injury is defined by the ABFO Bitemark Terminology Guidelines as not representing a human bitemark, then analysis and comparison to any suspected biter is not sanctioned under any circumstances, and as a rule cannot be performed to a reasonable degree of medical/dental certainty.

13.     Even if the patterned injury on the victim was a human bitemark, which it is not, its location on the penis of the victim makes the scientifically supportable identification of a particular biter impossible.

14.     It is not possible to determine from the evidence reviewed by Drs. Mertz and Levine that patterned injury on Raymond Fife's penis was created by a human teeth.

15.     It is not possible to determine from the evidence reviewed by Drs. Mertz and Levine that the patterned injury on Raymond Fife's penis was created by Danny Lee Hill to the exclusion of millions of other individuals in the open universe of possible biters.

## THE TESTIMONY AND OPINION OF DR. CURTIS MERTZ

16.     Dr. Mertz erred when he conclusively identified Mr. Hill as the source of the patterned injury on the victim.

17.     In my opinion, applying the current guidelines and standards of the ABFO, there is no scientific support for the conclusion that Mr. Hill left any portion of the patterned injury on the victim.

18.     Furthermore, it is my opinion that the location of the patterned injury in this case renders it impossible to make any positive association between a suspected biter and the patterned injury in question.  Dr. Mertz's assertion that Mr. Hill caused the injury on the victim's penis required him to speculate that the victim's penis was erect when the bite occurred, that this erect penis would have been one and a third the size of a flaccid penis, and that therefore the dimensions of the bite-mark that were actually measured were approximately a third smaller than the dentition of the alleged biter.  This speculation is nothing but a blind guess. Such blind guessing is not a reasonable or reliable scientific methodology, nor is it permitted under the ABFO Guidelines (or the ABFO-recommended "Decision Tree" based on those Guidelines). In my opinion, the extrapolations that Dr. Mertz made from his actual measurements (based on his speculation regarding the presence of erection and erect versus flaccid penis circumference) are not scientifically supportable, and suggest that, rather than objective, expert opinion, Dr. Mertz's testimony suffered from predictive outcome bias and confirmation bias.

19.     This bias is evidenced by the fact that Dr. Mertz chose to address only those aspects of the patterned injury that he felt that he could link to Mr. Hill's dentition, ignoring other aspects of the patterned injury that he could not link to Mr. Hill.

## <u>DR. MERTZ'S POST-TRIAL STATEMENTS</u>

20.     Dr. Mertz passed away in 2005.  He was my mentor, as well as a respected teacher and scholar in the forensic odontology community.  However, Dr. Mertz confided in me

that he regretted the testimony that he gave in this case, and that he did not believe that it was scientifically supportable.

21.     These statements, or statements like them, were made to me by Dr. Mertz on two occasions. I discussed this case with Dr. Mertz at the time that I was preparing to take my ABFO certification examination in 1988 and then again in the 1990s. During both conversations, Dr. Mertz and I discussed the testimony that he gave in Mr. Hill's case.

22.     On both occasions, in 1988 and again in the 1990s, Dr. Mertz confided to me that he no longer believed, to a reasonable degree of medical/dental certainty, that the patterned injury on the victim in this case was a human bitemark. He also stated, on both occasions, that he no longer believed, to a reasonable degree of medical/dental certainty, that Mr. Hill's dentition was the source of that injury. Dr. Mertz clarified that if he had the opportunity to give further testimony in proceedings involving Mr. Hill, he would not have given the same opinion and testimony that the Court admitted as evidence.

## THE TESTIMONY AND OPINION OF DR. LOWELL LEVINE

23.     Dr. Lowell Levine erred when he opined that the injury on the victim represents a human bitemark.

24.     Dr. Levine further erred when he stated (i) that either Mr. Hill, or his co-defendant, Tim Combs, could have been the biter, and (ii) that it is likely that one portion of the patterned injury was caused by Mr. Hill.

25.     In my opinion, the only reasonable and reliable scientific conclusion that could be asserted given Dr. Levine's recorded observations about the patterned injury was either (i) that the patterned injury lacked specificity, and thus could not supply a basis for identifying either

Mr. Hill or Mr. Combs (or anyone else) as the biter, or (ii) that Mr. Hill's and Mr. Comb's dentitions were similar enough that a bitemark left by either of them would leave a pattern indiscernible from a bitemark pattern left by the other.

I declare under penalty of perjury that the foregoing is true and correct.

Franklin D. Wright, D.M.D.

Executed this 22 day of August, 2014.

Subscribed and sworn to me by the person known to me as Franklin D. Wright, D.M.D., this 22 day of September, 2014.

Notary Public: _____

My commission number: 3/3/2018

My commission expires: 3/3/2018

MELANIE A. SAUTER
Notary Public, State of Ohio
My Commission Expires
March 3, 2018

Forensic Dental Services.

# Odontology Report

In the matter of Danny Hill v. Betty Mitchell, Warden

Report consists of 7 Pages, 2 Figures, 0 Appendices and 0 Attachments

My name is Iain Alastair PRETTY and I am a qualified dental surgeon. I obtained my dental qualification, BDS(Hons), in 1998 from the University of Newcastle upon Tyne. I have obtained a further qualification in forensic dentistry, MSc, from the University of British Columbia, Vancouver, BC, Canada, a doctoral degree (PhD) from the University of Liverpool and a Masters of Public Health (MPH) from the University of Manchester. I am a member of the American Society of Forensic Odontology, a fellow of the American Academy of Forensic Sciences, a fellow of the Forensic Science Society, a member of the British Association of Forensic Odontology and the British Academy of Forensic Science. I am a Fellow of the Royal College of Surgeons of Edinburgh. I have published numerous articles and several book chapters on various aspects of forensic dentistry, in particular bitemark injuries and their analysis. A copy of my curriculum vitae has been previously provided.

I have been instructed by attorneys representing Mr. Danny Hill. In particular, I have been asked to examine a number of photographs documenting injuries to a child (Raymond Fife) - and to consider:

a) Is the injury to Raymond's penis consistent with a bitemark?
b) If so, are there sufficient details to enable a comparison with a suspect's dentition
c) The reports of Drs Mertz and Levine.

## 1. MATERIALS SUPPLIED

1.1    I have been supplied with the following materials:



Case: 20-3863   Document: 1   Filed: 08/17/2020   Page: 373

a) Reports of Drs Mertz (November 4, 1985) and Levine (November 19, 1985)
b) Collection of black and white photographs (9)
c) Autopsy report of Dr Adelman (23rd October 1985)
d) Trial testimony
e) Defendant's dental records

## 2. INJURIES

2.1    When considering whether or not an injury is a bitemark there are a number of possible conclusion levels that can be drawn.  These conclusion levels are those of the American Board of Forensic Odontology and have been recently adopted by the British Association of Forensic Odontology:

- Insufficient evidence
- Not a human bitemark
- Suggestive of a human bitemark
- A human bitemark

2.2    Bitemarks typically present as two semi-circular injuries that are separated at their open ends, and there may be an area of unaffected tissue in the centre.  Bitemarks can present with a range of differing severities but a common feature is that focal points of bruising or laceration can be seen that relate to the class characteristics of teeth.  Bitemarks vary in size but fall within an accepted range.

2.4    In preparing this report I have relied upon the photographs supplied to me in order to render my opinion.

## 3. SUSPECTED BITEMARK INJURY TO RAYMOND FIFE

3.1    I have studied the photographs supplied to me carefully.  There is a single anatomical location that is of interest – the glans of the penis.  Injuries to the penis are difficult to assess.  The tissue is highly distortable and it is, of course, impossible to assess if the penis was flaccid, erect or semi-erect

during the infliction of the injury.  The surface is curved, soft and the risk of postural distortion high.  Indeed, looking at the photographs supplied the positioning of the metal scale and the holding of the penis by forceps demonstrates this. The injury in question is shown in Figures 1 and 2 attached to this report.

3.2     The injury appears to consist of a number of roughly circular injuries that may be lacerations.  As I am basing my assessment purely from photographs (which is not unusual) I cannot be sure of the exact nature of the marks.  I am not helped by the reports of either Levine of Mertz who do not describe the injuries in any detail other than stating that the injuries represent a bitemark. There are no measurements, descriptors or locators present in their written reports.  One would normally expect a bitemark to be described in detail, with salient features supporting the conclusion that the injury was caused by human teeth.

3.3     Each of the individual circular injuries ranges from approximately 2 through 4mm.  The appearance of these injuries is inconsistent with the appearance of human incisor teeth – but demonstrate *some* of the class characteristics of canine teeth.  However, the arrangement, spacing, and overall morphological appearance of these marks is inconsistent with the normal arrangement of a dental arch.

3.4     The forensic significance of the injury is *extremely low*.  This is largely due to the anatomical location, which, for reasons described in 3.1 is difficult to assess.  It is impossible to identify a dental midline, maxillary or mandibular arches, or class characteristics of incisor teeth. It is my opinion that the identification of these gross characteristics are essential before the identification of a bitemark can be made.

3.5     The absence of these features, and the presence of the injury on a highly distortable anatomical location, mean that a conclusion of a definite human bitemark cannot be reached.  Indeed it is my opinion that there is simply insufficient evidence presented to reach any conclusion regarding the

likely the nature of these wounds.  I understand that the body was discovered with the genitals exposed – raising the suspicion that the injuries may be related to animal predation in the peri-mortem period.

3.6     It is therefore my conclusion that there is insufficient evidence to reach a conclusion at any level of certainty regarding the causation of the small, circular wounds to the glans penis of Raymond Fife.  Given this conclusion, any further analysis of the injury is inappropriate.  Even if the evidence had supported a conclusion of "suggestive of a bitemark" (which it does not) further analysis, according the ABFO decision model, would still be considered inappropriate.

## 4. LEVINE

4.1     Levine provides a one-page report in the form of a letter with three bullet points.  I am not aware if a more comprehensive report was generated – with details of measurements undertaken, reasons for conclusions or the scientific processes underpinning those conclusions.  Levine simply states that human teeth caused the patterned injury, that he cannot be sure if one or both defendants caused the injury but that he feels it is "likely" that "Hall" *sic* caused one portion of it.  There is no information to support which element. There is no level of certainty provided to indicate what "likely" means – for example if it is at the level of medical certainty or below.

4.2     In his Court testimony, at 1143 – 4 he accepts that the condition of the penis is unknown in such cases and "could either be flaccid or erect….you really don't know.." Nothing else is provided in his testimony that enables us to understand how he reached his conclusion that this collection of injuries was a bitemark, nor was he asked in detail to support this conclusion.  The majority of the testimony concerns his linkage of suspects to the alleged bite. Cross-examination is limited and is largely based on trying to get Levine to provide a level of certainty for his "Likely" conclusion.  He concedes that the injury could have been produced by several bites and possibly from both defendants.  This goes to support the lack of forensic significance of the



injury.

## 5. MERTZ

5.1     Mertz's report is again a single page of conclusions, although there are two pages of notes that accompany it.  Again, these are focussed mainly on the comparative analysis and offer us no further insight into the reasons why the odontologist reached his conclusion that this collection of injuries should be considered a bitemark.

5.2     Testimony again is unhelpful and concentrates largely on the comparison of the injury to the dentition of the two suspects, without any real assessment of why Mertz felt that the injury was a bitemark. Mertz states that the measurements he took were inconsistent between the dentition of Hill and the injuries on the penis, to a "consistent" one-third.  He states that, had the penis been erect during the time of biting, this would account for this difference. This is clearly unscientific, unsubstantiated and speculative.

5.3     In cross examination, we find that the injuries are described as "areas of ecchymosis" (970-10) rather than "indentations".   The remainder of the testimony is a tortuous examination of the erect vs. flaccid argument in relation to the measurements of teeth and features such as diastemas.

## 6.     CONCLUSIONS

6.1     Returning to my original instructions I can conclude that:

6.2     There is insufficient evidence within the photographs supplied to me to reach a conclusion regarding the causation of this injury.

6.3     It is impossible to identify crucial elements of a bitemark injury including the midline, the maxillary or mandibular teeth, or class characteristics of human incisors.

Case: 20-3863   Document: 1   Filed: 08/17/2020   Page: 376

6.4    Current bitemark standards would indicate that no further analysis of the injuries would take place.

6.5    The reports of Levine and Mertz offer little in the way of scientific justification for their conclusions that the injuries are caused by human teeth.

6.6    It is my conclusion that this injury should not have been considered a bitemark and should not have been compared to the dentitions of the suspects.

6.7    The opinions rendered by Drs Levine and Mertz in this case are not based on scientific principles or processes – each odontologist agrees that bitemarks on the penis are difficult to assess and subject to distortion.  These facts alone should suggest a cautious approach. Mertz utilised unrelated and spurious data to account for inconsistencies in his measurements compared to his favoured biter. I would hope that in a contemporary Court such evidence would not be allowed.

## 7.    CONFLICTS OF INTEREST

7.1    I confirm that I have no conflict of interest of any kind in this case.

7.2    I will advise the party by whom I am instructed if, between the date of this report and the final hearing, there is any change in circumstances which affects my position in relation to conflicts of interest.

**Overriding duty to the Court**

'I understand my duty to the Court and I have complied with that duty.'

**Statement of truth**
'I confirm that insofar as the facts stated in my report are within my own knowledge I have made clear which they are and I believe them to be true, and that the opinions I have expressed represent my true and complete professional opinion.'

Signed                                                    Date  29th September 2014

Case: 20-3863    Document: 1    Filed: 08/17/2020    Page: 377

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Case No. 85-CR-317 |
| | ) | |
| DANNY LEE HILL, | ) | |
| | ) | |
| DEFENDANT. | ) | |

## AFFIDAVIT OF ZHONGXUE HUA, M.D., Ph.D.

I, Dr. Zhongxue Hua, being duly sworn under oath, hereby state to the best of my knowledge and belief as follows:

1.      I am a forensic pathologist and neuropathological consultant; an assistant clinical professor of pathology at Albert Einstein College of Medicine, Bronx, New York; and an attending neuropathologist and assistant laboratory director at Jacobi Medical Center and North Central Bronx Hospital, New York. Previously, I served as Chief County Medical Examiner, Union County, New Jersey (9/2007 to 9/2012); Chief Regional Medical Examiner, counties of Essex, Hudson, Passaic and Somerset, New Jersey (7/2005 to 9/2007), and Assistant State Medical Examiner, State of New Jersey (2004-2007). I obtained my medical degree from Peking Union Medical College, Beijing, China (1989 M.D.), and a doctorate degree in biochemistry from the University of Rochester, Rochester, New York (1995 Ph.D.). I was a resident in pathology at the Albert Einstein College of Medicine, Bronx, New York (7/1995 to 6/1998), a fellow in neuropathology at Columbia Presbyterian Medical Center, Columbia University, New York, NY (7/1998 to 6/2000), and worked with the City Medical Examiner, Office of the Chief Medical

Examiner, New York, New York (7/2000 to 6/2001). A full list of my educational background, work history, publications, and professional credentials is contained in my annexed curriculum vitae.

2.      I submit this Affidavit in support of the Motion for New Trial for Danny Lee Hill at the request of his attorneys. Mr. Hill was convicted and sentenced to death in 1986 for the murder of Raymond Fife, a 12 year old boy.

3.      I have been asked to review the scientific and medical opinions, conclusions and testimony proffered by pathologist Dr. Howard Adelman and forensic odontologist Dr. Curtis Mertz concerning the cause and nature of Raymond Fife's injuries and death. I am qualified to comment on these matters because of my training and experience.

4.      The victim Raymond Fife was attacked on September 10, 1985, and his death two days later was undisputedly caused by that attack. However, the testimony and opinions of Dr. Adelman and Dr. Mertz about the source, extent, cause and/or mechanism of Raymond Fife's injuries are not based on sound scientific principles. Indeed, the theories advanced by these experts at trial were based on unsupportable assumptions and gross inaccuracies. They do not constitute reliable, objective scientific testimony.

5.      There was, and is, no scientific basis for three significant areas of the testimony and conclusions of Drs. Adelman and Mertz. First, there existed no scientific basis at the time of trial which would have supported the conclusions about the varying size of the child's penis in a flaccid or erect state. Second, there was no scientific basis at the time of trial that could have supported the conclusion that the child would have had an erect penis as a result of being strangled. Third, Dr. Adelman's testimony that a stick introduced into evidence fit the injuries to the child's rectum and bladder like a "key in a

2

"lock" was entirely without scientific support. None of these conclusions have any more scientific support today than they did when originally given.

6. I have reviewed the following materials: 11/4/1985 Letter from Curtis Mertz to Dennis Watkins re: Bitemark; 12/19/1985 Curtis Mertz, Notes on Fife Bite Mark; Trial Testimony of Dr. Adelman; Trial Testimony of Dr. Mertz; Autopsy Report; Coroner's Verdict; St. Joseph Riverside Hospital Records on Victim; Photographs of the Victim Raymond Fife; Affidavit of Dr. Deborah Davis re: Hill; Affidavit of Dr. Franklin Wright; *Grandwohl's Legal Medicine; Basic Morphological Data of the External Genitals in 177 Healthy Central European Men* by J.G. Farkas.

## THE TESTIMONY AND OPINION OF DR. HOWARD ADELMAN

7. At no point, including at the time the opinions were proffered in 1985-86 or today, has there been a reliable scientific basis for Dr. Adelman's testimony regarding the nature of the wounds to Raymond Fife's rectum, or any object purportedly used to create those wounds.

8. There is no reliable scientific basis for Dr. Adelman's opinion and testimony that the piece of wood entered into evidence as Exhibit 47 at trial fit Raymond Fife's anus and/or wounds like a "key in a lock." Most importantly, it is not scientifically possible to reliably identify the instrument that caused the injuries in question through the type of examination performed on Raymond Fife by Dr. Adelman – let alone, to identify the instrument to the level of specific certainty necessary to describe it through the analogy of a key and a lock. The absence of blood or other biological material tying the object to Fife's injuries strongly indicates that it was not the object used to inflict the injuries. Dr.

3

Adelman's testimony on this point is unsupported speculation, and his comparison to a key and lock is unscientific and inflammatory pseudo-science.

9.      At no point, including at the time Dr. Adelman's opinions were proffered in 1985-86 or today, has there been a reliable scientific basis for Dr. Adelman's testimony that strangulation like that sustained by Raymond Fife causes penile erection to a specific degree.

10.     As Dr. Adelmen testified, there have been historical observations that judicial hanging can cause erection and/or ejaculation in its victims. Dr. Adelman's reliance on anecdotal evidence and/or historical narratives as a basis for his opinion is likewise inappropriate and renders his opinions in this specific case speculative and unreliable.

11.     Although he claimed that there existed medical articles supporting his opinions, Dr. Adelman did not cite any of those articles. At trial, he conceded that he was "not exactly sure of the mechanism" through which asphyxiation caused penile erection. Dr. Adelman's admission of ignorance was the only part of his testimony regarding asphyxia and erection that was not unscientific or speculative.

12.     Even setting aside the absence of a scientific foundation for his opinions, however, the differences between the biological mechanisms involved in judicial hanging, autoerotic asphyxiation, and strangulation are substantial, and any extrapolation from the effects of one to the others is baseless.

13.     It is entirely speculative to conclude from such limited observations that the asphyxiation of a prone 12-year-old boy would result in an erection to a very specific degree or that it did so in this case. I am not aware of a single scientific study to support this theory, much less am I aware of any that include children the age of the victim in this

4

case. Put simply, there is no sound science to support the conclusion that asphyxia under these circumstances causes erection to a specific degree.

14. In sum, Dr. Adelman's testimony analogizing autoerotic asphyxiation and judicial hanging to Raymond Fife's strangulation is wholly without reliable, scientific basis.

## OPINION AND TESTIMONY OF DR. CURTIS MERTZ

15. Dr. Curtis Mertz testified that the "probability that [Raymond Fife's] penis was in an erected state" was the basis for his opinion that the pattern injury on his penis matched the teeth of Danny Lee Hill.

16. At no point – including at the time Dr. Mertz proffered his opinions and testimony, in 1985-86, or today – has there been a scientifically reliable method of determining through post-mortem examination the probability that an erection may have occurred during an assault.

17. Dr. Mertz's review of the literature was cursory and inadequate, and the texts he relied upon were inapposite and outdated.

18. Dr. Mertz's reliance on *Grandwohl's Legal Medicine*, edited by Franci Camp, to support his opinion that it was probable Raymond Fife had an erection is misplaced and in error. Dr. Mertz selectively ignored the qualifications provided by his own authority, including the fact that there is "undoubtedly great variation" and there are "many factors [that] may interfere" with the symptoms listed, as well as the statement that "it is usually difficult or impossible to predict the physiological results" of asphyxia "with an accuracy at all." No reliable opinion that a penile erection was "probable" during strangulation could be based upon these limited findings.

5

19.     Dr. Mertz testified that "the average circumference of a penis upon erection is 1.3075 larger than in the flaccid state." He further testified that "this explains the difference in the measured size of approximately a third less" when comparing the purported bite marks on Raymond Fife's penis and the teeth of Danny Lee Hill.

20.     Dr. Mertz's claim that there are scientific studies that supported his calculation that the erect penis of a 12-year-old boy is one-third larger than a flaccid penis is unfounded. As far as I am aware, there have never been any such studies, medical or forensic, to support such a theory.

21.     The sole study that Dr. Mertz cited, *Basic Morphological Data of the External Genitals in 177 Healthy Central European Men* by J.G. Farkas does not support his opinion. First, there is no scientific basis for extrapolating the size differential between the erect and flaccid penis of a post-pubescent adult and that of a twelve year old child. Second, there is no scientific basis for applying an average measurement of that differential to a singular case. Third, none of the cited healthy men were under the extreme suffering of Raymond Fife, with fatal head trauma, strangulation and sexual assault. As a result, Dr. Mertz ignores both biological reality and statistical methodology, rendering his opinion speculative, unscientific, and fatally flawed.

22.     Dr. Mertz's opinions regarding Raymond Fife and the "probability" of his penile erection, as well as any resulting specific size differences between flaccid and erect states, are unsupported and speculative. They are post-hoc guesswork and do not constitute reliable scientific opinion.

Dr. Zhongxue Hua

Sworn to this 16th day of October, 2014

STEFANOPOULOS VITENTIA
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ST6099670
Qualified in Queens County
Commission Expires 10/06/2015

_____ Notary Public



**UNIVERSITY OF NEVADA •Reno**

Deborah
Davis, Ph.D.
Department of
Psychology/296
College of Liberal
Arts
Reno, Nevada 89557–0062
Tel: (775) 722 7779
FAX: (775) 784-1126
e-mail: debdavis@unr.edu

TO:      Ms. Vicki Werneke
Assistant Federal Public Defender
Capital Habeas Unit
Office of Federal Public Defender
Northern District of Ohio

FROM:      Deborah Davis, Ph.D.
Professor of Psychology
University of Nevada, Reno

RE:      Affidavit Ohio v. Danny Lee Hill: #85-CR-317

DATE:      9 2 2014

I, Deborah Davis declare as follows:

1. You have asked me to provide an analysis of the case of Danny Lee Hill to assess the potential that he falsely confessed.

2. This affidavit contains my qualifications as an expert on false confessions, the records I have reviewed regarding this case, and a general description of my opinions.

3. The attached report provides the specific basis of the opinions herein and details regarding what science has shown about the causes of false confession, sources of suspect vulnerability to influence/coercion, and difficulties of evaluating the validity of confessions.

4. **Education and Experience** (see Attached CV)

5. I am currently Professor of Psychology at the University of Nevada, Reno, where I have worked since 1978. I am also a member of the faculty of the National Judicial College.

6. I received a B. A. in Psychology from the University of Texas (Austin) in 1970, and a Ph. D. in Psychology from Ohio State University in 1973. After spending two years as a Post-Doctoral Fellow at Ohio State, I taught at Southern Illinois University for two years and Georgia State University for one year before moving to the University of Nevada, Reno.

7. I have published approximately 20 articles and chapters on the topic of police interrogation and confessions, and presented approximately 16 times on this topic at conferences of scientific organizations and 14 times at Continuing Legal Education events for legal organizations and the National Judicial College. In addition, I have published a number of other articles and chapters that include discussion of interrogations and confession, and many others that address the broader topic of social influence. Finally, I have published many other articles in other areas of psychology.

8. I was awarded a grant from the Department of Justice/Federal Bureau of Investigation to perform research on interrogation techniques in 2012.

9. I have completed the basic and advanced interrogation training seminars offered by John Reid, Assoc. and Wicklander-Zulawski (the primary interrogation training organizations in America), on criminal and corporate interrogation.

10. I have testified as an expert witness on interrogation and confessions in Alaska, Colorado, California, Illinois, Louisiana, Michigan, Missouri, Mississippi, New Mexico, New York, Oregon, South Carolina, Pennsylvania, Utah, and Washington State.

11. **Records Reviewed**

12. (SH1): Motion to Suppress Hearing Vol. 1  273 pp
13. (SH2): Motion to Suppress Hearing Vol. 2 259 pp
14. Adaptive functioning narrative (16 pp)
15. Trial Transcript Vol. 1  (321 pp)
16. Trial Transcript Vol. 2  (312 pp)
17. Trial Transcript Vol. 3 (346 pp)
18. Trial Transcript Vol. 4  (313 pp)
19. Tim Combs Statements to Police
20. Timeline for Danny Hill Case (7 pp)
21. Probation Report (22 pp)
22. Mitigation Report (408 pp)

23. Hill Video Interview Transcript (54 pp)
24. Hill Audio Interview Transcript (44 pp)
25. Coroner's Verdict (1 p)
26. Autopsy Report (11 pp)
27. Voluntary Statement of Timothy Combs Written (4 pp)
28. Interrogation Timothy Combs (78 pp)

29. **OVERVIEW OF OPINIONS**

30. Danny Lee Hill was a retarded teenage African American at the time of the murder in question. He became a suspect in the violent abuse and murder of a young 12 yr old boy because he went to police himself, saying he had relevant information about the crime. A reward of $5,000 had been posted for such information. Danny asserts that he went to police to try to tell them a false story that would get him the reward. Police quite correctly suspected him of lying (as he admits he did). But this led them to suspect he was involved in the crime himself. These suspicions led police to interrogate Danny on two subsequent occasions, during the second of which he eventually admitted involvement in the crime.

31. Danny Hill did not believe he could refuse to talk to police, though he was given Miranda warnings during each interrogation. Danny demonstrably did not understand many of the words entailed in the warnings, nor did he understand the implications of waiver. He could barely read, and could not read (or understand verbally) most of the content. Moreover, his interrogators essentially instructed him to talk to them and presented the warnings as a formality rather than a choice to be made. Thus, his waiver could not be considered voluntary, knowing or intelligent.

32. Danny Hill was an individual who was highly susceptible to influence, given his low IQ and difficult life history. He was interrogated by officers he had known most of his life, including his Uncle Morris Hill. He was explicitly told that nothing was going to happen to him, that he was not under arrest, and that he would be going home. At the same time, he was accused of involvement in the crime and interrogated in a very suggestive manner. That is, officers fed Danny Hill almost every fact that was incorporated into his final confession. The officers noted this pattern themselves:

> "You know, Danny, it seems like everything we suggest to you, you agree with us; right? Isn't that the way it seems to you? .. Now, if we suggest something, it seems that you agree with us. In other words, about the cigarette lighter; I suggested he was looking for it, and you agreed with it. Now, if I was to just suggest and say that the boy sucked your pee-pee, would you agree to that?" (Audio Interview Transcript, p. 37).

33. It is my opinion that this statement by the interrogator sums up very accurately where the content of Danny Lee Hill's confession came from. He was told he was involved and instructed to tell the officers exactly what happened. His denials were not believed, and they repeatedly told him he was lying and needed to admit his involvement. It was only after his own Uncle Morris Hill met with him alone and instructed him to start admitting that he was involved that Danny agreed, and the taped interrogations followed.

34. It is clear from the interrogation transcripts (which begin well after the questioning that day began) that Danny gets his answers from the interrogators' suggestions. They asked questions suggesting an answer (such as "Did he put anything in the victim's mouth."). Thus, Danny gave answers essentially agreeing with what he was asked. When he gave an answer inconsistent with what interrogators knew (or thought they knew), they corrected him and told him what they believe happened instead. He would then change his answers. When they asked him leading questions they knew to be false, Danny agreed with those too. This pattern is what led the interrogator to say that it seemed that everything they suggested Danny would agree with.

35. In addition to the interrogators suggestions, information about the case and details were widely available in the community. Countless members of the community were around the crime scene when police arrived. The victim had been found by his father. Thus, many details of how the victim was found and in what condition could have been conveyed through the community by the victim's family or directly observed by others at the crime scene.

36. I do not have access to all of the evidence in the case, and cannot offer an ultimate opinion of guilt or innocence. However, it is my opinion, based on the evidence surrounding the interrogations themselves and Danny's personal characteristics, that Danny Hill's confession was highly unreliable. It is very possible that he was simply a young teenager of low intelligence living in relative poverty who saw an opportunity to get what must have seemed a fortune to him ($5,000). He decided to concoct some lies that would seem like valuable evidence to police. But he didn't really know what he was talking about, in that he knew only publicly available facts about the crime.

37. His lies were not plausible, in part, because he didn't know the real facts. It is very difficult for liars to construct a plausible story that will fit facts others know but they don't. It is also difficult for them to keep straight in memory what they have told (keep track of their own stories and who they have told them to, etc.). Danny Hill started constructing a story he thought would be plausible, but he had to keep making up more stuff as police questioned him about details or challenged his first accounts—and then keep all that straight in memory. This is something that is essentially impossible for a retarded young man such as Danny.

38. Therefore, whether guilty or innocent, it is no surprise that he gave multiple inconsistent accounts in his initial two interrogations and stories to his interrogators: with the result that he became a serious suspect. Danny Hill had gotten himself in a situation where his initial efforts to claim a reward led him into a series of interrogations in which he first tried to maintain his original position as a witness with valuable information, but was so clearly caught in lies that his interrogators transitioned into trying to elicit admissions of guilt. By his third interrogation Danny was already stuck with his previous statements, could not see his way out of the interrogation itself or any way to successfully deny involvement (given the interrogators' insistence that he was involved and must tell them how) and was finally led to change his story in the direction his interrogators had become convinced was true.

39. Given Danny Hill's personal characteristics and vulnerability to influence, his personal history with his interrogators, the demands placed on him to confess, and the way in which the content of his confession was fed to him, little weight should be given to his confession as evidence of guilt. Moreover, whether he is actually innocent or guilty, the details of his confession were fed to him by his interrogators and should not be regarded as reliable.

Executed this 3rd day of September 2014 in Reno, Nevada.

Deborah Davis, Ph.D.

State of Nevada
County of Washoe

Signed and sworn before me on 3 Sept 2014
by Deborah Davis
Amber Miller
Notary Public

NOTARY PUBLIC
STATE OF NEVADA
County of Washoe
AMBER MILLER
No: 04-91829-2
My Appointment Expires July 11, 2016

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

**STATE OF OHIO**

        **Plaintiff-Respondent,**

    **v.**

**DANNY LEE HILL**

        **Defendant-Petitioner.**

**CASE NO, 85-CR-317**
**(CAPITAL CASE)**

**JUDGE PATRICIA A. COSGROVE**
**(Sitting by Assignment)**

**ORDER ON PETITIONER'S REQUEST**
**FOR LEAVE TO FILE A MOTION FOR**
**NEW TRIAL PURSUANT TO OHIO**
**CRIMINAL RULE 33 (B)**

On January 31, 1986, after a trial presided over by a three-judge panel, Danny Lee Hill (hereinafter referred to as (Petitioner), was found guilty of Aggravated Murder with four seperate death penalty specifications. The Petitioner was found guilty of Aggravated Murder with Specification of Aggravating Circumstances (O.R.C. 2903.01 (B), Count 2, Kidnapping (O.R.C. 2905.01), Count , Rape (O.R.C. 2907.02), Count 4, Aggravated Arson (O.R.C. 2909.02), Count 6, Felonious Sexual Penetration (O.R.C. 2907.12 (A) (1) (3). The Petitioner was acquitted on Count 5, Aggravated Robbery (O.R.C. 2911.01.

On February 28, 1986, the Court found the aggravating circumstances of the Aggravated Murder outweighed the mitigating factors beyond a reasonable doubt. The three-judge found numerous aggravating circumstances, including finding that both Danny Lee Hill and the Co-Defendant jointly participated in the torture, rape, and murder of the minor victim.

On March 5, 1986, the three-judge panel imposed the sentence of death on Danny Lee Hill. The convictions and sentences were affirmed on direct appeal. *State v. Hill,* 11th Dist. Nos.

1985 CR
00317
00055455622
Habeas Petition Exhibit 8

1 of 11

3720, 3745, 1989 WL 142761 (Nov. 27, 1989); *State v. Hill*, 64 Ohio St. 3d 313, 595 N.E.2d 884 (1992).

Mr. Hill filed a Petition to Vacate or Set Aside Judgment and/or Sentence pursuant to Ohio R.C. 2953.21. The trial court denied the petition and the decision was affirmed by the 11th District Court of Appeals. *State v. Hill*, 11th Dist. No. 94-T-5116, 1995 WL 418683 (June 16, 1995). The Ohio Supreme Court declined to accept jurisdiction. *State v. Hill*, 74 Ohio St. 3d 1456,656 N.E.2d 951 (1995).

From 1986 until present day, the Petitioner, by and through a number of different attorneys has filed several post-conviction motions in federal and state court. On December 2, 1996, Mr. Hill filed a Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. 2254 in federal district court. On September 29, 1999, the district denied the petition. Thereafter, the Petitioner raised a claim in an appeal to the Sixth Circuit Court of Appeals pursuant to the ruling in *Adkins v. Virginia*, 536 U.S. 304 (2002). On November 27, 2002, the Petitioner filed an initial *Atkins* claim in Trumbull County Common Pleas Court which was denied. The Court of Appeals affirmed the denial on July 11, 2008. The Ohio Supreme Court declined to accept jurisdiction on August 26, 2009. *State v. Hill*, 122 Ohio St. 3d1502, 2009-Ohio-4233, 912 N.E.2d 107.

Mr. Hill filed an amended petition based on the *Atkins* decision in the district court after he had exhausted the claim in state court. The petition was denied on June 25, 2014. The Sixth Circuit Court of Appeals affirmed the district court's ruling that the Petitioner did not establish a valid claim under *Adkins v. Virginia, supra.* Petitioner has appealed the decision.

On November 14, 2014, the Petitioner filed a request for leave to file a motion for a new trial pursuant to Ohio Crim. R. 33 (B). On November 20, 2014, the State filed a brief in opposition. On February 12, 2015, the Petitioner filed a reply brief. On March 19, 2015, the

judges in the Trumbull County Common Pleas Court voluntarily recused themselves from hearing the Petitioner's motion for leave to file a motion for new trial. On April 10, 2015, the Ohio Supreme Court appointed this Court to preside over the proceedings in this case. On May 14, 2015, the Petitioner, without leave of court, filed a brief citing supplemental authority in support of its request to file a motion for a new trial. The Respondent-Defendant filed a motion in opposition. The Court grants leave, instanter, to Petitioner to file the brief.

This Court conducted several pretrial conferences by telephone with the attorneys in this case. The Petitioner, in addition to filing this motion for leave to file a motion for new trial in state court, is still litigating a pending appeal of a the denial of a habeas corpus by the district court, based on the *Adkins* claim. As of December 21, 2015, the date of the hearing on this motion, the Sixth Circuit had not rendered a decision on the Petitioner's denial of his most recent habeas corpus petition.

## **STANDARD OF REVIEW**

Crim. R. 33 (B) governs the filing of an application for a new trial based on newly discovered evidence and states in pertinent part:

> Motions for new trial on account of newly discovered evidence shall be
> filed within one hundred twenty days after the day upon which the
> verdict was rendered, or the decision of the court where trial by jury has
> been waived. If it is made to appear by clear and convincing proof
> that the defendant was unavoidably prevented from the discovery of
> the evidence upon which he must rely, such motion shall be filed within
> seven days from an order of the court finding that he was unavoidably
> prevented from discovering the evidence within the one hundred
> twenty day period.

A defendant is "unavoidably prevented" from filing a motion for a new trial if the defendant "had no knowledge of the existence of the ground supporting the motion and could not have learned of that existence within the time prescribed for filing the motion in the exercise of

due diligence." *State v. Trimble*, 2016-Ohio-1307 (11[th] Dist.March 28, 2016 at page 8), quoting *State v. Alexander*, 11[th] Dist. Trumbull No. 2011-T-0120, 2012-Ohio-4468, para. 17, quoting *State v. Walden*, 19 Ohio App. 3d 141, 145-146 (10[th] Dist). 1984).

The crux of Petitioner's argument for leave to file a motion for a new trial pursuant to Crim. R. 33 (B) pivots on the scientific advances in forensic odontology made since 1986 that call into question the reliability of bite mark evidence presented in Hill's trial. In 2013, the American Board of Forensic Odontology (ABFO) Reference Manual established new guidelines for bite mark analysis. The 2013 guidelines utilize a flow chart modality and (with the exception of unique or distinct dental anomalies), do not recognize the identification of a specific biter in the open population. The ABFO guidelines were again modified in 2015 and are subject to continuing modification. However, the accuracy and consistency of the guidelines have been subject to intense scrutiny, even in the ABFO community.

The Petitioner relies on the affidavit by Dr. Franklin Wright in his motion seeking leave to file a motion for a new trial. Dr. Wright was hired by Petitioner in 2014 to render an opinion regarding the reliability of the expert opinions rendered by the forensic odontologists that testified in Hill's 1986 trial, utilizing the 2013 ABFO guidelines. In his report generated on March 30, 2014, Dr. Wright concluded that that the patterned injuries on the victim's penis do not represent a human bite mark using the 2013 guidelines (Exhibit K).

The Respondent argues that Dr. Wright's opinion based on the 2013 ABFO guidelines does not constitute "newly discovered evidence", but merely a new theory based upon on old evidence. However, for the Court to delve into this issue would require ruling on the merits of the motion for a new trial. Pursuant to case law the Court may not consider the merits of the motion until it makes a finding of unavoidable delay. *State v. Barrow*, 2016-Ohio-2839, para. 4,

quoting, *State v. Stevens*, 2d Dist. Montgomery Nos. 23236 and 23315, 2010-Ohio-556, para. 11,

*State v. Brown*, 8th Dist. Cuyahoga No. 95253, 2011-Ohio-1080, Para. 12-14.

In *State v. Trimble*, 11th Dist. Portage No. 2013-P-0088, 2015-Ohio-942, the Court

delineated the bi-furcated procedure for granting a request for leave to file for a new trial made

pursuant to Crim. R. 33.

> The foregoing rule anticipates a two-step process where the motion for new
> trial is made outside the permissible timeframe for filing the motion. First,
> the trial court must find the party was unavoidably prevented from filing his
> motion within the prescribed window set forth in Crim. R. 33 (B). The party
> must then file his or her motion within seven days of the trial court's
> determination. Crim. R. 33 does not specify the procedure by which the
> initial order is to be obtained.
> *Trimble*, supra, *State v.Elersic*, 11[th] Dist. Geauga No. 2006-G-2740, 2007-Ohio-33 71.

The threshold issue to be decided by this Court is whether the Petitioner-Defendant has

demonstrated by clear and convincing evidence that he was unavoidably prevented from filing

the motion for leave to file a motion for new trial within one hundred twenty days after the

verdict. Crim. R. 33 (B). Petitioner seeks a new trial based on the testimony of Dr. Wright

regarding the ABFO guidelines promulgated in 2013 that bring into question the reliability of

bite mark evidence. The Respondent posits that that his opinion does not constitute new

evidence, rather "a new opinion" that seeks to impeach old evidence.

The first witness called by Petitioner at the hearing was Dr. Franklin Wright. Dr. Wright

obtained his degree in dentistry in 1984 and began specializing on forensic odontology in 1985.

He is a diplomate with the American Board of Forensic Odontology (hereinafter "ABFO").

ABFO was founded in 1976. Dr. Wright has served in various positions with ABFO. He

currently serves as chair of the Ethics Committee and is chairman of the Bite Mark Proficiency

Examination Development Committee. Dr. Wright has testified as an expert in forensic

odontology between to 24-36 times in his career.

Dr. Wright testified that he was retained by Petitioner's counsel on January 16, 2014 to review the case. He reviewed the photographs of the bite mark in question on March 14, 2014 (TOP – 25). Dr. Wright acknowledged that he had seen the photographs years earlier but did not relate them to this case. He identified portions of the ABFO guidelines and procedures that were published in 1984. (Exhibit H).

Dr. Wright testified that the guidelines published by ABFO in 1984 have been under scrutiny by forensic odontology profession since 1985. (TOP – 28). As an example, he referenced a 2009 report issued by the National Academy of Sciences calling into question the weaknesses and strengths in entire forensic odontology field. (TOP – 28).

Dr. Wright identified an excerpt from 2013 edition of the American Board of Forensic Odontology Diplomates Reference Manuel. He testified that ABFO changed the guidelines and terminology in the field of bite mark analysis. (TOP – 30). In fact, the terminology was updated in 1999 and again in 2013.

Dr. Wright testified that the 1984 ABFO guidelines were very generic and offered a range linking suspected biters to bite mark patterns from absolute certainty to no chance and gradations in between. (TOP – 30). He stated that the analysis was based upon subjective observation science. (TOP – 31). According to Dr. Wright, the terminology was changed in 2013 and the ABFO adopted a bite mark flow chart. The current guidelines call for a four-step process in the examination of bite mark evidence. After utilizing the guidelines, an examiner could conclude that it was a bite mark, suggestive of a bite mark, or not a bite mark. (TOP – 32). If the pattern injury was created by teeth, the biter's dentation would be examined.

In response to the Court's questioning as to why the motion was not filed earlier since concerns about bite mark evidence have been ongoing in since at least 2009, as evidenced bt

articles on the Project Innocence website, Dr. Wright stated that the 2013 changes were the culmination of a process that started in 1999 or 2000, and this process is "ongoing" (TOP – 32-33). He testified that a report from the National Academy of Science (NAS) was a big motivator for all the forensic sciences, including odontology to "examine the methodology to re-examine the scientific basis and support for their findings." (TOP – 33).

Dr. Wright also testified that the 2013 guidelines were not "widely publicized" in the legal community (TOP – 33). Dr. Wright testified that the guideline changes were highly publicized in the forensic odontology community, posted on ABFO's website, and posted in the Diplomate's Reference Manual. (TOP – 34 - 35).

On cross-examination by Respondent's attorney, Dr. Wright admitted that the 2013 guidelines did not change all of his previous opinions in the more than two or three dozen cases where he testified as an expert in the past. (TOP – 40).

The last witness called was Dennis Terez, the federal public defender for the Northern District of Ohio. He became aware of the claim of alleged new bite mark evidence through conversations with Petitioner's attorney, Vicki Werneke and other members of the Capital Habeas Unit. (TOP – 42). First, Attorney Terez testified that he authorized the funds to hire a forensic odontologist to prepare a report. Second, pursuant to the national policy of his office, he testified that he needed to obtain federal judicial authority to file a motion for leave to file a motion for new trial in state court to exhaust the Petitioner's state court remedies. (TOP – 44).

On March 31, 2014, the Petitioner filed a motion in federal district court requesting authorization for habeas counsel to participate in any state court proceedings. (Exhibit M), TOP– 48 – 49). On May 15, 2014, Judge John Adams of the federal district court denied the

request of habeas counsel to represent the Petitioner in state court proceedings. (TOP – 51). On June 24, 2014, Judge Adams denied the Petitioner's motion for reconsideration. (TOP – 53).

On July 21, 2014, Attorney Sarah Kostick was contacted by the federal public defender's office to serve as pro bono counsel in the state. As a law student, Ms. Kostick had been an intern with the Capital Habeas Unit and is currently an attorney in private practice in Texas. (TOP – 54).

On cross-examination, Attorney Terez testified that Attorney Kostick and not the State Public Defender's Office, was contacted to serve as counsel in the state case due to a conflict of interest (TOP – 57 – 58). Attorney Terez testified that his office did not at any time contact the Ohio Public Defenders Office in Warren or Trumbull County to serve as counsel in the state proceeding. Terez acknowledged that the his office is not more qualified than the Ohio Public Defenders to file an application for leave to file a motion for new trial in a capital case (TOP – 61).

On cross-examination, Mr. Terez admitted that there was no continuity of counsel problems when the local Public Defender, State and not the Federal Public Defender filed the initial *Adkins* claim (TOP – 62-63). The local Public Defender turned over the *Adkins* claim to the State Public Defender's Office and again there were no problems with the continuity of the representation of the Petitioner since they were a new unit (TOP – 64). Terez testified that the Petitioner's original counsel was with the Trumbull Public Defender's in 2014 so it would have been a conflict to ask the office to represent Hill in this litigation (TOP – 74-75).

"[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new

trial in the exercise of reasonable diligence*." State v. Barrow*, supra, *State v. Walden*, 19 Ohio App3d 141, 145-146, 438 N.E.2d 859 (10th Dist.1984).

## CONCLUSION

Prior to the Court ruling on Petitioner's motion for leave to file a motion for new trial pursuant to Crim. R. 33 (B), it has considered all of the following: Petitioner's motion with attached exhibits, the motion in opposition filed by the Respondent-State of Ohio, Petititioner's reply brief containing supplemental authority, the testimony at the hearing by Dr. Wright and Attorney Dennis Terez, the exhibits introduced at the hearing (and admitted with no objection by the Respondent), oral arguments of counsel offered at the December 21, 2015 hearing, as well as applicable case law.

Based upon the foregoing, the Court finds, by clear and convincing evidence, the Petitioner was unavoidably prevented from filing his motion for leave to file a motion for new trial within the time parameters delineated in Crim. R. 33 (B). The ABFO guidelines on the reliability of bite mark evidence were implemented in 2013. Since the guidelines were not in existence in 1986 at the time of Petitioner's trial, no amount of due diligence by Petitioner's trial counsel, could have discovered the information that was not in existence.

The Court finds that based on the unrefuted testimony of Dennis Terez, the Federal Public Defender for the Northern District of Ohio, that the local and state Public Defender's Office had a conflict of interest in preparing and filing the motion for leave for a new trial, the Court finds that any delay in filing the motion for leave was unavoidable. The testimony of Mr. Terez, together with the exhibits admitted at the hearing, demonstrate at least a half-dozen attempts to

garner permission from the federal court to litigate this motion in state court, before counsel was finally obtained.

The Court, having found by clear and convincing evidence that the Petitioner was unavoidably prevented from filing his motion within the prescribed window set forth in Crim. R. 33 (B), the Petitioner is instructed to file within seven (7) days of the receipt of the filed order, a motion for new trial. A courtesy copy of the motion shall be furnished to opposing counsel and the Court.

At this juncture, the Court's decision addresses only the threshold issue as to whether the Petitioner was unavoidably prevented in filing the motion for leave to file a motion for a new trial. The Court's ruling should not be construed by either side as addressing the merits of Petitioner's claims for a new trial.

The Court schedules a telephone conference to be initiated by the Trumbull County Prosecutor's Office to the Court and opposing counsel on June 21, 2016, at 1:00 p.m., to schedule a hearing date on the merits of the Petitioner's motion for new trial.

The Trumbull County Clerk of Courts is instructed to furnish a time-stamped copy of this order, electronically, if possible, to the attorneys and the Court.

IT IS SO ORDERED.

JUDGE PATRICIA A. COSGROVE
(Sitting by Assignment)
Ohio Constitution
Art. 6, Sect. IV

FILED
COURT OF COMMON PLEAS

JUN − 7 2016

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

cc: Attorney Sarah R. Kostick, Pro Bono Counsel for Petitioner
    Attorney Vicki Ruth Adams Werneke, Assistant Public Defender
    Dennis Watkins, Trumbull County Prosecutor
    LuWayne Annos, Assistant Trumbull County Prosecutor
    Judge Patricia A. Cosgrove

STATE OF OHIO              )
                          ) ss:
COUNTY OF TRUMBULL         )

### AFFIDAVIT OF ROGER R. BAUER

1. I have been a licensed attorney in the State of Ohio since 1973.

2. My practice has been in Warren, Trumbull County, Ohio.

3. In 1985, I was on contract with the Ohio Public Defender to provide legal representation to indigent people charged with crimes in Trumbull County.

4. I recall very clearly in September 1985, the case involving the brutal attack on Raymond Fife, a 12 year old boy from Warren, Ohio, who died a few days after the attack.

5. After the boy died, I learned from George Kalafaut, the head of the Ohio Public Defender office, that a suspect was at the Warren Police Station and probably about to be questioned. He directed me to go the Warren Police Department.

6. I recall that it was daylight when I was at the police station.

7. When I got there, I saw Danny Hill. I knew Morris Hill, Danny's uncle, who was a police detective. I believe I saw him there that day as well.

8. I spoke with Danny at the police station. I recall very clearly telling Danny to not talk to the police.

9. The detectives would not let me to talk to him anymore though, since I had not been appointed yet. I had to leave the police station then.

10. After the incident, a grievance was filed against me with the Trumbull County Bar Association. I believe it was filed by the Warren Police Department who said I did not represent Danny Hill and therefore could not advise him. I responded to the grievance at



**Habeas Petition Exhibit 9**
**1 of 3**

the time with the details. The grievance was dismissed as unfounded. Unfortunately, I do not have the documents associated with the grievance in my possession.

11. When Danny Hill's case was returned to Trumbull County to litigate the *Atkins* claim, Danny contacted me requesting my assistance with his case. For a short time, I was involved in the litigation, but had to withdraw.

12. In 2004, Danny filed a grievance against me with the Disciplinary Counsel of the Ohio Supreme Court. I filed a response to that grievance on August 13, 2004. A copy of that response is attached to this affidavit.

13. None of Danny's attorneys over the years have ever asked me about my involvement with Danny's case at the beginning, or the grievance filed against me by the Warren Police Department. I would have provided this same information back then had anyone inquired.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Date

Roger R. Bauer

SWORN TO BEFORE ME, and subscribed in my presence, this 8 day of September, 2014.

NOTARY PUBLIC

**MELANIE GADLEY**
**NOTARY PUBLIC**
**STATE OF OHIO**
**TRUMBULL COUNTY**
My Comm. Exp.
October 16, 2017

2

**Habeas Petition Exhibit 9**
**2 of 3**

**ROGER R. BAUER**
**Attorney at Law**

Roger R. Bauer
Attorney at Law
244 Seneca Avenue
Warren, Ohio 44481

Area Code: 330
Warren: 393-3818
Fax: 393-9943

RECEIVED
BES
AUG 1 9 2004

DISCIPLINARY COUNSEL
SUPREME COURT OF OHIO

Augus t 13,2004

Disciplinary Counsel
The Supreme Court of Ohio
Attn: Brian Shinn
250 Civic Centre Drive, Suite 325
Columbus Ohio 43215-7411

RE:    File No. A4-1779
        Letter of Inquiry

Dear Mr. Shinn:

This letter is address ed as a res ponse to the grievance filed by Mr. Danny Lee Hill. He has als o filed a grievance agains t Attorney Gr eg Mey ers and Attorney Marid e Costanzo.

Approximately in February of 2004, I was contacted by Mr. Hill via tel ephone. Mr. Hill told me th at he trusted me and wanted my repres entation his capital murd er case. Attorney Costanzo, who practices in the same building, h as als o been contact ed but I am not aware of the spec ifics.

Mr. Hill trust ed me becaus eI represented him wh en he was firs t arrested on the case for which he now s its on d eath row. I spoke to him early about not giving a statemen t and the Warren Po lice Department filed a grievance agains t me for consulting him. I was cl eare d on any wrong doing.

After I spoke with Attorney Cos tanzo I called Attorney Meyers. It was my understanding that Attorney Mey ers represent ed Mr. Hill in an effort to stop his execution for the reason that Mr. Hill was mentally retard ed at the time of the ac t and still is retarded. It s eemed to me that Attorney Mey ers des ired my assistance because Mr. Hill trusted me. I told A ttorney Meyers, Attorney Costanzo and Mr. Hill that I would only work on the case only if Attorney Meyers



103                 Exhibit R to Motion for New Trial
                                 1 of 1



DEFENDANT'S
EXHIBIT

R

## DECLARATION OF FRANKLIN D. WRIGHT, D.M.D.

I, Dr. Franklin D. Wright, declare the following under penalty of perjury. If called, I would testify as follows:

### BACKGROUND

1.     I am a practicing forensic dentist with over three decades of experience as the forensic dental consultant to the Hamilton County, Ohio, Coroner's Office. I have presented lectures and workshops in forensic odontology throughout the United States, Europe, Central America, and South America, including to the President of the United States National Science and Technology Council, Committee on Science, Subcommittee on Forensic Science.

2.     I am a past president of the American Board of Forensic Odontology ("ABFO"), and past chair of the ABFO Bitemark Proficiency Examination Development Committee.

3.     I resigned my position and membership with the ABFO in November, 2017.

4.     Over the course of my three-decade career in forensic odontology, I have reviewed, investigated, and consulted on hundreds of bitemark cases.

5.     I have been retained by the State of Ohio on numerous occasions to analyze bitemarks in criminal investigations and trials. I have also testified on behalf of the State of Ohio in criminal trials, including homicides.

6.     A detailed curriculum vitae is attached as Exhibit A to this Affidavit.

7.     On January 26, 2014, Counsel for Danny Lee Hill requested that I review certain case files and evidence relating to the prosecution of Mr. Hill for the murder of Raymond Fife. I understood that Mr. Hill was tried and convicted in the Trumbull County Court of Common Pleas in January 1986. At that trial, the court heard testimony relating to alleged bitemark

evidence from two forensic dentists: Dr. Curtis Mertz and Dr. Lowell Levine. Such evidence is directly in my field of expertise.

8. After my review of the materials provided I authored a letter to Mr. Hill's counsel, dated March 30, 2014, in which I reported my findings.

9. On September 22, 2014, I executed an Affidavit that confirmed and supplemented my findings in that letter. The content of that affidavit has been incorporated into this declaration.

## MATERIALS CONSIDERED

10. In reaching my opinions, I have reviewed these materials: Report of Dr. Curtis Mertz Report, Report of Dr. Lowell Levine, Trial Testimony of Dr. Mertz, Trial Testimony of Dr. Levine, and twenty-two black-and-white images that were photographs admitted as evidence during the trial of Danny Lee Hill.

11. In addition to the case-specific materials, I reviewed the 2009 National Academy of Sciences (NAS) report, *Strengthening Forensic Science in the United States: A Path Forward* ("NAS Report"); the 2016 Report to the President by the President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* ("PCAST Report"); the ABFO Bite Mark Guidelines; and the *Construct Validity Bitemark Assessments Using the ABFO Bitemark Decision Tree* ("Construct Validity Study"), and the April 12, 2016, report from the Texas Forensic Science Commission, titled *Forensic Bitemark Comparison Complaint Filed by National Innocence Project on Behalf of Steven Mark Chaney*.

12. I also have relied on the experience and training acquired over my career as a forensic dentist and consultant.

13.     Finally, I have considered conversations I had with Dr. Curtis Mertz, who is now deceased.

14.     After I executed the 2014 affidavit, I reviewed a report by Dr. Levine dated February 29, 2016, that was filed with the state court by the prosecutor.

## OPINION

15.     As detailed in my 2014 Affidavit, it is my opinion that the patterned injury on the victim, Raymond Fife, is not a human bitemark.

16.     My opinion about this injury is based on my experience, but is also informed by the results of the *Construct Validity Study*, which demonstrated that even the ABFO Board-Certified Diplomates cannot reliably identify a pattern injury as a human bite mark.

17.     My recent resignation from the ABFO was prompted by the failure of the organization to recognize the profound implications of the *Construct Validity Study*. In my view, the results of that study required the organization to renounce the use of bitemark analysis and comparison unless and until the method could be scientifically validated. My position is consistent with the findings published by the Texas Forensic Science Commission following its six-month study, which I participated in as a subject matter expert.[1]

18.     As detailed below, under the ABFO's current Guidelines, Dr. Mertz's testimony identifying Mr. Hill as "the biter" is scientifically indefensible.

19.     I was prepared to testify at a full evidentiary hearing in 2016 where I would have expanded on my opinions about the lack of scientific reliability to bitemark comparison. I was also prepared to discuss the influence of bias, including racial bias, likely played in Dr. Mertz's

---

[1] The report and all of the exhibits are available online at http://www.fsc.texas.gov/sites/default/files/FinalBiteMarkReport.pdf.

ultimate opinion. However, I was informed by counsel for Mr. Hill that the judge retracted the order granting a hearing and then subsequently denied the request for a new trial. My testimony was substantially limited.

### THE TESTIMONY AND OPINION OF DR. CURTIS MERTZ

20.     I testified at an evidentiary hearing on December 21, 2015, about the significant changes by the ABFO on the scientific reliability of bitemark comparison.

21.     The guidelines in place for board-certified forensic dentists have dramatically changed, once again, since my 2015 testimony.  Though his testimony fell within acceptable limits at the time of trial, today, these guidelines would preclude the testimony given by Dr. Mertz in this case.

22.     Analyzing this injury under today's standards, I conclude that the two circular marks on the victim's penis contains insufficient detail to declare it a human bite mark.  Under today's Guidelines, it could be, at best, characterized as "Inconclusive," and no further comparison could or would be undertaken.

23.     Even if this could be determined to be a bitemark, there is insufficient evidentiary value for a comparison as one cannot definitively determine upper or lower arches, the midlines of the arches, or clear outlines of the incisal edges of individual teeth.[2]  Nor is it possible to state definitively the orientation of this injury.

---

[2] The ABFO Guidelines define a bite mark as follows:  A circular or oval patterned injury consisting of two opposing (facing) symmetrical, U-shaped arches separated at their bases by open spaces.  Following the periphery of the arches are a series of individual abrasions, contusions, and/or lacerations reflecting the size, shape, arrangement, and distribution of the class characteristics of the contacting surfaces of the human dentition.  ABFO Manual at 115.

24.     In my view, the injury at issue in this case is of uniquely poor quality and totally lacks evidentiary value. While obviously the quality of the injury has not itself changed since Mr. Hill's trial, available scientific understanding and evidence about how such poor quality can, as here, preclude further analysis has changed.

25.     In addition, the ruler Dr. Mertz used to analyze the injury is not a two-sided, right-angled ABFO forensic ruler, so one cannot determine definitively if there is photographic distortion due to the angle of the camera lens. Thus, pursuant to the ABFO Guidelines, under no circumstances should any comparison to a suspected dentition have been attempted using this evidence.

26.     Not only was this injury probably not a bitemark and unsuitable for comparison, but Dr. Mertz's conclusions about its source in this case are also now understood to be unreliable, and, indeed wrong, both as a matter of generally accepted science and pursuant to the ABFO Guidelines. As the NAS Report and PCAST Report have made clear, there is no science that supports a conclusion that a specific perpetrator inflicted a particular bite mark.

27.     Furthermore, it is my opinion that the location of the patterned injury renders it impossible to make any positive association between a suspected biter and this patterned injury. Dr. Mertz's assertion that Mr. Hill caused the injury on the victim's penis required him to speculate that the victim's penis was erect when the bite occurred, this erect penis would have been three times the size of a flaccid penis, and that therefore the dimensions of the bitemark that were actually measured were approximately a third smaller than the dentition of the alleged biter. This speculation is only a blind guess. Such blind guessing is not a reasonable or reliable scientific methodology, nor is it permitted under the ABFO Guidelines.

28. In my opinion, the extrapolations that Dr. Mertz made from his actual measurements (based on his speculation regarding the presence of erection and erect versus flaccid penis circumference) are not scientifically supportable, and suggest that, rather than objective, expert opinion, Dr. Mertz's testimony suffered from predictive outcome bias and confirmation bias.

29. This bias is evidenced by the fact that Dr. Mertz addressed only those aspects of the patterned injury he felt he could link to Mr. Hill's dentition, ignoring other aspects of the patterned injury he could not link to Mr. Hill.

## DR. MERTZ'S POST-TRIAL STATEMENTS

30. Dr. Mertz passed away in 2005. As noted, he was my mentor, and a respected teacher and scholar in the forensic odontology community. However, prior to his death, Dr. Mertz told me that he regretted the testimony he gave in this case, and that he did not believe that it was scientifically supportable.

31. These statements, recorded here to the best of my recollection, were made by Dr. Mertz on two different occasions after my questioning his conclusions in this case in 1988. The first conversation in the mid 1990s where Dr. Mertz stated to me that he still believed Mr. Hill bit the penis of the victim but he wouldn't state "reasonable medical/dental certainty" in his conclusions as he had in his testimony and our previous discussion of this case in 1988. Later in the 1990s, Dr. Mertz told me that he did not have the same opinion of "reasonable medical/dental certainty" to which he had testified in the case. He further explained that he would not be able to testify with ANY certainty that Mr. Hill's teeth caused the injury on the penis of the victim or that injuries on the penis were caused by teeth.

32.     Dr. Mertz further confided that he felt pressure from the prosecution to offer testimony that Mr. Hill was the source of a human bitemark on the victim's penis. Dr. Mertz told me he felt this pressure interfered with his ability to offer a scientifically unbiased analysis of the evidence. He also stated that absent that pressure he would not have given the opinion or testimony used to convict Mr. Hill. I do not know if he informed the prosecutor of his misgivings about his testimony.

33.     When Dr. Mertz was discussing this case with me, he made racially prejudicial statements about the defendant being a black man including the "n" word. I recall at the time finding those statements inappropriate, offensive, and unacceptable as they pertained to a case in which Dr. Mertz was working.

34.     Despite these expressed regrets, Dr. Mertz to my knowledge never came forward publicly and did not tell me the name of the case so that I could do so. Whether this was because of his beliefs about Mr. Hill's guilt or his race, I do not know. I did not know until Mr. Hill's current counsel contacted me that it was Mr. Hill's case to which Dr. Mertz was referring.

## OUTCOME AND CONFIRMATION BIAS

35.     It is my understanding that Dr. Mertz knew that Mr. Hill was a suspect in the case when he received the casts of his teeth, before undertaking any comparison and rendering his conclusions. This is improper under today's understanding of the proper scientific method because it creates cognitive bias which can infect the conclusions and render them unreliable. As the PCAST report found: "Cognitive bias refers to ways in which human perceptions and judgments can be shaped by factors other than those relevant to the decision at hand. It includes

'contextual bias,' where individuals are influenced by irrelevant background information . . . ."
PCAST Report at 31

36.     Here, the information that Mr. Hill was a suspect, given to Dr. Mertz *before* analyzing the evidence and reaching his conclusions, was irrelevant background information that could shape his ultimate judgment, rendering it even more unreliable. By today's standards, no forensic odontologist should know the facts of the case or the suspects formulated by the police prior to analyzing any suspected dentition. At the time of Dr. Mertz's analysis, that was the common, but mistaken, practice.

37.     Because cognitive bias occurs at a subconscious level and "cannot be willed away,"[3] these findings in no way diminish the professionalism or virtue of scientists, both forensic and otherwise. Instead, experts (given the shortcuts in reasoning and perception that their experience affords them) may actually be at a greater risk of succumbing to cognitive bias (again unintentionally) than non-experts.

38.     The contextual bias discussed above was, unfortunately, only one aspect of implicit bias likely to have influenced Dr. Mertz's opinion in this case. Considering his use of racially derogatory language in my presence, including the "n word," and comments he made to me about this case in particular, racial bias also played a role in Dr. Mertz's willingness to "match" Mr. Hill to the two marks on the victim's penis.

39.     I have personally reviewed hundreds of "bitemark" cases, including several with Dr. Mertz. *None* of those cases were close to the gross speculation he proffered in this case. In my experience with Dr. Mertz, he was always very careful not to speculate in order to simply inculpate a suspected biter. Indeed, as discussed above, Dr. Mertz confided to me that he had no

---

[3] NAS Report, at 122.

confidence in his opinion in this case, and yet did nothing to retract his testimony, perhaps because of Mr. Hill's race and what he viewed as Mr. Hill's likely guilt. Therefore, knowledge of the race of both the victim and the defendant in this racially charged, highly emotional case, is likely to have had an impermissible effect on Dr. Mertz's willingness to depart so far from the careful, conservative analysis he taught me during the years he acted as my mentor.

## THE TESTIMONY AND OPINIONS OF DR. LOWELL LEVINE

40.     Dr. Lowell Levine erred when he opined that the injury on the victim represents a human bitemark.

41.     Dr. Levine further erred when he stated (i) that either Mr. Hill, or his co-defendant, Tim Combs, could have been the biter, and (ii) that one portion of the patterned injury was likely caused by Mr. Hill.

42.     In my opinion, the only reasonable and reliable scientific conclusion that could today be asserted given Dr. Levine's recorded observations about the patterned injury was, as with Dr. Mertz, that the patterned injury lacked specificity, and thus could not supply a basis for identifying the injury as a bite mark and either Mr. Hill or Mr. Combs (or anyone else) as the biter.

43.     I agree with Dr. Levine's February 29, 2016, report insofar as he acknowledges that bitemark comparison is subjective. But when he states it is an art based on science, I am concerned that his own bias is clouding his current judgment. Dr. Levine should know by now that his testimony at Mr. Hill's trial was also not based on sound science and should not have been admitted.

44. As a forensic dentist, Mr. Hill's case is one of the most egregious examples of how bitemark comparison has been used wrongly and fraudulently to sustain a capital murder conviction.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Franklin D. Wright, D.M.D.

Executed this 7th day of June, 2020.

# FRANKLIN D. WRIGHT, D.M.D.

# FORENSIC DENTAL CONSULTANT

# FRANKLIN D. WRIGHT, D.M.D

---

## *GENERAL INFORMATION*

**EMAIL:**          **frankwright@msn.com**

**OFFICE:**          Full Time Family Practice
1055 Nimitzview Dr.
Cincinnati, Ohio 45230
PHONE  (513) 231-5353
FAX      (513) 231-6404

**EDUCATION:**

University of Kentucky
College of Dentistry
A.B. Chandler Medical Center
Lexington, Kentucky

**GRADUATE:**     **1984**


University of Kentucky
College of Arts and Sciences
Lexington, Kentucky

**GRADUATE:**     May 1980


Anderson Senior High School
Cincinnati, Ohio 45255

**GRADUATE**:     1976

2

## PUBLICATIONS, LECTURES, AFFILIATIONS

*Publications:*
- Cincinnati Dental Society "Bulletin"
"Forensic Odontology", April 1988 Vol. 57 No. 4 Pg. 16

Manual of Forensic Odontology
(A publication of the Amer. Society of Forensic Odontology)
- "Postmortem Dental Radiography", Second Edition, 1991

- Chapter 2,"Dental Identification", Third Edition, 1995

- Dental Identification, Fourth Edition, 2007

-Chapter 7 Bitemark Analysis, Fifth Edition, 2012

- Forensic Dentistry, Chapter 6 "Forensic Photography"; first edition, 6/97, CRC Press, Boca Raton, FL

- Photography in Bite Mark and Patterned Injury Documentation, Part 1 and part 2- a case study, Journal of Forensic Sciences, vol.43; num.5; pgs 871-881; July 1998

- Dental Clinics of North America: Forensic Odontology, Bitemark Chapter, April, 2001, pgs 365-397

- Bitemark Evidence, edited by Dr. Robert B.J. Dorion, {photography- chapter 7}"Collection of Evidence: Non-invasive Analyses: Photography" First edition 2004;

- Forensic Dentistry, 2nd edition, edited by Drs. David Senn and Paul Stimson, Ch.11 Forensic Photography (January, 2010)

-The Use of Full Spectrum Digital Photography for Evidence Collection and Preservation in cases involving forensic odontology, Forensic Science International, vol. 201 Nos. 1-3, September, 2010; pgs 59-67

-Bitemark Evidence, edited by Dr. Robert B. J. Dorion, {photography- chapter 7}"Collection of Evidence: Non-invasive Analyses: Photography" Second Edition, January ,2011

- Forensic Science: Current Issues, Future Directions; Odontology- Dentistry's Contribution to Truth and Justice; (publication of the American Academy of Forensic Sciences) Pretty, I.; Barsley, R.; Bowers, C.M.; Bush, M.; Bush, P.; Clement, J.; Dorion, R.; Freeman, A.; Lewis, J.; Senn, D.; Wright, F. September 2012; pgs 179-210

-Manual of Forensic Odonotology 5th edition, edited by David R. Senn; Richard A. Weems; Chapter 9; CRC Press, Boca Raton, FL February, 2013

-"Patterned bruises on 2 infants"; Luyet, F.; Feldman, K.; Wright, F.; Knox, B.; Contemporary Pediatrics; February 2013; pgs 21-22

3

**-**Online Continuing Education Courses:
        Forensic Odontology Part 1   October, 2017
        Forensic Odontology Part 2   November , 2017
        www.dentalcare.com  Proctor & Gamble Co online website

**-**Forensic Odontology Principles and Practice, edited by Thomas J. David ; James M Lewis, Chapter 4; Elsevier, Inc. February, 2018

*Lectures:*
    - "Forensic Dentistry"**-** Cincinnati Dental Assistant's Society,
October 17, 1988 **-** March 20, 1991 **-** March 21, 1994 **-** April 21, 1997

    **-** Hamilton County Dental Mass Disaster Team, "Dentistry's Role in a Mass Disaster in Cincinnati", January 6, 1990

    **-** "Dental Identification" **-**Cincinnati Dental Society, March 12, 1990

    - "Forensic Dentistry" **-** Lima Dental Study Club, January 14, 1992

    - "Forensic Dentistry"**-** All Ohio Dental Career Day, The Ohio State University March 1992; April 1993

    - "Distortional Correction in Bitemark Photography **-** an Unusual Case" &
"Problems and Solutions to the Formation of a Statewide Dental Disaster Team"
American Academy of Forensic Sciences **-** Annual Meeting, Boston February 1993

    - "Forensic Dentistry**-** A Look At Dentistry As You Have Never Seen It Before"
Radisson Hotel, Lexington Kentucky, Sponsored by the University of Kentucky, College of Dentistry **-** Commonwealth Continuing Education Dept., August 28, 1993 and December 16, 1994

    **-**"Forensic Dentistry**-** A New Look at an Old Friend", Eastside Dental Study Club May 1994

    **-**"Forensic Dentistry**-** Course and Workshop", Republica de Colombia Instituto Nacional de Medicina Legal y Ciencias Forenses Bogotá, Colombia, South América, December 12-17, 1994

    **-**"Bitemark Case Workup" **-** A.S.F.O. Annual Meeting, Seattle, WA February 14, 1995

    **-**"Forensic Dentistry: A Look at Dentistry as You've Never Seen It Before"
:Ohio Expanded Dental Function Assistants Association at the Annual Meeting of the Ohio Dental Association, September 1995

4

:Stark County (Canton, Ohio) Dental Society, November 1995
:Greater Cincinnati Oral Health Council, December 1995
:Raymond Walters College- Dental Hygiene Program University of Cincinnati,
January 1996
:Greater Cincinnati Dental Study Club, October 1996
:Cincinnati Dental Hygienists' Association, November 1997

-Death Investigation Seminar, Hamilton Co. Coroner's Office, Odontology Presentation-
"Forensic Dentistry, Pattern Injuries, Photography", 10/17/96, 9/9/97, 9/98; 9/99

- "Evidence Recovery with Dental Materials", FBI Evidence Recovery Team, Cincinnati
Office, 10/18/96

- "Bitemark Evidence Recovery", Hamilton Co. Sexual Assault Team, 1991,1993, 1997

- "Computers in Dental Identification"; "Human Abuse"; "Bitemark Update: Computers,
DNA and Digital Images" IX Congress de la Instituto de Medicina Legal y Ciencias
Forenses, Bogotá, Colombia, S.A. Sept. 17-20, 1997

- George Furst Bitemark Seminar, AAFS meeting, 2/14/98 case presentation,
San Francisco, CA

- "Forensic Dentistry: the basics and some nuggets for your office" Cincinnati Dental
Society, 3/9/98

- "Forensic Evidence" keynote speaker, Domestic Violence Conference "Effective
Investigation and Prosecution" workshop, Cincinnati, 4/2/98

- "Forensic Photography" California Attorney General's National Missing &
Unidentified Persons Violent Crime Workshop, 7/21-7/25/98, Sacramento, California

- "Forensic Dentistry- It's All in How You Look at It!"
University of Kentucky- Commonwealth Continuing Dental Education
University of Kentucky, 8/28/98

- "Child Abuse" & "Forensic Dentistry" Division of Pediatric Dentistry, Children's
Hospital Medical Center, Montgomery Inn, Cincinnati, Ohio 2/4/99

- 2nd George Furst Bitemark Seminar, AAFS Annual Meeting "Forensic Photography"
and "Overlay Fabrication", Saturday, 2/20/1999, Orlando, FL

- "Forensic Dentistry" Northwest (Ohio) Dental Society, Lima, Ohio, 3/17/99

- "Forensic Photography" - Ohio State Coroners Association Annual Meeting
Columbus, Ohio, 5/14/99

- "The ODA Mass Disaster Identification Team and Forensic Dentistry: an Introduction"
Ohio Dental Association Annual Session, Columbus, Ohio, 9/23/99

- "Forensic Dentistry" T.I. Law Dental Study Club, Cincinnati, Ohio, 9/27/99

5

- 3rd George Furst Bitemark Seminar AAFS Annual Meeting Three part Course Review and Summary, Reno, NV, February 19,2000

- "Forensic Dentistry: Dental Identification Exercise and Bitemark Case Analysis" University of Kentucky College of Dentistry-Commonwealth Dental Continuing Education, Lexington, KY, 3/24/00

- "Forensic Dentistry: Bitemarks – Who did It?" Ohio Dental Association Annual Session, Columbus, Ohio, 9/16/00

-" Human Abuse", teacher in-service: Lawrenceburg School System Lawrenceburg, Indiana, January 10, 2001

-"The Trials and Tribulations of Bitemarks Analysis: Seeing What is Really There" AAFS annual meeting Abstract presentation, Thursday February 22,2001 Seattle, Washington

-"Forensic Odontology 2001", Instituto de Medica Legal y Ciencias Forenses June 3-9, 2001, Bogotá, Colombia, South América

- "Forensic Dental Identification Workshop" Annual Session, Ohio Dental Association, September 14, 2001 Columbus, Ohio

-Dental Identification Unit, Office of the Chief Medical Examiner, New York City, NY World Trade Center Disaster  (Dental Identification of WTC victims) 9/15-9/23/01; 12/5-12/10/01

-VI Jornada de Medican Legal, Ministerio Publico: Instituto de Medicina Legal "Forensic Evaluation: Collection and Process of Identification at the Scene of the Crime"; "Identification by Human Bitemarks", "Identification by Forensic Dentistry", "DNA in Forensic Dentistry", Panama City, Republic of Panama, Central America October 23-25, 2002

-"Forensic Dentistry: Crime Scene Incidents" Northern Kentucky University Advanced Crime Scene Class Friday 11/8/02 - Prof. Jill Shelley, Highland Heights, KY 41099

-"Forensic Dentistry", Cincinnati Dental Hygienists Association Raymond Walters College, University of Cincinnati, 11/12/02, Cincinnati, Ohio

-"Advanced Forensic Photography" University of Texas, San Antonio San Antonio, TX   December 6-8, 2002, lecture & workshop; with Dr. Greg Golden, Upland, CA and Dr. James Lewis, Alabama

-ABFO Bitemark Workshop #5: Didactic Lecture: "ABFO Bitemark Terminology and Report Writing"; Moderator: oral presentations by candidates, AAFS Annual Meeting, Chicago, IL  Sunday February 16, 2003

-"Dental Identification Workshop Using Computers", sponsored by the Ohio Dental Association at the Ohio State University College of Dentistry April 12, 2003

6

Columbus, Ohio

-"Mass Disaster Identification Workshop", Tennessee Dental Association Annual
Meeting, Nashville, TN  May 22, 2003

-"Introduction to Forensic Dentistry", Ohio Dental Association Annual Session,
Columbus, Ohio September 13, 2003

"Ominous Signs of Abuse, including Bite Mark Analysis and Patterned Injuries",
Ohio Sexual Assault Nurses Association/Forensic nurses, MedCentral
Hospital, Mansfield, Ohio  Nov. 5,2003

"Photography in documentation of bitemark and patterned injuries in child abuse and
assault" Multi-disciplinary Child Abuse Team- Cincinnati Children's Hospital
Medical Center, Mayerson Center for Child Abuse, Children's Hospital,
Cincinnati, Ohio  November 21, 2003

"Forensic Dentistry: A Look at Dentistry as You Have Never Seen It Before", Lorain
County Dental Society, Holiday Inn, Ohio St. Rt. 57, Lorain, Ohio,
January 21, 2004

"Forensic Dentistry" Northern Kentucky University Criminal Justice Seminar
Farris Auditorium, NKU Campus 3/26/04

"Advanced Forensic Photography: Human Bitemarks: Detection, Photography and other
Evidence Collection",  NYU College of Dentistry/New York Society of Forensic
Dentistry  345 E. 24th St. NY, NY        3/29/04

"Be Careful Who You Bite: An Introduction to Bitemark Analysis"  Cincinnati Dental
Society Scientific Meeting Monday 4/19/04 Gregory Conference Center
Cincinnati, Ohio

"Forensic Dentistry: CSI"  University of Kentucky College of Dentistry Continuing
Education Network, Lexington, KY  12/3/04

"Forensic Dentistry: An Introduction for Dental Hygienists"  Ohio Dental Hygiene
Association Annual Meeting, Cincinnati, Ohio  1/22/05
"Forensic Dentistry: An Introduction" Ohio Dental Association Annual Session
Saturday 9/17/05 Greater Columbus Convention Center Columbus, Ohio
"Forensic Dentistry CSI" North Central Hygiene Association
October 7, 2005 Sandusky, Ohio
"Forensic Dentistry: A Look as Dentistry as You've Never Seen it Before
Toledo Dental Society October 19, 2005 Toledo, Ohio
"Forensic Dentistry in Child Abuse: First Annual James Steiner Lecture Series
Cincinnati Children's Hospital Medical Center, Oct. 31, 2005
"Photography in Forensic Dentistry to Document Bitemarks and Patterned Injuries
Grand Rounds, Cincinnati Children's Hospital Medical Center
November 1, 2005
"Photographic Documentation of Bitemarks and Patterned Injures in Child Abuse and
Domestic Violence"  Kentucky Association of Sexual Assault Programs annual
Meeting  Marriott Griffin Gate Resort, Lexington, KY 12/8/05

7

-"Patterned Injuries in Sexual Assault" Innovative Healthcare for Victims- Kentucky
    Association of Sexual Assault Programs; University of Kentucky Medical Center
    Lexington, KY 2/7/06
-"Forensic Dentistry CSI" Hocking Valley Dental Hygiene Association Lancaster,
    Ohio 2/06
-"Report Writing in Bitemark Analysis" American Board of Forensic Odontology
    Bitemark Workshop Seattle, Washington 2/19/06
-"Forensic Dentistry Introduction" and Ohio State Dental Board Update, Stark County
    Dental Society, Akron, Ohio 4/4/06
-"Forensic Photography in the Documentation of Bitemarks and Other Patterned Injuries
    Pediatric Sexual Assault Nurse Examiners Annual Meeting, Columbus, Ohio
    Children's Hospital, Columbus 4/28/06
-"Introduction to Forensic Dentistry" part of forensic series in collegiate course titled
    "Introduction to Forensic Science", University of Cincinnati, Professor Gideon
    Labiner, 5/3/06; also 5/2009
-"Mass Disaster Training and Preparation" National Mass Fatalities Institute Seminar
    sponsored by the Hamilton County Coroner's Office, Cincinnati, OH
    Scarlet Oaks Joint Vocational School 5/25/06
-"Bitemark Analysis, Evidence Collection and Report Writing" Southwest Symposium
    on Forensic Dentistry University of Texas-San Antonio, San Antonio, TX
    6/8- 6/10/06
-"Bitemarks" US Public Health Service Annual Session, Dental Category, Cincinnati,
    Ohio June 5, 2007
-"Forensic Odontology and the Coroner/Medical Examiner"; International Association of
    Coroners and Medical Examiners, millennium Hotel, Cincinnati, Ohio
    June 10, 2008
-"Bitemark Analysis, Evidence Collection and Report Writing" Southwest Symposium
    on Forensic Dentistry, University of Texas-San Antonio, San Antonio, TX
    6/4-6/7/2008
-"Forensic Dentistry; CSI" Ohio Expanded Function Dental Auxiliaries, Columbus,
    Ohio; 6/27/2008
- "Effects of the National Academy of Science (NAS) Preliminary Report on the Practice
    of Forensic Odontology, American Academy of Forensic Science Annual Meeting,
    Denver, CO, 2/2009

-"Bitemark Workshop", Ohio Dental Association Forensic Dental Team; Annual Meeting
    of the Ohio Dental Association, Greater Columbus Convention Center,
    Columbus, Ohio, September, 2009

- "Forensic Dentistry" Santiago, Chile, South America, 10/3- 10/12/2009; Inaugural
    meeting of the Latin American Society of Forensic Dentistry, at the invitation of
    the Division of Medicina Legal, Attorney General's Office, Country of Chile

-"Summary of the Findings of the National Academy of Science" American Academy of
    Forensic Sciences Annual Meeting, Denver, Colorado 2/20/2009
-"Forensic Dentistry- Human Abuse and Dental-Legal Issues" Ohio Dental Hygienists
    Association Annual Meeting, 4/23/10, Mason, Ohio
-Forensic Dentistry" Introduction to Forensics, Guest Lecturer , Un. of Cincinnati,
    Professor Gideon Labiner, Course Director 5/12/10 Cincinnati, Ohio
-"Introduction to Forensic Dentistry", Guest Lecturer, Advanced General Dentistry
    Program, Un. of Cincinnati, Dr. Jerome McMahon, Program Director

8

-Southwest Symposium on Forensic Dentistry, "Bitemark Analysis" and "Advanced
      Forensic Photography", Un of Texas- San Antonio, San Antonio, TX;
      June 9-12, 2010
-"The Use of Full Spectrum Digital Photography for Evidence Collection and
      Preservation in cases involving forensic odontology", International Organization
      of Forensic Odonto-Stomatology, Lueven, Belgium  September 2010
-"Human Bitemarks, NAS Report and *Daubert"* Executive Office of the President of the
      United States  National Science and Technology Council, Committee on
      Science, Subcommittee on Forensic Science, Washington, DC; January 12,2011
-"Forensic Dentistry and the NAS Report: then and now, really?" American Society
      of Forensic Odontology Annual Meeting, Chicago, Ill February 22, 2011
-"Pitfalls of Bitemark Analysis: where does one end and the other begin?" American
      Academy of Forensic Sciences, Hyatt Regency Hotel, Chicago, Ill,
      February 24, 2011
-"Bitemark Management 2011" American Board of Forensic Odontology Bitemark
      Workshop, Hyatt Regency Hotel, Chicago, Ill February 25, 2011
-"Forensic Odonotology" Ohio Association of Pediatric Dentistry, Nationwide
      Children's Hospital, Columbus, Ohio  March 4, 2011
-"Bitemark Analysis, Conclusions and Report Writing" American Society of
      Forensic Odontology Annual Meeting February 21, 2012 Atlanta, GA

-"Bitemark Analysis" University of Kentucky College of Dentistry- Senior Elective
      April, 2012, Lexington, KY
-"The Dental Record- Saving or Kicking your Butt", Cincinnati Dental Society
      May 7, 2012 Cincinnati, Ohio
- Introduction to Forensic Dentistry, University of Cincinnati, Advanced Dental Practice
      Residency  May 10, 2012 Cincinnati, Ohio
-Southwest Symposium on Forensic Dentistry-Bitemark , University of Texas, San
      Antonio; San Antonio, TX  June 6-9, 2012
-"The Use of Bitemark Evidence, Analysis and Comparison in Violent Crime; 43rd
      Annual Session of the American Society of Forensic Sciences, Feb. 19, 2013
      Washington, DC
-"Bitemark Analysis: Foundation, lessons from the Past and the Paradigm Shift to the
      Present and the Future"; American Academy of Forensic Sciences Annual
      Meeting, Washington DC, Feb. 22, 2013
-"Does Bitemark Evidence Meet Modern Evidentiary Reliability Standards? A Subject
      Expert Panel Discussion";  American Academy of Forensic Sciences Annual
      Meeting, Washington DC, Feb. 22, 2013
-"Human Bitemark Analysis"; University of Kentucky, College of Dentistry;
      Lexington, KY  3/8/2013
-" Forensic Dentistry" Introduction to Forensics, Guest Lecturer , Un. of Cincinnati,
      Professor Gideon Labiner, Course Director    Cincinnati, Ohio 4/4/2013
-"Forensic Dentistry" University of Cincinnati, Advanced Dental Practice
      Residency  May 9, 2013 Cincinnati, Ohio
-"Human Abuse in the Practice of Dentistry" Cincinnati Children's Hospital Medical
      Center Pediatric Residency Program, Montgomery Inn, Montgomery, Ohio
      October 8, 2013; Cincinnati, Ohio
-"Contemporary Forensic Dentistry: Bites, Burns, Slaps, Age and Dental Record- Where
      Modern Dentistry Meets the Law"; University of Kentucky College of Dentistry,
      October 25, 2013; Lexington, KY
-Two cases with Closed Suspect Populations and High-Quality Bitemark Evidence"

9

AAFS Annual Meeting- Odontology Section Friday Feb. 21. 2014 Seattle WA
-"Published Bitemark Research- Relevance in Real Bitemark Cases: Is It Helping to
    Better Understand Human Bitemarks in Living Skin?
    AAFS Annual Meeting- Odontology Section Friday Feb. 21. 2014 Seattle WA
-"Disaster Victim Identification and Identification Workshop"
    Georgia Dental Association, Atlanta, GA, Saturday April 26, 2014
--"Forensic Dentistry" University of Cincinnati, Advanced Dental Practice
    Residency  June 16, 2015 Cincinnati, Ohio

-"A Tour of Forensic Dentistry: An Introduction to the Fascinating World of Dentistry
    and the Law"; University of Kentucky College of Dentistry; Pulman Plaza Hotel
    Huntington, West Virginia 10-12-2014
-"Current State of Bitemark Research"; American Society of Forensic Odontology annual
    meeting, Orlando, Florida February 17, 2015
-"Bitemarks From the Emergency Room to the Courtroom: The Importance of the Expert
    in Forensic Odonotlogy" American Academy of Forensic Sciences annual
    meeting; Orlando,  Florida February 19, 2015
--"Forensic Dentistry" University of Cincinnati, Advanced Dental Practice
    Residency, June 23, 2016 Cincinnati, Ohio
-"Forensic Dentistry" Dayton VA Dental Service 5th Annual Dental Symposium
    Dayton VA Hospital, October `4, 2016
- "Forensic Odontology"; American Society of Indian Dentists, Annual meeting
    Cincinnati, Ohio June 22, 2017
-"Bitemark Moratorium: Past Culture and Present Thinking" American Academy of
    Forensic Sciences meeting; Baltimore, MD  February 21, 2019

*Affiliations*:
    Diplomat, American Board of Forensic Odontology (1989-2017) (ABFO)
    Member, American Society of Forensic Odontology (1986-2016) (ASFO)
        Fellow, American Academy of Forensic Sciences  (1992-) (AAFS)
    Fellow, International College of Dentists (2000-2010)
    Member, PANDA Coalition- Delta Dental of Ohio and the Ohio Dental
    Association (1994- ) (PANDA =prevent abuse and neglect through dental
    awareness)
    National Dental Advisor, Parents of Murdered Children (1993-)
    Hamilton Co. Coroner's Office, Forensic Dental Consultant (1986- )
    Disaster Committee Member, Greater Cincinnati- Northern Kentucky International
    Airport, Dental Mass Disaster Team  (1988-)
    American Dental Association, Ohio Dental Association (ODA)
    Cincinnati Dental Society (CDS) (1984-)
    CDS Council Member  (1997-2005) Delegate, ODA (1998-2005)
        -Chairman, CDS Public Relations Committee (2004-08)
    Forensic dental consulting provided in many states throughout the US, Central
    and South America, Europe
*Offices Held*:
    Member, Odontology Subcommittee, Organization of Scientific Areas Committee,
    National Institute of Standards and Technology, United States Department
    of Commerce (Nov 2014-Nov 2016)
    Forensic Dental Consultant, Hamilton Co. Coroner's Office (1986- )

10

Chairman, Mass Disaster Identification Team, Ohio Dental Association (1990-1998)
Chairman, Forensic Dental Team, Ohio Dental Association (1998-2010)
Chief, Hamilton County, Ohio-Dental Disaster Team (1986-)
American Board of Forensic Odontology (ABFO):
    - Board of Directors, A.B.F.O. (1994-1997) (1998-2001) (2004-2005)
    -ABFO Bitemark Proficiency Examination Development Committee (2011-2017)
    -ABFO Ethics Committee (2013-2016)
    -ABFO Immediate Past President (2011-2012)
    -ABFO President (2010-2011)
    -ABFO President-Elect (2009-2010)
    -ABFO Vice President (2008-09)
    -ABFO Secretary (2006-08)
    -ABFO Bitemark Committee Chairman (2016-2017)
    -Member, ABFO Human Abuse, Bitemark and Mass Disaster Committees
        Certification and Examination Committee, Human Identification
        Committee, Executive Committee, Nominating Committee
`    -Chairman, ABFO Strategic Plan Committee (2003-2006)
    -Cincinnati Center for Children's Dentistry, Board of Directors, Trustee (2006- )
Chairman, Cincinnati Dental Society Forensic Dental Team (2002-)
Chairman, Human Abuse Committee, A.B.F.O. (2000-2002)
Board of Governors- A.S.F.O. (1995- 1998)
Editorial Board, A.S.F.O. Newsletter (1999- 2006)
Odontology Section Program Chairman, A.A.F.S. (1997-1999)
Odontology Section Secretary, A.A.F.S. (1999-2001)
Odontology Section Chairman, A.A.F.S. (2001-2003)
AAFS: Local Arrangements, Cincinnati, 1990
    Continuing Education Committee (1997-2003)
    Nominating Committee (2000- 2002)
    Ethics Committee (2000- 2002)
    Council (1998-2002)
    *Journal of Forensic Sciences,* Peer Review, scientific articles (2009-2012 )
Texas Forensic Science Commission Bitemark Comparison Review Committee
    (1/2017- 9/2017); Co-chairman


Ohio State Dental Board :
    Term: 4/04 through 3/31/08
    Committees: Policy Committee (2004 -08 )
        Laws & Rules Committee (2004 - 08)
        Communication Committee (2004- 08 )
        Scope of Practice (2004- 08 )

**Recognized Meetings:**
    Symposium on Mass Disasters, A.D.A. Headquarters, Chicago, Illinois, March 1986
    Airport Disaster Exercise, Greater Cincinnati International Airport
    October 1988-December 1991, September 1993-September 1996
    September 1997- present
    American Academy of Forensic Sciences (AAFS)- Annual Meeting
        Cincinnati, Ohio – February 1990
        Anaheim, California – February 1991
        New Orleans, LA – February 1992

11

Boston, MA – February 1993
San Antonio, TX – February 1994
Seattle, WA – February 1995
Nashville, TN - February 1996
New York, NY – February 1997
San Francisco, CA - February 1998
Orlando, FL - February 1999
Reno, NV - February 2000
Seattle, WA - February 2001
Atlanta, GA - February 2002
Chicago, IL - February 2003
Dallas, TX – February 2004
New Orleans, LA February, 2005
Seattle, WA February 2006
San Antonio, TX February, 2007
Washington DC February, 2008
Denver, CO February 2009
Seattle, WA February 2010
Chicago, IL  February 2011
Atlanta, GA February 2012
Washington DC February 2013
Seattle, WA February 2014
Orlando, FL February 2015
Las Vegas, NV February 2016
New Orleans, LA  February 2017

American Society of Forensic Odontology Annual Meeting: 1986-2016
American Board of Forensic Odontology Annual Diplomates Meeting 1989- 2017
Second Symposium on Mass Disaster, ADA Headquarters, Chicago, Illinois, 6/96
Mass Disaster Workshop, ADA Headquarters, April 1997
C.A.R.E. Symposium (Child Abuse Recognition Education),
ADA Headquarters, 7/31- 8/1/98

***Continuing Education***:
- "Forensic Odontology", Armed Forces Institute of Pathology Washington, D.C.
September 1986
- "Forensic Odontology", University of Louisville, Louisville, KY
Mark Bernstein, D.D.S.  1985
- "Forensic Odontology", ADA Mid-Winter Meeting, Chicago, Illinois
John Kenney, D.D.S.  1987
-Mini- A.F.I.P Course, Indiana University- Purdue University, Indianapolis, IN
A.F.I.P. Faculty, 1988,
- Annual A.A.F.S meeting: 1990- 2017, Annual A.S.F.O. meeting: 1990- 2016; A.B.F.O.
Annual meeting: 1989-2017

***Research Interest:***
- Photo-documentation of patterned injuries using non-visible light  (Infra-red and ultra
violet light)- research on-going
- Digital Imaging and Enhancement, on-going

I have been involved in litigation, both in civil and criminal cases, as well as the review

12

of many cases that were not litigated   Specifics available upon request.

*American Board of Forensic Odontology, Inc.*
*Diplomates Reference Manual*
*Section I: Preface, Acknowledgments, Background, Functions & Purposes*

# American Board

# of

# Forensic Odontology

# Diplomates Reference



# Manual

**January 2012 Edition**

1


DEFENDANT'S
EXHIBIT
G

- Variation from normal, unusual, infrequent.
- Not one of a kind but serves to differentiate from most others.
- Highly specific, individualized.
- Lesser degree of specificity than unique.

## Bitemark Definitions

*Bitemark*:

- A physical alteration in a medium caused by the contact of teeth.

- A representative pattern left in an object or tissue by the dental structures of an animal or human.

## Describing the Bitemark

A circular or oval patterned injury consisting of two opposing (facing) symmetrical, U-shaped arches separated at their bases by open spaces. Following the periphery of the arches are a series of individual abrasions, contusions, and/or lacerations reflecting the size, shape, arrangement, and distribution of the class characteristics of the contacting surfaces of the human dentition.

## Variations:

1. Additional features:

- Central Ecchymosis (central contusion).
- Linear Abrasions, Contusions or Striations
- Double Bite - (bite within a bite)
- Weave Patterns of interposed clothing.
- Peripheral Ecchymosis

2. Partial Bitemarks

3. Indistinct/Faded Patterned Injury (e.g., fused or closed arches, solid ring pattern)

4. Multiple Bites.

5. Avulsive Bites.

## Terms Indicating Degree of Confidence That an Injury is a Bitemark:

**Bitemark** - Teeth created the pattern; other possibilities were considered and excluded.

115

• *criteria*: pattern conclusively illustrates a) classic features. b) all the characteristics, or c) typical class characteristics of dental arches and human teeth in proper arrangement so that it is recognizable as an impression of the human dentition.

**Suggestive** – The pattern is suggestive of a bitemark, but there is insufficient evidence to reach a definitive conclusion at this time.

• *criteria:* general shape and size are present but distinctive features such as tooth marks are missing, incomplete or distorted <u>or</u> a few marks resembling tooth marks are present but the arch configuration is missing.

**Not a bitemark** – Teeth did not create the pattern.

## Descriptions and Terms Used to Relate a Suspected Biter to a Bitemark

*All opinions stated to a reasonable degree of dental certainty*

**The Biter**

**The Probable Biter**

**Not Excluded as the Biter**

**Excluded as the Biter**

**Inconclusive**

## ABFO Standards for "Bitemark Terminology"

The following list of Bitemark Terminology Standards has been accepted by the American Board of Forensic Odontology.

1. Terms assuring unconditional identification of a perpetrator, or without doubt, are not sanctioned as a final conclusion.

2. Terms used in a different manner from the recommended guidelines should be explained in the body of a report or in testimony.

3. All boarded forensic odontologists are responsible for being familiar with the standards set forth in this document.

2/2006

116

# American Board
# of
# Forensic Odontology

# Diplomates Reference

# Manual

**August 2013 Edition**

1

*American Board of Forensic Odontology, Inc*
*Diplomates Reference Manual*
*Section III: Policies, Procedures, Guidelines & Standards*

## Terms Indicating Degree of Confidence That an Injury is a Human Bitemark:

**Human Bitemark** – Human Teeth created the pattern; other possibilities were considered and excluded.

• *criteria*: the injury pattern displays features that reflect the class and individual characteristics of human teeth.

**Suggestive** – The pattern is suggestive of a human bitemark, but there is insufficient evidence to reach a definitive conclusion at this time.

• *criteria:* general shape and size are present but distinctive features such as individual tooth marks are missing, incomplete or distorted <u>or</u> a few marks resembling tooth marks are present but the arch configuration is missing.

**Not a human bitemark** – Human teeth did not create the injury.

## Descriptions and Terms Used to Relate a Suspected Biter to a Bitemark

*All opinions stated to a reasonable degree of dental certainty*

**The Biter**

**The Probable Biter**

**Not Excluded as the Biter**

**Excluded as the Biter**

**Inconclusive**

*The ABFO does not support a conclusion of "The Biter" in an open population case(s).*

## ABFO Bitemark Case Review Guideline

A case review should be performed by a second ABFO Diplomate. The reviewer will not be required to provide a second opinion (but may do so if he/she wishes), but will provide an administrative review of the analysis that was done. This review should determine if the analysis and report adhered to the standards, guidelines, methodology and terminology of bitemark investigation as the required by these standards and guidelines.

117

03/07/2016 MON 11:30 FAX 518 869 3746 NYS VICAP ☒002/003

**LOWELL J. LEVINE, D.D.S.**
Forensic Consultant
240 Bentwood Court West
Albany, NY 12203
ljlevine@nycap.rr.com

February 29, 2016

LuWayne Annos
Assistant Prosecuting Attorney
160 High Street N.W.
Warren, Ohio 44481-1092

Dear Ms. Annos,

I have reviewed the following:

Report, Lowell J. Levine, DDS, November 19, 1985
Trial Testimony of: Lowell J Levine, DDS
        Joseph Sudimak, Jr., MD
        Howard Adelman, MD
        Curtis A. Mertz, DDS
Hearing Testimony of: Franklin D Wright, DDS, December 21, 2015
Report, Franklin D. Wright, DDS, March 30, 2014
Twenty-Seven Photographs of the victim's injuries
DVD, "Tim Combs, Dental Photos, Taken 2.19.16, Warren P.D., Eric Eric Laprocino"
DVD, "Danny Hill, Dental Photos, Taken At Warren P.D. 2.19.16, Eric Laprocino"

It should be understood that the analysis of pattern injuries believed to be Human Bite Marks is based upon a subjective interpretation of those patterns. The comparison of those injuries with the dentition and an exemplar of the bite pattern that the dentition in question would cause is an Art based upon Science. The comparison of dental radiographs for identification of an individual is also based upon an interpretation of the patterns of a "known" radiograph of the individual with the radiographic patterns of a radiograph of the individual in question. In any situation involving interpretation of the evidence competent professionals can arrive at differing opinions.

After review of all the material submitted I believe my trial testimony was honest, proper and correct and given to the best of my ability. My interpretation of the injuries is that they are consistent with bite marks based upon that review.

Sincerely,

*(signature)*

Lowell J Levine, DDS, DABFO

## DECLARATION OF STEPHEN GREENSPAN, Ph.D.

I, Stephen Greenspan, declare and state as follows:

All of the facts contained in this declaration are known to me personally and if called as a witness, I could and would testify thereto.

## BACKGOUND

1.   Danny Lee Hill is a 44-year-old Ohio prison inmate who was condemned to death for his participation in the 1985 rape-murder in Warren, Ohio, of a 12-year-old child: Raymond Fife. Mr. Hill drew attention to himself by presenting himself two days later at the Warren police station, where he volunteered information about the crime in an attempt to collect a $5,000 reward. Following a state "Atkins" hearing held in 2004, Mr. Hill was found not to have mental retardation, and his petition for relief from the death penalty was, consequently, denied. That ruling was subsequently upheld by the Ohio Supreme Court. My understanding is that Mr. Hill's current *habeas* counsel is appealing that decision in Federal court, and that my declaration likely will be used in support of that appeal.

2.   My role in this case is that of a teaching expert, informing the court about methodological and conceptual guidelines that should be followed in diagnosing mental retardation in criminal cases, and opining as to whether those guidelines were sufficiently understood or followed by various testifying experts, and as reflected in the 2004 court ruling. My opinions in this declaration are based on a review of various documents, including testimony transcripts. I have not interviewed the defendant, and I do not attempt to make a formal diagnosis. In the interest of full disclosure, I do know three (one now deceased) of the five experts who testified in this case, but I have never discussed the facts of this case with any of them.

2

3.    The standard used by the Ohio court in the earlier Atkins proceeding was spelled out in the Ohio Supreme Court's 2002 *State v. Lott* ruling. As I understand it, the framework laid down in Lott is a clinical definition derived from the section on mental retardation contained in the 2000 Diagnostic and Statistical Manual, 4th edition—text revision (DSM4-TR) published by the American Psychiatric Association. The constitutive definition has three prongs: (a) significant impairments in intellectual functioning, (b) associated with impairments in adaptive functioning, and with (c) onset of the disorder within the developmental years (i.e., prior to the age of 18). That constitutive definition is identical to, and derived from, the definition first developed in 1961 by the American Association on Mental Retardation (now known as the American Association on Intellectual and Developmental Disabilities).

4.    In the five decades since that constitutive definition was first propounded, it has remained essentially unchanged (except that initially prong three was set at onset prior to age 16). What has changed over the course of several decades is more in the operational definition: for example, IQ ceiling scores, and criteria for determining prong two (adaptive functioning) deficits. These operational criteria will be discussed in relevant following sections.

**MY QUALIFICATIONS**

5.    Over the past several years, I have been qualified as an expert in psychology and mental retardation, now increasingly referred to as Intellectual Disabilities (ID) by 15 state or Federal judges, in so-called "Atkins" (death penalty exemption) proceedings, at various stages: pre-trial, penalty and habeas. In addition, I have been used as a consultant in numerous other cases. In a sizeable percentage of these cases, I have not supported a diagnosis of ID.

6.    I am a Clinical Professor of Psychiatry at the University of Colorado Health Sciences Center, and Emeritus Professor of Educational Psychology at the University of Connecticut. I received a Ph.D. in Developmental Psychology from the University of Rochester, and was a Postdoctoral Fellow in MR and Developmental Disabilities at the UCLA's Neuropsychiatric Institute.

3

7.　　I have been elected "Fellow" (a designation given only to the most qualified members) by the MR/ ID division of the American Psychological Association and by the American Association on Intellectual and Developmental Disabilities. I was also elected to a term as President of the Academy on Mental Retardation (the most prestigious research organization in the field) and received a license to practice psychology in the states of Nebraska (expiration January 2013) and Tennessee (status: inactive). I also currently hold temporary visiting psychology licenses in the states of Oregon and Texas.

8.　　I have published extensively on ID, with particular emphasis on "adaptive behavior." I am a leading scholar in the ID field, as seen in the most recent diagnostic manual of the American Association on Intellectual and Developmental Disabilities MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORTS (11th Edition, 2010). I was also the most-cited authority in its predecessor manual, published in 2002. My 2006 book WHAT IS MENTAL RETARDATION, co-edited with H. Switzky, is considered one of the standard reference works in the ID field, and has been described as "the best book ever published on the definition and diagnosis of mental retardation". In 2008, AAIDD granted me its highest honor, the Gunnar and Rosemary Dybwad Award for Humanitarianism. In August 2011, the Intellectual Disability division of the American Psychological Association will award me its highest honor: the John Jacobson Award for critical contributions to the field of ID theory and practice.

9.　　In the past year, I have testified as a defense expert in Atkins proceedings in three federal district courts (in Ohio, Idaho and Louisiana). In the Ohio case (*in re Antun Lewis*), the judge cited my testimony extensively in support of a positive ruling (the other two cases have not yet been decided). In addition my scholarly writings were cited in support of the ruling by a federal judge in a Maryland capital proceeding (*in re Earl Davis*) in which I did not testify, and an affidavit submitted by me was cited as the basis for a ruling by a federal judge in a Texas case (i*n re Yokoman Hearn*).

4

## MATERIALS REVIEWED

10.     The following materials were reviewed by me:

- Video Depositions of Annette Campbell and Debbie Flaherty
- Judge Curran Judgment Entry (Findings of Fact and Conclusions of Law)
- Declaration of Kevin Keith
- Declaration of Gary Johnson
- Declaration of Percy Hutton
- Declaration of Gerald "Bob" Hand
- Dr. Huntsman Atkins Evaluation Report of 6/15/2004
- Declaration of Joe D'Ambrosio
- Dr. Hammer Psychological Consultation Report of 6/5/2004
- Testimony of Dr. Olley
- Dr. Olley Psychological Report of 4/26/2004 through 4/28/2004
- Declarations of John H. Vermeulen, M.D. and his wife, Mary Louise Vermeulen
- Prison Records Review Prepared by Federal Public Defender Office
- Declaration of James Spindler
- Declaration of Annette Campbell
- Declaration of William "Bill" Baer
- Declaration of Karen Weiselberg-Ross
- Volume XI Transcripts of Mitigation Testimony
- Dr. Crush Neuropsychological Report of 2/25/1986
- Dr. Darnall Psychological Report of 1/10/1984
- Danny Hill School Records
- Declaration by Dr. Sara Sparrow
- Declaration by Dr. Timothy Hancock
- Video of police interview with Danny Hill
- Curriculum Vitae for all experts who testified in the Atkins proceeding
- Court transcript for the Atkins proceeding
- Declaration of Dr. J. Gregory Olley, September 2010
- Report by Dr. Hoi Suen on issues pertaining to the Vineland
- Transcript of deposition of Dr. J. Gregory Olley, April 11, 2011

## QUESTIONS ADDRESSED IN THIS DECLARATION

11.    The questions I address in this declaration are the following:

- Were appropriate methods used by the three psychological experts in conducting the evaluation of Mr. Hill?

- Did the experts who testified in this case have requisite qualifications needed to express an opinion about mental retardation or other matters relating to this case?

- Were the experts justified in their conclusions about prong one (intellectual impairment)?

- Were the experts justified in their conclusions about prong two (adaptive behavior)?

- Were the experts justified in their conclusions about prong three (developmental onset)?

- Were the experts justified in concluding that Mr. Hill was not putting forth an adequate effort?

## WERE APPROPRIATE METHODS USED BY THE PANEL OF EXPERTS?

12.    The court appointed three experts to participate in an evaluation of Mr. Hill. They were Dr. Hammer (retained by the defense), Dr. Olley (retained by the prosecution) and Dr. Huntsman (appointed by the court). They chose to evaluate Mr. Hill as a team, deciding on the tests to administer and then deciding who would administer which test.  As noted by Dr. Olley in a recent declaration, this is a highly unusual approach. In fact, in 30 or more cases in which I testified or consulted, this is the first time I have heard of such an approach being used. In my opinion this group approach is problematic, for a number of reasons, to be discussed below.

6

13.     Although appointed as a panel, the experts were expected to function independently, and to testify as to their individual opinions about Mr. Hill. Yet, human nature being what it is, a group dynamic tends to take over in such a collective approach, and it is possible, indeed likely, that individual perspectives and concerns became subsumed to this group dynamic. This is reflected in comments recently made by Dr. Olley, the expert retained by the prosecution. He now states that he had some reservations at the time about some of the things that were done, but these reservations were not sufficient to cause him to dissent from the group-affected decisions that were made.

14.     The American Psychological Association (APA) ethics guidelines generally recommend against having third parties in the testing room, although this recommendation is aimed more at non-psychologists (such as attorneys and family members). There are two concerns stated for this recommendation: (a) protecting the copyright of test materials (not as much a relevant consideration in this instance), and (b) avoiding upsetting, disconcerting or affecting the performance of the subject. In fact, the only reason given by the APA (in a white paper by a special assessment committee) for when additional people should be in the testing room is if it would calm the subject (for example, when a child would be reassured by the presence of his mother) and facilitate better effort. In this case, there is evidence (the defendant struggling and breaking into tears twice) which suggest that the group format had a negative impact on Mr. Hill and was not, therefore, an appropriate testing climate.

15.     Dr. Huntsman started off her evaluation by giving Mr. Hill a standard forensic statement warning him that the information obtained was not confidential and could be used against him in court. As Dr. Huntsman reported in a recent deposition, both Dr. Olley and Dr. Hammer "took her to task," because they felt she had delivered this warning in too strong a manner, that it appeared to upset Mr. Hill, and that it was not congruent with the friendly and supportive climate they believed was essential for psychological testing. This is another possible contributor to the performance which Dr. Huntsman used to support her diagnosis of malingering but which could have been an artifact of a far from optimal testing climate.

7

16.     An even more serious deviation from recommended practice was the manner in which the videotaping of the session occurred. As with the presence of third parties, the APA's position is that this is not a generally recommended practice, but they stopped short of outlawing it. However, there is a clear instruction to conduct the taping in a way that is not intrusive and that does not affect the ability of the subject to concentrate and to give a maximum effort. Ideally, the videotaping should be done from a remote location or through an unmanned camera left running in the room. Allowing a prosecution investigator who had a negative history with Mr. Hill to be in the room, operating the camera, was a serious breach of assessment protocol. In a recent declaration, Dr. Olley states he was unaware of the identity of the camera operator and his history with Mr. Hill, and would have objected to the arrangement if he had possessed that knowledge. Dr. Huntsman has since stated that she was also unaware of the history between the defendant and the video camera operator as well.

### DID THE EXPERTS POSSESS REQUISITE QUALIFICATIONS?

17.     The court commented on the excellence of the five main psychologists who testified, almost terming them the "dream team of expert witnesses." At the risk of seeming overly critical, I think the characterization was only partially accurate, in that two, and possibly three, of the five witnesses, while highly qualified for tasks other than what was required of them in this case, lacked requisite qualifications for the testimony that they offered.

18.     Two of the psychologists who assessed Mr. Hill--Dr. Hammer (appointed by the defense) and Dr. Olley (appointed by the prosecution)—possessed decades of deep and impressive training and experience in evaluating and working with people with MR. The third psychologist, Dr. Hunstsman (appointed by the court) was almost completely lacking in MR expertise. Looking at her CV, I saw only one item—an early article on which she was second author—that gave any indication that she had ever even been in the presence of someone with MR. That article described an experiment conducted with "retardates," (the title of the article), apparently in an institutional setting. Participating in one study, in the role of junior researcher, hardly qualifies Dr. Huntsman to evaluate individuals with mild MR who live outside of institutional settings.

8

19.    In the past several years (after his testimony in the Hill case), the main prosecution expert, Dr. J. Gregory Olley, has written extensively on the credentials necessary to testify competently on the matter of MR in an Atkins case.  He co-chaired a joint committee of the American Psychological Association divisions 33 (mental retardation) and 41 (law and psychology) which worked on the development of professional guidelines for psychologists involved in Atkins proceeding. Furthermore, he authored a frequently-cited article (in a special Atkins issue of APPLIED NEUROPSYCHOLOGY edited by me) which specifically addressed the qualifications needed for psychologists to diagnose MR in a forensic context.

20.    In an Arizona case (*in re McGee*), Dr. Olley submitted a 2009 declaration in support of a defense effort to bar a psychologist with nonexistent MR experience comparable to Dr. Huntsman's from testifying. (I know about this, because he submitted the declaration in response to a request from me). In his declaration, Dr. Olley wrote: "Mental retardation is a specialty field within psychology, and, thus, an expert should have training in a doctoral program with specialization in developmental disabilities or should have participated in extensive continuing education in this area. The typical graduate program in clinical, counseling, or forensic psychology contains very little information on this topic, and a generic clinical, counseling, or forensic psychologist would not be expected to have the necessary background in this field. An expert in mental retardation would be expected to be a member of professional organizations that focus on developmental disabilities, …[and to] be familiar with this [Atkins-related] scholarly literature. The expert should be familiar with the publications on the diagnosis of mental retardation…"

21.    Dr. Huntsman clearly met none of these requirements, as reflected in the fact that of all of the experts, she is the only one who did not mention the clinical definition criteria for defining and diagnosing MR. She also demonstrated some of the mistaken stereotypic notions about MR that are held by lay people and by psychologists who lack specialized MR training. In his article about psychologist qualifications needed to conduct competent Atkins evaluations, Dr. Olley pointed to the holding of these stereotypes as the main reason why testimony by clinical psychologists without specialized MR training should not be given much weight by courts.

9

22.     In a landmark Virginia Atkins proceeding for Daryl Atkins (the man after whom these kind of proceedings was named), the trial judge ruled against the Atkins petition, relying heavily on a psychological expert, Dr. Stanton Samenow. He is a highly qualified forensic psychologist, as is Dr. Huntsman, but he testified that he lacked any familiarity with clinical guidelines for defining MR and also that he lacked any specialized training or experience in MR. The high court of Virginia later reversed the judge's decision, citing the excessive reliance on an unqualified expert as a major reason. Given that the courts in Ohio seemed to place great stock on testimony by an equally unqualified expert, Dr. Nancy Huntsman, it seems to me that this is a source of legitimate concern.

23.     Two other experts testified in the rebuttal phase of the hearing: Dr. Sara Sparrow (who passed away recently) for the defense and Dr. Timothy Hancock for the prosecution. Their testimony focused on a relatively narrow question, but one to which the court apparently attached great importance.  It had to do with the extent to which the Vineland Social Maturity Scale (VSMS) on which Mr. Hill was rated when of school age, predicted a standardized score on its successor test, the Vineland Adaptive Behavior Scale (VABS) that was significantly lower. Dr. Sparrow, a psychologist who was an eminent Yale professor and one of the leading scholars in the MR field, was the senior author of the VABS, and someone well-qualified to talk about the VABS and its predecessor measure, the VSMS. However, she admitted on the stand that she was neither a statistician nor a psychometrist, and she stated that one should be brought in to address technical statistical issues pertaining to the reliability of her concluding from the earlier VSMS that Mr. Hill now met the requirement for adaptive deficits prior to the age of 18.

24.     Dr. Timothy Hancock, a psychologist brought in by the prosecution in sur-rebuttal to Dr. Sparrow, described himself as a psychometrics expert, but in my view he lacked qualifications necessary to speak to the specific matter he addressed in the hearing. Dr. Hancock is a clinical psychologist at a mental health clinic, who maintains a consulting practice helping attorneys understand assessment issues. I do not doubt that he is a fine clinician, that he knows something about test construction, or for that matter that he knows about how to diagnose MR (which was not his assigned role in this case).

10

25.     However, Dr. Hancock's CV does not list any academic affiliation or a single refereed publication, in test statistics or psychometrics (or anything else, for that matter).  He is second author on one conference presentation with a psychometrics focus, but it is a stretch to describe him as a recognized authority on psychometrics. That impression was certainly reinforced for me by his testimony in this case.  The problem with Dr. Hancock's testimony is that he mistakenly assumed that the central question the court should address was whether the VSMS was *equivalent* to the VABS, whereas in fact the central question (which Dr. Sparrow initially raised but was unable to subsequently explain) is whether a score on the VSMS could reliably *predict* a score on the VABS.

26.     Dr. Hancock was correct in testifying that a correlation coefficient of 0.55 was insufficient to establish that VSMS and the VABS are equivalent tests (although even there, he committed a fundamental arithmetic error in calculating the degree of that non-equivalence). However, a correlation coefficient of 0.55 is more than sufficient for devising a prediction formula; in fact, many quite reliable prediction formulas have been devised in spite of correlations that are smaller than 0.55. The statistic which Dr. Hancock should have been discussing is not the correlation coefficient but rather the "standard error of estimate", which could have been derived from a prediction equation which likely was contained in an appendix to the VABS manual, where the data linking the VSMS and VABS was supposedly provided. One could then apply those statistics to the VSMS score of Mr. Hill and determine if the range of predicted VABS scores is below the cutoff predicted by the standard error of estimate. This is a very fundamental procedure that a psychometrics expert should be expected to understand and use.

## WERE THE EXPERTS JUSTIFIED IN THEIR VIEW OF PRONG ONE?

27.     The first prong of the Ohio legal definition of MR is significant impairments in intellectual functioning, and it can be met through various indices of cognitive incompetence. The most widely used index is an IQ score on an individually-administered comprehensive full-scale measure of intelligence (such as the Wechsler scales or the Stanford-Binet) that is below approximately 70-75.

11

28.     Mr. Hill has taken a great many IQ tests, dating back to the childhood years. Without exception, they all fall in the range of mental retardation. That includes a Wechsler Adult Intelligence Scale, 4th edition (WAIS-4) administered by Dr. Huntsman, on which he received a full-scale IQ score of 58, which falls within the MR range.  Dr. Huntsman characterized this as an invalid score, arguing that Mr. Hill was malingering. However, it is not dramatically different from earlier scores in the 60's obtained by Mr. Hill, all of which were also squarely in the MR range.

29.     In my view, Dr. Huntsman's characterization of Mr. Hill as malingering is debatable, a view which I discuss at greater length later in this declaration. The other two experts agreed that Mr. Hill clearly met prong one of the Ohio definition of MR, a conclusion which to me appears justified. The judge concurred, and ruled that prong one was met. Therefore, I shall devote most of my attention in the remainder of this declaration to the other two prongs.

**WERE THE EXPERTS JUSTIFIED IN THEIR VIEW OF PRONG TWO?**

30.     The decision to deny Atkins relief to Mr. Hill was based on the judge's view that the petitioner failed to meet prong two: impairments in adaptive functioning (which is termed "adaptive behavior" in the AAMR/ AAIDD manuals and in most other state Atkins statutes). In my view, there were many irregularities in the methods and arguments that led two of the three experts to conclude that prong two was not met. I believe that better methods, in addition to new information that has recently come to light, would almost certainly have led Dr. Olley, and possibly Dr. Hunstman, to reach a different conclusion.

31.     One of the more questionable aspects of the earlier proceeding was the weight attached to a score on a single administration of a rating instrument, the Vineland Social Maturity Scale (VSMS) in 1984, administered when Danny was 17 years old and evaluated by the Juvenile Court. The informant was Mr. Hill's mother. The report, by psychologist Dr. Douglas Darnall, gave Mr. Hill a "social quotient" of 82.9, in the borderline range. Dr. Darnall observed that the informant, Ms. Vaughn, was motivated to make her son look more competent than he actually was, and he considered the score to overestimate Danny's actual adaptive functioning, which Dr. Darnell estimated to be in the "mildly retarded range."

12

32.     The VSMS was developed in the 1930's, did not have adequate norms or meet other requirements for current psychometric instruments, and is very different in terms of its content from more recent rating measures of adaptive behavior. To counter the impression that the VSMS score might be a disqualifying factor for prong two, the defense brought in Dr. Sara Sparrow, an eminent psychologist and MR expert from Yale University. Dr. Sparrow was the senior author of the Vineland Adaptive Behavior Scale (VABS), a successor instrument to the VSMS, and an instrument with excellent psychometric properties which is widely used today in schools and legal settings. Dr. Sparrow discussed the results of a "linkage" study, with nearly 400 subjects rated on both the VSMS and the VABS, and which she testified enabled one to reliably predict a VABS score from a score on the VSMS. Based on that study, Dr. Sparrow testified that Mr. Hill would have received a much lower score on the VABS, one that was well under the ceiling for diagnosing MR. That conclusion was challenged by Dr. Timothy Hancock, who argued that the correlation between the VSMS and the VABS was insufficient to make such a prediction The judge sided with Dr. Hancock, and cited the results of the Vineland disputation in his order.

33.     Unfortunately, neither Dr. Hancock nor Dr. Sparrow possessed the qualifications, in my opinion, to address adequately the complicated statistical issues raised by that question. I recently recommended to Mr. Hill's defense attorney that she seek an opinion on this controversy from Dr. Hoi Suen, who is Distinguished Professor of Educational Psychology at Pennsylvania State University and one of this country's most eminent psychometrics experts. I have seen a report from Dr. Suen, and he concludes that Dr. Sparrow was more correct than Dr. Hanock, in that the correlation of 0.55 was more than high enough to make a reliable prediction, and that the VABS score predicted by the linkage study would definitely be lower than the VSMS obtained from the rating of Mr. Hill as an adolescent. However, insufficient data was available for him to say with confidence exactly what the predicted score would be.

34.     Aside from questions about the VSMS-to-VABS prediction, there is a problem in the reliance on a single adaptive behavior rater, because she could be biased or have a skewed view. Parents will often overstate the competence of their child, as was noted by Dr. Darnell, both because of shame about having a deficient family member, but also because they may also be impaired. Dr. Olley has himself subsequently written that one should rely on multiple raters, whenever possible.

13

35. Regardless of who was correct on the VSMS/ VABS prediction issue (and I believe that Dr Suen is justified in siding more with Dr. Sparrow), I consider it a trivial controversy, not deserving of the importance attached to it by the court. There is no requirement, in Ohio or in any clinical manual, that incompetence on prong two has to be quantified through use of a standardized instrument. One can rely on qualitative and descriptive information alone to see if someone does or does not meet prong two; there is an abundance of such information, including during the developmental period, which supports the view that Mr. Hill was significantly impaired. To dismiss the importance of such information because of a questionable number on an ancient test with inadequate norms and obtained from an unreliable informant is to raise the importance of numbers to an absurd level.

36. That said, it can be useful to obtain standardized prong two rating information, and the evaluators might have done so had they been willing or able to move outside of the prison environment physically or through telephone contact. The current standard practice for rating of adaptive behavior is to ask current raters to fill out a Vineland or ABAS (Adaptive Behavior Assessment System, which is also widely used) retrospectively. This involves asking the rater to answer each rating question as the ratee was at some point in the past, typically before the age of 18. This does two things: (a) it places less emphasis on evaluating the person in a highly structured and restricted prison context, where there are few opportunities to engage in most of the behaviors on the rating instrument and where the most likely informants (i.e., correctional officers) typically do not know the individual well enough to rate him validly; and (b) it enables one to gather additional information about how the individual functioned within the developmental (pre-18) period. The fact that such a method was not used by any of the evaluators in this case is, to me, a significant problem. I have no doubt that if this evaluation was being done today, such a method would have been used by one or more of the evaluators. I know it would have been done today, because Dr. Olley has co-authored a book chapter on using the ABAS in Atkins proceedings, in which he endorsed such a retrospective method.

37. As mentioned, competence within the prison setting is not a reliable source of data about prong two, because: (a) people with MR do much better in a highly restricted and controlled setting such as prison, and have few opportunities to perform most of the community-oriented items on adaptive behavior rating measures; and (b) informants, such as prison guards, even if one overlooks their

14

possible bias as state employees, typically do not know the individual well enough to rate him. Yet, the panel did collect and rely upon such information, even if they did not use formal rating instruments. It now turns out, from interviews with some of the guards who testified, that their testimony was misunderstood and that Mr. Hill was not as competent as portrayed by them. Furthermore, declarations from other inmates (who are better able than guards to recognize mental retardation in a peer) now provide a picture of Mr. Hill as someone less well able to function adequately than was portrayed to the experts. To my knowledge, none of the experts were allowed access to interview other inmates about Mr. Hill.

38.     Two "direct" methods were used to assess prong two. By direct, I am referring to an interview or test session with the petitioner himself. Dr. Olley administered the Street Survival Skills Questionnaire (SSSQ), a measure of Practical Adaptive Skills, one of the three components of adaptive behavior identified by the AAIDD 2010 diagnostic manual, and based on a tripartite model of prong two generally attributed to me. Mr. Hill obtained a standard score of 43, which is within the range of moderate MR, and which could in itself be cited in support of prong two qualifying. Dr. Olley questioned the veracity of the score, noting that Mr. Hill responded in a slow fashion (slow responding, in my experience, is common in people with MR, reflecting a lack of confidence or certainty). There is a literature which today questions the validity of the SSSQ, and its norms are of questionable quality. Dr. Olley would probably not use the SSSQ today but there is nothing in the obtained results which dispute a diagnosis of MR and much which confirms it.

39.     The other direct measure was the administration of the ABAS-2 to Mr. Hill as the rater, rating himself. The obtained standardized scores were in the MR range, but it is not recommended practice today to use the petitioner as a self-rater. That is because people with mild MR will typically overstate what they can do, although that does not appear to have occurred here. Mental retardation is a status ascribed by others—laypeople as well as professionals—and self-perception is generally not an adequate basis for making the diagnosis.

40.     One of the factors which apparently contributed to the conclusion that Mr. Hill failed to meet prong two was his performance on the stand during the court proceedings before his Akins hearing. Dr. Olley, in particular, stated that this was a consideration which pushed him from (apparently) being on the fence about

15

prong two, to deciding that prong two was not met. As Dr. Olley is well-aware, the oral language of people with mild MR is generally relatively normal, as one would expect of anyone with a mental age of ten or eleven. It can, therefore, be highly misleading to use evidence of language competence as a basis for ruling out MR.

41.     People in prison have much time and many opportunities to talk with others (inmates as well as attorneys) about their cases, and individuals with mild MR can often go on and on at great length about various twists and turns of their case, the problems they have had with various attorneys, the motions that were made or not made, etc. Although superficially impressive, such verbalizations often have an obsessive repetitive quality, are often inaccurate in the particulars (apparently the case here) and are usually not fully responsive or pertinent to the question being asked. The communicative incompetence of people with mild MR is typically more in the area of sociolinguistics (interpersonal uses of language) than in the area of psycholinguistics (formal structure of language). I have not seen anything in the language used by Mr. Hill that is inconsistent with a diagnosis of mild MR.

42.     A related consideration, mentioned by Dr. Olley in his April, 2011 deposition is his opinion that people with MR cannot make attributions about feelings. He found it diagnostically indicative of non-MR, therefore, that Mr. Hill accused the judge of taking a break in the proceedings because he feared that he (the judge) was about to start crying on the bench. Ms. Werneke pointed out that the judge denied having that motivation and, therefore, that Mr. Hill's attribution was incorrect. Dr. Olley replied that what mattered was not the correctness of the emotion judgment but, rather, the making of an emotion judgment at all. He asserted that this was unusual in people with MR, citing both his own clinical experience and the research literature. I cannot speak to Dr. Olley's experience but I can speak to the research literature, and it is my view that Dr. Olley's interpretation of the research on this topic is incorrect. It is true that people with mild MR are less likely to interpret others' emotions correctly, and that in fact was the case here (as Dr. Olley acknowledged). However, people with MR can speak the language of emotion, as reflected in the fact that they can correctly identify emotions when they are obvious (as for example say that someone is sad when she is crying). Their problem in identifying emotion comes in when emotions are ambiguous, as for example when someone feels something different than one might expect. Normal children of ten or eleven can talk about emotions, sometimes correctly, often incorrectly. Adults with MR (who may have a mental

16

age as high as ten or eleven) function in the same inconsistent manner with regard to emotion recognition.

43.     I speak to this point as a scholar who has written extensively about "social intelligence," a construct that includes emotion recognition as a sub-topic. I have authored two widely-cited chapters on social intelligence in people with MR, in which I reviewed the literature on emotion recognition among other sub-topics: see S. Greenspan (1979). Social intelligence in the retarded. In N.R. Ellis (Ed.), Handbook of mental deficiency: Psychological theory and research. 2nd ed. Erlbaum, and S. Greenspan & P. F. Love (1997). Social intelligence and developmental disorder: Mental retardation, learning disabilities and autism. In W.F. MacLean, Jr. (Ed.) Ellis' handbook of mental deficiency, 3rd ed. Erlbaum. This research shows, as I stated above, that adults with MR are poor affective perspective-takers, especially in situations of ambiguity.

44.     In my view, however, Dr. Olley went too far in asserting that people with MR cannot attend to or talk about emotions. As example, a study in a British MR journal [R.P. Hobson, J. Ouston & A. Lee (1989). Naming emotion in faces and voices: Abilities and disabilities in autism and mental retardation. British Journal of Developmental Psychology, Vol 7(3)] found that people with MR were better at identifying emotion-in-context than people with autism, and that some people with MR were able to accurately identify emotion under some circumstances. Certainly, there was no evidence that people with MR could not talk about others' emotions at all. Thus, to the extent that Dr. Olley's diagnostic conclusion was, as he said, heavily influenced by his (to my mind, mistaken) view of that research literature, his diagnostic conclusion should be reexamined.

45.     As part of her attempt to convince the court that Mr. Hill did not meet prong two of the Ohio definition of mental retardation, Dr. Huntsman characterized the Vineland Adaptive Behavior Scale (VABS) as a poor measure of adaptive functioning, and compared it unfavorably to the Scales of Independent Behavior, revised edition (SIB-R). In my opinion, this is a distinctly minority opinion, as the VABS (now VABS-2) is one of the most widely-used and respected measures in the fields of mental retardation and school psychology while the SIB-R, which is a test with inadequate and outdated norms, is rarely used. In the Atkins cases on which I have consulted or testified, the two most widely-used measures of adaptive functioning are the VABS and the Adaptive Behavior Assessment

17

System (ABAS, now ABAS-2), while the SIB-R is almost never used. Unless I misunderstood her testimony, if Dr. Huntsman was saying that the Vineland lacks scientific or professional support, then that is an opinion with which I disagree.

46. In this case, because Ohio relies on DSM4-TR (based on the 1992 AAMR manual), the standard used for establishing prong two impairment is not the one-out-of-three deficits approach reflected in the 2002 and 2010 AAMR/ AAIDD manuals, but rather the two-out-of-eleven deficits approach reflected in DSM4-TR. In this approach, one can qualify if one has significant impairments in at least two adaptive skill areas. The eleven skill areas are as follows: communication, community use, functional academics, home living, health, safety, leisure, self-care, self-direction, social and work. Dr. Olley and, I believe, Dr. Huntsman, felt that Mr. Hill was significantly impaired only in functional academics. Based on new information from Ms. Campbell and also from prison inmate informants about serious hygiene problems, Dr. Olley in a recent deposition indicated that he now believes that Mr. Hill is significantly impaired in self-care as well. Thus, prong two now perhaps appears to be met in the opinion of at least two of the evaluators.

47. Dr. Huntsman indicated that Mr. Hill's diagnosis of antisocial personality disorder explains his impaired adaptive functioning, because of the presence of "maladaptive behaviors" which might explain or mask the presence of adaptive behaviors. However, both DSM4-TR and the AAIDD "green book" both state that adaptive behavior deficits should be evaluated according to whether or not an individual can perform certain tasks, without regard for any inferred cause or explanation. Furthermore, the manuals make clear that MR is not an exclusionary diagnosis, and someone with MR can have other diagnoses. The existence of another diagnosis, regardless of how reliable or unreliable it might be, should not be used to argue against meeting prong two. Lastly, the notion of maladaptive behavior as a diagnostic construct was specifically excluded from both DSM and AAMR in the 1990's. This was partly in response to a paper by me in which I pointed out that MR is a disorder marked by an inability to perform age-expected tasks and is not defined by how "nice" or 'well-adjusted" one might be.

48. In sum, I believe that there is little credible evidence to justify the view that Mr. Hill does not meet prong two. To the contrary, there is much evidence which suggests that Danny Lee Hill has significant impairments in adaptive functioning, and that these impairments became evident at an early age.

18

**WERE THE EXPERTS JUSTIFIED IN THEIR VIEW OF PRONG THREE?**

49.     Prong three refers to the requirement that the disability (as defined by deficits in prongs one and two) first manifest itself during the "developmental period," which is usually interpreted as before the age of 18 (in at least two states it is before the age of 22). Another way of framing prong three is as a failure to ever develop adult competencies beyond what would be expected of someone aged eleven or twelve. This reflects a view of MR as a "developmental disability," i.e., a disorder rooted in brain abnormality or insufficient brain development, and which is traceable to factors—known or unknown—which manifest early in life.

50.     Prong three does not mean that there was a formal diagnosis of MR made during the developmental period, as that could be affected by many factors, including: availability of services; school policies and practices; location (rural versus urban); family resources and persistence, etc. Obviously, when a diagnosis occurs in childhood, establishing prong three is made easier.

51.     Mr. Hill was evaluated for special education by Warren City Schools psychologist Karen L. Weiselberg in 1973, when he was six years old. He was given a diagnosis of "EMR" (Educable Mental Retardation, roughly comparable to mild MR). To my mind, this fact alone establishes that prong three has been met.

52.     Many concerns were expressed about the developmental delays of Danny Lee Hill when he was a young person. These have recently been confirmed by new declarations of teachers who knew Danny as a child. At the time of the hearing, Dr. Hammer detailed Danny's developmental problems, and indicated a conviction that, in spite of a relative absence of school information, he felt that Danny met prongs one and two within the pre-18 period and also (despite some indication of poor effort) within adulthood as well. Based on what I have seen, I believe that Dr. Hammer's conclusions were justified.

**WERE THE EXPERTS JUSTIFIED IN POINTING OUT MALINGERING?**

53.     A picture of Mr. Hill that was presented during the hearing, particularly by Dr. Huntsman, was one of Mr. Hill faking "dumb," that is deliberately giving a poor effort and consciously attempting to be seen as having mental retardation. Dr.

19

Huntsman even went so far as to give Mr. Hill an Axis-1 DSM4-TR diagnosis of "malingering disorder." This testimony, by an expert witness who in my view lacked sufficient training and expertise in diagnosing mental retardation, was apparently very persuasive, as it was cited heavily by Judge Curran in his ruling. However, in my view, the basis for Dr. Huntsman's diagnosis of malingering rests on very shaky ground.

54.    A major reason given by Dr. Huntsman for concluding Mr. Hill was malingering was his low score on the Test of Memory Malingering (TOMM). That is a widely-used measure of effort on cognitive tasks, which is based on the notion that on tasks which are very easy, poor performance must be an indication of poor effort rather than poor task-relevant ability. A problem with Dr. Huntsman's reliance on the TOMM results is that the measure was developed for use with people with relatively intact intelligence, and it has never been validated for use with subjects with seriously impaired intelligence. In fact, the author of the test has acknowledged that individuals with MR were not included in the test standardization sample, and he has cautioned against using the TOMM to infer lack of efforts in subjects who have MR. The reason for this caution is that the assumption of test easiness is unproven for a MR population, and thus poor performance may reflect poor ability rather than poor effort.

55.    Dr. Karen Salekin, a professor of psychology at the University of Alabama, has co-authored a widely-cited article on the validity of efforts tests (in a special Atkins issue of the journal APPLIED NEUROPSYCHOLOGY that I edited). Her conclusion, after reviewing the research on a number of measures, including the TOMM, was that these measures are of questionable validity for diagnosing malingering in people with IQs in or near the MR range, and should not be used with that population. Furthermore, psychologists who participate in Atkins evaluations typically administer two or three (sometimes more) measures of effort. That practice was not followed in this case.

56.    Dr. Huntsman relied heavily in her conclusion that Mr. Hill was malingering on her belief that Mr. Hill was lying when he stated that he could not read or write. That belief was based on a statement by a person who said she had observed Mr. Hill writing. That witness has now clarified her testimony, by admitting that she observed him one time from a distance and did not know what he was writing. Furthermore, there are now statements from inmates who support

20

Mr. Hill's claim that he could not read or write. Thus, a major basis for Dr. Huntsman's diagnosis of malingering now appears to be of questionable validity.

57.     Dr. Huntsman stated that it was her belief that Mr. Hill was malingering not only adaptive functioning but also a low score on the WAIS-4 which she administered. In support of this view, she also noted that his performance was variable, with good performance on hard items and poor performance on easy items, but she provided no specific details to support that observation. One way of determining the validity of an IQ score is to see if it agrees with earlier scores, and there is strong consistency across these many IQ tests, some of which were given long before Mr. Hill had any reason to fake a low score.

58.     The diagnosis of malingering in an Atkins context rests on the assumption that the defendant understands that being diagnosed with MR would be to his benefit. I have participated in many Atkins proceeding and I have yet to encounter more than one or two defendants who: (a) fully understood the nature of the evaluation, and (b) wanted to be labeled as having MR, regardless of that understanding. MR is a label which people with MR hate (that is the main reason for switching to a new term "Intellectual Disability"). Many spend a lifetime trying to dispute or cover up their limitations (there is an extensive literature on such "passing", pioneered by UCLA professor Robert Edgerton under the rubric of "cloak of competence"). Malingering requires some degree of sophistication, and it does not appear to me that Mr. Hill possesses that degree of sophistication. There is an extensive research literature (by Yale professor Edward Zigler among others) which explains why people with mild MR often give up in testing situations, and it has to do not with malingering but with the fact that they have always failed on academic (including testing) tasks, and they find such tasks very aversive, threatening and difficult. In my professional opinion, a diagnosis of cognitive malingering should be backed up by at least some evidence that Mr. Hill was aware of the purpose of the evaluation and was motivated to support a diagnosis of MR, and I have not seen any discussion of such evidence.

59.     A recent declaration by retired psychiatrist Dr. John H. Vermeulen, states that he diagnosed Mr. Hill as having mental retardation when he was first admitted to the Ohio adult correctional system. This was long before the Atkins decision and long before Mr. Hill had any motive to feign cognitive incompetence. Mr. Hill was first labeled as possessing mental retardation in elementary school and he was

21

also given that label as an adolescent, when he was evaluated by the juvenile justice system. Throughout his whole life he has scored in the range of mental retardation on standardized tests of intelligence. If this were not such a serious matter, I would say that it is laughable to assert that Danny Lee Hill has feigned, and continues to feign, mental retardation, especially given the questionable methods and evidence that were relied upon to reach that conclusion.

## SUMMARY AND CONCLUSIONS

60.     The evaluation of Danny Lee Hill occurred early in the history of Atkins proceedings, in Ohio and the United States, and many of the methods, concepts and arguments used in this case would today be considered inappropriate. The chief state expert, Dr. J. Gregory Olley, has become one of the leading published authorities on how to conduct such evaluations, and he has come out strongly against some of the approaches used in this evaluation. For example, he has argued in a series of papers on prong two (adaptive functioning) assessment that it is inappropriate to administer an adaptive behavior rating instrument to the defendant himself, and also that one should not rely on a single adaptive behavior rater. Yet, both of these were done in this case.

61.     Dr. Hammer, the defense expert, and a man with decades of experience in the mental retardation field, testified that Mr. Hill qualified for a diagnosis of mental retardation under clinical and Ohio guidelines. I believe, if he were conducting the evaluation today and the methods that are now standard, that Dr. Olley (a man with experience comparable to Dr. Hammer's) would possibly reach the same conclusion.

62.     Dr. Huntsman lacked, in my view, the experience and training needed to rule in or out a diagnosis of MR in this case. However, she was given misleading information by prison guards, about Mr. Hill's abilities, and that information factored into her conclusion that he was malingering mental retardation. Furthermore, Dr. Huntsman relied on an instrument (the TOMM) which, as a qualified forensic psychologist, she likely now understands to be inappropriate for use with low IQ subjects. For these reasons, I believe that Dr. Huntsman (who as the court's expert, was especially heavily relied upon) would today possibly reach a different conclusion as well.

63.      There were significant problems with the group approach used by the panel of three experts in conducting their evaluation of Mr. Hill. It was a highly unusual practice, which blurred the ability of the experts to arrive at independent conclusions, and it appeared to have the effect of upsetting the defendant and thus created a non-optimal evaluation climate. An especially egregious aspect of the approach followed was allowing a prosecution employee with a negative history with Mr. Hill to conduct the videotaping while in the same room with him and the experts. In my view, these deviations from standard or optimal practice make it difficult to consider the experts' results, or conclusions drawn from those results, to be valid.

64.      As reflected in the court's ruling, the judge relied on misleading and inadequate testimony regarding the linkage between the earlier and later Vineland rating scales. The evidence actually supports a different conclusion than was reached, but at any rate, the matter is in my view trivial and irrelevant, as there is an abundance of qualitative evidence regarding Mr. Hill's meeting prong two. There is no requirement in Ohio or in clinical manuals, which require that prong two data be quantified in order to be considered, and the whole controversy, in my view, placed way too much emphasis on the importance of a qualifying number however questionable the number or the norms on which it was based.

65.      Mr. Hill is a person who has been viewed all of his life as having mental retardation. Everything that I have read suggests to me that the label still applies. Based upon all of these factors enumerated by me in this declaration, it is my scientific, professional, and expert opinion, which I provide with a reasonable degree of scientific certainty, that the evidence pertaining to Danny Lee Hill is much more congruent with a diagnosis of Intellectual Disability than was the conclusion reached by two of the three experts in the original hearing.

I declare under penalty of perjury under the laws of the State of Ohio and the United States of America that the foregoing is true and correct.

Executed this 27th day of April, 2011, at Littleton, Colorado.

Stephen Greenspan, PhD

23

STATE OF OHIO         )            IN THE COURT OF APPEALS
                      ) SS.
COUNTY OF TRUMBULL    )            ELEVENTH DISTRICT

STATE OF OHIO,                    JUDGMENT ENTRY

         Plaintiff-Appellee,

                          CASE NO. 2016-T-0099

   - vs -

DANNY LEE HILL,

         Defendant-Appellant.

Pending before this court is defendant-appellant, Danny Lee Hill's, Motion to Disqualify the Trumbull County Prosecutor's Office, filed on February 27, 2017. Hill requests that the Trumbull County Prosecutor's Office be barred from any further involvement in this case and that a special prosecutor be appointed. Plaintiff-appellee, the State of Ohio, filed its Response on March 9, 2017.

As grounds for the disqualification of the Trumbull County Prosecutor's Office, Hill asserts the "intolerable appearance of impropriety."

As an initial matter, we note that Hill's sixth assignment of error challenges the trial court's denial of a motion to disqualify the Trumbull County Prosecutor. We construe Hill's present motion as only pertaining to the prosecutor's office's involvement in this appeal.[1]

---

1. This court is cognizant of the fact that the arguments supporting the motion pending before this court are virtually identical to the arguments raised in the sixth assignment of error. As a practical matter, however, this court decides the present motion on our estimation of its merits whereas our review of the trial court's denial of the prior motion must defer to the lower court's exercise of its discretion. *State ex rel. Keenan v. Calabrese*, 69 Ohio St.3d 176, 179-180, 631 N.E.2d 119 (1994).

**Habeas Petition Exhibit 15**
**1 of 7**

Hill's first concern is that his former trial attorney, James Lewis, was hired by the prosecutor's office in January 2013, following his retirement from the Trumbull County Public Defender. Hill maintains this "creates a real and significant conflict of interest that, by itself, warrants disqualification of the office."

Hill further directs this court's attention to the "close relationship between the victim's mother, Miriam Fife, and the prosecutor's office," noting her employment as "victim-witness advocate." Hill maintains that Fife's association with the prosecutor's office "has made it impossible for the prosecutor to review the case through an objective lens."

Finally, Hill claims the State's recent pleadings demonstrate "disrespect and vitriol" toward him and defense counsel. Hill cites accusations of defense counsel "manufacturing evidence" and "obstructing justice" and characterizations of arguments for the defense as a "trek down a rabbit trail" and such as "late night comics would have a field day."

With respect to motions for disqualification, the Ohio Supreme Court has established the following test:

> In ruling on a motion for disqualification of either an individual (primary disqualification) or the entire firm (imputed disqualification) when an attorney has left a law firm and joined a firm representing the opposing party, a court must hold an evidentiary hearing and issue findings of fact using a three-part analysis:

2

      (1) Is there a substantial relationship between the matter at issue and the matter of the former firm's prior representation;

      (2) If there is a substantial relationship between these matters, is the presumption of shared confidences within the former firm rebutted by evidence that the attorney had no personal contact with or knowledge of the related matter; and

      (3) If the attorney did have personal contact with or knowledge of the related matter, did the new law firm erect adequate and timely screens to rebut a presumption of shared confidences with the new firm so as to avoid imputed disqualification?

*Kala v. Aluminum Smelting & Refining Co, Inc.*, 81 Ohio St.3d 1, 688 N.E.2d 258 (1998), syllabus.

      When the motion for disqualification is directed against the entire prosecutor's office, however, Ohio courts of appeals have consistently held that the mere appearance of impropriety is insufficient to merit disqualification, and that there must be evidence of an actual breach of confidence resulting in prejudice to the defendant. *State v. Bachman*, 5th Dist. Stark No. 2014CA00198, 2015-Ohio-2054, ¶ 24 (cases cited); *State v. Richardson*, 2014-Ohio-3541, 17 N.E.3d 644, ¶ 32 (3d Dist.) (cases cited); *State v. Goff*, 4th Dist. Lawrence No. 11CA20, 2013-Ohio-42, ¶ 61 (cases cited); *State v. White*, 8th Dist. Cuyahoga

3

No. 82066, 2004-Ohio-5200, ¶ 25-26 (cases cited); *State v. Waggaman*, 9th Dist. Medina No. 96CA0078, 1997 WL 537680, 5-6 (Aug. 20, 1997) (cases cited).[2]

Several cases have discussed at length the justification for treating a government office differently from a private firm for the purposes of disqualification for conflict of interest. Citing ABA Committee on Professional Ethics Formal Opinion 342, 62 A.B.A.J. 517 (1976), the Sixth Circuit Court of Appeals noted that "[t]he relationships among lawyers within a government agency are different from those among partners and associates of a law firm." *United States v. Caggiano*, 660 F.2d 184, 191 (6th Cir.1981). "[T]he duty of the public prosecutor to seek justice, not merely to convict, and the duty of all government lawyers to seek just results rather than the result desired by a client * * * lessens the temptation to circumvent the disciplinary rules through the action of associates." *Id.* The court further observed, as a practical matter, that "disqualification of an entire government department, because of a conflict of interest of a government attorney arising from his former employment, would not be appropriate" in the absence of prejudice. *Id.*; *In re Disqualification of Carr*, 105 Ohio St.3d 1233, 2004-Ohio-7357, 826 N.E.2d 294, ¶ 15 ("[a]s long as the

---

2. The one exception to this authority appears to be this court's decision in *State v. Wiles*, 126 Ohio App.3d 71, 709 N.E.2d 898 (11th Dist.1998), in which this court held that, when faced with a motion for disqualification, "the trial court must hold a hearing and allow the state the opportunity to rebut that presumption [of shared confidences]." *Id.* at 83. The *Wiles* decision, while sound with respect to the necessity of holding a hearing when a conflict of interest is alleged, *see In re Disqualification of Cirigliano*, 105 Ohio St.3d 1223, 1229, 826 N.E.2d 287 (2004), is not binding on this court. Neither of the other two judges on the panel concurred in the opinion. One concurred in judgment only and the other concurred separately on the grounds that she was "not convinced that when a government attorney is involved, there is the same presumption that applies when there is a private attorney." *Wiles* at 85 (Christley, J., concurring separately). This concurring judge further noted that, "in footnote 3 of *Kala*, the Supreme Court of Ohio acknowledges the American Bar Association Model Rules of Professional Conduct as well as the distinction that the American Bar Association makes between government lawyers and private lawyers in matters of disqualification." *Id.*

4

government attorney whose conflict of interest prevents him or her from handling a particular matter is effectively screened from any participation in the case, other attorneys in the office can, in most circumstances, continue to handle the case").

Hill's pending motion, by its own admission, seeks the disqualification of the prosecutor's office for the "appearance of impropriety." Hill alleges neither an actual breach of confidence nor prejudice from such a breach. Accordingly, disqualification is not merited.

Even were this court to presume such breach of confidence, that presumption would be effectively rebutted by the following considerations. Attorney Lewis represented Hill from 1985 to 1986, but was not hired by the prosecutor's office until 2013. According to counsel for the State, Lewis was hired for a part-time position in the child support division and "has had no input in any felony case * * * includ[ing] any postconviction litigation or appeal filed by [Hill]." The motion underlying the present appeal was not filed until over twenty-five years after Lewis' representation of Hill had terminated and was based on newly discovered evidence, i.e., evidence discovered after Lewis' representation of Hill had ceased.

Lastly, the present appeal must be decided on the record as it existed before the trial court. The possibility of some shared confidence by Attorney Lewis affecting the course of these proceedings after judgment was rendered by the trial court is simply unfathomable. *State v. Murphy*, 3d Dist. Marion No. 9-87-35, 1988 WL 126748, 2 (Nov. 17, 1988) ("the acquisition of knowledge by

[Attorney] Moore [while representing] defendant-appellant would not change that record [on appeal]").

The other arguments put forth by Hill provide scant justification for the disqualification of the prosecutor's office and/or the appointment of a special prosecutor. The fact that the State of Ohio shares the same belief in Hill's guilt as does Miriam Fife is wholly unremarkable. The State's purportedly disrespectful comments contained in "recent pleadings" raise no inference of impropriety, prejudice, or inability of the prosecutor's office to prosecute the present appeal. Hill cites no authority and offers little argument as to why Fife's employment as a victim's advocate or the State's "vitriol" support disqualification. Admittedly prosecutors, while "charged with a duty to prosecute vigorously, * * * must remain professional and courteous to opposing counsel." *State v. Thompson*, 161 Ohio App.3d 334, 2005-Ohio-2508, 830 N.E.2d 394, ¶ 35 (2d Dist). That obligation, however, has little relevance to the issues raised by Hill's Motion to Disqualify.

For the foregoing reasons, Hill's Motion to Disqualify is denied.

FILED
COURT OF APPEALS

MAY 1 5 2017

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

JUDGE DIANE V. GRENDELL

THOMAS R. WRIGHT, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion

6

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

I disagree with the majority's position in denying Mr. Hill's motion to disqualify the Trumbull County Prosecutor's Office. Based on the facts presented, it is this writer's position that a special prosecutor be appointed.

One of Mr. Hill's main concerns here is that his former trial attorney was later hired by the prosecutor's office, following his retirement from the Trumbull County Public Defender. Mr. Hill aptly asserts this "creates a real and significant conflict of interest that, by itself, warrants disqualification of the office."

The ongoing record in this case is long and hard fought. It is clear, based upon the record, that the prosecutor's office as well as Mr. Hill's prior attorney's involvement implicates a conflict of interest as specified in *Kala v. Aluminum Smelting & Refining Co., Inc.,* 81 Ohio St.3d 1 (1998). In addition, the Ohio Rules of Professional Conduct further support the disqualification of the prosecutor's office. *See Dickens v. J & E Custom Homes, Inc.*, 187 Ohio App.3d 627, 2010-Ohio-2634, ¶2, 4 (2d Dist.); Prof.Cond.R. 1.9; Prof.Cond.R. 1.10.

I respectfully dissent.